**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

SENECA NATION OF INDIANS,

                        Plaintiff,

     v.

STATE OF NEW YORK,

                       Defendant.

_____

Index No. _____

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE FINAL ARBITRATION AWARD**

Table of Contents

INTRODUCTION ...................................................................................................1

STATEMENT OF THE CASE..................................................................................2

I.  Statutory Framework ....................................................................................2

II.  The 2002 Nation-State Class III Gaming Compact .....................................4

III.  The Secretary of the Interior's 2002 Review of the Compact ....................5

IV.  The Present Dispute and Arbitration............................................................7

V.  The Nation's Application to the Department of the Interior.........................8

ARGUMENT.............................................................................................................9

I.  The Final Award should be vacated because it was issued in "manifest
disregard" of IGRA's clear, and critically important, requirement for
Secretarial review..........................................................................................9

    A.  The manifest disregard standard ......................................................10

    B.  The IGRA Secretarial review mandate is well-defined, explicit, and
        clearly applicable here .....................................................................11

    C.  The Panel was aware of IGRA's Secretarial review mandate...................12

    D.  The Panel majority refused to adhere to IGRA's Secretarial review
        mandate ............................................................................................ 12

        1.  The Secretary approved payments only over the Compact's
            14-year schedule .................................................................13

        2.  The Compact text did not place a "Years 15-21" payment
            obligation before the Secretary .........................................13

        3.  The Panel majority likewise found that the Parties' written
            explanations of the Compact did not address a "Years 15-21"
            revenue-sharing term ..................................................14

        4.  The majority adopted a "Years 15-21" payment obligation based on
            extrinsic evidence that did not place such an obligation before the
            Secretary ..........................................................................15

|  | *i.* | *"Prior Negotiations"* ...........................................................16 |
|  | *ii.* | *"Post-Execution Communications"*...................................16 |
|  | *iii.* | *"Context (Surrounding Facts and Circumstances)"* .........18 |
|  | *iv.* | *"Meaning of 'Renew' Gleaned from Extrinsic Evidence"*..............................................................................18 |
|  | *v.* | *"Common Sense"*...............................................................19 |
|  | *vi.* | *"Absurdity and Commercial Unreasonableness"* .............19 |

5. The Panel majority never affirmatively claimed or substantiated that the Secretary reviewed and approved a "Years 15-21" payment period..................................................................................21

II. The Court could refer this matter to the Department of the Interior under the primary jurisdiction doctrine.....................................................................24

CONCLUSION................................................................................................25

Table of Authorities

**Cases**

*Cabazon Band of Mission Indians v. Wilson,* 37 F.3d 430 (9th Cir. 1994) .......................18

*Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383 (2d Cir. 2003)..12

*Ellis v. Tribune TV Co.*, 443 F.3d 71 (2d Cir. 2006) ........................................24

*Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51 (2d Cir. 1994) ........24, 25

*Gwynn v. Clubine*, 302 F. Supp. 2d 151 (W.D.N.Y. 2003) ....................................10, 11, 12

*Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 (2d Cir. 1998) ...............................10, 11, 21

*Hardy v. Walsh Manning Sec., L.L.C.*, 341 F.3d 126 (2d Cir. 2003) ..............10, 12, 21, 23

*Mo. River Servs. v. Omaha Tribe*, 267 F.3d 848 (8th Cir. 2001)......................................23

*N.Y. Tel. Co. v. Commc'ns Workers Local 1100*, 256 F.3d 89 (2d Cir. 2001) ..................10

*Reiter v. Cooper,* 507 U.S. 258 (1993) ..............................................................24

*Rincon Band of Luiseno Mission Indians of the Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019 (9th Cir. 2010) ......................................................................4, 18, 20

*Shearson/Am. Express v. McMahon*, 482 U.S. 220 (1987)........................................ 23-24

*Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200 (2d Cir. 2002) ......11, 21, 23

**Statutes**

25 U.S.C. § 81...................................................................................................23

Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721........................................ *passim*

**Regulations**

25 C.F.R. §§ 293.1-296.15..............................................................................3, 9, 11, 25

**Other Authorities**

67 Fed. Reg. 72,968 ..........................................................................................7

**INTRODUCTION**

The Seneca Nation of Indians ("Nation") brings this motion to vacate an arbitration award with full comprehension of the stringent standards that apply to such motions, but with the conviction that the award here was issued in "manifest disregard of the law" and hence, under well-established precedent, cannot stand.

In 2002, the Nation and the State of New York ("State") entered into a gaming compact ("Compact," Ex. D) providing that the Nation would make payments to the State over a fourteen-year schedule in exchange for a limited form of gaming exclusivity. They did so pursuant to the terms of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA"). The Nation and the State dispute whether the Nation must continue making such payments beyond the fourteen-year schedule and until the end of the Compact's twenty-one-year lifespan. In its Partial Final Award, an arbitration panel ("Panel"), in a sharply divided 2-1 decision, found the Compact language ambiguous and held in favor of the State based on extrinsic evidence. Ex. B at 24, 36. On April 12, 2019, the Panel (again over a dissent) issued its Final Award (Ex. A), reiterating its conclusions and ordering the Nation to specifically perform the disputed payment obligation. While the Nation vigorously disagrees with the Panel majority's interpretation of both the Compact language and the extrinsic evidence, it understands the limitations on this Court's scope of review and does not seek to relitigate those issues. The Nation limits its challenge to the legality of the Final Award's order requiring it to make payments to the State even though the Secretary of the Interior has yet to sanction them.

For an award to issue against the Nation, not only did the Parties have to agree to the payments in question, but the Secretary of the Interior had to approve them, as Secretarial review and approval is a bedrock requirement of IGRA. This is where the Panel majority faltered badly.

The majority's conclusion that the Compact language is hopelessly ambiguous precludes any argument that the Secretary approved the extended payments based on that language alone (and the majority in fact made no such claim). And the extrinsic evidence that the majority relied on in its support of its interpretation of the Parties' intent was not before the Secretary in 2002. To the contrary, in approving the Compact's payment terms, the Secretary clearly stated – as the majority acknowledged – that she was reviewing payments for a fourteen-year period.

