# AMERICAN ARBITRATION ASSOCIATION

## In the Matter of Arbitration Between

---

State of New York

-vs-

Seneca Nation of Indians

AAA Case Number:  01-17-0005-3636

---

## PARTIAL FINAL AWARD

Counsel for Claimant State of New York:

Paul Friedland
Damien Nyer
Justin Lee
WHITE & CASE LLP
1221 Avenue of the Americas
Tel.: (212) 819-8200
Fax: (212) 354-8113
E-Mail: pfriedland@whitecase.com; dnyer@whitecase.com; justin.lee@whitecase.com


Counsel for Seneca Nation of Indians:

Riyaz A. Kanji
David A. Giampetroni
KANJI & KATZEN, PLLC
303 Detroit Street
Suite 400
Ann Arbor, Michigan 48104
Tel.: (734) 769-5400
Fax: (734) 769-2701
E-Mail: rkanji@kanjikatzen.com

Michele Mitchell
Deputy General Counsel
SENECA NATION OF INDIANS

90 Ohi:yoʹ Way
Allegany Territory
Seneca Nation
Salamanca, New York 14779
E-Mail: michele.mitchell@sni.org

John G. Horn
HARTER SECREST & EMERY LLP
50 Fountain Plaza, Suite 1000
Buffalo, New York 14202-2293
E-Mail: jhorn@hselaw.com

Carol E. Heckman
LIPPES MATHIAS WEXLER FRIEDMAN LLP
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202-2216
E-Mail: checkman@lippes.com

<u>Arbitration Panel</u>

Hon. William G. Bassler
130 Bodman Place, Suite #15
Red Bank, NJ 07701
Tel.: (732) 842-4919
E-mail: judgewb@comcast.net

Henry Gutman
425 Lexington Avenue
New York, NY 10017
Phone: (212) 455-3180
E-mail: hgutman@gmail.com

Dean Kevin Washburn
University of Iowa College of Law
280 Boyd Law Building
Iowa City, Iowa 52242-1113
Phone: (319) 384-4658
E-mail: kevin.washburn@gmail.com

<u>Place of Arbitration:</u>  New York, New York
<u>Date of Partial Final Award:</u>  January 7, 2019

# Table of Contents

I.    **PROCEDURAL HISTORY** ...................................................................................**4**

II.   **FACTS** ............................................................................................................**6**

    A.    **Prior Negotiations** ............................................................................ **10**

    B.    **Post-Execution Communications** ...................................................... **13**

    C.    **Other Gaming Compacts** .................................................................. **17**

III.   **DISCUSSION** ................................................................................................ **18**

    A.    **Choice of Law** ................................................................................... **18**

    B.    **Applicable Law** ................................................................................. **19**

    C.    **Burden of Proof** ............................................................................... **23**

    D.    **Analysis** ........................................................................................... **24**

      1.    **Ambiguity** ................................................................................ 24

        a.    **Paragraph 12(b) (Purpose)** ............................................... 24

        b.    **Paragraph 4(b) (Term of Compact)** .................................. 27

        c.    **Paragraph 4(c) (Renewal)** ................................................ 30

        d.    **Other Compact Provisions** ............................................... 33

      2.    **Extrinsic Evidence** .................................................................. 36

        a.    **Prior Negotiations** ........................................................... 37

        b.    **Post Execution Communications** ...................................... 41

        c.    **Context (Surrounding Facts and Circumstances)** .............. 45

        d.    **Meaning of "Renew" Gleaned From Extrinsic Evidence** ........ 47

      3.    **Common Sense** ........................................................................ 49

      4.    **Absurdity and Commercially Unreasonableness** ...................... 50

IV.   **CONCLUSION** .............................................................................................. **54**

THE UNDERSIGNED ARBITRATORS, having been appointed pursuant to the arbitration provision set forth in ¶ 14 of the August 18, 2002 Nation-State Gaming Compact (the "Compact") between the Seneca Nation of Indians ("the Nation") and the State of New York ("the State"), and having examined the allegations, submissions, and evidence find, conclude and issue this Partial Final Award on Liability as follows.

INTRODUCTORY COMMENT

The State and the Nation (jointly "the Parties") have advanced before the Panel legal and factual submissions, as well as oral Opening and Closing Arguments. The Panel acknowledges with thanks the high level of advocacy in this arbitration. The Award does not make reference to every piece of evidence or to all the arguments made by counsel. Nonetheless, such selection should not be interpreted as a consideration of only some of the evidence and arguments relied upon. On the contrary, the Panel has carefully considered all relevant facts, evidence, legal authorities and arguments put before it in this arbitration. To the extent that the facts found and the legal conclusions reached by the Panel in this Award differ from any party's position, these conclusions are the result of determinations as to credibility, relevance, burden of proof considerations, and evaluation of the evidence, both oral and written.

## I.   PROCEDURAL HISTORY

On September 8, 2017, the State filed its Demand for Arbitration[1] against the Seneca Nation of Indians requesting specific performance and a declaration that the Nation is in breach

---

[1] Paragraph 14(c) authorizes any unresolved dispute to be submitted to binding arbitration. Under ¶ 14(f) of the Compact, this arbitration is governed by the AAA's Commercial Arbitration Rules, effective October 1, 2013.

of the Compact.[2]  A preliminary conference was held by telephone on June 27, 2018.  On July 1,

2018, the Panel issued Procedural Order No. 1 and denied the Nation's request to file a motion

for summary judgment.  (See Procedural Order No. 1.)  Procedural Order No. 2, a Joint

Procedural Timetable, was entered on August 6, 2018 and subsequently revised by Procedural

Order No. 3 dated September 6, 2018.  As set forth in Procedural Order No. 4, filed December

17, 2018, the parties jointly agreed to bifurcate liability from damages.

At the arbitration hearing, the State presented live testimony from Robert Williams,

Deputy Secretary in the Office of New York State Governor Andrew Cuomo.  The Nation cross-

examined Mr. Williams at the hearing.  The State also submitted two written witness statements

from Mr. Williams.

Seneca provided witness statements from Todd Gates, President of Seneca Nation of

Indians, and David Sheridan, Chief Financial Officer at Seneca Gaming Corporation.

---

Section 14(h) of the Compact provides: "For Material Breaches, the arbitrators may impose as a remedy only specific performance or termination of the Compact.  For all other breaches other than Material Breaches, the arbitrators may impose as a remedy only specific performance.  In no event shall monetary damages, other than specific performance, be available as a remedy to either Party for any alleged breaches of this Compact, including Material Breaches.  An arbitration award against the Nation for specific performance that entails the payment of money to the State shall be satisfied solely and exclusively from the revenues of the Nation's Class III Gaming Facilities operated pursuant to this compact."

Section 14(i) of the Compact provides that the "decision of the arbitrators shall be final, binding and non-appealable.  Failure to comply with the arbitration award within the time specified therein for compliance, or should a time not be specified, then forty-five (45) days from the date on which the arbitration award is rendered, shall be deemed a breach of the Compact.  The prevailing party in an arbitration proceeding may bring an action solely and exclusively in the U.S. District Court for the Western District of New York to enforce the arbitration award . . ."

[2] Although the parties disagree on what efforts were made to settle this matter prior to the filing of this arbitration, (see State's Statement of Claim at ¶ 31; Sworn Witness Statement of President Todd Gates), settlement efforts are not dispositive of the issue before the Panel and therefore need not be considered.

Each side offered documentary evidence.

This arbitration requires the Panel to interpret the Nation-State Gaming Compact Between the Seneca Nation of Indians and the State of New York to determine whether upon renewal of that Compact, the Nation must continue to pay to the State a portion of its gaming revenue ("State Contribution") in exchange for the State granting the Nation exclusive rights to operate slot machines and video lottery games in parts of Western New York. The State seeks both currently owed as well as future payments during the seven-year renewal period of the Compact. In response, the Nation alleges that under the plain terms of the Compact, it is not under any contractual obligation to pay State Contribution beyond the Compact's initial 14-year payment period.

For the reasons set forth below, the Panel finds that the Compact is ambiguous as to whether State Contribution is owed upon renewal. After examination of extrinsic evidence to resolve this ambiguity, the Panel interprets the Compact to require the Nation to make revenue sharing payments in the renewal period (Years 15-21) at 25% of net drop of each category of Gaming Device for which exclusivity exists.

## II.  FACTS

The following is a statement of facts found by the Panel to be true and material to the Award.

In 1988, the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, et seq., was enacted. IGRA addresses the conduct of gaming on Indian lands and divides gaming into three categories, including Class III gaming, i.e., casino-type gaming. IGRA provides that an Indian tribe that wishes to conduct Class III gaming must request the state in which the tribe's lands are

located to enter into a gaming compact governing the conduct of such gaming activities.  The

Secretary of the Interior is "authorized to approve any Tribal-State compact entered into between

an Indian tribe and a State governing . . ." 25 U.S.C. § 2710 (d)(8)(A).

In 1998, the Nation sought negotiations with the State regarding a gaming compact for a

casino in western New York.  (Sworn Witness Statement of Robert Williams[3] ("Williams Stmt.")

at ¶ 14.)  After four years of negotiations, on June 20, 2001, the State and the Nation signed a

Memorandum of Understanding ("MOU").  (June 20, 2001 MOU, CX-22.)  Based on that MOU,

on August 18, 2002, the Parties executed the Compact at issue, which expressly incorporates the

MOU by reference. (Compact at ¶ 1(r), CX-27).

The Compact affords the Nation "total exclusivity with respect to the installation and

operation of" certain casino-type gaming devices, including slot machines, in parts of Western

New York. (Compact at ¶ 12(a)(1)). "In consideration of the exclusivity granted by the State

pursuant to Paragraph 12(a)," the Nation must

> contribute to the State a portion of the proceeds from the operation and conduct of each
> category of Gaming Device for which exclusivity exists, based on the net drop of such
> machines ... in accordance with the sliding scale set forth below ("State Contribution"):
>
> Years 1-4
> 18% . . .
> Years 5-7
> 22% . . .
> Years 8-14
> 25%

---

[3] Mr. Williams, then Assistant Counsel to the New York State Racing and Wagering Board, was
directly involved in the negotiations, drafting and implementation of the August 18, 2002
Nation-State Gaming Compact. (Williams Stmt. at ¶¶ 3, 5.)

(Compact at ¶ 12(b)(1)).  "Gaming Device" is defined as "two categories of gaming devices: (i) 'slot machines' as that term is defined in Section 9(a) of Appendix A; and, (ii) 'video lottery games' as that term in [sic] defined in Section 9(a) of Appendix A."  (Compact at ¶ 1(m)).

Paragraphs 12(a)(4) and 12(a)(5) provide for the cessation of State Contribution payments upon breach of exclusivity rights by the State.  Paragraph 12(a)(4) states that

> the Nation's obligation to pay and the State's right to receive the State Contribution from the operation and conduct of a particular category of Gaming Device . . . shall cease immediately in the event of a breach by the State of the exclusivity provisions set forth in this Paragraph 12(a) only as to that particular category of Gaming Device for which exclusivity no longer exists.

Paragraph 12(a)(5) provides that if the State permits any tribe to establish a Gaming Facility within a 25-mile radius of one of the Nation's Gaming Facilities, "the Nation's obligation to pay and the State's right to receive the State Contribution shall cease immediately as to all categories of Gaming Devices."

