**AMERICAN ARBITRATION ASSOCIATION**

**In the Matter of Arbitration Between**

---

State of New York

-vs-

Seneca Nation of Indians

AAA Case Number: 01-17-0005-3636

---

**DISSENT**

Panel Member Kevin Washburn, dissenting.

I respectfully dissent from my Panel colleagues' view of the Compact.

In my view, the Compact is clear and we need not look past the four corners of the document. The record is clear that both the revenue sharing percentage and length of term of the compact were hotly contested. After much negotiation, the parties reached agreement on a provision designated ¶ 12(b)(1) of the Compact. It provided that revenue sharing would occur in consideration of the exclusivity granted by the state as percentage of net drop from gaming machines at the following rates:

| Years 1-4 | Years 5-7 | Years 8-14 |
|-----------|-----------|------------|
| 18% | 22% | 25% |

It is neither impossible nor commercially unreasonable to enforce the Compact as drafted. If the State wished to receive payment for an additional term, it would have been easy to draft a term that would do so. It might look something like this:

| Years 1-4 | Years 5-7 | Years 8-14 (and during the period of renewal, if any) |
|-----------|-----------|--------------------------------------------------------|
| 18% | 22% | 25% |

Or, it could have negotiated an additional line in the renewal provision in ¶ 4(c), indicating, for example, that "revenue sharing will continue at 25% through the renewal period." The Parties did not do so.

Under these circumstances, a judge's job is clear. <u>Matter of Wallace v. 600 Partners Co.</u>, 86 N.Y.2d 543, 547-48 (1995) ("transposing, rejecting, or supplying words to make the meaning of the contract more clear . . . is appropriate only in those limited instances where some absurdity has been identified or the contract would otherwise be unenforceable either in whole or in part.")

The language that the Parties deliberately chose should govern their relationship. The Panel should not look past the clear and unambiguous terms of the Compact. <u>Wallace</u>, at 548 ("clear, complete writings should generally be enforced according to their terms"). It is compelling to me that all of the Nation's actions and assertions during negotiations and signing of the Compact are consistent with the plain terms of the Compact. It is significant that, in more than 14 years since the Compact was negotiated, signed, and implemented, the Nation has never said or done anything inconsistent with its interpretation of the Compact today. That the Nation owed (at least) 14 years of revenue sharing payments is unambiguous. It is crystal clear. And the Nation made 14 years of revenue sharing payments.

In my view, the Compact reflects revenue sharing terms that are fixed and clear. When written and signed, these terms provided for the Compact to remain in effect, under renewal, for a period from two to seven years after the final revenue sharing had ended. The Panel need not proceed beyond the terms of the Compact. In my view, the Panel's decision properly cites the applicable law in cases such as <u>Jade Realty LLC v. Citigroup Commercial Mortgage Trust 2005</u>, 20 N.Y.3d 881, 884 (2012) and <u>Matter of Wallace v. 600 Partners Co.</u>, 86 N.Y.2d 543, 548 (1995), but the Panel fails to apply these cases faithfully.

Though the revenue sharing percentage and the length of the Compact were hotly contested during negotiations, the Panel agrees that the Compact says nothing about revenue sharing beyond the fixed terms through Year 14 identified in the Compact. The result that the Panel reaches can be achieved only by inferring or assuming provisions that are absent from the Compact. In awarding hundreds of millions of dollars of Indian gaming revenues to the State, the Panel has essentially written a new provision into the Compact. The new provision creates a term that benefits the State, but it is not a term for which the State bargained.

To its credit, the Panel has made the new provision clear: "Years 15-21 - 25%." It is, however, entirely made up. It is a provision that does not exist. This is contrary to law. See Reiss v. Financial Performance Corp., 97 N.Y.2d 195, 199 (2001) ("[c]ourt will not imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms . . .." (citing Haines v. City of New York, 41 N.Y.2d 769 (1977)); see also Tonking v. Port. Auth., 3 N.Y.3d 486, 490 (2004) ("[W]e are unwilling to rewrite the contract and supply a specific obligation the parties themselves did not spell out"). Indeed, the very simplicity of the Panel's new provision makes clear how easy it would have been for the parties to express such a term if one had been intended.

