

THE SECRETARY OF THE INTERIOR

WASHINGTON

NOV 1 2 2002

The Honorable George E. Pataki
Governor of New York
Albany, New York 12224

Dear Governor Pataki:

We have completed our review of the Tribal-State Gaming Compact (Compact) for the conduct of Class III gaming activities between the Seneca Nation of Indians (Nation) and the State of New York (State), executed on August 18, 2002, and received by the Department on September 10, 2002. Generally, the Compact authorizes the Tribe to conduct Class III gaming at three sites: an identified area within the City of Niagara Falls, or an alternative site within the County of Niagara; an unidentified area within the County of Erie or the City of Buffalo; and an on-reservation site. The Compact requires that the Tribe pay the State a percentage of the Tribe's gaming revenue in exchange for several benefits including an exclusive 10,500 square-mile area in Western New York and start-up benefits, provided by the State. The Tribe agrees to purchase the gaming sites with funds from the Seneca Nation Settlement Act of 1990, 25 U.S.C. § 1774 (Settlement Act) reserving five million dollars for housing adjacent to the gaming sites.

Under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2710(d)(8)(C), the Secretary may approve or disapprove the Compact within forty-five days of its submission. If the Secretary does not approve or disapprove the Compact within forty-five days, IGRA states that the Compact is considered to have been approved by the Secretary, "but only to the extent the compact is consistent with the provisions of [IGRA]." Under IGRA the Department must determine whether the Compact violates IGRA, any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or the trust obligations of the United States to Indians.

As part of the Department's review of the Compact, on September 30, 2002, we sent a letter to the parties seeking clarification of various provisions of the Compact. The responses we received from the State and the Nation have resolved most of our questions, as well as resolving some additional issues raised by non-compacting parties. We have also held several meetings and conference calls with the parties to discuss the Compact and our concerns.

I have decided to allow this Compact to take effect without Secretarial action. I use this approach reluctantly. In enacting IGRA, Congress provided limited reasons for Secretarial approval or disapproval. However, because I want to express my views on important policy

R00006630

concerns regarding the Compact, concerns that fall outside of the limited reasons in IGRA for Secretarial disapproval, I must avail myself of the opportunity to do so. I believe the State and Nation negotiated in good faith, however, I could not affirmatively approve the Compact because of the effect it is likely to have on future compacts.[1]

General Observations

Since taking office, I have had the opportunity to review and decide a number of Indian gaming-related matters. I do not have the luxury of reviewing any compact without considering the trends that will emerge with each successive compact. As I have reviewed this and previous compacts, my concerns regarding IGRA and the interplay with other aspects of Indian policy have become sufficient to warrant this explanation.

I fully support Indian gaming as envisioned by the drafters of IGRA – that Indian tribes should have the full economic opportunity of gaming within the boundaries of reservations existing at the time of IGRA's passage. But I am also mindful that when tribes seek to game on off-reservation land, the State has a greater governmental interest in regulating tribal off-reservation gaming activities. Tribes are increasingly seeking to develop gaming facilities in areas far from their reservations, focusing on selecting a location based on market potential rather than exercising governmental jurisdiction on existing Indian lands. It is understandable that tribes who are geographically isolated may desire to look beyond the boundaries of their reservation to take advantage of the economic opportunities of Indian gaming. However, I believe that IGRA does not envision that off-reservation gaming would become pervasive.

Even with this concern in mind, I have concluded that this Compact appropriately permits gaming on the subject lands because Congress has expressly provided for the Nation to acquire certain lands pursuant to the Settlement Act. I am nevertheless concerned that elements of this Compact may be used by future parties to proliferate off-reservation gaming development on lands not identified as part of a Congressional settlement but instead on lands selected solely based on economic potential, wholly devoid of any other legitimate connection. Thus, to the extent that other states and tribes model future compacts after this one, and seek to have the United States take land into trust for these gaming ventures, they should understand that my

---

[1] It seems to me that the Department and compacting parties could work more closely on an informal basis to improve the compact development and review process. While I do not want to intrude into the parties' arms-length negotiations, I am concerned that the Department receives a compact that is a fait accompli without much opportunity for the Department to express its policy views, except as part of the 45-day review process. Thus, as the process currently works, compacting parties have only the guidance of previous compacts as a starting point for the parameters of their negotiations. I believe that the process would be enhanced if both parties availed themselves of the Department's informal guidance prior to the delivery of their finalized compact to my desk for review. At times, parties have been able to make changes during the 45-day review process, however, the parties here informed the Department that it would be impossible to make changes to this Compact within the review period. Departmental input, prior to the compact being submitted, might have been extremely helpful here.

