

STATE OF NEW YORK
EXECUTIVE CHAMBER
ALBANY 12224

GEORGE E. PATAKI
GOVERNOR

JAMES M. McGUIRE
COUNSEL TO THE GOVERNOR

October 11, 2002

George T. Skibine
Director, Office of Indian Gaming Management
Bureau of Indian Affairs
U.S. Department of Interior
1849 C Street NW, MS 2070-MIB
Washington, DC 20240-0001

Dear Mr. Skibine:

I write in response to your letter of September 30, 2002, which requests clarification and/or additional documentation concerning the Nation-State Gaming Compact (the "Compact") recently submitted by the State of New York (the "State") and the Seneca Nation of Indians (the "Nation") for review and approval by the Secretary of the Interior (the "Secretary").

1.  **Niagara Falls Convention Center.**

Under separate cover, we will be providing the documentation you request relating to the purchase, lease and lease back of the Niagara Falls Convention Center and Lackey Plaza in the City of Niagara Falls.

2.  **The provision dedicating $5 million of funds derived from the Seneca Nation Settlement Act to meet the housing needs of the Nation is directly related to the operation of gaming activities.**

By virtue of Paragraph 11(b)(4) of the Compact, $5 million in funds derived from the Seneca Nation Settlement Act of 1990, 25 U.S.C. § 1774 et seq. (the "Act"), will remain available to the Nation after the expenditure of funds derived from the Act for the gaming facility sites in the cities of Buffalo and Niagara Falls. The Nation agreed to dedicate the remaining funds derived from the Act for "the acquisition of parcels to meet the housing needs of the Nation's members." Compact ¶ 11(c). In turn, the State agreed to support the Nation both in developing the housing projects and with respect to any notification by the Nation under Section 1774 of the Act for a housing development. For the reasons set forth below, the provision of Paragraph 11(c) of the Compact dedicating the remaining $5 million for the housing needs of the Nation's members (the "dedication provision") is "directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii).

What is of decisive importance here is that the Compact provides that the housing parcels "shall be physically and immediately contiguous and adjacent to either: (i) an existing reservation of the Nation, or (ii) the sites referenced in Paragraph 11(a)(1) and 11(a)(2) [the gaming facility sites located in, respectively, the City of Niagara Falls and the City of Buffalo]..." Compact ¶ 11(c). The purpose and effect of this provision is to enable the Nation not only to meet the legitimate housing needs of Nation members who become casino employees, but to do so with land that enjoys all the benefits of restricted fee land pursuant to Section 1774f (c) of the Act.

Absent these provisions, Nation members would be constrained to commute approximately 50-80 miles from existing Nation lands or to find non-tribal housing closer to the gaming facilities. To be sure, no provision of the Compact precludes the Nation from acquiring all the housing parcels at a reservation on which it does not elect to establish a gaming facility. There is no rational reason, however, for the Nation so to act. More to the point, the absence of such a provision does not undercut the central point: the provisions of Paragraph 11(c) of the Compact enable the Nation to meet the legitimate housing needs of Nation members who become casino employees through the acquisition of parcels of land enjoying all the benefits of restricted fee status pursuant to Section 1774f (c) of the Act.

Even if the dedication provision of Paragraph 11(c) of the Compact did not "directly relate[]" to the operation of gaming activities," it would not thereby afford a basis for disapproval of the Compact. No provision of the Indian Gaming Regulatory Act of 1988, 25 U.S.C. § 2710 et seq. ("IGRA"), prohibits the inclusion in a compact of a provision that is not "directly related" to gaming activities. Rather, the relevant section of IGRA provides merely that a compact "may include" provisions relating to a number of specified subjects and "any other subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710 (d)(3)(C)(vii) (emphasis added). Nor is there any need to adopt a strained construction of Section 2710 (d)(3)(C)(vii) that would prohibit the inclusion of subjects that are not so "directly related." The provisions of Section 2710 (d)(8)(B)(iii) of IGRA, after all, authorize the Secretary to disapprove a compact which violates "the trust obligations of the United States to Indians." This substantive authority, rather than essentially formalistic and necessarily imprecise judgments about whether or not compact provisions are sufficiently related to gaming activities, provides the Secretary with an adequate and far more appropriate basis upon which to disapprove a compact.