There exists no basis, then, for concluding that the Secretary approved the payments that the Panel majority has now awarded to the State. But such approval is a well-defined and explicit requirement of IGRA, central to its purpose. The Nation briefed IGRA's Secretarial approval mandate to the Panel. The Panel majority acknowledged that mandate but then proceeded to disregard it (as emphasized by the dissenting opinion, authored by a former Assistant Secretary of Indian Affairs at the Department of the Interior who had significant responsibility for compact approval when at the Department). Vacatur is called for under these troubling and unusual circumstances.

## STATEMENT OF THE CASE

### I. Statutory Framework

The Nation operates and regulates gaming activities on its territories as an incident of its sovereignty. Congress enacted IGRA to provide a framework for conducting such gaming. IGRA calls for the negotiation of a compact between a state and an Indian nation in order for the nation to offer casino-style (or "Class III") games. *See* 25 U.S.C. § 2710(d). Compacts may address the licensing of facilities and employees, game offerings and standards, and "any other subjects that are directly related to the operation of gaming activities." *Id*. § 2710(d)(3)(C). But while compacts may include provisions for "the assessment by the State of . . . such amounts as

are necessary to defray the costs of [gaming regulation]," *id.* § 2710(d)(3)(C)(iii), states may not impose "a tax, fee, charge, or other assessment" on the gaming activity, *id.* § 2710(d)(4).

Since IGRA's enactment, a number of states and Indian nations have included revenue-sharing agreements in their compacts, under which an Indian nation makes payments to a state in exchange for the state's guarantee that the nation will enjoy the exclusive right to conduct certain forms of gaming within a defined geographic region. The State and the Nation included a revenue-sharing provision in their compact, and it lies at the heart of this dispute.

It is a core requirement of IGRA – well-defined and explicit in both the statute and its implementing regulations – that compacts and compact amendments may not lawfully go into effect unless their terms have been approved by the Secretary of the Interior. Section 2710(d)(8)(A) provides that "[t]he Secretary is authorized to approve any Tribal-State compact entered into between an Indian tribe and a State[.]" Section 2710(d)(3)(B) provides that "such compact *shall take effect only* when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register" (emphasis added). *See also* 25 C.F.R. § 293.4 (IGRA "[c]ompacts [and] . . . . [a]ll amendments . . . are subject to review and approval by the Secretary."). Under these requirements, compact provisions that have not been approved by the Secretary may not lawfully be enforced.[1]

A primary purpose of the Secretarial review and approval requirement is "to protect [Indian] gaming as a means of generating tribal revenue" and "to ensure that the Indian tribe is the primary beneficiary of the gaming operation[.]" 25 U.S.C. § 2702 (2), (3). Secretarial

---

[1] The Secretary has a 45-day period to approve or disapprove a compact (or compact amendment) once submitted. If the Secretary does not affirmatively approve or disapprove the compact or amendment during this period, it goes into effect "to the extent the compact is consistent with the provisions of [IGRA]." 25 U.S.C. § 2710(d)(8)(C). In that situation, the compact is "deemed approved."

review of revenue-sharing provisions, in particular, is critical to ensuring that such payments do not constitute a tax and that Indian nations in fact receive meaningful exclusivity in return. Congress was well aware that "the compact requirement skews the balance of power over gaming rights in favor of states by making tribes dependent on state cooperation[.]" *Rincon Band of Luiseno Mission Indians of the Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1027 (9th Cir. 2010). Congress thus sought to "set[] boundaries to restrain aggression by powerful states." *Id.* (citing S. Rep. No. 100-446, at 33 (1988); 134 Cong. Rec. at S12654). Secretarial review of revenue-sharing provisions is where those boundaries are drawn and enforced. The Department has accordingly singled out revenue-sharing provisions as calling for "great scrutiny" to ensure that they are "consistent with the purposes of IGRA[.]"[2]

## II. The 2002 Nation-State Class III Gaming Compact

The Nation and the State executed a Class III Gaming Compact on August 18, 2002. Ex. D. It provided for an initial term of fourteen years (to commence upon publication of the Secretary's approval of the Compact in the Federal Register), *id.* ¶ 4(a), (b), and that, absent objection by either party, "the term of this Compact shall be renewed automatically for an additional period of seven (7) years," *id.* ¶ 4(c)(1).

The Compact also provided for revenue-sharing payments by the Nation in exchange for

---

[2] Aug. 17, 2010, Letter of Department to Habematolel Pomo Tribe at 3, https://www.indianaffairs.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-024698.pdf. *See also*, *e.g.*, Oct. 12, 2012, Letter of Department to Massachusetts at 11, https://www.indianaffairs.gov/sites/bia.gov/files/assets/as-ia/oig/webteam/pdf/idc1-028222.pdf (Department reviews revenue-sharing provisions "with great scrutiny" to ensure "that Indian tribes, not states . . . [are] the primary beneficiaries of Indian gaming revenues."); Nov, 21, 2001, Letter of Department to Pueblo of Santa Clara at 1, https://www.indianaffairs.gov/sites/bia_prod.opengov.ibmcloud.com/files/assets/as-ia/oig/oig/pdf/idc1-025720.pdf ("Department has a trust obligation to Indian tribes to ensure that the benefit received by the State . . . is appropriate in light of the benefit conferred on the tribe.").

State promises of exclusivity. The payments were limited to a defined fourteen-year schedule (to commence not on the effective date of the Compact but on the date the Nation opened its first gaming operation), separated into three fixed periods with the rate of payment increasing in each period, as follows:

> (b) State Contribution.
>
> (1) In consideration of the exclusivity granted by the State pursuant to Paragraph 12(a), the Nation agrees to contribute to the State a portion of the proceeds from the operation and conduct of each category of Gaming Device for which exclusivity exists, based on the net drop of such machines (money dropped into machines, after payout but before expense) . . . in accordance with the sliding scale set forth below ("State Contribution"):
>
> Years 1-4
>
> > 18%, with "Year 1" commencing on the date on which the first Gaming Facility established pursuant to this Compact begins operation, and with Payments during this initial period are to be made on an annual basis.
>
> Years 5-7
>
> > 22%, with payments during this period to be made on a semi-annual basis.
>
> Years 8-14
>
> > 25%, with payments during this period to be made on a quarterly basis.

*Id.* ¶ 12. No provision of the Compact mentions payments beyond this schedule.