On September 10, 2002, the Compact was submitted to the Department of the Interior ("DOI") for review.  Subsequently, the DOI requested that the Parties clarify various Compact provisions, noting that approval required the DOI to "assess whether the economic benefit that the Nation is receiving under the Compact is sufficient consideration that justifies the [revenue sharing] payment to the State."  (September 30, 2002 Letter from George T. Skibine (Director, Office of Indian Gaming Management, Bureau of Indian Affairs, U.S. Department of Interior) to Governor George E. Pataki at 1-2, CX-46.)  The State and the Nation wrote the DOI separate response letters.  (See October 11, 2001 Letter from James M. McGuire (Counsel to the Governor George E. Pataki) to G. Skibine, CX-30; October 11, 2002 letter from Donald R. Pongrace (counsel to the Nation) to G. Skibine, CX-31.)  Thereafter, the Compact was deemed approved and allowed to take effect on November 12, 2002. (November 12, 2002 Letter from

8

DOI, CX-32.) The Secretary of the Interior published the notice of approval in the Federal Register on December 9, 2002, making that date the "Effective Date" of the Compact. (Compact at ¶ 4(a)).

Under the terms of the Compact, the Nation then had up to five years to open its first casino. Paragraph 12(a)(3) provides in part: "The exclusivity granted under Paragraph 12(a)(1) shall cease to apply with respect to any one of the sites authorized under this Compact: . . . (ii) if the Nation fails to commence Class III Gaming operations on such site within sixty (60) months of the Effective Date."

Nevertheless, only a few weeks after the Effective Date of the Compact, on December 31, 2002,[4] the Nation opened its first Class III gaming facility, the Seneca Niagara Casino & Hotel, which included slot machines and table games, in Niagara Falls, New York. (Sworn Witness Statement of David Sheridan ("Sheridan Stmt.") at ¶ 21.) In May 2004 and July 2007, the Nation opened two additional gaming facilities in Salamanca on Nation territory and in the City of Buffalo. (Id.) Pursuant to ¶ 12(b)(1), the Nation's State Contribution payments were to commence "on the date on which the first Gaming Facility . . . begins operation." Thus, in accordance with the payment schedule set forth in ¶ 12 of the Compact, the Nation made State Contribution payments based on slot revenues earned from the opening of the first casino, December 31, 2002, through December 31, 2016, or 14 years after payment commenced.

Although the Compact contains a termination date of December 9, 2016 (the fourteenth anniversary of the Effective Date), it also provides for automatic renewal absent objection: "[u]nless either party objects in writing…no later than one hundred twenty (120) days prior to

---

[4] According to the Sworn Witness Statement of Robert Williams, the first casino opening was December 30, 2002. (Williams Stmt. at ¶ 15.)

the expiration of the fourteen (14)-year term . . ., the term of this Compact shall be renewed automatically for an additional period of seven (7) years." (Id. at ¶ 4(c)(1)). Because neither Party timely objected, the Compact automatically renewed for an additional seven years until December 9, 2023.

On March 31, 2017, the Nation informed the State that it had paid its final revenue sharing payment to the State. (March 31, 2017 Letter from Nation President Todd Gates to Governor Andrew Cuomo, CX-37).

### A. Prior Negotiations

The State's initial draft of the Compact in 1999 did not contain any provisions on revenue sharing or exclusivity. (Williams Stmt. at ¶ 22; December 22, 1999 Draft Compact, CX-8.) In early 2000, the Parties had opposing views on the term of the Compact; the State wanted a sunset clause while the Nation had "extreme concern[s]" about the inclusion of "any limitation of years on a compact." (Williams Stmt. at ¶ 22, Jan. 10, 2000 Meeting Notes at 3, CX-9.)

The idea of revenue sharing was introduced at a meeting on April 12, 2000. Because slot machines were prohibited in New York at that time, the State's representative, Patrick Kehoe, explained that the New York legislature would likely not support a bill to allow slot machines and approve the Compact without a State Contribution of 25% of the Nation's casino gaming facilities' revenues, particularly from slot machines. (Williams Stmt. at ¶ 24; April 12, 2000 Meeting Notes at 1, CX-11.)

Still at odds concerning the Compact term, the Nation continued to seek an agreement that would be "in effect until terminated by written agreement of both parties." (May 26, 2000 Draft Compact, CX-12.) After the State suggested a seven-year term for the Compact and a five-

year renewal term, (July 3, 2000 Draft Compact at ¶ 2(b), (c), CX-13), the Nation subsequently proposed a 10-year initial term and a 10-year renewal term. (Williams Conference Call Notes at 2, CX-14.) During that discussion, the Nation noted that 25% revenue share was the highest in the country. (Id. at 4.)

In 2001 negotiations, the Nation indicated its interest in revenue sharing and the State confirmed its desire for a 25% revenue share. (March 26, 2001 Meeting Notes at 3, CX-15.) When the State proposed a seven-year term and 25% of slot revenues (local revenue share to be supplementary to State share), the Nation considered that to be a "deal breaker" because the term was "too short" and the "percentage too high." (Williams Stmt. at ¶¶ 32-33; April 3, 2001 Agenda, CX-16). The Nation wanted the term of the compact to be "long enough to pay the debts associated with the casino and to help the Nation." (Williams Stmt. at ¶ 33; April 3, 2001 Meeting Notes at 3, CX-17.) The State indicated flexibility on the term of the Compact, but not on revenue sharing. (April 3, 2001 Meeting Notes at 3.) As a compromise, the Nation proposed a sliding scale building to 25%. (Id.) The State remained unwilling to accept anything less than 25%, (May 21, 2001 Meeting Notes at 5, CX-18), which is what neighboring Connecticut was receiving from the Pequot Tribe, discussed infra, in exchange for exclusivity to operate slot machines, (see Williams Stmt. at ¶ 19); the Nation, however, characterized 25% as a "deal breaker," (May 21, 2001 Meeting Notes at 5), referring to the Pequot Tribe as the "poorest rich people on earth," (April 3, 2001 Meeting Notes at 3).

In the Parties' first draft Memorandum of Understanding ("MOU"), the State adopted the Nation's proposed initial 10-year term and automatic 10-year renewal term. (Williams Stmt. at ¶ 39; "Conceptual Agreement: Parameters of a Nation-State Gaming Compact," undated at 1, CX-45.) The State's MOU also provided for the Nation's exclusivity with regard to electronic

gaming devices within certain geographical boundaries, and in exchange, the State would receive

a portion of gaming proceeds based on a sliding scale linked to total revenue:

- 15% if annual net drop totals $0 to $49,999,999.99
- 20% if annual net drop totals $50,000,000.00 to $99,999,999.99
- 25% if annual net drop totals $100,000,000.00 or more

("Conceptual Agreement: Parameters of a Nation-State Gaming Compact," undated at 3, CX-45.)

Preferring "to pay % on increments," and to "only pay[] 25% on very high end of net," (id. at 3.), the Nation suggested the following sliding scale:

| Revenue Level | Revenue Share Percentage |
|---|---|
| Up to $100 million | 10% |
| 100,000,001 to 150,000,000 | 12.5% |
| 150,000,001 to 175,000,000 | 15% |
| 175,000,001 to 200,000,000 | 17.5% |
| 201,000,001 to 225,000,000 | 20% |
| 225,000,001 to 250,000,000 | 22.5% |
| 250,000,001 and above | 25% |

(Williams Stmt. at ¶ 45; May 21, 2001 Document, "Conceptual Agreement: Parameters of a

Nation-State Gaming Compact" at 3, CX-20.) The Nation also sought an initial 14-year term

with a seven-year automatic renewal term because "management contracts normally track a 7

year duration." ("Conceptual Agreement: Parameters of a Nation-State Gaming Compact,"

undated at 2 CX-45.)

In the next draft MOU exchanged on June 5, 2001, the Nation's proposed 14-year initial

term and seven-year automatic renewal period remained intact. (Document, "Conceptual

Agreement: Parameters of a Nation-State Gaming Compact" at 2, CX-21). In contrast to prior

drafts, however, the Nation set forth a sliding scale that matched State Contribution to specific

years of the Compact rather than to total revenue:

Years 1-7          Years 8-14

|          |          |
|----------|----------|
| 16%      | 22%      |

> The Nation and the State agree that the total government share (State and local) shall not exceed 19% in Years 1-7 and that it shall not exceed 25% in Years 8-14.

(Williams Stmt. at ¶ 47; June 5, 2001 Document, "Conceptual Agreement: Parameters of a Nation-State Gaming Compact" at 4, CX-21.) The Nation's June 11, 2001 draft suggested raising the first payment period rate from 16% to 18%. ("Conceptual Agreement: Parameters of a Nation-State Gaming Compact" at 4, R-14.)

In response, on June 12, 2001, the State submitted a counterproposal that increased the number of payment periods from two to three and changed the last period, "Years 8-14," to "Years 7+" at 25% as follows:

| Years 1-4 | Years 5-7 | Years 7+ |
|-----------|-----------|----------|
| 18%       | 22%       | 25%      |

("Conceptual Agreement: Parameters of a Nation-State Gaming Compact" at 5, RX-15.)

The final MOU, executed on June 20, 2001, contains the State's three-period and accompanying rate payment proposal and replaces the suggested "Years 7+" terminology with the "Years 8-14"; these terms were later incorporated into ¶ 12 of the Compact. (See June 20, 2001 MOU at 4, CX-22; Compact at ¶ 12(b)(1)).

## B. Post-Execution Communications

Following execution of the MOU, the Nation issued written explanations of the Compact's revenue sharing provision to its citizens. For instance, on July 5, 2001, the Nation published a document entitled "FREQUENTLY ASKED QUESTIONS GAMING

MOU/COMPACT WITH NEW YORK STATE."  (CX-23.)  Included in that document is the

following question and answer:

> 11. **Will State governments receive any revenue? If yes, why?**
> Yes. The State will receive a percentage of revenue generated only by the play of slot machines. The money paid to the State under the compact is essentially a cost of doing business. Federal Indian gaming policy provides that tribes can agree to pay the State a portion of the revenue generated by the casino in exchange for some form of exclusivity within the State. The Seneca Compact provides for exclusivity to the Seneca Nation within that portion of New York west of State Route 14, which is essentially the boundary for the Senecas' aboriginal lands. The only exception to this exclusivity is for other Indian tribes located within the State of New York and even then on condition that they not locate their facility within 25 miles of those contemplated under the Seneca Compact. No non-Indian can operate a casino, with slot machines, within our exclusive geographical region. Our payments to the State are essentially buying an exclusive franchise to offer casino gaming, with slot machines, in Western New York.

(Id.)

Similarly, in an April 15, 2002 document entitled, "POSSIBLE QUESTIONS AND

ANSWERS" the Nation concluded that "[o]verall, we have been able to negotiate the most

favorable terms possible from the State, more favorable than any other tribe has or likely will

ever be able to negotiate in the future."  (CX-26 at 1.)  In that same document, the Nation

described the Compact as a "commercial arrangement with the State," (id. at 2), and explained

the reason for paying a State Contribution from its revenues:

> The State is providing us with a zone of exclusivity that will protect us from competition in a very large zone of exclusivity.  This commitment from the State is very important to us economically and will help ensure the success of our facilities.  It is worth a great deal.  Moreover, the State is committing to help us launch our new facilities in a number of ways, including . . . helping us with the necessary procedures with the Secretary, phasing in our contribution commitment, . . .  Finally, although we are making a significant contribution to the State, the contribution the State is demanding of other tribes will be much higher in that they will not have the same favorable phase-in that we have.

(Id. at 4.)