The effect of the Panel's decision, of course, is to take resources from the Nation that the State appears not to have explicitly requested in negotiations or included in the terms of the Compact. As a result, the State has received from this Panel a benefit that it failed to obtain in Compact negotiations. The Panel's new provision rewrites the Compact in a way that harms the Nation and provides an unjustified windfall to the State.

**I. Ambiguity**

The Panel finds that the Compact is ambiguous about what was intended regarding revenue sharing during the renewal period, ultimately concluding that "reading the Compact to require the State to provide the Nation with an additional seven years of rights to exclusivity without any [additional] consideration is commercially unreasonable." (Partial Final Award at III.D.4.)

It is remarkable that a contract that the Panel concludes is ambiguous on its face can be interpreted to require the Nation to pay the State what likely amounts to hundreds of millions of dollars of gaming revenues. It is more reasonable to expect that a party who wishes to receive hundreds of millions of dollars from another party to explain its expectations clearly in the contract. See Jade Realty LLC v. Citigroup Commercial Mortgage Trust 2005-EMG, 20 N.Y.3d 881, 884 (2012) (reversing trial court's decision for judicial revision of contract on grounds that application of contract's literal language did not result in absurdity or unenforceability despite terms that were unconventional). It is true that the law allows such an outcome in a contract determined to be ambiguous, but only if there is adequate evidence to support it. In my view, the State has not met the burden of persuasion of proving that it is entitled to revenue sharing beyond the end of 14 years of gaming. See Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995) ("in an ordinary contract action, the party claiming a breach carries the burden of persuasion.").

If I were to view the contract as ambiguous, and proceed to examine the extrinsic evidence, I see no evidence in the record indicating that the State negotiated for a share of the Nation's gaming revenue during the renewal period. I see no evidence anywhere in the record that the State even mentioned the issue during negotiations. The State produced extensive detailed notes of each negotiation session. None of the State's own evidence suggests that the

State fought for or considered the issue. It is not unreasonable at all to expect that a party who wishes to receive hundreds of millions of dollars from a counterpart to mention the issue during negotiations. See <u>Greenfield v. Philles Records, Inc.</u>, 98 N.Y.2d 562, 573 (Ct. App. 2002) ("silence does not equate to contractual ambiguity").

In the face of a damning lack of evidence that revenue sharing during the renewal period was contracted for, or negotiated for, I think that the State and the Panel simply seem to be proceeding on an assumption that this is what the State would have wanted if the State had bargained for it. I do not doubt that the State wishes for a share of gaming revenues during the renewal period and would have wanted such revenues at the time of contracting, if the State had considered the issue. But the negotiations were hard fought, took several years in total, and produced a carefully negotiated outcome that failed to include revenue sharing during the renewal period. It is not an irrational outcome.

If I were to agree with my Panel colleagues that the Compact is ambiguous as to revenue sharing during the renewal period, I would look for evidence, even a modest glimmer of extrinsic evidence that the parties had thought about the issue. As explained further below, none exists.

**A. Extrinsic Evidence**

The only asserted extrinsic evidence cited by the State about the meaning of the contract is the Nation's utter silence about these matters. But silence is no evidence at all. It is the absence of evidence. In the pleadings and in the hearing, the State places great weight on the fact that the Nation did not brag about the extraordinary good terms it negotiated for the renewal period. The Nation did not include it in the talking points it used to explain the Compact to its people (<u>See</u> July 5, 2001, "FREQUENTLY ASKED QUESTIONS GAMING MOU/COMPACT WITH NEW YORK STATE," CX-23), and also failed to mention it in a letter to the Secretary of the

Interior, who was reviewing the Compact, (October 11, 2002 letter from D. Pongrace to G. Skibine, CX-31). This is the "dog that didn't bark" argument, or perhaps better termed the "rooster that didn't crow" argument.