2

R00006631

views regarding land acquired through a Congressional settlement are somewhat different from my views when a tribe is seeking a discretionary off-reservation trust acquisition or a two-part determination under IGRA. While I do not intend to signal an absolute bar on off-reservation gaming, I am extremely concerned that the principles underlying the enactment of IGRA are being stretched in ways Congress never imagined when enacting IGRA.

<u>Revenue Sharing and Geographic Exclusivity</u>

Section 12(a) of the Compact grants the Nation the exclusive right to operate specifically defined gaming devices within a 10,500 square-mile, geographic area in Western New York.[2] In exchange for this geographic exclusivity right, Section 12 requires the Nation to make graduated revenue-sharing payments to the State (from 18% to 25% of net drop, less a local share) over the course of the 14-year duration of the Compact. If the State violates the exclusivity provision in Section 12(a)(1), the payment to the State ceases as to the particular category of gaming device for which exclusivity no longer exists. If the State violates the exclusivity provision in Section 12(a)(2), the payment to the State ceases altogether.[3]

The Department has sharply limited the circumstances under which Indian tribes can make direct payments to a state for purposes other than defraying the costs of regulating Class III gaming activities. To date, the Department has approved payments to a state only when the state has agreed to provide the tribe with substantial exclusivity for Indian gaming, *i.e.*, where a compact provides a tribe with substantial economic benefits in the form of a right to conduct Class III gaming activities that are on more favorable terms than any rights of non-Indians to conduct similar gaming activities in the state. The payment to the state must be appropriate in light of the exclusivity right conferred on the tribe.

The Nation and the State have advanced arguments that the geographic exclusivity defined in Section 12(a)(1) of the Compact is substantial and meaningful, pointing out that this zone of exclusivity is a 10,500 square-mile area in Western New York that, based on professional analysis of the market from which the Nation's gaming facility would draw, includes primary (up to 50 miles), secondary (51-99 miles), and tertiary (100-150 miles) customer markets for any

---

[2] Section 12(a)(1) of the Compact provides the following description of the geographic area: "(i)to the east, State Route 14 from Sodus Point to the Pennsylvania border with New York; (ii) to the north, the border between New York and Canada; (iii) to the south, the Pennsylvania border with New York; (iv) to the west, the border between Pennsylvania and New York."

[3] The Department asked if the Nation's exclusive right to operate slot machines within the zone of exclusivity was lost and the Nation therefore ceased making revenue payments, whether it would violate the provision of New York law permitting the possession of slot machines only pursuant to a gaming compact where the · State receives a negotiated percentage of the net drop. The State has argued that by negotiating this Compact with the Nation that includes the receipt of a negotiated percentage of the net drop, it has met its obligation under the law, even if revenue payments decline to zero. We concur with the State's interpretation of the meaning of its law and conclude that the State has met its legal obligation.

3

R00006632

established Buffalo and Niagara Falls gaming facility. According to the economic analysis provided by the Nation, the total revenues currently anticipated from the gaming operations over the term of the Compact, exceed five billion dollars, of which the State would receive less than one billion dollars, and a portion of those State funds would go to local governments. The Nation estimates its anticipated return after all expenses to significantly exceed two billion dollars over the fourteen-year term of the Compact.

The Nation argues that exclusivity in a gaming market of this size is extremely valuable and justifies on its own the average seventeen percent revenue share that the State will receive under the Compact after the local payment. However, the Nation and the State argue that the State is also providing the Nation with other substantial benefits in exchange for the revenue share. Section 11 of the Compact commits the State to transfer the Niagara Falls Convention Center for the sum of one dollar, which will enable the Nation to realize substantial savings, approximately forty million dollars, on otherwise significant development and start-up costs. Other forms of State assistance that the Nation bargained for and obtained are the State's agreement to use its sovereign power of eminent domain to acquire other parcels of land required for the project. Finally, Section 11 of the Compact secures for the Nation the opportunity to operate two off-reservation gaming facilities within the populous and well-visited geographic markets of Buffalo and Niagara Falls.

While I believe that the Nation is receiving a substantial economic benefit that justifies the revenue sharing, I am very troubled that the parties have chosen to exclude other tribes within the area of geographic exclusivity. The Compact creates two areas of exclusivity – one the entire Western portion of New York and another a twenty-five-mile radius of any gaming facility authorized under this Compact. Those provisions support my conclusion that the revenue sharing is justified. However, the drafters of this Compact have excluded Indian gaming from most of the area of exclusivity. The choice to specifically deny other tribes gaming opportunities is the primary reason I have chosen not to affirmatively approve this Compact.