3. **The broad and substantial exclusivity rights that the Nation has bargained for provide it with valuable economic benefits that are more than sufficient to justify the payments that the Nation has agreed to make in exchange for such rights.**

The bargained-for agreement by the Nation to make payments to the State in exchange for the exclusive right to offer slot machines and video lottery terminal devices in a vast region of New York State is entirely consistent with IGRA as well as precedents of the Secretary approving payments from a tribe to a State where the tribe is "purchasing a valuable right from the State," including an exclusive right to install and operate slot machines. Letter from Ada Deer, Assistant Secretary, Indian Affairs, to Chief Ralph Sturges, Mohegan Tribe of Indians of Connecticut, at 2 (December 5, 1994).

Paragraph 12 of the Compact grants sweeping exclusivity rights to the Nation with respect to the operation of two highly lucrative types of gaming devices: slot machines and video lottery gaming devices (collectively, the "gaming devices"). The State has granted the Nation these exclusivity rights within a vast geographical area of nearly 11,000 square miles – an area roughly twice the size of the State of Connecticut – in the western part of New York. Compact ¶ 12 (a) (1). No person or entity may install or operate either gaming device in this zone of exclusivity, with the exception of only the Tuscarora Indian Nation (the "Tuscarora") and the Tonawanda Band of Seneca Indians (the "Tonawanda"). Id. ¶ 12 (a) (1), (2). Even if the State were to enter into compacts with the Tuscarora or the Tonawanda authorizing the use of these gaming devices, any such gaming facility must be located more than 25 miles from any gaming facility authorized by the Compact unless it is located on federally recognized Indian lands existing as of the effective date of the Compact. Id. ¶12 (a) (2).

As consideration for its purchase of these valuable exclusivity rights from the State, the Nation agreed to provide payments to the State in accordance with a sliding-scale based on the "net drop" (gross money wagered, after payout but before expenses) from the gaming devices for which exclusivity has been granted. Id. ¶ 12(b)(1). The Compact provides that the Nation shall pay the State 18% of the net drop from the gaming devices in the first four years after gaming commences pursuant to the Compact, 22% of the net drop in years five through seven and 25% of the net drop in years eight through fourteen. Id. These sliding-scale provisions of the Compact enable the Nation to retain a greater share of the net drop in the earlier stages of the development of its gaming facilities, thereby enhancing the Nation's ability to cover its start-up costs. And the phased-in nature of the payments reduces significantly the overall effective rate of the payments over the life of the Compact. Further, a minimum of 25% of the funds received by the State pursuant to the Compact shall be made available to local governments hosting the gaming facilities to defray the costs associated with such facilities – costs the Nation might otherwise bear. N.Y. State Finance Law §99-h (McKinney 2002).

In the event that any entity or person (other than the Tuscarora or the Tonawanda) is permitted to operate either of the gaming devices within the zone of exclusivity, the Nation's obligation to make payments to the State completely ceases with respect to the type of gaming device for which exclusivity no longer obtains. Id. ¶ 12 (a)(4). If the State permits another Indian nation to establish a Class III gaming facility within a 25-mile radius of any gaming facility authorized under the Compact on lands other than federally recognized Indian lands existing as of the Compact's effective date, the Nation's obligation to make payments shall cease immediately as to all categories of gaming devices. Id. ¶ 12 (a)(5).

First and foremost, the exclusivity rights purchased by the Nation effectively establish a Nation monopoly in the zone of exclusivity over the operation of slot machines and video lottery gaming, a monopoly the Nation will enjoy to its exclusive benefit unless and until the Tuscarora or the Tonawanda tribe begin operation of such devices. Currently, no person or entity – Indian or non-Indian – is authorized to operate either gaming device in the zone of exclusivity. Indeed, the economic benefits to the Nation from the exclusivity rights are significantly enhanced by the fact that

even outside the zone of exclusivity in New York State, no person or entity is authorized to operate slot machines and no non-Indian person or entity is authorized to operate video lottery gaming devices.[1]