## III.    The Secretary of the Interior's 2002 Review of the Compact

After executing the Compact, the Nation and the State submitted it to the Department for review as required by IGRA. On September 30, 2002, the Department sought "clarification" of several of the Compact's provisions, including the revenue-sharing terms set forth in Paragraph 12. Ex. G at 1. The Department expressed its understanding of that provision as follows:

> Subsection 12(a)(1) of the Compact provides that "the Nation shall have total exclusivity with respect to . . . gaming devices, including slot machines, within the geographic area defined . . ." and Section 12(b)(1) further provides that "[t]he Nation agrees to contribute

5

to the State a portion of the proceeds from the operation and conduct of each category . . . years 1-4, 18% . . . years 5-7, 22% . . . and years 8-14, 25%."

*Id.* (alterations in original). The Department made no mention of a payment obligation extending beyond the "years 8-14" period. The Department then underscored that

[i]n order for us to approve such a provision, we need to determine that it does not violate 25 U.S.C. § 2710(d)(4) of IGRA which prohibits the imposition of any tax, fee, charge, or other assessment on an Indian tribe. . . . [T]o date, the Department of the Interior has approved payments to the State only when the State has agreed to provide substantial exclusivity for Indian gaming within the State, *i.e.*, where the compact provides a tribe with substantial economic benefits in the form of a right to conduct Class III gaming activities in the State that are on more favorable terms than any rights of non-Indians to conduct similar gaming activities.

*Id*. at 1-2.

Both the State and the Nation responded to the Department on October 11, 2002. In its submission, the State declared that

[t]he Compact provides that the Nation shall pay the State 18% of the net drop from the gaming devices in the first four years after gaming commences pursuant to the Compact, 22% of the net drop in years five through seven and 25% of the net drop in years eight through fourteen.

Ex. H at 3 (citing Compact (Ex. D) ¶ 12(b)(1)). Like the Secretary, the State made no mention of any payment stream beyond the fourteen-year schedule, which had the potential to extend well into the Compact renewal period because it would be triggered by the Nation's actual commencement of gaming operations. In its submission, the Nation similarly limited its explanation of the anticipated duration of the revenue-sharing obligation to the fourteen-year schedule set forth in the text. Ex. I at 8.

On November 12, 2002, Secretary Norton issued her response. She first recounted the terms of the revenue-sharing arrangement subject to her review, again framing her understanding of the payments as limited to a fourteen-year schedule:

Section 12(a) of the Compact grants the Nation the exclusive right to operate specifically

defined gaming devices within a [defined geographic zone]. In exchange for this geographic exclusivity right, Section 12 requires the Nation to make graduated revenue-sharing payments to the State (from 18% to 25% of net drop, less a local share) over the course of the 14-year duration of the Compact.

Ex. E at 3. Just like the State and the Nation, the Secretary made no mention of any additional revenue-sharing obligation. Instead, after setting forth the fourteen-year schedule and the Parties' anticipated financial returns over that time period, she affirmatively concluded that "*this* revenue-sharing arrangement is consistent with IGRA." *Id*. at 5 (emphasis added). The Secretary then determined that a separate concern not relevant here "counsel[ed] against an affirmative approval" of the Compact while not compelling its rejection. *Id.* at 7. She therefore allowed the Compact to go into effect, deeming it approved "to the extent the compact is consistent with the provisions of [IGRA]." *Id*. at 7-8 (brackets in original).

The Compact took effect on December 9, 2002, *see* 67 Fed. Reg. 72,968, and the Nation began operating its first facility (on its Niagara Falls Territory) on December 31, 2002. At that point, the Department had never before approved a compact including a revenue-sharing rate as high as 25% for less-than-statewide exclusivity, and it has not done so since.[3] From the onset of the Nation's revenue-sharing obligations to the conclusion of the "Years 8-14" period on December 31, 2016, the Nation paid more than $1.4 billion to the State.

**IV.     The Present Dispute and Arbitration**

The initial fourteen-year term of the Compact concluded on December 9, 2016. As

---

[3] Over 700 compacts, amendments, and Secretarial review letters are available at https://www.indianaffairs.gov/as-ia/oig/gaming-compacts. The 1999 St. Regis Mohawk Compact Amendment (which expired after one year) provided for a 25% revenue-sharing rate, but only at the highest revenue levels. *See* https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-025712.pdf.

neither Party had objected, the Compact renewed on that date for an additional seven-year term, which will conclude on December 9, 2023.  In accordance with the Paragraph 12 schedule, the Nation made payments based on slot machine revenues earned through December 31, 2016, or fourteen years after opening its first gaming facility.  Thereafter, the State insisted that payments should continue to the end of the Compact's renewal period in 2023.  After attempts at a resolution failed, the State commenced arbitration on September 7, 2017.

On January 7, 2019, a majority of the three-member arbitration panel, over the dissent of former Assistant Secretary of Indian Affairs at the Department of the Interior Kevin Washburn, issued a Partial Final Award in the State's favor.  Ex. B.  On April 12, 2019, it then issued a Final Award requiring the Nation to continue making exclusivity payments beyond the "Years 8-14" period set forth in Paragraph 12 and through what the majority coined a "Years 15-21" payment period.  Ex. A at 1-2; Ex. B at 6.  The majority did so despite finding that the Compact text does not expressly provide for such payments and that neither Party had raised this as a possibility when presenting the Compact to the Secretary for review in 2002.  The order of specific performance contained in the Final Award thus acts to amend the Compact to impose a payment obligation that has not been reviewed and approved by the Secretary.

## V.      The Nation's Application to the Department of the Interior

In late 2016, the Nation asked for the Department's views on the Compact's payment terms and the scope of the Secretary's approval.  In a Technical Assistance letter of January 19, 2017, the Department confirmed the accuracy of the Nation's position, stating that "our understanding of the revenue sharing provision in the Compact [in 2002] was that its duration was for 14 years.  We understand that the Compact has now been automatically extended for an additional 7 years. . . .  In our view, the Nation's 14-year revenue sharing obligation granted the

Nation 21 years of exclusivity." Ex. F at 1-2. The Department provided this information because "[w]e find that ensuring tribes and states have *accurate information about the Department's past decisions*, regulatory requirements, and current policies is critical." *Id.* (emphasis added). On December 15, 2017, the Department, noting the fact that the arbitration had by then commenced, withdrew the letter. Ex. J. It did so based not on any reconsideration of its views, but rather out of deference to the arbitration process. *Id.*

On April 16, 2019, the Nation submitted the Final Award and accompanying materials for Secretarial review because the Award acts to amend the payment schedule approved by the Secretary in 2002, as set forth in her 2002 letter and reiterated in the Technical Assistance Letter. Ex. K.[4] On June 3, 2019, the Department responded that it cannot yet review the submission because it "lacks a certification from the Governor or other State representative that he or she is authorized under State law to enter into the compact or amendment," which certification the Department declared is required under the Department's regulations. Ex. O at 1. However, the Department added that "[w]hile we regret that we must return the proposed Arbitration Award, we look forward to receiving a new submission that includes a complete set of documents in compliance with the requirements of 25 C.F.R. Part 293." *Id.*

## ARGUMENT

### I. The Final Award should be vacated because it was issued in "manifest disregard" of IGRA's clear, and critically important, requirement for Secretarial review.