After the Compact was executed, in order to convince the Department of the Interior that the State was conferring an economic benefit to the Nation sufficient to warrant revenue sharing payments, the State's October 11, 2002 letter to the DOI explained that in consideration for "sweeping exclusivity rights . . . within a vast geographical area of nearly 11,000 square miles – an area roughly twice the size the State of Connecticut – in the western part of New York," the Nation would pay a State Contribution based on a sliding-scale structure so that the Nation could initially keep a larger proportion of its revenue in order to recoup its start-up costs:

> The Compact provides that the Nation shall pay the State 18% of the net drop from the gaming devices in the first four years after gaming commences pursuant to the Compact, 22% of the net drop in years five through seven and 25% of the net drop in years eight through fourteen. These sliding-scale provisions of the Compact enable the Nation to retain a greater share of the net drop in the earlier stages of the development of its gaming facilities, thereby enhancing the Nation's ability to cover its start-up costs. And the phased-in nature of the payments reduces significantly the overall effective rate of the payments over the life of the Compact.

(October 11, 2001 Letter from J. McGuire to G. Skibine at 3 (citations to Compact omitted), CX-30).

The letter also described that under ¶ 12(a)(4) and (5), the Nation's obligation to make State Contribution payments would completely cease upon a breach of exclusivity:

> In the event that any entity of person (other than the Tuscarora or the Tonawanda) is permitted to operate either of the gaming devices within the zone of exclusivity, the Nation's obligation to make payments to the State completely ceases with respect to the type of gaming device for which exclusivity no longer obtains. If the State permits another Indian nation to establish a Class III gaming facility within a 25-mile radius of any gaming facility authorized under the Compact on lands other than federally recognized Indian lands existing as of the Compact's effective date, the Nation's obligation to make payments shall cease immediately as to all categories of gaming devices.

(Id.)

Furthermore, the State explained that the Nation's obligation to make revenue sharing payments would also cease if the Nation chose to stop operating the Gaming Devices:

> the Nation retains the ultimate ability to determine whether to make any payments to the State. The Nation is under no obligation under the Compact to operate either gaming device. If the Nation begins operations with both gaming devices and subsequently loses the exclusive rights to operate one of the devices, the Nation is free to decide to stop operating with the other device, thereby completely eliminating its obligation to make payments to the State.

(Id. at 5; see also October 11, 2002 letter from D. Pongrace to G. Skibine at 7-8 n.19, CX-31.)

In order to obtain DOI approval of the Compact, the Nation also wrote to the Secretary of the Interior detailing the "valuable rights and benefits" to the Nation in exchange for the State Contribution. (See October 11, 2002 Letter from D. Pongrace to G. Skibine at 5, CX-31.) The Nation's letter discussed the geographic size of its area of exclusivity relative to the size of other states, as well as the reach of its exclusivity rights over the initial term of the Compact:

> The area of total exclusivity granted to the Nation is a 10,716.5 square mile area in Western New York that, based on professional analysis of the market from which the Nation's Gaming Facilities would draw, includes the primary (1-50 mile), secondary (51-99 mile) and tertiary (100-150) customer markets for any established Buffalo or Niagara Gaming Facility. This professional analysis indicates a capturable gaming market of $9.39 billion (in 2001 dollars) over the 14-year term of the Compact.

(Id. at 8 (footnote omitted)). The Nation informed the DOI that after undertaking a market analysis, the Nation anticipated that the total revenues

> from the gaming operations contemplated under the Compact exceed $5,487,000,000.00. Of this total revenue, the State will receive around $825,000,000.00, approximately $206,000,000.00 of which will be returned by the State to the host governments for the facilities, leaving approximately $618,000,000.00 in net revenue for the State, approximately 17% of the total revenues before expenses.

(Id. at 8.)  In short, recognizing that "[e]xclusivity in a gaming market of this size is extremely valuable for the Nation," the Nation wrote that based on such exclusivity alone, the average 17% revenue share to the State pursuant to the Compact was justified.  (Id. at 9, 11.)

### C.  Other Gaming Compacts

During the Parties' March and April 2001 negotiations, the Parties made reference to the 25% revenue share required under New York's gaming compact with St. Regis Mohawk Tribe ("Mohawk Compact"), (see April 3, 2001 Meeting Notes at 3, CX-17), as well as Connecticut's agreement with the Mashantucket Pequot Tribe ("Pequot MOU"), (see March 26, 2001 Meeting Notes at 3, CX-15).

The Mohawk Compact was entered into in October 1993 and amended in May 1999 to include exclusivity provisions and revenue sharing on a sliding scale with contribution levels based on the "annual net revenue of the electronic gaming devices."  (May 27, 1999 Amendment to Mohawk Compact, Appendix A, XXVII(B)(4), CX-7).  The contribution levels begin at 10% and increase by 1.25% - 2.50% up to a maximum of 25%.  (Id.)  In a 2005 Amendment containing no fixed term, the parties agreed to revenue share payments as follows: "in years one through four, eighteen percent; years five through seven, twenty-two percent; and in years after seven, twenty-five percent."  (2005 Amendment to Tribal-State Compact Between the St. Regis Mohawk Tribe and the State, CX-47).

The State of Connecticut and the Mashantucket Pequot Tribe entered into the Pequot MOU on January 13, 1993 to implement the May 31, 1991 final Mashantucket Pequot Gaming Procedures, 56 Fed. Reg. 24996. The Pequot MOU provides, among other things, the exclusive right for the Pequot Tribe to operate "video facsimiles" in exchange for a 25% state contribution.

17

(January 13, 1993 Pequot MOU at ¶ 1, CX-2.)  Under that MOU, the 25% state contribution continues as long as exclusivity exists.  (Id.; see also Second Amendment to Pequot MOU, CX-2).

## III.  DISCUSSION

### A.  Choice of Law

Although the Compact does not specify what law applies, both Parties agree that New York contract law should govern the interpretation of the terms of the Compact.  (See State Demand at ¶ 34; Resp. Answer at ¶ 2.)  However, the State also contends that federal common law of contracts also governs interpretation of the Compact because the Compact is a solemn agreement between two sovereigns that was entered into pursuant to federal law, specifically IGRA.  The Nation does not disagree that federal law applies, but asserts that under both New York and federal common law, the State's extrinsic evidence is inadmissible even where state and federal law diverge.

Where a gaming compact does not clearly identify what law applies, courts have determined that federal contract law governs compacts entered pursuant to IGRA.  Arizona v. Tohono O'odham Nation, 818 F.3d 549, 560 (9th Cir. 2016); Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation v. California, 813 F.3d 1155, 1163 (9th Cir. 2015); Citizen Potawatomi Nation v. Oklahoma, 881 F.3d 1226, 1238-39 (10th Cir. 2018) ("a gaming compact is similar to a 'congressionally sanctioned interstate compact the interpretation of which

18

presents a question of federal law.'" (citing <u>Cuyler v. Adams</u>, 449 U.S. 433, 442 (1981)), <u>petition for cert. docketed</u>, (June 1, 2018).

Federal common law is presumed to incorporate state law "unless application of the particular state law in question would frustrate specific objectives of the federal programs." <u>Kamen v. Kemper Financial Serv., Inc.</u>, 500 U.S. 90, 98 (1991). This presumption is particularly strong where "private parties have entered into legal relationships with the expectation that their rights and obligations would be governed by state-law standards." <u>Id.</u>

To the extent that federal and New York contract law are consistent, either may be relied on. <u>See</u> <u>Pauma</u>, 813 F.3d at 1163 ("We may also rely on California contract law since there is no practical difference between state and federal law in this area." (citation omitted)). Here, not only do the Parties agree New York is the applicable state law, but it is also the state law of closest connection to this dispute. Therefore, in this arbitration since there is no real difference between federal and state law with respect to the issues of contract interpretation state law is applied.

### B. Applicable Law

Under governing contract principles, the fundamental goal of contract interpretation is to construe the agreement in accordance with the parties' intent.[5] <u>Greenfield v. Philles Records,</u>

---

[5] The State urges the Panel to employ a "purposive interpretation" of the Compact, which provides that where "a literal construction defeats and contravenes the purpose of the agreement, it should not be so construed." <u>Tougher Heating & Plumbing Co. v. State</u>, 73 A.D.2d 732, 733 (3rd Dep't 1979); <u>Ronnen v. Ajax Elec. Motor Corp.</u>, 88 N.Y.2d 582, 589 (1996). Rather, "[w]ords in a contract are to be construed to achieve the apparent purpose of the parties." <u>Hooper Associates, Ltd. v. AGS Computers, Inc.</u>, 74 N.Y.2d 487, 491 (1989). The State also advocates that the Compact, like a treaty, must be "liberally construed." <u>See</u> <u>Rocca v. Thompson</u>, 223 U.S. 317, 331-32 (1912); <u>Valentine v. United States</u>, 299 U.S. 5, 10 (1936) (citing to <u>Tucker v. Alexandroff</u>, 183 U.S. 424, 437 (1902)), <u>superseded by statute on other grounds</u>.

<u>Inc.</u>, 98 N.Y.2d 562, 569 (Ct. App. 2002). The written agreement itself is the "best evidence" of the parties' intent. <u>Id.</u> As such, where a contract is clear and unambiguous, the intent of the parties must be discovered from within the four corners of the instrument without resort to extrinsic evidence. <u>Greenfield</u>, 98 N.Y.2d at 569; <u>Feifer v. Prudential Ins. Co. of America</u>, 306 F.3d 1202, 1210 (2nd Cir. 2002). Unambiguous written agreements "must be enforced according to the plain meaning of its terms." <u>Greenfield</u>, 750 N.Y.S.2d at 569; <u>Ellington v. EMI Music</u>, 24 N.Y.3d 239, 244 (2014). "[T]o determine the plain and ordinary meaning of words to a contract," courts may refer to dictionary definitions. <u>Lend Lease (US Constr. LMB Inc. v. Zurich Am. Ins. Co.</u>, 136 A.D.3d 52, 57 (1st Dep't 2015). Furthermore, a contract should be read as a whole, "giving a practical interpretation to the language employed." <u>Ellington</u>, 24 N.Y.3d at 244.

These rules of contract interpretation provide that as a matter of law, the threshold issue for the courts to decide is whether the writing is ambiguous. <u>Matter of Wallace v. 600 Partners Co.</u>, 86 N.Y.2d 543, 548 (1995) ("The rules governing the construction of ambiguous contracts are not triggered unless the court first finds an ambiguity."); <u>Greenfield</u>, 98 N.Y.2d at 569; <u>Baldwin v. Univ. of Pittsburgh Medical Center</u>, 636 F.3d 69, 76 (3d Cir. 2011). As explained in <u>Greenfield</u>, for a contract to be deemed unambiguous, the language it uses must have

> "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion" [citations omitted]. Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity. [citations omitted].

---

As noted by the Nation, these principles merely echo the settled rule that a fundamental goal of contract interpretation is to construe the agreement in accordance with the parties' intent. <u>See</u> <u>Tucker v. Alexandroff</u>, 183 U.S. 424, 437 (1902) ("Treaties of every kind are to receive a fair and liberal interpretation according to the intention of the contracting parties . . . Their meaning is to be ascertained by the same rules of construction and course of reasoning which we apply to the interpretation of private contracts.")

<u>Greenfield</u>, 98 N.Y.2d at 569-70.

In contrast, a contract is ambiguous "when the contract, read as a whole, fails to disclose its purpose and the parties' intent [citation omitted], or when specific language is 'susceptible of two reasonable interpretations' [citations omitted]." <u>Ellington</u>, 24 N.Y.3d at 244; <u>see also</u> <u>Kerin v. U.S. Postal Serv.</u>, 116 F.3d 988, at n.2 (2nd Cir. 1997) (ambiguity "must be considered from the viewpoint of one cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (citation and internal quotes omitted)).  Plain language is not ambiguous merely because the parties advocate different interpretations of the contract.  <u>Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA</u>**,** 25 N.Y.3d 675, 680 (2015).