The State asks, if the Nation had this view at the time it signed the Compact, why didn't the Nation make it plain in the negotiations? Why didn't it brag about this negotiation success at every opportunity, including when explaining the deal to its own people and when it responded to inquiries from DOI?

A plausible answer is, of course, that renewal was a long way off and was in no way a certainty. (See Nation Closing Stmt., Hearing Tr. at 288:15-289:16.) Whether renewal would happen at all was entirely within the State's discretion. It was not a fait accompli. Bragging about an advantage that would accrue, if at all, 14 years hence and only with the State's approval would be absurd; it would hardly be considered a tremendous victory in negotiations. The Panel characterizes renewal as "automatic," but it was not "automatic" in the ordinary sense. The State maintained full discretion over whether renewal would occur. Renewal was simply the default outcome if the State did not object.

Silence is said to be golden, but the larger problem is that the State too was utterly silent.[1] In life, as well in the law of contracts, one gets what one negotiates. If the State had made plain its understanding about what revenue sharing rate, if any, would apply during the renewal period and if its claim had gone uncontested in the negotiations, then the State would have a compelling

---

[1] In its briefing and the hearing, the State made much of the absence of attorney, Donald R. Pongrace, who negotiated for the Nation. The State, however, was the party seeking to introduce very weak extrinsic evidence. For the State, it was presumably more advantageous to highlight his absence than to risk calling Mr. Pongrace as a witness. If the State had tried, perhaps the Nation would have objected. If so, this might have supported the State's argument. In the absence of such an effort, however, the State's argument is not compelling.

point. But there is not a whit of evidence from the State supporting its own interpretation. The State offered no public words of any sort to which the Nation might have responded.

Most notable is that the State failed to tell DOI that it expected to earn a revenue share during the renewal period. In a letter to the Parties shortly after receiving the Compact, DOI explicitly asked questions about revenue sharing. (September 30, 2002 Letter from G. Skibine to G. Pataki, CX-29.) This information was crucial to the agency because it was acting as a federal regulator; the primary purpose of this federal review is to allow the federal government, acting in its capacity as trustee of the tribe, to ensure that the state is not taking advantage of the tribe. See 25 U.S.C. § 2710(d)(8)(b)(iii). In responding to question from the federal regulator about the Compact, the State carefully explained the revenue sharing arrangement in its letter. (October 11, 2001 Letter from J. McGuire to G. Skibine, CX-30.) It failed to mention revenue sharing in the renewal period which the State now asserts is worth several hundreds of millions of dollars.

To me, this omission is compelling. If the State believed that it was entitled to revenue sharing during the renewal period, it should have come clean with the federal regulatory agency that was reviewing the transaction and not hidden this expectation.

The two obvious explanations for the omission are: 1) the State was deliberately misleading the federal regulatory agency, or 2) the State's letter fully explains the revenue sharing anticipated from the Compact. The necessary implication in the Panel's decision is that the State either purposefully or inadvertently misinformed the federal regulatory. Purposefully deceiving the federal regulatory agency would be a potential federal criminal violation. Inadvertently doing so would constitute negligence. In other words, the implication of the Panel's decision is that the State was behaving either criminally or negligently about the facts.

7

I am more inclined to think that the State was being honest with the federal regulator and that the revenue sharing periods carefully explained in the State's letter are the entirety of the revenue sharing contemplated under the Compact. This is the simpler answer. But if this is true, and the State officials were being forthcoming with the regulator, the Nation's central assertions in this case are correct and the Nation must prevail.

Aside from this important public statement to a federal regulator, the State also fails to identify any internal documents in its possession that demonstrated its subjective intent. Ordinarily, such evidence would be inadmissible in a contract action, but it could be used here at least to verify the State's claim that it indeed expected such revenue.