It is worth noting, however, that the Compact does create an exception for two non-compacting tribes, the Tuscarora Indian Nation and the Tonawanda Band of Seneca Indians, in both of these areas of exclusivity. Without violating the terms of the Compact, the State may negotiate with these Tribes to establish a gaming facility either on federally-recognized Indian lands existing on the effective date of this Compact or outside of the twenty-five-mile radius within Western New York.

The Tonawanda Band and the Tuscarora Nation have notified us that they strongly object to approval of the Compact because, in their view, it violates the trust obligation of the United States to the two Nations by including provisions that explicitly restrict the economic opportunities that would otherwise be available to them under federal law, without their consent. There is no question that in approving the Compact, the Department would essentially ratify an agreement that has the effect of restricting the economic opportunities of the Tonawanda Band and the Tuscarora Nation because the State has a strong incentive not to permit these two Nations

4

R00006633

to conduct gaming off-reservation within the twenty-five mile (exclusivity) radius, to avoid losing revenue-sharing payments to which it is otherwise entitled from the Nation.

I have reviewed whether this provision violates our trust obligation to Indians, and I conclude that it does not. Under the terms of the Compact, the State does not violate the exclusivity provision of the Compact if the Tonawanda Band and the Tuscarora Nation game on existing federally-recognized Indian lands. Thus, there is no disincentive to the State to negotiate for on-reservation gaming activities. The remaining question is, therefore, whether any tribe enjoys a legal right to off-reservation gaming under IGRA. I believe that Congress in enacting IGRA, struck a delicate balance between State and tribal interests that did not create an absolute right to off-reservation gaming.

Even though this provision does not violate my trust obligation to Indians, I am still troubled that parties in future compacts may pit tribe against tribe. While I believe that it was unintentional here, especially because both the Tonawanda Band and the Tuscarora Nation are regarded as traditionally opposed to gaming, I do not welcome the prospect of future compacts pitting tribes against one another. While I understand that the State is required to negotiate in good-faith with all Indian tribes and it has assured us that it understands its obligation under law, I still find a provision excluding other Indian gaming anathema to basic notions of fairness in competition and, if pushed to its extreme by future compacts, inconsistent with the goals of IGRA.[4]

To summarize, this Compact provides for substantial geographic exclusivity coupled with other valuable consideration. It is for this reason that I believe this revenue-sharing arrangement is consistent with IGRA.

## Lands Acquired through the Seneca Nation Settlement Act

Subsections 11(b)(4) and (c) of the Compact provide for the use of settlement funds derived from the Seneca Nation Settlement Act of 1990, 25 U.S.C. § 1774 (Settlement Act) to "acquire the parcels in the City of Niagara Falls and the City of Buffalo" for the purpose of gaming. Under the terms of the Settlement Act, the Nation may use settlement funds to acquire "land within the aboriginal area in State or situated within or near proximity to former reservations lands." The Settlement Act also provides that unless the Secretary determines that lands acquired pursuant to the Act should not be subject to 25 U.S.C. § 177, such lands shall be held in "restricted fee" as opposed to being held in trust by the United States.

In reviewing whether the proposed gaming parcels meet the Settlement Act's requirement that the lands are "situated within or near proximity to former reservations lands," the Nation has

---

[4] Moreover, notwithstanding this or any other provision of this Compact, the Department will continue to entertain any Section 20 two-part determination applications submitted by an Indian tribe within the State of New York pursuant to IGRA.

5

R00006634

provided sufficient documentation demonstrating that the exterior boundaries of the Nation's former Buffalo Creek Reservation overlap a portion of the present day boundary of the City of Buffalo and is within fourteen miles of the City of Niagara Falls exterior boundary. Moreover, the exterior boundary of the Nation's former Tonawanda Reservation is within fourteen miles of the City of Buffalo and within twenty-two miles of the City of Niagara Falls. While the Settlement Act does not define "within or near proximity" and there is no legislative history for guidance, it is our opinion that the two cities of Niagara Falls and Buffalo are "situated within or near proximity to" the Nation's former Buffalo Creek and Tonawanda reservations for purposes of the Settlement Act.

I want to emphasize, however, that the analysis regarding off-reservation land as part of a Congressionally-approved settlement greatly differs from the analysis the Department engages in when the issue is simply a trust acquisition for off-reservation gaming. Here, Congress tied the acquisition of lands through the Settlement Act to lands in "near proximity" to the Nation's former reservation. This decision rests squarely on a Congressionally-approved settlement of a land claim. Consequently, my analysis of "within or near proximity" should be understood as limited to the interpretation of the Settlement Act alone.