These bargained-for exclusivity rights purchased by the Nation pursuant to the Compact unquestionably will provide enormous economic benefits to the Nation. Given the total exclusivity within Western New York, the large population of the zone (some 2.7 million people), and its ready accessibility to visitors from other states and Canada, the economic benefits to the Nation of these exclusive rights to operate slot machines and video lottery gaming devices are truly extraordinary. Indeed, the New York State Task Force on Casino Gambling has estimated that, even excluding visitors from Canada, a stand-alone casino in Western New York could attract 6.4 million visitors a year and a resort-style casino could attract 10.5 million visitors a year.[2] In light of the broad and substantial exclusivity offered by the State and the vast economic benefits that will flow to the Nation, the payments required under the Compact are lawful and appropriate.

Indeed, in many respects, the terms and conditions agreed to in the arm's length negotiations between the Nation and State provide the Nation with benefits beyond what may be required by IGRA. Thus, for example, the Compact provides that in the event that any entity or person (other than the Tuscarora or the Tonawanda) is permitted to operate either of the gaming devices within the zone of exclusivity, the Nation's obligation to make payments to the State completely ceases with respect to the type of gaming device for which exclusivity no longer obtains, regardless of the restrictions and limitations that may be imposed on such entity or person. Id. ¶ 12 (a)(4). Thus, although the Compact could have provided for a reduction in the payments required by the Nation in proportion to the extent to which the value of the exclusivity rights was reduced by the operation of a gaming device on significantly less favorable terms,[3] the Nation bargained for and obtained a provision completely and immediately eliminating its obligation to make payments with respect to the particular gaming device.

---

[1] The issue of whether or not the Oneida Nation of New York ("ONY"), which operates the Turning Stone Casino in Central New York, is authorized to operate electronic gaming devices known as Instant Multi-Game is in litigation. The State instituted a suit in the United States District Court for the Northern District of New York seeking to enjoin the continued use of those machines on the grounds that they were not among the list of approved games annexed to the compact between the State and ONY and have not been added to the list of approved games in accordance with the terms of the compact. See State v. Oneida Indian Nation of New York, Civil Action No. 95-CV-0554.

[2] Report of the New York State Task Force on Casino Gambling at 44 (August 30, 1996) (available upon request).

[3] We understand that a provision requiring only a reduction in the payments otherwise due to a state in the event of such a reduction in the value of exclusivity rights enjoyed by a tribe is permissible under IGRA. See Letter from Kevin Gover, Assistant Secretary, Indian Affairs, to George E. Pataki, Governor of New York at 1 (July 26, 2000) ("any event that eliminates or reduces the exclusivity enjoyed by a tribe must trigger the elimination of, or a reduction in, the tribe's payment obligation") (emphasis added).

-4-

The value to the Nation of this bargained-for provision is underscored by the enactment last year of a New York statute authorizing the operation of video lottery gaming devices at certain racetracks in New York, including three racetracks located within the zone of exclusivity. See N.Y. Tax Law § 1617-a (McKinney 2002). If any racetrack within the zone is licensed by the New York Division of the Lottery to install and operate these devices, the Nation will be under no obligation at all to make payments to the State based on the net drop realized by the Nation's operation of video lottery gaming devices. That is so even though Section 1617-a limits substantially the hours during which video lottery gaming can occur at the racetracks (to 10:00 a.m. through 10:00 p.m. on Sundays through Thursdays and 12:00 p.m. through 12:00 a.m. on Fridays and Saturdays and, in the discretion of the Division of the Lottery, on public holidays and the day preceding such holidays).[4] Section 1617-a (b). And this is true even if Section 1617-a is not extended prior to or after the date it is scheduled to expire and be deemed repealed (three years after the date on which video lottery gaming begins operation in at least one racetrack). Act of Oct. 29, 2001, N.Y. Laws of 2001, ch. 383, pt. C §4.

Furthermore, the Nation retains the ultimate ability to determine whether to make any payments to the State. The Nation is under no obligation under the Compact to operate either gaming device. If the Nation begins operations with both gaming devices and subsequently loses the exclusive rights to operate one of the devices, the Nation is free to decide to stop operating with the other device, thereby completely eliminating its obligation to make any payments to the State.