For the Nation to owe revenue-sharing payments during what the Panel majority coined the "Years 15-21" period of the Compact, two things must be true. <u>First</u>, the Parties must have

---

[4] In the Technical Assistance Letter, the Department stated that "an extension of the revenue sharing requirement beyond the 14-year Compact duration would be tantamount to an increase in revenue sharing, requiring additional meaningful concessions from the State with corresponding substantial economic benefit to the Nation." Ex. F at 2.

agreed to such payments.  <u>Second</u>, the Secretary must have approved them.  As to the first requirement, the majority found the Compact language ambiguous, but interpreted the Compact to include a "Years 15-21" revenue-sharing term based on its view of the extrinsic evidence. The Nation vigorously disagrees with the majority's interpretation of both the text and the extrinsic evidence but does not challenge that interpretation here given the constrained scope of review applicable to arbitration decisions.

The majority's treatment of the Secretarial review issue is, however, a bridge too far. The majority expressly found that the text of the Compact did not place a "Years 15-21" payment obligation before the Secretary.  It further acknowledged that neither Party presented such an obligation to the Secretary during the review process, and that the Secretary made no mention of such an obligation in deeming the Compact approved.  The majority nevertheless issued an award imposing that obligation through an order of specific performance.  This blatant disregard of the Secretarial approval requirement compels vacatur.

A.      **The manifest disregard standard.**

An arbitration award should be vacated if it is in manifest disregard of the law.  The Second Circuit has made clear that

> [t]o modify or vacate an award on manifest disregard, a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.

*N.Y. Tel. Co. v. Commc'ns Workers Local 1100*, 256 F.3d 89, 91 (2d Cir. 2001) (quoting *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir. 1998)).  *See also*, *e.g.*, *Gwynn v. Clubine*, 302 F. Supp. 2d 151, 161-62 (W.D.N.Y. 2003) (same).  The Circuit has found this standard met where, for example, an arbitrator "expressly disregarded" controlling Circuit precedent.  *N.Y. Tel. Co.*, 256 F.3d at 91.  Similarly, in *Hardy v. Walsh Manning Sec., L.L.C.*,

10

341 F.3d 126 (2d Cir. 2003), the Circuit found the standard met where the arbitrator's decision was contrary to "well-defined and explicit" New York law and where the arbitrator "was made aware" of that law in the parties' briefing. *Id.* at 130. While the manifest disregard standard "requires more than simple error in law," *Gwynn*, 302 F. Supp. 2d. at 161 (internal quotation marks omitted), it is "not confined to that rare case in which the arbitrator [makes] explicit acknowledgment of wrongful conduct," *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 218 (2d Cir. 2002); *see also Halligan*, 148 F.3d at 204 (it is not "necessary for arbitrators to state that they are deliberately ignoring the law").

> **B.** **The IGRA Secretarial review mandate is well-defined, explicit, and clearly applicable here.**

Gaming compacts and amendments lack legal effect absent review and approval by the Secretary. IGRA and its implementing regulations are well-defined and explicit in this regard. Section 2710(d)(3)(B) of IGRA provides that a "compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register." *See also* 25 U.S.C. § 2710(d)(8)(A); 25 C.F.R. § 293.4(a) (IGRA "[c]ompacts are subject to review and approval by the Secretary"); *id.* § 293.4(b) (same for amendments); *id.* § 293.3. Revenue-sharing provisions, in particular, are accorded "great scrutiny" during the Secretarial review process to ensure that they do not constitute disguised taxes. *See supra* 3-4 & n.2. Consistent with IGRA, then, an arbitration panel simply cannot impose payment obligations that were not reviewed and approved by the Secretary. Indeed, *there is not a single class III compact revenue-sharing provision in effect in the United States today the specific terms of which were not approved (or deemed approved) by the Secretary as required by IGRA.*[5]

---

[5] As noted, *supra* note 3, over 700 compacts, amendments, and Secretarial review letters are available at https://www.indianaffairs.gov/as-ia/oig/gaming-compacts. The Secretarial review

**C.    The Panel was aware of IGRA's Secretarial review mandate.**

In addition to requiring that the law underpinning a manifest disregard challenge be well-defined and explicit, the Second Circuit also "look[s] to a subjective element, that is, the knowledge actually possessed by the arbitrators." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003); *see also Gwynn*, 302 F. Supp. 2d at 162 (same). This requirement for vacatur is again amply satisfied here. In its briefing, the Nation underscored IGRA's Secretarial review mandate for the Panel, emphasizing that

> of critical importance . . . the Secretary did not address, *and therefore did not approve*, a stream of 25% payments flowing from the Nation to the State after the "Years 8-14" period and continuing for the remainder of the 21-year life of the Compact. Under IGRA, approval and disapproval of Compact provisions are the exclusive province of the Secretary. 25 U.S.C. § 2710(d)(8). What the State is asking this Panel to do is to usurp that role and bless a Compact term that the Secretary never considered and clearly did not bless.

Ex. L at 48. *See also id.* at 50-51 ("The State now asks this Panel to displace the role of the Secretary and approve an *additional* 7 years of payments to the State at a revenue-sharing rate exceeded nowhere in the United States . . . . There exists no legal warrant for this Panel to do that. *See* 25 U.S.C. § 2710(d)(8)."). No question exists, then, that the Panel "was made aware," *Hardy*, 341 F.3d at 130, of the Secretarial review requirement. Indeed, as set forth below, the Panel majority expressly discussed the statutory command, but nevertheless declined to honor it.

**D.    The Panel majority refused to adhere to IGRA's Secretarial review mandate.**

The majority consciously imposed a Compact term that was never reviewed and approved by the Secretary as required by IGRA.