To decide this initial question of ambiguity, the Parties agree that under New York law, a court must look only "within the four corners of the document," and not to extrinsic evidence. <u>Brad H. v. City of New York</u>, 17 N.Y.3d 180, 186 (2011).   Federal common law also recognizes that "extrinsic evidence is generally inadmissible to determine whether a contract is ambiguous," <u>Kerin v. U.S. Postal Serv.</u>, 116 F.3d 988, 992 n.2 (2d Cir. 1997); but see <u>In re New Valley Corp.</u>, 89 F.3d 143, 150 (3d Cir. 1996) (noting requirement that judge "hear the proffer of the parties and consider extrinsic evidence to determine whether there is an ambiguity"); <u>Baldwin v. Univ. of Pittsburgh Medical Center</u>, 636 F.3d 69, 76 (3d Cir. 2011).  In <u>Baldwin</u>, the court stated that courts should consider:

> "words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Mellon Bank*, 619 F.2d at 1011; *see also New Valley*, 89 F.3d at 150 . . . The objective, extrinsic evidence proffered may include, for example, 'the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.'")

Id. Similarly, the Second Circuit recognized its implicit adoption of the rule set forth in <u>AM Int'l, Inc. v. Graphic Management Assocs., Inc.</u>, 44 F.3d 572, 575-77 (7th Cir. 1995), that while "subjective" evidence (defined as "testimony of the parties themselves as to what they believe the contract means") is inadmissible, "objective" evidence (defined as "evidence of ambiguity that can be supplied by disinterested third parties"), can be considered to determine ambiguity. <u>Kerin</u>,116 F.3d at 992 n.2 (examining definition of "utilities" in federal regulations to conclude that term "service" was ambiguous).

New York jurisprudence is clear that only if the agreement is first deemed ambiguous may extrinsic evidence of the parties' intent  be considered.  <u>Greenfield</u>, 98 N.Y.2d at 569<u>.</u> Extrinsic evidence, however, cannot be considered "in order to *create* an ambiguity in the agreement" in an otherwise unambiguous contract.  <u>W.W.W. Assoc. v. Giancontieri</u>, 77 N.Y.2d 157, 163 (Ct. App. 1990).

Federal common law would allow us to consider extrinsic evidence without an express finding of ambiguity. <u>See e.g.</u>, <u>United Fire & Cas. Co. v. Arkwright Mut. Ins. Co.</u>, 53 F. Supp.2d 632 (S.D.N.Y. 1999); Restatement (Second) of Contracts (1981) ("Restatements"); <u>see</u> Comment a to Restatement § 202.

Because federal common law does not uniformly follow either the traditional four corners approach or the more liberal Restatement standard and given that the parties agree that New York law applies, we apply New York law on contract interpretation in the discussion below.  In any event, as discussed below, given that there is ambiguity in the Compact, there is no difference in outcome whether state or federal law is applied.

**C. Burden of Proof**

The State, as the party alleging breach, bears the burden of persuasion. See Frigaliment Importing Co. v. B.N.S. Int'l Sales Corp., 190 F. Supp. 116, 117 (S.D.N.Y. 1960) (holding that plaintiff failed to meet its "burden of persuasion that the contract used 'chicken' in the narrower sense" rather than in the broader sense);[6] Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995) ("in an ordinary contract action, the party claiming a breach carries the burden of persuasion."). "Burden of persuasion,"[7] sometimes referred to as burden of proof, "means that the proponent retains the ultimate burden of persuading the fact-finder of its position." Gatewood v. District of Columbia Water and Sewer Authority, 82 A.3d 41, 51 (D.C. 2013); Director Office of Workers Compensation Programs Dept. of Labor v. Greenwich Collieries, 512 U.S. 267, 273 (1994). The burden of persuasion has also been explained as "the notion that if the evidence is evenly balanced, the party that bears the burden of persuasion must lose." Director Office of Workers Compensation Programs Dept. of Labor, 512 U.S. at 272; United Steelworkers of America v. North Bend Terminal Co., 752 F.2d 256, 261 (6th Cir. 1985) ("where there is a mutual misunderstanding as to a contract term and [supplying a missing term is not an option available to the court], the court will rule against the party bearing the burden of proof"); but see Cooke v. Lynn Sand & Stone Co., 70 F.3d 201, 205 (1st Cir. 1995) (declining to follow United Steelworkers to rule against party carrying burden of proof); United Com. Ins. Serv. v.

---

[6] The dissent in Katz v. Am. Mayflower Life Ins. Co., 14 A.D.3d 195, 207 (1st Dep't 2004) interpreted Frigaliment to require that "[a] party who assigns a narrower interpretation to a commonly understood term bears the burden to prove that the parties accepted that interpretation as controlling."

[7] "Burden of persuasion" is distinct from "burden of production" which refers to "a party's obligation to come forward with evidence to support its claim." Director Office of Workers Compensation Programs Dept. of Labor v. Greenwich Collieries, 512 U.S. 267, 272 (1994).

Paymaster Corp., 962 F.2d 853, 856 n.2 (9th Cir. 1992) (rejecting approach in United Steelworker that when choosing interpretation of unclear contract, court "simply rule[s] against whatever party has the burden of proof").

A majority of the Panel is satisfied that the State has sufficiently met its burden of proof.

### D. Analysis

#### 1. Ambiguity

Under applicable New York law, the threshold issue for the Panel to decide is whether the Parties' intent is clearly discernible from within the four corners of the Compact or is reasonably susceptible of more than one meaning regarding revenue sharing obligations during the renewal period. Both Parties insist that the written agreement is unambiguous, (see Stmt. of Claim, at ¶ 103; Stmt. of Defense, at 32), but different interpretations by counsel do not itself render the Compact's language ambiguous. See Universal Am. Corp., 25 N.Y.3d at 680. Nevertheless, the contending positions demonstrate that the Compact is in fact ambiguous as to whether or not the Nation's obligation to share revenue ends after fourteen years or whether it continues on renewal of the Compact.

##### a. Paragraph 12(b) (Purpose)

Paragraph 12(b)(1) of the Compact provides in pertinent part that the Nation's revenue sharing payments are "[i]n consideration of the exclusivity granted by the State" to operate certain casino-type gaming devices and are owed for "each category of Gaming Device for which exclusivity exists, . . . in accordance with the sliding scale set forth" in the Compact. Notably, the sliding scale refers to payment obligation in Years 1-14, but is silent regarding the

renewal period of Years 15-21. That the Compact does not expressly address revenue sharing payment obligations during Years 15-21 does not alone create an ambiguity. See Greenfield, 98 N.Y.2d at 573 ("silence does not equate to contractual ambiguity"); see also Reiss v. Financial Performance Corp., 97 N.Y.2d 195, 199 (2001) ("An omission or mistake in a contract does not constitute an ambiguity[.]"). Rather, ambiguity rises "from what was written so blindly and imperfectly that its meaning is doubtful." Nissho Iwai Europe v. Korea First Bank, 99 N.Y.2d 115, 121-22 (2002).

Focusing on the specific phrase in ¶ 12(b)(1) that requires the Nation "to contribute to the State a portion of the proceeds from the operation and conduct of each category of Gaming Device for which exclusivity exists . . .," the State posits that the Parties' fundamental bargain is that State Contribution payments are in consideration of the Nation's right to "total exclusivity" and that those essential terms are contemporaneous; that is, the Nation must pay the State Contribution for as long as it retains exclusivity rights. Indeed, this provision is written in the present tense, suggesting a continuous, open-ended obligation to pay as long as exclusivity "exists." Based on this "manifest purpose and *central quid pro quo* of the Compact (exclusivity payments for exclusivity)," (State Reply at ¶ 44), the State maintains that the Parties could not have intended for such essential terms to end implicitly.

The Nation reads the Compact differently, claiming that the purpose of the Parties' agreement was not exclusivity in exchange for exclusivity payments; rather, because the Compact is principally an agreement entered under the framework of IGRA, the primary purpose is to ensure that "*tribes* are the *primary beneficiaries* of gaming and ensuring that gaming is protected as a means of generating *tribal revenue*." Rincon Band of Luiseno Mission Indians of

25

the Rincon Reservation v. Schwarzenegger, 602 F.3d 1019, 1034-35 (9th Cir. 2010); 25 U.S.C. § 2701.

The Nation further notes that as a general matter, when interpreting an ambiguous contract entered into pursuant to a statute, the contract should be construed in light of the statute's purposes. See e.g., Bank of Kansas v. Nelson Music Co., 949 F.2d 321, 324 n.7 (to extent that contract was ambiguous, noting "underlying purposes and policies of [Kansas UCC]" and adopting reading of contract that "best accomplish[es]" statutory purpose). On this basis, the Nation argues that in addition to the State's burden of persuasion that requires resolving any "close calls" in its favor, IGRA's purposes govern the interpretation of the Compact and therefore, any doubts in the interpretation of the Compact must be resolved in favor of the compacting tribe.

The dissent agrees with the Nation that because the respondent is a Native American tribe and the purpose of IGRA is to protect their interests, we are obligated to resolve any close or uncertain questions in favor of the Nation. But neither the Nation nor the dissent has cited any authority for the proposition that IGRA's purposes govern the Compact's interpretation and that we are to put aside conventional tools of fact finding, legal analysis and contract interpretation in favor of this unique rule of decision based on the identity of one party. We decline to do so in this case.

As noted earlier, New York jurisprudence counsels that a contract's purpose should be considered in resolving ambiguous provisions. See Hooper Associates, Ltd., 74 N.Y.2d at 491. Apart from Congress' intentions in enacting IGRA, which is outside the four corners of the written agreement, the purpose of the Compact can be discerned from the language of the Compact itself. The "Understanding" between the State and the Nation was to create a Compact

that would in the words of the Parties themselves "define the Nation's Class III gaming activities, and the respective rights of each Party with regard to such gaming." (MOU at 1.) To that end, with respect to "Exclusivity and Revenue Share," the "State and the Nation agree that in entering into an Agreement with the State to offer electronic gaming devices, including 'slot machines,' at its facilities, the Nation is receiving an *exclusive franchise* to offer a form of gaming no non-Indian person or entity has been permitted to offer." (MOU at 3 (emphasis added)). As indicated by the plain terms of the Compact and the MOU, which is incorporated in the Compact by reference, the purpose of the Compact is an "exclusive franchise" for which the Nation is to pay revenue share "for each category of Gaming Device for which exclusivity exists."

### b. Paragraph 4(b) (Term of Compact)

While ¶ 12(b)(1) does provide that State Contribution payments are in consideration for exclusivity, those payments are explicitly subject to a "sliding scale" that plainly provides for only three fixed time periods accompanied by three different rates of contribution covering solely Years 1-14. That much is clear. What is not clear is what rate, if any, the State Contribution amount should be upon renewal under ¶ 4(c).

In the State's view, there is no express payment obligation for the renewal period because the Compact had a 14-year term which provided exclusivity for exclusivity payments for 14 years. What was renewed were the terms and conditions of the Compact providing exclusivity for exclusivity payments with the rate in effect at the time of renewal: 25%.