Remember that this Compact was certain to be worth hundreds of millions of dollars to the State and was ultimately worth more than a billion dollars. (See Sheridan Stmt. at ¶ 36.) Yet, the State produced no briefing memo to the Governor about the Compact decision. It produced no briefing memo for a signing ceremony or ribbon-cutting. It offered no briefing memorandum from the Pataki administration to the Spitzer transition team. There is simply no evidence to support the State's claim. Moreover, the State's witness, Robert Williams, took extensive notes that are comprehensive and credible. Nowhere do they reflect any discussion of revenue sharing during the renewal period.

In sum, the State's silence damns the State's position more than silence damns the Nation's position. The Nation's silence is explained easily by the facts. The State's silence, on the other hand, is inexplicable.

Consistent with what both Parties explained to DOI, the Nation has argued that the payment for exclusivity lasts for 14 years, but that the exclusivity could last from 16 to 21 years, depending on when gaming began under the Compact. The only affirmative evidence in the

record that reaches this issue is the extrinsic evidence that the Nation rejected the State's open-ended approach to revenue sharing for the period of "7+ years" and negotiated for a closed-end period of revenue sharing to which the State eventually agreed, providing revenue sharing of 25% through "years 8-14." (See "Conceptual Agreement: Parameters of a Nation-State Gaming Compact," at 5, RX-15; June 20, 2001 MOU at 4, CX-22.) This evidence was not really controverted by the State. The State's witness, Mr. Williams, asserted in a statement and testimony that he had no recollection of this exchange or why the State proposed an open-ended term. (Williams Second Stmt. at ¶ 8; Hearing Tr. 133:2-4.) Indeed, Williams had apparently failed to disclose his notes regarding this period in discovery, at least in this case. On the basis of extrinsic evidence, the Nation's argument and evidence would seem to resolve the matter.

The Nation claims that this solution produced a breakthrough in the negotiations because it allowed the State to claim that it was getting 25%, at least for some portion of the time period for which there was gaming. (Hearing Tr. 116: 20-23.) The Nation's argument rings true, in part, because a compromise between the Parties was reached soon thereafter, and it embodied the Nation's terms. In response, the State argues that the demand for 25% revenue sharing was sacrosanct and non-negotiable. (See e.g., May 21, 2001 Meeting Notes at 5, CX-18). But the clear terms of the Compact belie that claim. Revenue sharing was less than 25% for the first seven years of gaming.

We know not why particular compromises are reached. This is an agreement that was signed by political officials of sovereign governments, not business people. According to one of the State's own negotiators, the 25% revenue share was "political, not economic." Statement of Claim, at p. 17, ¶ 50 (quoting Patrick Kehoe). Because of the substantial revenue it was destined to provide for 14 years, the Compact was likely considered to be a major victory for the State.

The Panel should not award hundreds of millions of additional dollars in specific performance based entirely on the absence of affirmative evidence.

In 2016, the State, of course, had the opportunity to object to renewal. That it failed to do so may well reflect that it had a misunderstanding about what a different governor had negotiated more than 14 years earlier. But the best evidence of the compromise that was then reached is reflected in the specific terms of the Compact. If the State had expected to obtain hundreds of millions of dollars in the renewal period, common sense suggests that the State would not have left such an important matter ambiguous.

On the other hand, the reason that the Nation may have negotiated no revenue sharing in the renewal period is obvious, even beyond the economics of the agreement. From the Nation's perspective, the lack of revenue sharing in the renewal period would presumably bring the State more quickly to the negotiation table to work out terms for a new compact. This would not be the first Indian gaming compact that contained a provision that forced renewed negotiations before the end of a compact. If a compact expires, it creates serious risk for the tribe and hundreds or perhaps thousands of its gaming employees.

As written, the provision would have the effect of encouraging the State to come to the table to negotiate a new compact before the current one expired. Indeed, in this case, the original negotiations appear to have begun in 1998 and the Parties did not have an approved gaming compact until 2002. In other words, it took three to four years to achieve an approved compact. As a practical matter, the State is more likely to return to the table if there is a period of time when it is earning no revenue share. It is neither absurd nor commercially unreasonable to believe that the Nation might have sought to create such an incentive in the distant years of a lengthy gaming compact.