Indian Lands under IGRA

IGRA permits a tribe to conduct gaming activities on Indian lands if the tribe has jurisdiction over those lands, and only if the tribe uses that jurisdiction to exercise governmental power over the lands. There is no question that the Settlement Act requires the parcels to be placed in "restricted fee" status. As such, these parcels will come within the definition of "Indian lands" in IGRA if the Nation exercises governmental power over them. The Department assumes that the Nation will exercise governmental powers over these lands when they are acquired in restricted fee. It is our opinion that the Nation will have jurisdiction over these parcels because they meet the definition of "Indian country" under 18 U.S.C. § 1151. Historically, Indian country is land that, generally speaking, is subject to the primary jurisdiction of the Federal Government and the tribe inhabiting it. As interpreted by the courts, Indian country includes lands which have been set aside by the Federal Government for the use of Indians and subject to federal superintendence. In this regard, it is clear that lands placed in restricted status under the Settlement Act are set aside for the use of the Nation, and that such restricted status contemplated federal superintendence over these lands. Finally, the Settlement Act authorizes lands held in restricted status to expand the Nations' reservation boundaries, or become part of the Nation's reservation. Accordingly, we believe that the Settlement Act contemplates that lands placed in restricted status be held in the same legal manner as existing Nation's lands are held and thus, subject to the Nation's jurisdiction.

Application of Section 20 of IGRA

Section 20 of IGRA, 25 U.S.C. § 2719 contains a general prohibition on gaming on lands acquired in trust by the Secretary for the benefit of an Indian tribe after October 17, 1988, unless

R00006635

one of several statutory exceptions is applicable to the land. Under the Compact, the Nation plans to use the provisions of the Settlement Act to acquire the land in restricted fee, rather than in trust. The Department has examined whether Section 20 of IGRA applies to the Compact. We have reviewed whether Congress intended, by using the words "in trust" in Section 20 of IGRA, to completely prohibit gaming on lands acquired in restricted fee status by an Indian tribe after October 17, 1988. I cannot conclude that Congress intended to limit the restriction to gaming on after-acquired land to only *per se* trust acquisitions. The Settlement Act clearly contemplates the acquisition of Indian lands which would otherwise constitute after-acquired lands. To conclude otherwise would arguably create unintended exceptions to the Section 20 prohibitions and undermine the regulatory regime prescribed by IGRA. I believe that lands held in restricted fee status pursuant to an Act of Congress such as is presented within this Compact must be subject to the requirements of Section 20 of IGRA.

The legislative history to the Settlement Act makes clear that one of its purposes was to settle some of the Nation's land claim issues. Thus, the Nation's parcels to be acquired pursuant to the Compact and the Settlement Act will be exempt from the prohibition on gaming contained in Section 20 because they are lands acquired as part of the settlement of a land claim, and thus fall within the exception in 25 U.S.C. § 2719(b)(1)(B)(i).

## Use of Remaining Settlement Act Funds for Housing

Section 11(c) of the Compact provides for the "acquisition of parcels to meet the housing needs of the Nation's members." IGRA provides that a gaming compact will govern gaming activities on Indian lands of the Indian tribe and "may include provisions relating to . . . any other subjects that are directly related to the operation of gaming activities." It has been the policy of the Department that a Class III gaming compact can only include provisions that are "directly related" to the operation of gaming activities, and cannot include provisions that are not germane to gaming activities. The Department has taken this position because it represents a common sense approach to the interpretation of IGRA.

In response to our inquiry, the Nation has advised us that land acquired for housing under Section 11(c) of the Compact is directly related to the operation of gaming activities because the primary purpose in acquiring such parcels is to provide housing for tribal members next to the Nation's gaming facilities. However, because Section 11(c) of the Compact does not require any relation to the gaming activities, we believe that the Nation's argument that this provision is directly related to gaming is tenuous and strains the directly related criterion required by IGRA.

## Conclusion

In conclusion, while I believe that the Nation and the State worked hard to negotiate a Compact that met the parties' immediate needs, I believe the policy considerations outlined above counsel against an affirmative-approval. Since I did not approve or disapprove the Compact within 45 days, the Compact is considered to have been approved, "but only to the

7

R00006636

extent the compact is consistent with the provisions of [IGRA]." The Compact takes effect when notice is published in the *Federal Register* pursuant to Section 11(d)(3)(B) of IGRA, 25 U.S.C. § 22710(d)(3)(B).

Sincerely,

Gale A. Norton

Identical letter sent to:
The Honorable Cyrus Schindler
Seneca Nation

8

R00006637