Finally, under the Compact the State has agreed to provide other important benefits to the Nation, the most notable of which is the State's agreement to transfer title to the Nation to the Niagara Falls Convention Center and Lackey Plaza on highly favorable terms. Compact ¶ 11(b)(2). As the Nation itself points out, the State thereby provided crucial financial assistance to the Nation that so significantly reduced its capital costs for the initial gaming facility in Niagara Falls as to make the facility feasible. Letter from Donald R. Pongrace and Barry W. Brandon to George T. Skibine, Director, Office of Indian Gaming Management, dated October 11, 2002, at 10-11.

In sum, the payments agreed to by the Nation in the compact – the product of arm's length negotiations between the Nation and State – represent the purchase of valuable, exclusive rights to operate slot machines and video lottery gaming devices in a vast region of New York State. In light of the broad and substantial exclusivity and the associated economic benefits conferred upon the Tribe, the Nation's purchase of these exclusivity rights is lawful and appropriate.

4.  **Class III gaming is permissible under IGRA on the parcels of land to be acquired by the Seneca Nation in the City of Buffalo and the City of Niagara Falls.**

As you know, Section 11 of the Compact provides for the use of settlement funds derived from the Seneca Nation Settlement Act of 1990, 25 U.S.C. § 1774 et seq. (the "Act"), to acquire parcels of land in the cities of Buffalo and Niagara Falls for the purpose of conducting Class III

---

[4]By contrast, there is no limitation on the hours of operation under the Compact.

gaming. The Department requests additional documentation and explanation concerning the position of the State: (i) that the parcels either are within the aboriginal area of the Nation or are situated within or in near proximity to former reservation land; (ii) that the parcels qualify as "Indian lands" under 25 U.S.C. § 2703(4)(A) or (B); and (iii) on the applicability of 25 U.S.C. § 2719. Our response is set forth below.

*(i) The parcels are situated within or in near proximity to former reservation land.*

Section 1774f(c) of the Act authorizes the use of settlement funds to purchase land that is either within the Seneca Nation's "aboriginal area in the State or situated within or near proximity to former reservation land . . ." (emphasis added). Both parcels are, at the very least, in "near proximity" to former reservation land.

In the 1797 Treaty of Big Tree ("Big Tree"), 7 Stat. 601, the Seneca Indians transferred to Robert Morris all their interest in a tract of land lying within the State of New York as to which the Commonwealth of Massachusetts had the right of preemption pursuant to the 1786 Hartford Convention. Big Tree expressly "except[ed]" from such transfer and "reserv[ed]" to the Senecas a number of parcels of land in the western part of New York, each of which is depicted on the map annexed hereto as Exhibit A. Those reserved parcels included "two hundred square miles to be laid off partly at the Buffalo and partly at the Tonnawanta [Tonawanda] creeks" (the "Buffalo Creek Reservation" and the "Tonawanda Reservation," respectively). 7 Stat. 601, 602.[5]

As is shown by maps prepared by the New York State Office of General Services and attached hereto as Exhibit B, the northwest corner of the former Buffalo Creek Reservation actually lies within the city limits of the present day City of Buffalo and is less than 15 miles from the city limits of the present day City of Niagara Falls. Moreover, the western boundary of the former Tonawanda Reservation is only 22 miles from the City of Niagara Falls.

Although the Act contains no definition of the term "near proximity," the common definition of proximate is "close" See, e.g., Webster's New International Dictionary 1828 (3rd ed. 1986). Depending on the precise location of the parcel to be acquired in the City of Buffalo, the site will be either within or adjacent to the boundaries of the Buffalo Creek Reservation or at most just a few miles away. Under any rational reading of the Act, any parcel acquired in the City of Buffalo will be within "near proximity" to former reservation land.[6] The same conclusion applies with respect

---

[5] Thereafter, by treaty entered into in August 31 1826, the Senecas transferred large portions of the two reservations. See Anthony F.C. Wallace, The Death and Rebirth of the Seneca 324 (Alfred A. Knopf ed. 1969); William Sturtevant, 15 Handbook of North American Indians 452 (1978); Report of Special Committee to Investigate the Indian Problem of the State of New York 144, 145-46 (1889). Any remaining rights of the Seneca in the reservations were extinguished at the time of the 1838 Treaty of Buffalo Creek. See 7 Stat. 550, 557-80; see also 1842 Treaty at Buffalo Creek, 7 Stat. 586, 587-88.