---

letters consistently articulate the settled policy of the Department that compact terms – and revenue-sharing terms in particular – are subject to close Secretarial review and approval.

1.    <u>The Secretary approved payments only over the Compact's 14-year schedule.</u>

In 2002, the Secretary plainly understood the text setting forth the Nation's payment obligation as "requir[ing] the Nation to make graduated revenue-sharing payments to the State . . . over the course of the 14-year duration of the Compact." Ex. E at 3.  In her letter allowing the Compact to take effect, she concluded that it was "*this* revenue-sharing arrangement [that] is consistent with IGRA." *Id*. at 5 (emphasis added).  She said not one whit about approval of payments beyond Section 12's fourteen-year schedule.[6]  This was not simply an inconvenient fact that the Panel majority was at liberty to ignore.  Nothing in the Compact text or the extrinsic evidence considered by the Panel undermines the Secretary's own understanding as to the extent of her statutorily mandated approval.

2.    <u>The Compact text did not place a "Years 15-21" payment obligation before the Secretary</u>.

The Panel majority conceded that the Compact text, as reviewed and approved by the Secretary in 2002, does not ordain a "Years 15-21" payment obligation.  According to the majority's own understanding, the text imposes a "payment obligation in Years 1-14, *but is silent regarding the renewal period of Years 15-21*." Ex. B at 24-25 (emphasis added).  *See also id.* at 25 (text "does not expressly address revenue sharing payment obligations during Years 15-21"); *id.* at 52 (revenue-sharing terms in Compact text do "not expressly mandate" payments in Years 15-21 period); *id.* at 36 (same).  The majority's ultimate determination on this point was that "looking to the four corners of the Compact and construing the Compact as a whole," it could not conclude "that the State Contribution payments continue at the 25% rate in effect when the initial

_____

[6] In its Technical Assistance Letter, the Department confirmed that "our understanding of the revenue sharing provision in the Compact was that its duration was for 14 years . . . .  In our view, the Nation's 14-year revenue sharing obligation granted the Nation 21 years of exclusivity." Ex. F at 1-2.

13

14-year term ended[.]" *Id.*

The majority did not view itself, then, as imposing a "Years 15-21" payment obligation based on the text approved by the Secretary. To the contrary, it repeatedly found that "the Compact is ambiguous as to whether [payment] is owed upon renewal." *Id.* at 6; *see also*, *e.g.*, *id.* at 24, 36, 51 n.17 (same).[7] Courts and arbitrators, of course, frequently confront contract language they find ambiguous and must undertake to interpret it. But here, a controlling federal statute requires that, to go into lawful effect, the Compact terms must have been reviewed and approved with respect to their specific substance by the head of a cabinet-level federal agency, who reviews provisions of the type at issue "with great scrutiny." The Panel majority accordingly had no warrant for ordering specific performance of a payment obligation nowhere identified by the Secretary or, by the majority's own admission, in the text she reviewed. As the dissent aptly stated, "[i]f, as the Panel admits, the Compact is ambiguous as to the revenue share during the renewal period, DOI cannot be said to have considered and reviewed or approved this key provision. . . . [T]he Panel's decision has the effect of enforcing an agreement that goes beyond what was approved by DOI[.]" Dissent (Ex. C) at 20.

3. <u>The Panel majority likewise found that the Parties' written explanations of the Compact did not address a "Years 15-21" revenue-sharing term</u>.

Not only did the majority concede that the Compact text failed to place a "Years 15-21" payment obligation before the Secretary, it also found that the Parties' submissions to the Secretary likewise did not suggest such an obligation. This is especially telling, as neither the

---

[7] In fact, the Panel Chair and author of the majority opinion viewed the text as so ambiguous as to render the Panel's decision essentially a coin flip. *See* Hearing Transcript (Ex. M) at 281-82 (stating that Compact text left him "in utter bafflement, because we . . . have a contract here that is dysfunctional. . . . [The arbitral award is] going to be an ad hoc decision.").

majority nor the State pointed to anything reviewed by the Secretary in 2002 other than the

Compact text and the Parties' submissions regarding it.

Both the State and the Nation limited their October 2002 explanations of the Nation's

revenue-sharing obligation to the fourteen-year schedule. As the State declared:

> The Compact provides that the Nation shall pay the State 18% of the net drop from the gaming devices in the first four years after gaming commences pursuant to the Compact, 22% of the net drop in years five through seven and 25% of the net drop *in years eight through fourteen*.

Ex. H at 3 (citing Compact (Ex. D) ¶ 12(b)(1) (emphasis added)). Indeed, the majority

specifically found that "the State's letter to the DOI . . . *fails to mention* [the State's] belief that

revenue sharing payments continue into any renewal of the Compact." Ex. B at 41 (emphasis

added). Likewise, the Nation limited its discussion of the payment obligation (in language

quoted by the majority, *id.* at 16) to "the 14-year term of the Compact." Ex. I at 8. These 2002

Party statements to the Secretary square with the Secretary's own 2002 characterization of the

text as requiring the Nation "to make . . . revenue-sharing payments to the State . . . over the

course of the 14-year duration of the Compact." Ex. E at 3.[8]

In sum, the majority pointed to nothing reviewed by the Secretary – neither text nor Party

submission – undermining her statement that she was approving a 14-year payment stream.

> 4. <u>The majority adopted a "Years 15-21" payment obligation based on extrinsic evidence that did not place such an obligation before the Secretary</u>.

In discerning the Parties' intent in 2002, the majority interpreted the Compact to include

a "Years 15-21" payment term based on six factors extrinsic to the Compact text. While the

Nation vigorously disagrees with the majority's treatment of that evidence, that is not the basis

---

[8] They also square with the Department's more recent description of what it approved in 2002. *See* Technical Assistance Letter (Ex. F) at 1 ("[O]ur understanding of the revenue sharing provision in the Compact was that its duration was for 14 years.").

for the Nation's argument to this Court. The relevant point here is that, with the exception of the Parties' written submissions to the Department, none of this evidence was addressed by (or even within the cognizance of) the Secretary when she reviewed the Compact's revenue-sharing terms in 2002, and hence none of it can be said to satisfy IGRA's requirement of express Secretarial review and approval of a payment obligation extending beyond 14 years.