In contrast, the Nation insists no further State Contribution payments are due beyond the initial term of the Compact because it views the Compact as having a 21-year term (rather than a

14-year term with a seven-year renewal). In return for the stated rates for 14 years, the Compact provided for 21 years of exclusivity. In the Nation's view, exclusivity and State Contribution need not run concurrently for the life of the Compact. To show that exclusivity and exclusivity payments need not occur at the same time, the Nation points out that under ¶ 12, exclusivity rights began before exclusivity payments were triggered. The Compact provides that "Year 1" of State Contribution payment for exclusivity was to commence "on the date on which the first Gaming Facility" began operation. (Compact at ¶ 12(b)(1)). The right to exclusivity, however, would "cease to apply with respect to any one of the sites authorized under this Compact" if the Nation failed to "commence Class III Gaming operations on such site within sixty (60)) months of the Effective Date." (Id. at ¶ 12(a)(3)(ii)). From this, the Nation infers that its rights to exclusivity began on the Compact's Effective Date of December 9, 2002, while payments did not commence until the Nation opened its first casino on December 31, 2002.[8] Thus, the Nation concludes that its payment obligations are not linked to coincide in time with the State's exclusivity obligations through the 21-year life of the Compact. While the Nation may contractually have had exclusivity rights before payments were triggered, payments did not begin until, upon opening of the first casino, exclusivity rights could be exercised and bore value; in that practical sense, exclusivity and exclusivity payments do coexist. (See ¶ 12(a)(4) and (5), discussed infra, (linking revenue sharing to exclusivity in that obligation to pay State Contribution ceases upon breach of exclusivity.))

---

[8] Accordingly, the Nation made exclusivity payments based on slot revenues earned from December 31, 2002 through December 31, 2006 at 18% (Years 1-4), through December 31, 2009 (Years 5-7) at 22%, and then finally through December 31, 2016 at 25% (or 14 years after the Nation had opened its first gaming facility). The State accepted those payments on that schedule without objection. (Sheridan Stmt. at ¶

Further relying on ¶ 12(a)(3)(ii), the Nation maintains that the revenue sharing payments are also independent of the initial 14-year term of the Compact. To illustrate, the Nation explains that if it had not commenced its first gaming operations until 5 years after the Effective Date, December 2007, then Years 1-4 of State Contribution would have been 2008-2011 and Year 14 would end on December 9, 2021. In that event, the three fixed periods of payment would have failed to coincide with the initial 14-year term of the Compact. The Nation argues that in this example, the State's claim for payments beyond the express "Years 8-14" period would have made no sense. However, it is unclear why that makes no sense and how that demonstrates the Parties' intent regarding payment during renewal, even if, as in the Nation's illustration, the last payment period does not end until 2021.

In short, both the Nation and the dissent argue that the potential for delay (in this case, only three weeks) in opening one or more of the casinos proves that exclusivity and the payment obligation are not linked, but instead are independent and unrelated terms of the Compact. The argument proves nothing of the sort. The reason the Nation's payment obligations did not commence until the first casino opened was obvious—the State could not collect a percentage of casino revenues for the period before a casino opened, because by definition there were no such revenues. Starting the clock on the graduated Contribution rate schedule only at the point the first casino opened and the payments actually began, simply served to ensure that the Nation received the full four years at 18% and the full three years at 22% for which it had negotiated so strenuously.[9] Nothing in this structure, or in the parade of horribles about all the reasons a casino

---

[9] For example, had the Compact been structured so that the graduated rate schedule began to run at the point the Compact took effect, and had it taken the Nation the full five years it was allowed before it opened any casinos, the Nation would have lost the entire benefit of the 18% rate and one year of the 22% rate.

opening might be delayed, supports the argument that once the casinos were up and running the Nation might be entitled to years of exclusivity for free.

Finally, the plain terms of the Compact undercut the Nation's attempt to portray the Compact as a 21-year agreement rather than a 14-year agreement with an automatic seven-year renewal.[10] Paragraph 4(b) of the Compact could not be any clearer that the Compact "shall terminate on the fourteenth (14th) anniversary of the Effective Date, unless renewed . . ." (Compact at ¶ 4(b)); MOU at 1 ("The initial term of this Agreement shall be 14 years with an automatic 7-year renewal upon the expiration of the initial 14 year term . . .")).

### c. Paragraph 4(c) (Renewal)

Under the State's theory, the plain meaning of "renew" establishes the Nation's obligation to pay a 25% revenue share in the renewal period. Because the Compact does not define the term "renew," the State relies on various dictionary definitions of the word, including a definition of "renew" as meaning "to restore *to the same condition* as when new, young, or fresh." Oxford English Dictionary (2018) (emphasis added); see also Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 570 (2nd Cir. 1991) ("[r]enewal normally involves a continuation of the relationship on essentially the same terms and conditions as the original contract.") (internal citation and quotes omitted); Williams Petroleum Co. v. Midland Cooperatives, Inc., 679 F.2d 815, 819 (10th Cir. 1982) ("[r]enewal and extension are concepts closely allied to another, normally involving a continuation of the relationship on essentially the same terms and conditions as the original contract."). Thus, the State argues that when the

---

[10] The description of renewal as "automatic" is not, as the dissent describes it, a "characterization" made by the Panel, but rather, is the word expressly used in the Compact to describe renewal under ¶ 4(c)(1).

Compact automatically renewed on December 9, 2016, the Compact continued on the same "terms and conditions existing prior to the renewal," including the Nation's payment obligations under ¶ 12(b)(1).

On that premise, the State insists that the same terms and conditions that govern upon renewal are those that were in effect in 2016 "immediately prior" to renewal - 25% of the net drop of the Nation's Gaming Devices on a quarterly basis. (Stmt. of Claim at ¶ 113(i); State Reply at ¶ 19.) According to the State, requiring renewal at 25% does not necessitate implying any additional terms, but simply adhering to the plain meaning of "renew." To show that the Parties intended renewal at that rate, the State refers to the use of a "sliding scale" to phase-in payment up to 25%, rather than dropping payments to zero upon renewal as might occur had the Parties employed a "payment schedule" or "payment window."

Even under the State's definition of "renew" as revival of the same "terms and conditions that existed prior to the renewal," the Nation argues that no State Contribution payments are due upon renewal because those same terms expressly and unambiguously required the Nation to make payments on revenues earned through only those three fixed time periods, Years 1-4, Years 5-7, Years 8-14.

In light of the Compact's silence regarding State Contribution in Years 15-21, the Nation is emphatic that the State's request for revenue sharing payments of 25% of the Gaming Device proceeds during the renewal period is not merely a "renewal" of "immediately prior" existing terms as the State characterizes it, but instead, requires the Panel to imply that term, which it may not do where the contingency at issue, here renewal, was foreseeable. See Reiss, 97 N.Y.2d at 199 (declining to imply price adjustment for reverse stock split that caused five-fold increase in per-share price of stock and explaining that "[c]ourt will not imply a term where the

circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms . . .." (citing <u>Haines v. City of New York</u>, 41 N.Y.2d 769 (1977)); <u>see also</u> <u>Tonking v. Port. Auth.</u>, 3 N.Y.3d 486, 490 (2004) (concluding that the language was not clear enough to support an indemnity obligation.)  There is no doubt that in this matter, the possibility of renewal was not only foreseeable, but expressly contemplated in the Compact.

According to the Nation, the very absence of any provision setting forth payment obligations beyond "Years 8-14" evidences the Parties' intent to exclude such an obligation, particularly because the Compact was negotiated between sophisticated parties and experienced counsel.  <u>See e.g.</u>, <u>N. Fork Bank & Trust Co. v. Romet Corp.</u>, 596 N.Y.S.2d 449, 449-50 (2d Dep't 1993) ("[The contract] contained no provision requiring the Bank to provide advancements on the $4,000,000 loan . . . Therefore, the Bank had no such obligation."). "Even where there is ambiguity, if parties to a contract omit terms – particularly, terms that are readily found in other, similar contracts – the inescapable conclusion is that the parties intended the omission." <u>Quadrant Structured Prods. v. Vertin</u>, 23 N.Y.3d 549, 560 (2014). This rule is supported by the maxim *expression unius est exclusion alterius*,[11] which precludes a court from implying terms where terms were omitted by a sophisticated drafter. <u>Id.</u>; <u>Assured Guar. Mun. Corp. v. DLJ Mortgage Capital, Inc.</u>, 117 A.D.3d 450, 450-51 (1st Dep't 2014) (noting if a contract was negotiated between sophisticated parties, the failure to include a specific term in the contract "can only be construed as the intentional exclusion" of that term).

---

[11] "A maxim of statutory interpretation meaning that the expression of one thing is the exclusion of another."  Blacks_law.enacademic.com.

These contentions by the Nation comport with the definitions of "renew" that do not necessarily encompass the "same" or "immediately prior" terms. See Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/renew (defining "renew" as "to make a formal or official agreement continue for an extra period of time"); see also https://en.oxforddictionaries.com/definition/renew (defining "renew" as "[e]xtend[ing] the period of validity of (a license, subscription, contract, etc."). These definitions demonstrate that "renew" is susceptible to more than one reasonable interpretation. See Black's Law Dictionary (6th ed. 1990) ("To renew a contract means to begin again or continue in force the old contract.").

### d. Other Compact Provisions

Reading the Compact as a whole requires that the other Compact provisions also be examined. The Nation contends that if the Parties had intended the exclusivity payments to span the entire 21-year term of the Compact, they would have expressly done so as they did in ¶ 11(b)(2)(b-c), which provides for annual lease payments of one dollar for the Niagara Falls Convention Center "for a period of twenty-one (21) years." However, that the Parties accommodated the possibility of renewal by providing for a 21-year lease does not negate the clear provision in ¶ 4(c) that the initial term of the Compact was to expire 14 years after the Effective Date.

Nevertheless, as the Nation points out, the Parties could have similarly provided for State Contribution payments in an open-ended fashion as they did other provisions in the Compact. (See e.g., Compact at ¶ 5(a) (the Nation "shall have responsibility for the on-site regulation" of gaming); ¶ 6(a) (State Gaming Officials "shall have responsibility to ensure Nation compliance

33

with the terms of this Compact"); ¶ 8(a) ("The Nation Gaming Operation shall make and keep books and records that accurately and fairly reflect each day's transactions")).

However, because numerous provisions, including ¶ 6(a) and ¶ 8(a), are to ensure accuracy of the State Contribution, the Nation's interpretation would shorten the life of some of these very provisions that are, in the Nation's own words, "unlimited as to duration" and "remain in effect for so long as the Compact does." (Stmt. of Defense at 16.)  To enable State Gaming Officials to fulfill their duties under ¶ 6(a), ¶ 6 authorizes, among other things, access to the gaming facilities, (Compact at ¶ 6(c)), and access to business and accounting records of the Class III Gaming activities, (Compact at ¶ 6(f)). Similarly, ¶ 8(a) requires the Nation to maintain books and records that "accurately and fairly reflect each day's transactions." Both provisions require confidentiality of records pursuant to ¶ 15. (Compact at ¶¶ 6(f), 8(c)(6)).  Paragraph 15(b) in turn expressly states that the purpose of providing the State access to the Nation's gaming records is to ensure accuracy of the calculation of State Contribution.  (See id. at ¶ 15(b) ("the Nation gaming Operation will provide promptly records and information relating to its Class III Gaming operations to the SGO [State Gaming Officials] solely for oversight of the State Contribution on the condition that the State agrees that the access to and use of such documents and information is strictly limited to this purpose."); see also id. at ¶ 12(b)(3) ("Any dispute regarding a payment by the Nation of the State Contribution must be raised within one (1) year of the receipt by the State of the audited financial statements required pursuant to Paragraph 8(c)(2)").  If, as the Nation contends no State Contribution is owed during renewal, these open-ended provisions to ensure the accuracy of State Contribution payments become meaningless and contrary to their plain terms, are not in effect for the entire life of the Compact.  (Hearing Tr. at 378:11-15 ("the

State no longer has access to the . . . underlying data to check and verify the calculations of the net drop and the percentage of the net drop.”))