It is also not absurd to hypothesize that a governor who was in the midst of campaigning for a third term might have been more interested in a negotiation victory than in drawn out negotiations. <u>Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC</u>, 20 N.Y.3d 438, 445 (2013) (parties enter into contracts "for all sorts of reasons"). The deal was signed by Governor Pataki in the summer of 2002. That fall, he was re-elected to a third term. Who knows whether the fact that revenue sharing would end 14 to 19 years later was a significant concern? We can't know because we have no evidence.

In sum, the only affirmative extrinsic evidence strongly supports the Nation's argument, and the Nation's argument better fits the known facts.

**B. Context**

The Nation supports its argument by separating the Compact term length which provides for gaming of up to 21 years from the revenue sharing payment term which explicitly extended only 14 years. The Nation explains that, although the Compact runs for 21 years, the gaming would not (and indeed cannot) continue for 21 years because the gaming did not begin on Day One of the compact. The Compact required only that the gaming commence within five years (60 months) from the Effective Date of the Compact. Compact at ¶ 12(a)(3)(ii). It was thus possible that no gaming would occur in the first five years of the Compact.  If gaming had commenced at the far end of the window negotiated by the Nation and the State, gaming under the Compact would have lasted only 16 years.

The Nation's argument is compelling, in part, because successful development of an Indian gaming operation in a matter of weeks or months is exceedingly unusual in Indian gaming. The State's own witness, Robert Williams, used words like "unbelievable," "fantastic" and "remarkable," as well as "all the moons and the stars aligned" when discussing the Casino's opening a mere three weeks after the Compact was approved. (Williams Cross Examination,

Hearing Tr. at 194:17-19 ("unbelievable how quickly we were able to make things happen"); id. at 196:16-18 ("in 90 days they went from a hole in the roof to a fantastic looking facility"); id. at 196:2 ("Nation was remarkable")). The early opening was fortuitous, but by no means foregone at the time of negotiating.

The federal regulatory review alone is usually quite time consuming. For myriad reasons, a federal approval for a new Indian gaming operation is time-consuming, especially if it involves some sort of construction. Aside from the business considerations, construction in these circumstances usually requires some level of environmental review because it potentially implicates a "significant effect on the human environment" requiring either a full Environmental Impact Statement or an Environmental Assessment followed by a Finding of No Significant Impact under the federal National Environmental Policy Act.

Significant construction was contemplated here. The Convention Center was to be converted to a casino, needing to meet not only the physical expectations of casino patrons, but also the federal regulatory requirements of a gaming operation. Even under the regulatory rules that existed at the time, an Indian gaming operation was required to have video surveillance of every physical space where gaming occurred. For purposes of gaming machines, video cameras were required to capture the face of the patron and the front of a gaming machine sufficient so that the payout line can be clearly seen. As a practical matter, this rule necessarily would have required installing literally hundreds of video cameras and a video surveillance center so that officials can surveil each physical space where gaming occurred. See Final Rule, National Indian Gaming Commission Minimum Internal Control Standards, 25 CFR Part 542, 64 Federal Register 590, 622-23 (Jan. 5, 1999) (describing the requirements for video surveillance in the then-newly-enacted 25 C.F.R. 542.15).

Such construction also no doubt required the development of significant financing. In this case, the construction was happening presumably in December, when winter was coming on and apparently roof repairs were needed. (Williams Cross Examination, Hearing Tr. at 196:17 ("in 90 days they went from a hole in the roof to a fantastic looking facility")). I understand that this region of New York receives significant snowfall each winter and it stands to reason that the construction project faced the risk that winter would set in before the transformation could be completed.