[6] To be sure, under the Compact the site could be located not in the City of Buffalo proper, but within the County of Erie. This possibility, however, is of no legal moment since any site within the County of Erie would be within "near proximity" to former reservation land. After all, the former Buffalo Creek Reservation stretched across

to the parcel within the City of Niagara Falls, since the City lies within 22 miles of the boundary of the former Tonawanda Reservation and 15 miles of the boundary of the former Buffalo Creek Reservation.

In other contexts, Congress, the federal courts and federal agencies have concluded that geographic distances in the 15 to 35 mile range satisfy requirements of "proximity" or "close proximity." For example, Congress specified 18 miles as the allowable proximity of lands to be exchanged by the Secretary in relation to the Navajo Reservation. 25 U.S.C. § 640d-10(b); see also Mount Elliot Cemetery Ass'n v. Troy, 171 F. 3d 398, 407-08 (6th Cir. 1999) (addressing claim of exclusionary zoning, which required showing that the land use sought by petitioner did not otherwise occur "within close geographical proximity" of the city's boundaries, court found that use occurring within 16 miles of city limits was in close geographical proximity); Athens Community Hosp., Inc. v. Shalala, 21 F.3d 1176, 1178 (D.C. Cir. 1994) (discussing and noting earlier decision upholding Department of Health and Human Services regulation for re-designation of hospital's geographic designation, used to determine medical reimbursement rates, that required "close proximity" to the redesignated area and defined "close proximity" as "35 road miles"); United States v. Atofina Chemicals, Inc., 2002 WL 1832825 at *5 n.4 (E.D. Pa. 2002) (EPA's Supplemental Environmental Project Policy, which provides agency guidelines for allowing beneficial projects to mitigate civil penalties for environmental violations, requires "adequate nexus" between project and violation, which turns in part "on geographic proximity" of project and violation; 50 miles is benchmark for determining such proximity).

Moreover, the Act was intended to "effectuate and support the Agreement between the city [of Salamanca] and the Seneca Nation . . . ." 25 U.S.C. § 1774 (b)(1). That agreement provides that settlement funds "may be used, at the Nation's option, to acquire lands to increase the land base of the Seneca Nation . . . ." Agreement, Part VI (E), reprinted in H.R. Rep. No. 101-832 (1990). Although the parties could have limited land acquisitions to areas contiguous to the Nation's existing reservations, they did not do so. Instead, the Act provides broadly for land to be purchased anywhere within the Nation's aboriginal area or within or in near proximity to any former reservation lands. Thus, a broad construction of the term "near proximity" is consistent with the intent of the parties and of Congress.

Relatedly, one of the central purposes of the Act is remedial in nature. See 25 U.S.C § 1774 (b)(2). Consistent with that purpose, the legislative history demonstrates that Congress believed the Act was necessary to rectify a "clear violation of the Nation's treaty obligation to the Seneca Nation." S. Rep. No. 101-511, at 6 (1990). Since remedial legislation in general, and legislation enacted for the benefit of Indian tribes in particular, is to be broadly construed, it is all the more appropriate for a broad construction to be given to the term "near proximity." See Alaska Pacific Fisheries, 248 U.S. 78 (1918) (statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the

---

Erie County bounded to the East by Wyoming County and to the West by Lake Erie. Thus, no point in Erie County is more than 31 miles from the reservation. See attached Exhibit C.

-7-

Indians); see also Sutton v. United Airlines, Inc., 527 U.S. 471, 506 (1999)(applying the "familiar canon of statutory construction that remedial legislation should be construed to effectuate its purposes"); United States v. Absentee Shawnee Tribe of Oklahoma on behalf of the Shawnee Nation, 200 Ct. Cl. 194, 199-200 (Ct. Cl. 1972)(remedial purpose of Indian Claims Commission Act would not be "served by narrowly or strictly construing the general use of the word 'claim' in the statute").