### i. "Prior Negotiations"

First, the majority relied on the recollections of the State's hearing witness, whose testimony postdated the Secretary's review *by sixteen years*, that limiting the Nation's payment obligations to the three payment periods set forth in the text was "never discussed" during negotiations. Ex. B at 38. The majority also drew inferences against the Nation from the purported absence of a paper trail supporting the Nation's position. *See id.* at 39-40. Leaving aside the demonstrable inaccuracy and bias in the majority's view of the evidence,[9] the crucial point here is that neither these nor any other aspect of the Parties' negotiations was *brought to the attention of the Secretary*; and neither the majority nor the State has claimed that they were.

### ii. "Post-Execution Communications"

The majority next relied on two sets of "Post Execution Communications" – the Parties' written submissions to the Department, and public statements the Nation made to its members about the Compact. *Id.* at 41-45. The latter were never shared with the Secretary; and neither

---

[9] For example, the majority also identified no evidence that *the State's* view of the Compact was ever discussed. The majority further disregarded the clear course of drafting showing that the State had proposed to replace the "Years 8-14" final payment period with an open-ended "Years 7+" payment period and that the Nation had rejected that proposal. *See* Dissent (Ex. C) at 8-9 (noting that State did not controvert Nation's "Years 7+" evidence and that it should have been dispositive of the dispute).

the majority nor the State has claimed that they were.[10]  With respect to the Parties'

Departmental submissions, the majority, as discussed above, conceded that they did not place a

"Years 15-21" payment obligation before the Secretary.  *See supra* 14-15.  The majority instead

drew a negative inference against the Nation based on its view that, while both Parties'

submissions were silent regarding additional payments, the Nation's view alone was required to

be shared with the Secretary:

> [T]here was no reason not to extoll a benefit as significant as having no obligation to pay
> a State Contribution during the renewal period, particularly because approval of the
> Compact by the DOI . . . required highlighting the economic benefits to the Nation, not to
> the State.

*Id.* at 43; *see also id*. at 41 (same).  Notably, this reasoning was directed to the majority's

examination of the Parties' intent.  The majority made no claim that the Secretary would have

drawn the same inference.  Nor can such a claim plausibly be made.

The justification for the majority's one-sided inference – i.e., that Secretarial approval is

concerned with "benefits to the Nation, not to the State," *id*. at 43 – is a view that the Secretary

did not share in 2002, and indeed lawfully could not have shared.  To the contrary, the Secretary

had made clear by then that the benefits flowing to a state are central to its statutorily mandated

review:  "[T]he Department has a trust obligation to Indian tribes to ensure that the benefit

received by the State under the proposed compact is appropriate in light of the benefit conferred

on the tribe."[11]  The Secretary accordingly stated in reviewing the Nation-State Compact that

---

[10] To be clear, the Nation's statements to its members do not remotely suggest a payment
obligation beyond the "Years 8-14" period set forth in the Compact, but the salient point here is
that the communications were never brought to the Secretary's attention.
[11] Nov. 21, 2001, Letter of Department to Pueblo of Santa Clara at 1,
https://www.indianaffairs.gov/sites/bia_prod.opengov.ibmcloud.com/files/assets/as-
ia/oig/oig/pdf/idc1-025720.pdf.  *See also*, *e.g.*, Dec. 21, 2001, Letter of Department to Jicarilla
Apache Nation at 1 (in reviewing revenue-sharing arrangement, "Department has a trust
obligation" to examine "the benefit received by the State" for compliance with IGRA),

"[t]he payment to the State must be appropriate," explicitly set forth her understanding that the State was projected to receive "less than one billion dollars" in payments, and concluded that "*this* revenue-sharing arrangement is consistent with IGRA." Ex. E at 3-5 (emphasis added).

Moreover, it is not plausible that the Secretary inferred an additional payment stream to the State worth hundreds of millions of dollars yet remained utterly silent about it in explaining the results of her "great scrutiny" of the Compact. An explicit statutory approval mandate grounded in the federal government's affirmative trust obligations to Indian tribes cannot be satisfied based on one-sided inferences about the issue for which express approval is required.

### iii. "Context (Surrounding Facts and Circumstances)"

The majority next addressed the negotiating context, Ex. B at 45-47, but conceded that this factor did not support a "Years 15-21" payment obligation, *see id.* at 47.

### iv. "Meaning of 'Renew' Gleaned from Extrinsic Evidence"

The majority then considered the "Meaning of 'Renew' Gleaned from Extrinsic Evidence." *Id.* at 47-49. As noted above, the Compact provides for a fourteen-year initial term, Ex. D ¶ 4(b), and further that, absent objection by either party, "*the term* of this Compact shall be renewed automatically for an additional period of seven (7) years," *id.* ¶ 4(c) (emphasis added). The State argued that renewal triggered an additional "Years 15-21" revenue-sharing arrangement despite the fact that no mention of such an arrangement, much less of its terms,

---

https://www.indianaffairs.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc-038379.pdf; Nov. 21, 2001, Letter of Department to Pueblo of Isleta at 1 (same), https://www.indianaffairs.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc-038351.pdf; Mar. 7, 2002, Letter of Department to Governor of Louisiana at 1 (same), https://www.indianaffairs.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-029778.pdf. *See also Rincon*, 602 F.3d at 1035 (finding amount of "net revenue to the State" violative of IGRA); *Cabazon Band of Mission Indians v. Wilson*, 37 F.3d 430, 433 (9th Cir. 1994) (finding benefits to the State from a tribal gaming operation to "contravene[] the purposes of IGRA").

18

appears anywhere in the Compact. The majority disagreed with the State that the plain meaning renewal clause calls for that result, instead finding the Compact "ambiguous" as to "whether the term 'renew' means that the State Contribution payments continue." Ex. B at 36. *See also*, *e.g.*, *id*. at 6 ("[T]he Panel finds that the Compact is ambiguous as to whether State Contribution is owed upon renewal."). It nevertheless adopted the State's view based on unspecified extrinsic evidence from which it inferred that the Parties' "essential bargain" called for continuing payments. *Id*. at 47-48. However, whatever the nature of that extrinsic evidence, it was again not presented to the Secretary, and neither the majority nor the State has claimed that it was.

> v.  *"Common Sense"*

The majority next contended that if the State shared the Nation's view of the Compact, then as a matter of "common sense" it would have objected to renewal of the Compact and sought to renegotiate it in 2013 when the parties settled a separate dispute. *Id.* at 49-50. This is no more than a deduction about the subjective views of one party on a matter that self-evidently was not within the Secretary's cognizance in 2002.