Likewise, ¶¶ 12(a)(4) and (5), which bind cessation of exclusivity payments to breach of exclusivity, are also open-ended provisions that are of no effect under the Nation's interpretation. Paragraph 12(a)(4) explicitly, and with no indication that it is only applicable during the initial term of the Compact, provides that the Nation's obligation to make exclusivity payments “shall cease immediately” only for “that particular category of Gaming Device for which” the State has breached its exclusivity obligations. Likewise, ¶ 12(a)(5) is another open-ended term establishing that if the State permits any other tribe to establish a Gaming Facility within a 25-mile radius of one of the Nation's Gaming Facilities, its right to receive payments “shall cease immediately as to all categories of Gaming Devices.” (See also MOU at 3, CX-22 (“In the event the State were to breach this exclusivity agreement with the Nation, the Nation's revenue share obligations pursuant to this exclusivity agreement shall no longer apply.”)). Under the Nation's interpretation of its revenue sharing obligations during renewal, there would be no payments to cease upon any breach of exclusivity by the State.

Thus, reading the Compact as the Nation does would contravene a well-settled rule of contract interpretation that “dictate[s] giving effect to all the provisions of a contract, construing it as a whole and reconciling its clauses.” Kerin, 116 F.3d at 993 (internal quotes and citation omitted); Ronnen v. Ajax Elec. Motor Corp., 88 N.Y.2d 582, 589 (1996) (“We have long and consistently ruled against any construction which would render a contractual provision meaningless or without force or effect . . .”); see also Williams Press, Inc. v. State, 37 N.Y.2d 434, 440 (1975) (“A written contract ‘will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general

35

purpose.'"); <u>see also</u> Restatement § 203(a) ("an interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect").

The dissent entirely ignores that the Nation's interpretation of the Compact would render numerous Compact provisions meaningless.

In sum, looking to the four corners of the Compact and construing the Compact as a whole, it is ambiguous whether the term "renew" means that the State Contribution payments continue at the 25% rate in effect when the initial 14-year term ended, or whether "renew" means to continue with the original terms that did not expressly provide for any State Contribution payments in Years 15-21. Accordingly, the Panel will look to extrinsic evidence to assist it in resolving the ambiguity and in determining the Parties' intent regarding State Contribution payment obligations in the renewal period.

### 2. Extrinsic Evidence

To resolve the ambiguity in a written agreement, extrinsic evidence that may be considered to aid in the interpretation of the writing includes surrounding facts and circumstances. <u>See</u> Restatement § 202(1) ("Words and other conduct are interpreted in the light of all the circumstances"). A court may also consider "any relevant course of performance, course of dealing, or usage of trade," <u>see</u> Restatement § 202(1), (5), as well as "[a]greements and negotiations prior to or contemporaneous with the adoption of a writing," <u>see</u> <u>id.</u> at § 214(c). Contract interpretation requires that "the entire contract must be considered and, as between possible interpretations of an ambiguous term, that will be chosen which best accords with the

sense of the remainder of the contract." <u>Metro. Life Ins. Co. v. Noble Lowndes Int.'l Inc.</u>, 84 N.Y.2d 430, 437 (1994) (internal quotes and citation omitted).

### a. Prior Negotiations

Among the Parties' negotiations, the single piece of evidence that is heavily contested is the State's June 12, 2001 proposal in which the State suggested a final payment period of "Years 7+" rather than "Years 8-14." (June 12, 2001 State Proposal at 5, RX-15). Because that proposal was not adopted, the Nation concludes that "the State proposed, and the Parties considered and rejected, the State's precise position in this dispute." (Nation Br. at 44). In response, the State explains that "just like the Nation's 'Years 8-14' formulation, the formulation 'Years 7+' did nothing more than communicate that the percentage applied through the end of that term." (State Reply at ¶ 50.) The State also suggests that the drafting change back to the initial "Years 8-14" wording may have been because "Years 7+" made it ambiguous as to what percentage would apply during Year 7 since the second payment period also included "Years 5-7." Even assuming that these explanations had merit, they are undoubtedly mere conjecture.

The State also maintains that if, as the Nation posits, the change from "Years 7+" to "Years 8-14" was a "stunning concession" by the State that there would be no State Contribution during the renewal period, the State contends that that fact would have been "all over the written record," in notes, emails, and in communications to the Nation members and written submissions to the DOI, discussed above. The Nation retorts that the Parties had already agreed to "Years 8-

"14" and that this "simple and swift rejection of a replacement for an existing term" did not warrant being "all over the written record." (Nation Reply at 27.)

If, as the Nation claims, this rejection was "simple and swift" as it merely reverted back to an existing term, it is unlikely that by agreeing to the "existing term," the State intended to provide a benefit as significant as relieving the Nation of all exclusivity payment obligations upon renewal, particularly without significant (or any) discussions between May 2001 when State Contribution was linked to revenue levels and the following month when the change was made to tie revenue share to specific years. (See June 5, 2001 Document, "Conceptual Agreement: Parameters of a Nation-State Gaming Compact" at 4, CX-21.)

Likewise, if the rejection of "Years 7+" demonstrates that "the State proposed, and the Parties considered and rejected, the State's precise position in this dispute," (Nation Br. at 44), then it is curious that there are no meeting notes or other indicia that such discussions ever occurred. Absent any evidence offering context or insight into the intent behind these changes in terminology, precisely as the Nation claims, whatever explanation the State (or the Nation) can offer, it is "only rank speculation" as "to the Parties' intent in rejecting [the "Years 7+" term]." (Nation Reply at 27.)

Indeed, neither Donald Pongrace, the Nation's lead negotiator, nor Patrick Kehoe, one of the State's lead negotiators, testified in this arbitration regarding any of the negotiations. (Hearing Tr. at 97:6-8; 104:13-15.) The only evidence proffered on this point is Mr. Williams' testimony that the Parties never discussed that the Nation's obligation to pay the State Contribution would cease upon renewal of the Compact.[12] (Williams Stmt. at ¶¶ 9, 11; Second

---

[12] Mr. Williams' testimony regarding what discussions did or did not occur is not the type of subjective self-serving testimony about his belief as to the meaning of the contract that is precluded under <u>AM Intern Inc.</u>, 44 F.3d at 575. <u>See</u> discussion <u>supra</u>.

Witness Statement of Robert Williams ("Williams Second Stmt.") at ¶ 5; Williams Direct

Testimony, Hearing Tr. at 131:11-15.)  Therefore, that the State's June 12, 2001 proposal of

"Years 7+" was not adopted does not demonstrate that the Parties' intent was to eliminate any

obligation to pay State Contribution in the renewal period.

The extrinsic evidence offered by the State to illustrate what was — and was not —

discussed and agreed by the parties during the negotiation of the Compact includes both the

relevant correspondence between the Parties and the notes and testimony of one of the primary

negotiators, who was also subjected to extensive cross-examination.[13]  In contrast, there is no

evidence in the negotiations to support the Nation's assertion that the Parties intended the term of

the Compact to be anything contrary to the plain meaning of ¶ 4(c) (an initial 14 year term with a

seven year automatic renewal), that revenue sharing was to be independent of exclusivity rights,

(i.e., that 14 years of payment would cover 21 years of the right to exclusivity given that

exclusivity and payments for exclusivity are not contemporaneous), or that State Contribution

payments in Years 1-14 are independent of the initial 14-year term of the Compact.  The

Nation's response did not include a single contemporaneous note, memo, email or scintilla of

evidence suggesting that anyone representing the Nation in the negotiations believed at that time

that the obligation to make Contribution payments in return for exclusivity somehow disappeared

in the event of renewal —much less that this understanding was communicated to and shared by

the State.[14]  Neither did the Nation produce Mr. Pongrace or any other representative to testify

---

[13] Contrary to the dissent's assertion, the notes found at RX-15 were produced in discovery by the State in the earlier arbitration between the parties and were available for use by the Nation here.  They do not, however, support the Nation's interpretation of the Compact provision in question.

[14] For example, if the rejection of the "Years 7+" draft, ("Conceptual Agreement: Parameters of a Nation-State Gaming Compact," at 5), marked the decisive moment when the negotiators

concerning the negotiations. These witnesses and their documents were within the exclusive control of the Nation and, to the extent that any of the contemporaneous writings or communications were arguably privileged, only the Nation could have waived the privilege to make them available for use in this proceeding. If any of the Nation's contemporaneous documents or the testimony of any of its negotiators could have supported the Nation's interpretation of the Compact, one certainly would have expected its highly competent counsel to have presented it to the Panel. That they did not speaks volumes. The dissent's effort to blame the State for the Nation's failure to produce evidence from its own files and its own witnesses to support its own case is not persuasive.

Moreover, this is not a situation in which silence in the negotiating history about the Nation's current interpretation of its obligations during the renewal period is a neutral fact, much less cuts against the State. The central premise of the Compact is that the Nation was to receive exclusivity protection of a defined scope within a defined geographic area in return for a percentage of the revenues it derived under the protection of that exclusivity. This point is repeated throughout the Compact, and is central to the parties' presentations to the DOI and the Nation's messages to its own constituents in support of the deal. The notion that the parties somehow agreed that during the renewal period — for as much as seven years — the State would be obligated to provide exclusivity, but the Nation would pay nothing, without a single scrap of paper or witness recollection that this deviation from the basic bargain was even discussed, simply defies credulity.

---

agreed that Contributions would end at year 14, where are the emails, or even contemporaneous notes, supporting the position that the issue was raised and resolved at that time?

### b. Post Execution Communications

Neither the Nation's post-execution letter to the Department of the Interior nor the Nation's information sharing documents to its members about the meaning of the Compact suggest that the Nation's revenue sharing payment obligations cease in the renewal period. Likewise, the State's letter to the DOI also fails to mention its belief that revenue sharing payments continue into any renewal of the Compact. However, given that approval of the Compact required highlighting the economic benefits to the Nation (not to the State), the State contends that these communications in which the Parties fail to extoll a benefit as significant as having no obligation to pay a State Contribution during the renewal period, is "course of performance" evidence that the Parties did not intend for revenue sharing payments to cease. The State makes the same argument with respect to the Nation's communications to its Nation members.