The construction was only one complication. In this case, the acquisition of land by the Nation was also a significant issue because IGRA generally forbids gaming on land acquired by an Indian tribe after its enactment in 1988, 25 U.S.C. § 2719, and only allows gaming on "Indian lands," which the Convention Center property did not then appear to constitute. In most ordinary instances, the lands issues alone would have taken at least months or, more likely, years. In the best-case scenario, the process would require the development of a federal Indian lands opinion, which requires cooperation by two different federal agencies, DOI and the National Indian Gaming Commission. Here, the matter was especially complicated because it involved a novel interpretation of the law related to Indian lands. Moreover, a local Member of Congress objected. (Nation Opening Stmt., Hearing Tr. 59-61.)

Months or years of delay did not ensue of course. In circumstances that Mr. Williams conceded was a minor miracle, (Williams Cross Examination, Hearing Tr. at 194:6-17), the Nation successfully navigated the federal Indian gaming bureaucracy and overcame the formidable financing and construction challenges in a matter of weeks or months, and somehow managed to commence gaming within three weeks of the Effective Date of the Compact.

I fear that my Panel colleagues do not appreciate the unlikelihood of this outcome and, therefore perhaps, discount the Nation's argument. Although the Compact extended for 21 years, it was extremely fortuitous that it actually will involve almost 21 years of gaming. In the ordinary course of Indian gaming, it might well have taken years to commence gaming, with the outcome that the first 14 years of the Compact may have involved several years less of actual gaming, causing the revenue sharing to extend much farther into the "renewal" period.

In sum, the Nation has stated a plausible explanation as to why a reasonable person might have interpreted the Compact to provide for 14 years of payments for exclusivity that ultimately involved 16 to 21 years of gaming. The payment period was simply not intended to sync with the length of the Compact. It was not linked at the front end of the Compact because the payments were not required until gaming commenced, and it need not have been linked to the back end of the Compact because the Compact only provides clearly for 14 years of payments.

The State's strongest argument, which the Panel accepts, is that exclusivity is the central *quid pro quo* for the revenue sharing and that revenue sharing should thus continue co-extensively with the exclusivity. In my view, the State has provided no evidence that this necessarily follows or that this is the bargain that was struck. Revenue sharing was not, of course, the central purpose of the Compact; the State was required by federal law to negotiate a compact with the Nation. 25 U.S.C. § 2710(d)(7)(B)(iii).

**C. Intent of the Parties**

The record suggests that the Parties may have been more focused on the near term implications than on the long term implications of the renewal period, which would not begin, if at all, at least until 14 years after the Compact went into effect. From the record, I am fully satisfied that revenue sharing during the renewal period was not a focus of discussion. It does not

14

appear to have been mentioned at all. There are natural explanations for such circumstances. Indeed, the Compact was signed not by lawyers, but by political leaders. Political leaders surely have the best interest of their constituents in mind, but they can be criticized for being focused more on the next news cycle or at most the next election. As Patrick Kehoe noted, "the 25% share to the State" was "political, not economic. Statement of Claim, at p. 17, ¶ 50. Political actors might well choose to focus more on the near term rather than what might happen 14 to 19 years later. The renewal period was simply not the primary focus of negotiations. If the key language was overlooked by the State, I suspect that this would not be the first time that a lawyer negotiated favorable language in the portions of a contract that he or she knew would receive less attention.

One might naturally ask why the State allowed the renewal to go into effect if it meant the end of revenue sharing payments. It is possible that the State was under the misapprehension, nearly 14 years later, that the revenue sharing payments would continue during the renewal period. How could such a misapprehension have occurred? At the time of renewal, the State was on its fourth gubernatorial administration since the compact was signed. Robert Williams is apparently the only public servant who has remained involved from the State's perspective and he likely had a natural inclination to view the Compact through rose-colored lenses. (See Williams Cross Examination, Hearing Tr. at 153-157.) It is an unenviable position to have to explain to Governor Cuomo why his administration is suddenly earning less in revenue sharing than the previous administrations. The Panel's finding that the Compact is ambiguous is a damning finding for the State's negotiators of the Compact.