Accordingly, the parcels to be acquired fall squarely within the scope of the Act as they are "situated within or near proximity to former reservation land" of the Seneca Nation.[7]

*(ii) Lands acquired under the Act qualify as Indian Lands under IGRA.*

Pursuant to IGRA, the term "Indian lands" includes land that is subject to restriction by the United States against alienation and "over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4)(B). The Act plainly provides for land purchased with settlement funds to be subject to restriction against alienation and the exercise of tribal governmental power. By its express terms, Section 1774f(c) sets forth a two-step procedure for land to become subject to restricted fee status. First, the Secretary or the Nation must give notice of the "acquisition, or the intent to acquire" lands to State and local governments, which have 30 days to comment; and second, the Secretary has 30 days after the expiration of the comment period to decide whether the land should be "subject to the provisions" of the Non-Intercourse Act ("NIA"), 25 U.S.C. § 177. Absent a determination by the Secretary that the land should not be subject to the NIA, the land "shall be subject to the provisions of [the NIA] and shall be held in restricted fee status by the Seneca Nation." 25 U.S.C. § 1774f(c).

The unmistakable import of the Act is that any land that assumes restricted fee status under Section 1774f(c) is subject to the exercise of tribal governmental power. Indeed, Section 1774f(c) plainly links the tax status of land acquired with settlement funds to its restricted fee status. In fact, the stated purpose of the 30-day notice to State and local government is to allow for "comment on the impact of the removal of such lands from real property tax rolls of State political subdivisions." 25 U.S.C. § 1774f(c). See also H.R. Rep. No. 101-832, at 10-11 (1990) ("If the Nation buys additional land, this could result in loss of property tax revenue to local governments, since the land would become non-taxable").

Whether Indian-owned land is subject to state and local regulation (including, specifically, taxation), on the one hand, or tribal jurisdiction, on the other, turns on whether the land is considered to have the status of Indian country. See, e.g., Oklahoma Tax Comm'n v. Sac & Fox Nation, 508 U.S. 114, 125 (1993) (explaining that in determining whether states have jurisdiction to tax sales by Indian tribes on particular types of land, the Supreme Court "ask[s] only whether the land is Indian

---

[7] The Department need not reach the issue of whether the parcels are within the aboriginal area of the Seneca Nation. As you may know, the State has consistently taken the position that the Nation's aboriginal area was limited to the Genesee River Valley and did not extend to the Niagara region. The State maintains that position and expressly reserves its right to litigate the issue in any pending or future judicial action.

-8-

country"); Narragansett Indian Tribe v. Narragansett Elec. Co., 89 F.3d 908, 915 (1st Cir. 1996) ("'The Indian country classification is the benchmark for approaching the allocation of federal, tribal and state authority with respect to Indians and Indian lands'") (quoting Indian Country, U.S.A., Inc. v. Oklahoma, 829 F.2d 967, 973 (10th Cir. 1987)); Felix Cohen, Handbook of Federal Indian Law 27 (1982 ed.) ("[F]or most jurisdictional purposes the governing legal term is 'Indian country'").

Although Indian country is defined to include "reservations," "dependent Indian communities" and "allotments," the Supreme Court has made clear that the particular designation of the land is not determinative. See Oklahoma Tax Comm'n v. Citizen Band Potawatami Indian Tribe, 498 U.S. 505, 511 (1991) ("[T]he test for determining whether land is Indian country does not turn upon whether that land is denominated 'trust land' or 'reservation.' Rather, we ask whether the area has been validly set apart for the use of the Indians as such under the superintendence of the Government'") (quoting United States v. John, 437 U.S. 634, 648-49 (1978)).