> vi.  *"Absurdity and Commercial Unreasonableness"*

Finally, the majority asserted that "the nearly $1 billion in consideration that the State would not receive under the Nation's interpretation" renders that interpretation "commercially unreasonable." *Id*. at 53. Aside from again showing clear bias in favor of the State's interests,[12]

---

[12] As the State explained to the Panel, it received "over $1.4 billion" in payments from the Nation, Demand for Arbitration (Ex. N) ¶ 16, which will amount to an average of more than $66 million per year over the 21-year life of the Compact. This amount has approached 50% of the Nation's net (after expenses) gaming revenues to date, and the State bears no risk in generating these revenues. *See* Ex. L at 7-8. The State's receipts have been extraordinary by IGRA standards. As the dissent explained, "[l]ess than one half of one percent of tribal state gaming compacts provide for such a large amount to revenue sharing to a state." Ex. C at 19 (emphasis added) (footnote omitted).

the majority's notions of "commercial reasonableness" cannot plausibly be imputed to the Secretary in 2002, and the majority (and the State) sensibly did not suggest otherwise.

The majority determined that the State is entitled to an estimated "nearly $1 billion" of additional revenues, *id.* at 53, beyond the $1.4 billion the State has already received under the Compact, *id.* – more than doubling, then, the "less than one billion dollars," Ex. E at 4, the Secretary anticipated would flow to the State under the terms she approved. The Secretary, as evidenced by her own communications, clearly did not have in mind the sums the majority deemed commercially necessary for the State's purposes. Even more fundamentally, the Secretary reviews compacts for their economic benefits *to Indian nations* and may not, under IGRA, take the commercial interests of a state into account. *See* 25 U.S.C. § 2702(3) (IGRA intended "to protect [Indian] gaming as a means of generating *tribal revenue*" (emphasis added)); *Rincon*, 602 F.3d at 1034-35 (9th Cir. 2010) (stating that "the only *state* interests mentioned in § 2702 are protecting against organized crime and ensuring that gaming is conducted fairly and honestly" and that it is thus "incorrect that pursuit of state general economic interests is consistent with IGRA's purposes").[13]

* * *

In sum, none of the factors identified by the majority as supporting its interpretation of the Parties' agreement placed the possibility of a "Years 15-21" payment obligation before the Secretary. And while arbitrators, like courts, must often interpret contract language they deem ambiguous, the Compact is no ordinary contract. It is governed by a federal statute conditioning

---

[13] The Department looks to the Ninth Circuit's decision in *Rincon* as "[a]n important part of [its] analysis" in determining "the extent to which revenue sharing [agreements] . . . . [are] consistent with the purposes of IGRA[.]" Aug. 17, 2010, Letter of Department to Habematolel Pomo Tribe at 3, https://www.indianaffairs.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-024698.pdf.

the lawful enforcement of its provisions on a process of formal, exacting scrutiny by the Secretary for compliance with the statute and the congressional purposes behind it. The majority entirely elided this requirement in ordering specific performance of a payment obligation that the Secretary never approved. *See* Dissent (Ex. C) at 20 (The "DOI cannot be said to have considered and reviewed or approved this key provision.").

     5.   <u>The Panel majority never affirmatively claimed or substantiated that the Secretary reviewed and approved a "Years 15-21" payment period</u>.

To find an arbitration award subject to vacatur under the manifest disregard standard, it is not "necessary for arbitrators to state that they are deliberately ignoring the law," *Halligan,* 148 F.3d at 204, or that they offer "explicit acknowledgment of wrongful conduct," *Westerbeke*, 304 F.3d at 218. It is enough that their explanation of how their award purports to comply with the law "strains credulity," *id.*, or that there is "no reading of the Award that resolves its apparent contradiction with the law," *Hardy*, 341 F.3d at 132. Both circumstances are present here.

In its 56-page opinion, the Panel majority devoted a single paragraph to addressing the substance of the Nation's Secretarial review argument. In that paragraph, the majority did not claim that the Secretary had in fact reviewed and approved a "Years 15-21" payment obligation. It instead set forth three reasons for rejecting the Nation's contention that the Secretarial review requirement precludes the majority's imposition of a "Years 15-21" payment term. Ex. B at 42. None of these reasons even remotely suggests that the Secretary in fact approved the payment term imposed by the majority, as is explicitly required by IGRA.

The majority first asserts that

> while it is beyond dispute that the Panel has no legal authority to usurp the Secretary's role and enforce a Compact term that the Secretary did not approve, *see* 25 U.S.C. § 2710(d)(8) (approval and disapproval of Compact provisions are the exclusive province of the Secretary under IGRA), the Panel does have the duty and authority to determine whether the terms of the Compact already provide for revenue sharing payments upon renewal.

*Id.* That the Panel had the authority to interpret the Compact *begs the question* whether its interpretation of the Compact to contain a "Years 15-21" payment obligation was approved by the Secretary, as IGRA mandates. If it was not, then it may not lawfully be enforced against the Nation because, as detailed above, both the Parties' agreement *and* Secretarial approval are prerequisites to an enforceable obligation under IGRA. The Panel had the duty to interpret the Parties' agreement; but it likewise had the duty to leave Secretarial approval to the Secretary, a duty it unfortunately flouted in ordering the Nation to specifically perform a payment obligation the Secretary never approved.

> The majority's next justification for avoiding Secretarial review fares no better:
>
> Second, the Nation's contention that enforcement of revenue sharing in the renewal period is beyond the Panel's authority assumes that the DOI interpreted the Compact in the same way that the Nation advocates in this arbitration . . . . There is no evidence in the record to suggest that the DOI shared the view now asserted by the Nation.

*Id.* This has things exactly backwards. What was required in the record to satisfy Secretarial approval was not evidence that the Secretary "shared the view now asserted *by the Nation*." Rather, it was evidence that the Secretary shared *the majority's* interpretation of the payment terms and approved it. The approval requirement is explicit – it cannot be subverted by requiring the Nation, or anyone else for that matter, to prove a negative.