At the outset, the Nation objects to the admissibility of the Parties' post-execution letters to the Department of the Interior and its own communications to its citizens on the grounds that such extrinsic evidence consist of statements rather than "performance" and accordingly, do not constitute "course of performance" evidence. See Restatement (Second) of Contracts § 202(4) ("course of performance" involves "repeated occasions for performance" by one party). We agree with the Nation that the communications at issue are not "course of performance," but that does not preclude their admissibility to aid in interpreting the payment obligations under the Compact. See Restatement § 202(1) ("Words and other conduct are interpreted in the light of all the circumstances").[15]

---

[15] The Nation also claims the Panel cannot consider the Parties' correspondences to the DOI on the basis that these statements are subjective party "beliefs about the general ramifications of the contract" that pursuant to Baldwin, 636 F.3d at 76-77, are not the "right type" of evidence in

Next, since the Parties addressed only the first 14 years of the Compact's provisions in their respective letters to the DOI, the Nation maintains that the Secretary did not address or approve revenue sharing upon renewal of the Compact. Therefore, the Nation concludes that the State is asking this Panel to displace the role of the Secretary by approving an additional seven years of payments to the State. This contention is flawed for several reasons. First, while it is beyond dispute that the Panel has no legal authority to usurp the Secretary's role and enforce a Compact term that the Secretary did not approve, see 25 U.S.C. § 2710(d)(8) (approval and disapproval of Compact provisions are the exclusive province of the Secretary under IGRA), the Panel does have the duty and authority to determine whether the terms of the Compact already provide for revenue sharing payments upon renewal. Second, the Nation's contention that enforcement of revenue sharing in the renewal period is beyond the Panel's authority assumes that the DOI interpreted the Compact in the same way that the Nation advocates in this arbitration – that "renewal" did not include revenue sharing. There is no evidence in the record to suggest that the DOI shared the view now asserted by the Nation. Third, whether or not the Parties addressed any terms of renewal in their respective letters to the DOI, renewal was part of the Compact that was reviewed and deemed approved. If, however, the Secretary did not approve the terms of renewal, then that arguably would mean that renewal of the Compact was not properly authorized and the Nation's gaming activities are unlawful.

---

contrast to evidence that "show[s] that the parties normally meant to refer to Canadian dollars when they used the term 'dollars.'" As in Kerin, the Baldwin court was discussing the "right type" of evidence "to establish latent ambiguity," rather than to resolve ambiguity as is the case here. Moreover, the letters to the DOI do not contain self-serving statements made to advance a position in arbitration "that a party did not understand the contract to mean what it says (or appears to say)" Am Intern Inc., 44 F.3d at 575. Thus, these post execution communications do not constitute inadmissible extrinsic evidence under Baldwin. See discussion supra.

The Nation also objects to the "approval" of an additional seven years of payment based on its belief that its exclusivity rights have been diluted since the Compact was approved in 2002 due to changes in the landscape of gaming.  However, upholding the State's interpretation of the Compact would not be "approving" an additional seven years of payment without legal or economic warrant to do so; rather, it would simply be finding that the terms of renewal in the Compact deemed approved by the Secretary included revenue sharing payment obligations.

In addition to disputing that the DOI approved revenue sharing payments upon renewal, the Nation explains that its DOI submission fails to mention the absence of revenue sharing payment obligations in the renewal period because of the uncertainty of renewal and because its market analysis covered only 14 years.  (See October 11, 2002 Letter from D. Pongrace to Skibine at 8, CX-31.)  However, that the Nation only did market research for 14 years and informed its citizens of estimated revenue "over the 14 years of the Compact," (see April 15, 2002 "POSSIBLE QUESTIONS AND ANSWERS" at 2, CX-26), belies the Nation's contention that it considered the Compact to be a 21-year agreement.

Further, notwithstanding the uncertainty of renewal and even if the Nation's market analysis only covered 14 years, there was no reason not to extoll a benefit as significant as having no obligation to pay a State Contribution during the renewal period, particularly because approval of the Compact by the DOI and Nation members required highlighting the economic benefits to the Nation, not to the State.  (See September 30, 2002 Letter from G. Skibine to State at 1-2, CX-46); see also Rincon, 602 F.3d at 1034-35.  For example, in the State's correspondence to the DOI, the State wrote that the "phased-in nature of the payments reduces significantly the overall effective rate of the payments over the life of the Compact." (October 11, 2001 Letter from J. McGuire to G. Skibine at 3, CX-30).  Had the Parties intended for

payments to phase-out or cease upon renewal, that factor would have even more dramatically reduced the overall effective rate of the payments. Why would the parties fail to mention that in seeking DOI approval? Likewise, when the State addressed circumstances in which the obligation to pay State Contributions would completely cease, no mention was made that that included the renewal period. (Id. at 5.) Similarly, the Nation's April 15, 2002 statement to its members explained that it has a "favorable phase-in" but made no mention that State Contribution would phase-out or drop to zero upon renewal. (April 15, 2002 "POSSIBLE QUESTIONS AND ANSWERS" at 4.) While these statements and letters are not conclusive evidence of the Parties' intent, in light of the Parties' need to obtain approval by justifying revenue sharing payments, the failure to note such a substantial benefit as the cessation of revenue sharing undoubtedly supports the State's position.

Finally, the Nation's statements to its citizens confirm the purpose of the Compact that is stated in the MOU - the Nation's "payments to the State are essentially buying an exclusive franchise to offer casino gaming, with slot machines, in Western New York." (July 5, 2001 document "FREQUENTLY ASKED QUESTIONS GAMING MOU/COMPACT WITH NEW YORK STATE," CX-23; see also MOU at 3). The essential bargain of the Parties' agreement is a commercial agreement wherein exclusivity payments are made in consideration for exclusivity. (See April 15, 2002 "POSSIBLE QUESTIONS AND ANSWERS" at 2) ("We [the Nation] view the compact as a commercial arrangement with the State and the compact provides a normal commercial waiver . . .This is a very standard provision in most, if not all, commercial contracts between Indian and non-Indian parties.")); id. at 4 ("WHY DO WE HAVE TO PAY THE STATE CONTRIBUTION FROM OUR REVENUES? Answer: The State is providing us with a zone of exclusivity . . . This commitment from the State is very important to us economically

and will help ensure the success of our facilities."). Finally, it is notable that consistent with this purpose of an "exclusive franchise" for which the State intended to continue to receive revenue share payments as long as it provided exclusivity, the State budgeted to receive exclusivity revenue for fiscal years 2017 and 2018. (See e.g., CX-35, CX-41, CX-43.)

The dissent fails adequately to explain why, if the Nation believed it had an agreement for a contribution-free period of exclusivity in the event of renewal, it neglected to share that highly material information with either its members or the DOI. To be sure, renewal of the agreement was not guaranteed, and was subject to objection by either party, but even a contingent right to up to seven years of free exclusivity was a matter of substantial value to the Nation and logically would have been part of any effort to persuade either the DOI or the Nation's members that this Compact was of great benefit to the Nation and ought to be approved. This is not a matter of bragging, but of providing the relevant and helpful information to those charged with assessing the merits of the deal. In advocating approval of the deal, why would one omit such a valuable concession by the State (if, that is, anyone on either side actually interpreted the Compact that way at the time)? The baseless suggestion that the State may have violated Federal law by failing to advise the DOI that it understood "renewal" to mean what it normally does —in this case, to extend the period in which exclusivity would be exchanged for payments — assumes that the DOI needed such advice because it understood the Compact to provide for a contribution-free renewal period, as the Nation now contends. There is no evidence in the regulatory record before the Panel that the DOI was under this misimpression and, as noted, the Nation never even hinted at this reading in any of its submissions.

### c. Context (Surrounding Facts and Circumstances)

The State contends that the context existing at the time of the Compact's execution confirms its interpretation of the Nation's revenue sharing obligations during renewal. Primarily, the State's proffered context evidence is that other gaming compacts (Mohawk Compact and Pequot MOU) do not provide for State Contribution payments to drop to zero after a certain point of time, that a 25% revenue share was linked to exclusivity, and that this constituted the Parties' "baseline expectation" as they negotiated the Compact. (Stmt. of Claim at ¶¶ 95-99, 104; Williams Stmt. at ¶ 19.) According to the State, that the Nation shared this "baseline expectation" of a 25% revenue share is evidenced by the State's proposal of a sliding scale building up to 25% in response to discussions about the other gaming compacts.

Although the Mohawk and Pequot agreements do involve a 25% revenue share for the life of the compact, what the State did in a different gaming Compact does not necessarily reveal its intent in this Compact. That the State agreed to revenue sharing at 25% "in years after seven" in the Mohawk Compact is also not particularly instructive given that that agreement did not contain a fixed term.

Next, the State relies upon the testimony of Mr. Williams regarding the Parties' "baseline expectation." Even assuming that this particular testimony is admissible, which the Nation disputes as subjective, Mr. Williams' testimony that the 25% revenue share formed "our" (the State's) baseline expectation (Williams Stmt. at ¶ 19), only reveals that the "baseline expectation" belonged solely to the State rather than to both Parties. In fact, the Nation denies that it ever shared any such "baseline expectation" with the State, insisting rather, that its intent was to avoid the fate of the Pequots, whom the Nation negotiators referred to as "the poorest rich people on earth." (April 3, 2001 Meeting Notes (CX-17)).

On balance, evidence of the other gaming compacts does not clearly support the interpretation of either side regarding the Parties' intent.

### d.  Meaning of "Renew" Gleaned From Extrinsic Evidence

Consistent with the Compact terms, there is no dispute that the Parties intended the Nation to pay for exclusivity through the end of "Years 8-14."  Then upon "renewal," the Nation agrees that all "rights and obligations" continue, that is, "[n]othing about renewal extinguished that [ongoing payment] obligation."  (Nation Opening Stmt., Hearing Tr. at 70:20-73:4.)  Thus, the Nation continued meeting its payment obligation until December 31, 2016, three weeks into the renewal period.  Thereafter, the Nation stopped State Contribution payments alleging that it had fulfilled its payment obligations under the Compact.  (Id. at 73:10-74:2.)  In essence, the Nation treats the Compact as having a 21-year term that required the fulfillment of only the original initial payment terms.  (See Nation Closing Argument, Hearing Tr. at 240:10-11 ("Renewal kept in place the obligation to complete that schedule of payments.") As discussed supra, however, the term of the Compact clearly is "14 years, with an automatic 7-year renewal." (MOU at 1; see also Compact at ¶ 4(c)).  Interpreting the Compact to require the Nation to fulfill only the original payment obligation from Years 1-14 renders the term "renew" meaningless and ignores that the purpose of the Compact was revenue share in exchange for exclusivity.

Because the term "renew" does not mean continuation of only the duration of the Compact without its attendant rights and obligations, and in light of the extrinsic evidence that shows the essential bargain was exclusivity rights in exchange for exclusivity, the Panel finds that "renewal" of the Compact means that the Nation's obligation to pay State Contribution in

consideration for exclusivity rights continues in the renewal period for as long as exclusivity exists.

As to the rate of revenue share upon renewal, it is evident from the documentary evidence that throughout the negotiations, the State required a 25% rate, which the Nation resisted. As a compromise, the Parties agreed to a gradual increase up to 25% in the form of a sliding scale in order to enable the Nation to retain a greater share of its revenues in the earlier years; in contrast, there is no evidence to show that in order to help bridge the gap on the Parties' disagreement over rate of revenue sharing, there would be a concession by the State on the back end, i.e., a complete cessation of exclusivity payments for the renewal period. Moreover, neither the State nor the Nation argues, nor does any of the extrinsic evidence show that the Parties intended for "renew" to mean restarting the sliding scale such that at Year 15, the rate would be 18% just as in Year 1.

Given that "renew" is a "*continuation* of the relationship," and in light of the extrinsic evidence, "renewal" signifies that the Compact was to continue on the same terms and conditions that were in place when the Compact's initial term expired. Trans-Orient Marine Corp., 925 F.2d at 570 (emphasis added). In fact, if the payment terms change from 25% in Year 14 to 0% in Years 15-21, that arguably does not constitute "renewal" of existing terms. See id. (describing East Bay Union of Machinists v. Fibreboard Paper Prods. Corp., 285 F. Supp. 282, 287 (N.D. Cal. 1968), aff'd mem. 435 F.2d 556 (9th Cir. 1970) as holding that "offer including modified terms is not an offer to renew but an offer to enter a different or new contract."). Although neither party has argued that any State Contribution rate other than 25% or zero is appropriate here, the Panel has considered that question and decided that any rate other than 25% is contrary to the term "renewal."