It seems likely that state political officials failed to examine the Compact language closely through subsequent administrations. The Panel's finding that the language is ambiguous

presumably means that any state official reading the Compact for the first time should have had a sinking feeling upon reading it. In light of the ambiguity found by the Panel, no official could have been confident that the Nation's contributions to the State would continue. Hundreds of millions of dollars hung in the balance. From the State's perspective, if it expected to receive revenue sharing during the renewal period, it should have made such a requirement clear and given the Nation notice that it was demanding hundreds of millions of dollars beyond what was required on the face of the Compact.

## II. A Meeting of the Minds?

The record makes clear that, although the amount of revenue sharing and the term length were hotly negotiated, neither party explicitly discussed revenue sharing during the renewal period. The State did not demand it, and the Nation did not discuss it either. From a practical standpoint as an arbitrator seeking to answer these questions, it would be far more satisfying to have some evidence in the record. The Parties seemingly could not have been more successful in avoiding discussion of this issue if they had tried. Indeed, perhaps it was deliberate avoidance because the Parties were interested politically in resolution and were willing to overlook those items on which they could not reach agreement.

On the evidence, it is possible to presume that both Parties acted in good faith. On that presumption, it is possible to posit the following facts. First, the State concluded the Compact negotiations somehow assuming in good faith that they would receive revenue sharing payments as long as the Compact was in place, including during the renewal period.[2] Second, the Nation

---

[2] The problem is that, from the State's perspective, the Compact is at best ambiguous on this point and the State did not use language in the Compact adequate to put the Nation on notice about the State's expectations. The Nation was entitled to have clear notice that it would be giving up hundreds of millions of dollars of revenue. Thus, this conclusion is not entirely satisfying.

concluded the Compact negotiations believing in good faith that they had negotiated well and achieved a 14-year revenue sharing period for a period of 16 to 21 years of gaming.[3]

In sum, if we take both Parties at good faith, it is possible to conclude that the Parties never really achieved a meeting of the minds as to revenue sharing during the renewal period. Indeed, this may be the best reading of the entire record, which is largely devoid of substantial evidence on this issue.

If the Parties left the compact negotiations without agreement on revenue sharing during the renewal period, then there is an obvious solution. One could rationally conclude that the Parties reached agreement on the terms that would apply during the first 14 years of the Compact, and the Compact served its purpose during that time, but that the Parties simply did not reach agreement on revenue sharing during the renewal period.

If the Parties did not reach an agreement, then the Panel has nothing to enforce, through specific performance or otherwise. In other words, the State has no clear entitlement to revenue sharing, but likewise the Nation has no clear entitlement to renewal on terms to which the State did not agree. The solution would be for the Panel to leave the parties where it found them, with a good faith, though unfortunate, disagreement that cannot be resolved through interpretation of what our Panel chairman, Judge Bassler, called a "meshugas[4] contract." (Hearing Tr.: 277:19.)

---

[3] The problem for my colleagues on the Panel, as I understand it, is that there is little objective evidence that the Nation placed the State on notice of the Nation's understanding in this regard. Though the Nation did nothing inconsistent with its view of the Compact through the entire course of its performance under the Compact, the Nation waited until after the date passed for notice of non-renewal to notify the State that revenue sharing payments would end shortly after renewal.
[4] This is a Yiddish word meaning "craziness." For an essay on the word and its recent popularity, see "Philologos: Some Yiddish Words Jump into American English Quickly. Others Take Much Longer." Mosaic Magazine (May 24, 2017), avail at: https://mosaicmagazine.com/observation/2017/05/some-yiddish-words-jump-into-american-english-quickly-others-take-much-longer/

Under my view, the more traditional option, in such circumstances, would be to enforce the Compact as written because the State took the risk that it would receive only 14 years of payments when it signed the Compact. For the State, the revenue sharing terms are ambiguous at best, as the Panel so concludes. While it is potentially unfair to the State to hold the State to what it actually negotiated which is perhaps far less than what it expected, the record is devoid of any evidence that the Nation agreed to make revenue sharing payments during the renewal period. It is not commercially reasonable to expect to receive hundreds of millions of dollars from a Compact that is ambiguous as to that right. While such ambiguity could be overcome with real evidence, it is not overcome here. If the State wished to take hundreds of millions of dollars of Indian gaming revenues, it could easily have expressed its expectation much more clearly in the Compact.