Land that assumes restricted fee status under Section 1774f(c) meets both requirements. As the Tenth Circuit has stated, to satisfy the set-aside requirement, the federal government "must take some action indicating that the land is designated for use by Indians"; and in order for the superintendence requirement to be satisfied, there must be some indication that the federal government "is prepared to exert jurisdiction over the land." Buzzard v. Oklahoma Tax Comm'n, 992 F.2d 1073, 1076 (10th Cir. 1993). Here there is federal action — Congress' determination to grant the Nation broad rights in Section 1774f(c) of the Act to acquire lands, with funds appropriated pursuant to the Act, over which it would exercise tribal jurisdiction -- which satisfies both criteria. And, of course, upon a determination by the Secretary that lands so acquired shall be held in restricted fee status, there is additional federal action satisfying the set-aside and superintendence requirements. Compare id. (refusing to find Indian country status where the restriction against alienation without approval of the Secretary of the Interior was imposed by the tribe's own charter), with United States v. Roberts, 185 F.3d 1125, 1135 (10th Cir. 1999) (finding that land had Indian country status where, among other things, the Bureau of Indian Affairs ("BIA") had "approved the land acquisition" and the "state considered the land to be beyond its taxing jurisdiction").

That Section 1774f(c) confers tribal jurisdiction over land acquired in restricted fee status under the Act is also demonstrated by the last sentence of that provision. That sentence permits acquired land that is contiguous to one of the Nation's existing reservations to become "part of and expand" the boundaries of such reservation "in accordance with procedures established by the Secretary for this purpose." 25 U.S.C. § 1774f(c). The BIA's procedures for transferring land into reservation status apply only to land already subject to tribal jurisdiction. See Department of the Interior Guidelines For Proclamations §4 (explaining that notice given to state and local governments "should remind the governing entity that [the proposed] action is simply an administrative function"). Thus, by providing that land enjoying restricted fee status pursuant to Section 1774f(c) could become part of a reservation, Congress further confirmed that such land was subject to tribal jurisdiction.

We agree that land does not acquire Indian country status (and thereby become subject to tribal jurisdiction) merely by reason of the fact that it is held by an Indian tribe and subject to restriction against alienation. See Letter from Kevin K. Washburn, General Counsel to the National Indian Gaming Commission, to Hon. Jim Henson, Chief, United Keetoowah Band of Cherokee Indians of Oklahoma, dated September 29, 2000, at 3-4 (noting concern that a "tribe could unilaterally purchase land [and thereby] effectuate[] the removal of land from state jurisdiction and place[] it into federal jurisdiction with no action by either of these sovereigns"). But here Congress, not the Nation, has provided for land acquired under the Act to be removed from state jurisdiction and placed under federal (and tribal) jurisdiction absent an objection from the Secretary. In other words, it is not the restricted fee status of the land that alters its jurisdictional status; rather, that is accomplished by the Congressional directive that this particular restricted fee land shall be exempt from state taxing jurisdiction upon the Secretary not disapproving such status. Consequently, finding that the Nation will exercise governmental power over lands purchased under the Act does not implicate the concerns expressed in the Henson letter.

*(iii) Section 2719 does not apply to lands acquired under the Act.*

By its express terms, the prohibition set forth in Section 2719 (a) of IGRA applies only to lands "acquired by the Secretary in trust" for the benefit of a tribe after October 17, 1988. Land acquired pursuant to the Act, by contrast, is acquired by the Nation and is not acquired by the Secretary "in trust" for the Nation. Despite the express terms of Section 2719 (a), we understand that the Department is considering the view that the prohibition was intended to apply to all lands acquired after October 17, 1988, regardless of whether or not it was "acquired by the Secretary in trust." For a number of reasons, the prohibition cannot be so construed.

First, the Supreme Court has repeatedly made clear that congressional intent is to be determined in the first instance from the statutory language. When the statutory text is clear, legislative history is irrelevant. See, e.g., United States v. Gonzales, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history"); Ratzlaf v. United States, 510 U.S. 135, 147-48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear"), citing United States v. Wiltberger, 5 Wheat. 76, 95-96 (1820) ("Where there is no ambiguity in the words, there is no room for construction").