The majority's final rationale is similarly misguided: "Third, whether or not the Parties addressed any terms of renewal in their respective letters to the DOI, renewal was part of the Compact that was reviewed and deemed approved." *Id.* The majority's argument assumes that continued payments were *implicit* in the concept of "renewal." But this assumption is impossible to reconcile with a foundational premise of the majority opinion, which is that "the Compact is in fact ambiguous as to whether or not the Nation's obligation to share revenue ends after fourteen

years or whether it continues on renewal of the Compact." *Id.* at 24. This premise pervades the opinion. *See*, *e.g.*, *id.* at 6 ("the Panel finds that the Compact is ambiguous as to whether State Contribution is owed upon renewal"); *id.* at 36 ("it is ambiguous whether the term 'renew' means that the State Contribution payments continue"); *id.* at 51 n.17 ("the Compact is ambiguous as to the Nation's revenue sharing payment obligations upon renewal"). If the Panel itself was admittedly unable to discern a continuing payment obligation in the Compact's renewal mechanism, it certainly had no plausible basis to assume that the Secretary somehow did. And the demonstrable invalidity of that assumption is underscored by the fact that the Secretary, in explaining in exacting detail the outcome of her "great scrutiny" of the Compact's revenue-sharing terms, spoke only of a fourteen-year payment obligation.

In sum, while the majority acknowledged IGRA's Secretarial review requirement, it then evaded that requirement through transparently invalid post hoc reasoning. Under IGRA, Secretarial approval of a compact's terms is evidenced by Secretarial approval, not through attempts at backfilling by an arbitration panel. In conflating its views as to the proper interpretation of the Compact's revenue-sharing provision with Secretarial approval of the same, the majority usurped the Secretary's authority and acted in manifest disregard of a critical requirement in the governing federal statute. Its attempts to frame its ruling otherwise "strain[] credulity," *Westerbeke*, 304 F.3d at 218, as there simply is "no reading of the Award that resolves its apparent contradiction" with IGRA's express Secretarial review mandate, *Hardy*, 341 F.3d at 132. Vacatur of the Final Award is called for under these rare circumstances. *See Mo. River Servs. v. Omaha Tribe*, 267 F.3d 848, 854-55 (8th Cir. 2001) (vacating award where arbitrator added term to tribal contract that was subject to federal approval under IGRA and 25 U.S.C. § 81 and thus "effectively overrode" those statutes); *see also*, *e.g.*, *Shearson /Am. Express*

*v. McMahon*, 482 U.S. 220, 232 (1987) (noting that "judicial scrutiny of arbitration awards" enables courts "to ensure that arbitrators comply with the requirements of the statute" at issue).

**II.      The Court could refer this matter to the Department of the Interior under the primary jurisdiction doctrine.**

As set forth above, there exists a clear basis to vacate the Panel's Final Award under the manifest disregard standard. However, should the Court harbor any uncertainty, it could stay this proceeding under the primary jurisdiction doctrine and refer to the Department the question whether the requisite Secretarial approval was obtained for the "Years 15-21" payment term imposed by the Panel majority. In its letter of June 3, 2019, Ex. O, the Department indicated its willingness to address the question upon a proper submission by the Parties, and would undoubtedly do so upon a referral by this Court.

As the Supreme Court has explained, primary jurisdiction

> is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a "referral" to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling. . . . Referral of the issue to the administrative agency does not deprive the court of jurisdiction[.]

*Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993) (citations omitted). The Second Circuit has made clear that the doctrine "applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body." *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58-59 (2d Cir. 1994). *See also Ellis v. Tribune TV Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (same).

For the reasons detailed above, the Nation believes that the Department clearly did not supply the approval required under IGRA for a "Years 15-21" payment term, and the Department has confirmed the same through its Technical Assistance Letter. However, if the

Court has any questions on this score, their resolution would be materially aided by referral to the Department, which certainly possesses "special competence" to advise the Court as to the scope of its Compact approval. The Department's Compact review was undertaken in fulfillment of duties imposed upon it by Congress, *see* 25 U.S.C. § 2710(d)(8), and pursuant to a comprehensive regulatory scheme established to implement that authority, *see* 25 C.F.R. §§ 293.1-296.15. These factors would render "deference to the primary jurisdiction of the agency appropriate." *Golden Hill*, 39 F.3d at 60.

Nor would referral to the Department risk undue delay. *See id.* Presumably, the Department would advise the Court with appropriate dispatch as to the scope of the payment obligation it approved in 2002. Indeed, the Department has invited the Parties to submit the question to it in the form of a properly certified Compact amendment, Ex. O at 1, and the Department's own regulations impose a 45-day period under which it must weigh in on such submissions. *See* 25 U.S.C. § 2710(d)(8)(C); 25 C.F.R. §§ 293.10-293.12. Only the lack of State certification of the amendment submission has precluded the Department from addressing the issue to date.

## CONCLUSION

For the foregoing reasons, the Nation respectfully requests that the Court vacate the Final Award as being in manifest disregard of IGRA's Secretarial review requirement. In the alternative, the Nation respectfully requests that the Court ask the Department, under the primary jurisdiction doctrine, to advise as to the scope of the payment obligation it approved in 2002.

Dated this 6th day of June, 2019                    Respectfully submitted,


Michele Mitchell, Esq.                                      Riyaz A. Kanji, Esq.
General Counsel (Acting)                                    David A. Giampetroni, Esq.
Seneca Nation of Indians                                    Kanji & Katzen, PLLC
90 Ohi:yoʹ Way Allegany Territory                          303 Detroit Street, Suite 400
    Seneca Nation                                           Ann Arbor, Michigan  48104
Salamanca, New York  14779                                 Telephone:  (734) 769-5400
Telephone:  (716) 945-1790                                 Facsimile:  (734) 769-2701
Facsimile:  (716) 945-6869                                 rkanji@kanjikatzen.com
michele.mitchell@sni.org                                   dgiampetroni@kanjikatzen.com


John G. Horn, Esq.                               By:  s/  Carol E. Heckman, Esq.
Harter Secrest & Emery LLP                            Carol E. Heckman, Esq.
50 Fountain Plaza, Suite 1000                         Lippes Mathias Wexler Friedman LLP
Buffalo, New York  14202                              50 Fountain Plaza, Suite 1700
Telephone:  (716) 853-1616                            Buffalo, New York  14202
Facsimile:  (716) 853-1617                            Telephone:  (716) 853-5100
jhorn@hselaw.com                                      Facsimile:  (716) 853-5199
                                                      checkman@lippes.com

*Counsel for Plaintiff Seneca Nation of Indians*