Apart from noting that "renewal" can mean "starting over" for purposes of reaching a compromise within the Panel, (see Dissent at n.5), the dissent reads "renewal" to mean that every term and condition in the Compact is continued except payment; such an interpretation distorts the meaning of "renewal" in the context of this Compact.

Rather than applying a reasonable definition of the term "renew," portions of the dissent turn on speculation about the motivations and knowledge of various political figures, how their approaches differ from those of people in business, the risks involved in the Native American casino industry and various other matters outside the record in this arbitration. As arbitrators, we are not free to resolve this matter on such a basis. The parties have framed the issues in their pleadings and submissions and we are obligated to decide it based upon the record before us, not our subjective, perhaps cynical views about the actions of politicians and tribal leaders.

### 3. Common Sense

The State charges that the Nation's reading of the Compact - that upon renewal, the State must continue to give exclusive gaming rights to the Nation while the State ceases to receive hundreds of millions of dollars in State Contribution – violates common sense. See Progress Bulk Carriers v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, 939 F. Supp.2d 422, 428-29 (S.D.N.Y. 2013) ("The presumption in commercial contracts is that the parties were trying to accomplish something rational. Thus, common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canon." (internal quotes and citations omitted)); Dispatch Automation, Inc. v. Richards, 280 F.3d 1116, 1119 (7th Cir. 2002) ("When a contractual interpretation makes no economic sense, that's an admissible and . . . compelling reason for rejecting it. . ."); Koninklijke Philips Elecs. N.V. v. Cinram Int'l, Inc., 2012 U.S. Dist. LEXIS

135839, at *17 (S.D.N.Y. 2012) ("The construction of a written instrument to be adopted is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It is to be interpreted as a business transaction entered into by practical men to accomplish an honest and straightforward end." (internal quotes and citations omitted)); see e.g., Kerin, 116 F.3d at 991 (finding that magistrate did not err in emphasizing common sense to resolve ambiguity in favor of plaintiff); Lai v. Gartlan, 46 A.D.3d 237, 246 (1st Dep't 2007) (rejecting interpretation of agreement that cash capital accounts are fixed irrevocably on the date of dissolution" as making "no economic sense").

Indeed, if the Parties did not intend there to be any payment obligations in the renewal period, then it would appear contrary to common sense for the State not to have objected to automatic renewal of the Compact if it were to receive the same amount of State Contribution regardless of whether it were to give the Nation exclusivity rights for only the initial term or for the initial term plus an additional seven years.[16]

### 4. Absurdity and Commercially Unreasonableness

The State is emphatic that its interpretation of the Compact must be upheld, relying on the principle that "[a] contract should not be interpreted to produce a result that is absurd . . . , commercially unreasonable . . . or contrary to the reasonable expectations of the parties  . . ."

---

[16] The Nation analogizes the Compact terms to where A agrees to protect B's business from competition for 10 years in exchange for a percentage of revenues for only the first six years of operation. Here, however, the State had the option to object to renewal, but did not do so. (See Nation's Reply at 6.) It was not until 2013 that the Parties apparently agreed, as part of the settlement of their last arbitration, not to object to renewal absent material breach. (Id. at n.3.)

Lipper Holdings LLC v. Trident Holdings, LLC, 766 N.Y.S.2d 561, 562 (1st Dep't 2003);[17] see also Metropolitan Life Ins. Co., 84 N.Y.2d 430, 438 (explaining court would "endeavor to give the contract construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other" and also noting unlikelihood that "two sophisticated business entities, each represented by counsel, would have agreed to … harshly uneven allocation of economic power under the Agreement.")

The Nation counters that New York courts have established an extremely high standard for a contract to be deemed absurd or commercially unreasonable, particularly one negotiated between sophisticated, counseled parties. Although the Nation cites Fundamental Long Term Care Holdings, LLC, 20 N.Y.3d at 445 for that proposition, in that case, the court expressly declined to examine whether "payment of $1,000 for a membership interest valued at $33 million is commercially unreasonable" because the contract was unambiguous.  The court did, however, note that parties enter into contracts "for all sorts of reasons," and that the agreement at issue had been "executed by sophisticated, counseled parties."  Id.

To support its assertion that the standard for judicial rewriting of a contract due to absurdity is also high, the Nation relies on Wallace, 86 N.Y.2d 543. In Wallace, the lease provided for a 33-year renewal term with a renewal-period rent adjustment to be determined no earlier than 1 year prior to the "expiration" of the renewal term. Id. at 546. Due to the term "expiration," a literal reading of the lease required that the rent amount for the first renewal term would not be determined until 32 years after the term began.  Nonetheless, the Court of Appeals

---

[17] Although the Parties disagree on whether commercial reasonableness can be considered without a finding of ambiguity, the Panel need not settle that dispute because, as discussed supra, the Compact is ambiguous as to the Nation's revenue sharing payment obligations upon renewal.

declined to alter the express terms of the lease, noting that "transposing, rejecting, or supplying words to make the meaning of the contract more clear . . . is appropriate only in those limited instances where some absurdity has been identified or the contract would otherwise be unenforceable either in whole or in part." Id. at 547-48.

The court further explained that "clear, complete writings should generally be enforced according to their terms" and that that rule "has even greater force in the context of real property transactions, 'where commercial certainty is a paramount concern' [citation omitted], and where, . . .the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length." Id. at 548. See also Jade Realty LLC v. Citigroup Commercial Mortgage Trust 2005-EMG, 20 N.Y.3d 881, 884 (2012) (reversing trial court's decision for judicial revision of contract on grounds that application of contract's literal language did not result in absurdity or unenforceability despite term providing for pre-payment premiums that were unconventionally higher in later years than in earlier years of loan); see also Meyer v. Stout, 79 A.D.3d 1666, 1668 (4th Dep't 2010) (concluding it was proper to disregard explicit phrase in deed that would have created "the absurd result that the easement would commence on property that plaintiff did not own and would continue onto property that he also did not own.")

Here, unlike Wallace, apart from the rights and obligations that accompany "renewal," there is no other literal language to apply since the Compact does not expressly mandate either the continuation or the cessation of State Contribution payments in Years 15-21. If the Compact is interpreted to mean that revenue sharing payments cease upon renewal, over the course of the additional seven years of renewal, the State estimates its "loss" in revenue would be nearly $1 billion, which would also deprive cities in western New York of hundreds of millions of dollars, and that such an extreme economic consequence is absurd and commercially unreasonable.

In contesting that its interpretation would lead to absurd or commercially unreasonable results, the Nation explains that between 2003 and 2017, the State received over $1.4 billion in exclusivity payments, which it calculates is 42.6% of adjusted net income[18] from the its gaming enterprises. (Demand at ¶ 16; Sworn Witness Statement of David Sheridan ("Sheridan Stmt.") at ¶ 36.) That amount, evenly distributed over 21 years (2002 - 2023) instead of 14, is an average annual payment to the State of over $70 million. (Id. at ¶ 36.) Moreover, as emphasized by the Nation, the State received these payments while bearing none of the risks or costs associated with generating such revenues. Further, the Nation provides that it has invested over $1.2 billion in its three casino properties and is one of the largest employers in Western New York, with approximately 3,700 employees. (Sworn Witness Statement of Nation President Todd Gates at ¶ 26.) State and local economies benefit from more than $150 million in wages and benefits paid to its gaming employees and from the $75-80 million of annual purchases from New York vendors. (Id.) The casinos generate approximately 7.8 million visits per year, arguably providing a benefit to the local economies. (Id.)

Despite these benefits to the State, which pale in comparison to the nearly $1 billion in consideration that the State would not receive under the Nation's interpretation, and notwithstanding the extent of any past revenue sharing payments that the State was owed for exclusivity rights, reading the Compact to require the State to provide the Nation with an additional seven years of rights to exclusivity without any consideration is commercially unreasonable.

---

[18] This percentage of adjusted net income figure provided by the Nation is distinct from percentage of actual and projected "net drop." Under the Compact, State Contribution payments are calculated based on "net drop," which is "money dropped into machines, after payout but before expenses)." (Compact at ¶ 12(b)(1)).

## IV.  CONCLUSION

A majority of the Panel finds that the Compact read as a whole and in light of the extrinsic evidence supports the conclusion that "renewal" means that the Compact was continued on the same terms and conditions that were in place immediately prior to expiration of the Compact's initial term which entailed revenue sharing for exclusivity. To conclude otherwise and interpret "renew" to mean that the Nation gets exclusivity without sharing revenue would render several provisions of the Compact meaningless, ignore the purpose of the Parties' agreement, challenge common sense and produce a commercially unreasonable result. As the party claiming breach of contract, the State has met its burden of proof.

A majority of the Panel concludes that pursuant to the terms of the Compact, the Nation is obligated to make State Contribution payments of 25% of net drop payable on a quarterly basis during the seven-year renewal period.

## PARTIAL FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration provision set forth in Paragraph 14 of the August 18, 2002 Compact between the Nation and the State, and having been duly sworn, and having duly heard the proofs and allegations of the parties, for the reasons stated above, we hereby AWARD as follows:

(1)     This decision is a PARTIAL FINAL AWARD ON LIABILITY as to all claims and counterclaims submitted in this arbitration. This Award is final as to liability only;

(2)     During the renewal period, the Nation remains obligated under ¶¶ 4(c)(1) and 12(b) of the Compact to pay the State Contribution on the same terms and conditions as in effect immediately prior to the renewal (25% of net drop of each category of Gaming Device for which exclusivity exists payable on a quarterly basis);

(3)     The Nation is in breach of its obligations under ¶¶ 4(c)(1) and 12(b) of the Compact by failing to pay the State Contribution after the Compact's renewal;

(4)     The Nation is ordered to specifically perform its obligation under ¶¶ 4(c)(1) and 12(b) by paying the State Contribution currently owed to the State, including all past due payments, and by making all future payments in accordance with the Compact;

(5)     Pursuant to Procedural Order No. 4, the Parties have jointly agreed to bifurcate the issues of liability and remedy;

(6)     Pursuant to Procedural Order No. 4, the Parties will meet and confer with respect to proposed terms of a remedial order and provide a joint report to the Panel no later than February 19, 2019;

(7)     The State is no longer pursuing its request for prejudgment interest;

(8)     Pursuant to ¶ 14(h) of the Compact, specific performance by the Nation as set forth herein involving the payment of money to the State "shall be satisfied solely and exclusively from the revenues of the Nation's Class III Gaming Facilities operated pursuant to th[e] Compact";

(9)     The Panel reserves jurisdiction to issue a later final award on the remaining issues. This partial final award does not include a determination of all issues submitted to the Panel.

(10)    This Partial Final Award on Liability may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute together one and the same instrument.


January 7, 2019_____
Date                                                    William G. Bassler

I, Hon. William G. Bassler, do hereby certify as Arbitrator that I am the individual

described in and who executed this instrument, which is my Partial Final Award in this matter.


Date_____January 7, 2019_____

_____
Arbitrator, Hon. William G. Bassler, Chair

I, Henry Gutman, do hereby certify as Arbitrator that I am the individual described in and who executed this instrument, which is my Partial Final Award in this matter.

Date_____

_____

Arbitrator, Henry Gutman

I, Henry Gutman, do hereby certify as Arbitrator that I am the individual described in and who executed this instrument, which is my Partial Final Award in this matter.

Date 1/07/19

_____
Arbitrator, Henry Gutman