Rather than enforce the Compact as written, my colleagues on the Panel are inclined to use a variety of interpretive tools to create a substitute term. They assume, not entirely unreasonably, that the State would not have agreed to provide exclusivity during a period in which they were not receiving revenues and thus that revenue sharing should last as long as the Nation is gaming under this Compact. The problem is that there is no evidence that the Nation agreed to that term or that the State demanded it.[5] The Panel's outcome is unfair to the Nation

---

[5] I, too, was willing to be creative in the spirit of compromise. For me, it would have turned on the meaning of the term "renewal" in light of the Panel's conclusion that the word was ambiguous. At the hearing, the State explicitly rejected the notion that the "renewal" was an "extension" of the Compact. (State Closing Stmt., Hearing Tr. at 337:5-11). Moreover, each of the definitions provided by the State, from three different dictionaries, suggest that renewal means essentially to start over at the beginning. For example, the State quotes the American Heritage Dictionary for the notion that renew means "to make new or as if new again; restore" and also "[t]o start over." And a definition that the State italicized in its brief was this one: "to restore to the same condition as when new, young or fresh" from the Oxford English Dictionary (2018). Finally, the State offers the following from Merriam Webster: "to make like new," to do again, or to begin again." The Panel adds an additional definition, from Black's Law Dictionary (6th ed. 1990): "To renew a

because there is no evidence, other than silence, that the Nation agreed to it. The law does not allow such a result.

**IV. The Broader Context of Federal Law**

For the record, I also believe that the Panel's interpretation of the Compact is inconsistent with federal law and policy. A compact is, in essence, a treaty between a state and a tribe. According to the Supreme Court, in a case rising out of New York, "it is well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit[.]" County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 247 (1985) (internal citations omitted). Thus, if the Compact is ambiguous, then the Nation should prevail.

Congress enacted IGRA "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments[.]" 25 U.S.C § 2702. In 1988, President Ronald Reagan signed the law in hopes of seeing Indian tribes become more self-sufficient. When a tribe is forced to pay such a substantial portion of its revenue to state governments, it challenges the very foundations of IGRA. Less than one half of one percent of tribal state gaming compacts provide for such a large amount to revenue sharing to a state.[6] At a minimum, such a provision is controversial.

---

contract means to begin again or continue in force the old contract."). If the word "renewal" is ambiguous, it would be reasonable to interpret the word consistently with so many dictionary definitions as requiring the parties to start at the beginning with regard to revenue sharing. If my colleagues on the Panel had been willing to accept the State's dictionary definitions and Black's Law Dictionary at face value and agreed that the rate during the seven-year renewal would "begin again" with the rate provided in the first seven years of the Compact, I would have been willing to hold my nose and join my Panel colleagues in a compromise.

[6] Government Accountability Office, Indian Gaming: Regulation and Oversight by the Federal Government, States, and Tribes, GAO Report 15-355 (June 2015), at 17, avail. at: https://www.gao.gov/assets/680/670603.pdf.

If, as the Panel admits, the Compact is ambiguous as to the revenue share during the renewal period, DOI cannot be said to have considered and reviewed or approved this key provision. While the Compact indeed contains an arbitration clause, which the Secretary did not disapprove, the Panel's decision has the effect of enforcing an agreement that goes beyond what was approved by DOI, thus potentially undermining DOI's important regulatory role. This federal policy context is not irrelevant in interpreting a federally-approved compact that the Panel claims to be ambiguous.

For all of these reasons, I respectfully dissent.

***

I, Kevin Washburn, do hereby certify as Arbitrator that I am the individual described in and who executed this instrument, which is my Dissent from the Partial Final Award in this matter.

Date __January 7, 2019_____ .

_____
Arbitrator, Kevin Washburn