Here, the text of the statute is clear. It unambiguously refers to land "acquired by the Secretary in trust" and only such land. Congress' exclusive use of the term "in trust" is particularly telling because the sections of IGRA that define the term "Indian lands" and use that term to specify the lands on which gaming activities are lawful were adopted at the same time, and as part of the same piece of legislation, as Section 2719(a). Thus, in Section 2703(4)(B), Congress carefully differentiated between lands title to which "is held in trust by the United States" and lands title to which "is held by any Indian tribe . . . subject to restriction against alienation and over which an Indian tribe exercises governmental power." In construing this section, effect should be given to

-10-

every term. Duncan v. Walker, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute.... We are reluctant to treat statutory terms as mere surplusage in any setting" (internal quotations and citations omitted)); Williams v. Taylor, 529 U.S. 362, 404 (2002) (same). Accordingly, there is no rational basis for eliding in Section 2719(a) the distinction between trust lands and such restricted lands that Congress clearly made in other sections of IGRA.

Nor is such a basis supplied by the title of Section 2719, since the title is not part of the statute. "The title of a statute ... can not limit the plain meaning of the text. For interpretation purposes [it is] of use only when [it] sheds light on some ambiguous word or phrase." Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206, 212 (1998) (citations and internal quotations omitted). In any event, the title of subsection (a) reads "[p]rohibition on lands acquired in trust by Secretary." 25 U.S.C. § 2719(a)(emphasis added).

In short, well-established rules of statutory construction and the plain language of the statute lead inescapably to the conclusion that the prohibition of Section 2719(a) does not apply to lands acquired under the Act. Even if, however, the prohibition were read to apply to all lands acquired by a tribe after October 17, 1988, the lands acquired under the Act nonetheless would be lands on which Class III gaming may lawfully be conducted.

After all, by the express terms of Section 2719, the prohibition does not apply to lands "taken into trust" as part of a land claim settlement. 25 U.S.C. § 2719(b)(1)(B)(i). If the phrase "in trust" in subsection (a) is given a broad construction that includes restricted lands acquired by a tribe, a similarly broad construction must be given to the phrase "into trust" in subparagraph (B) of paragraph (1) of subsection (b) of Section 2719. In other words, there is no rational basis for broadly construing subsection (a) to apply to restricted fee lands acquired by a tribe and narrowly construing the subsection (b)(1) exception to exclude such lands. See, e.g., Sullivan v. Stroop, 496 U.S. 478, 484 (1990)("[T]he normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning" (internal quotations and citations omitted)); Sorenson v. Secretary of Treasury, 475 U.S. 851, 860 (1986)(same).

The only remaining question then is whether lands acquired under the Act are acquired "as part of ... a settlement of a land claim." The answer to the question must be "yes", for the Act itself was enacted to settle a land claim. Indeed, in Section 1774 of the Act, which expresses Congress' findings and purposes, Congress made clear that it was acting on the basis of a long history of tribal land transactions that occurred "without Federal authorization or approval..." 25 U.S.C. § 1774(a) (2), (A), (B) and (C). Since the right to acquire lands that Congress provided for in Section 1774f (c) of the Act was accorded to the Seneca as part of a land claim settlement, lands obtained pursuant to the Act are acquired "as part of ... a settlement of a land claim."

I appreciate this opportunity to address these matters. The State stands ready to provide any additional documentation or clarification that might assist the Department.

Sincerely,

James M. McGuire
Counsel to the Governor

cc: Donald R. Pongrace, Esq.
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue N.W.
Washington D.C. 20036-1564

# THE DEATH AND REBIRTH OF THE SENECA

*Anthony F. C. Wallace*

WITH THE ASSISTANCE OF SHEILA C. STEEN



Alfred A. Knopf · New York

1 9 7 0

**Source for Exhibit A**



Exhibit "A"



Exhibit "B.1"



Exhibit "B.2"



ORIGINAL BUFFALO CREEK AND TONOWANDA INDAIN RESERVATIONS IN RELATION TO THE CITY OF BUFFALO AND THE CITY OF NIAGARA FALLS

GEORGE E. PATAKI
Governor
KENNETH J. RINGLER, JR.
Commissioner
NEW YORK STATE OFFICE OF GENERAL SERVICES

Prepared by: OGS Bureau of Land Management