# AKIN GUMP
## STRAUSS HAUER & FELDllp

Attorneys at Law

October 11, 2002

Mr. George T. Skibine
Director, Office of Indian Gaming Management
Bureau of Indian Affairs
U.S. Department of Interior
1849 C Street, N.W., MS 2070-MIB
Washington, D.C. 20240

Dear Mr. Skibine:

On behalf of the Seneca Nation of Indians ("the Nation"), we are pleased to respond to the questions submitted by your office by letter dated September 30, 2002 regarding the Nation-State Gaming Compact Between the Seneca Nation of Indians and the State of New York ("the Compact"), which was executed on April 18, 2002 and submitted to the Department of the Interior ("the Department") for approval on September 10, 2002. Below, we have provided written responses to each numbered question, along with copies of relevant documentation as indicated:[1]

1. We will provide to you on Monday, October 14, 2002, drafts of the documentation relating to the purchase, lease and lease back provision in the Compact. Set forth below is a brief description of the intent behind this provision and how it has been implemented in that documentation.

A.     Background on Section 11(b) of the Compact

As the Nation was beginning this project in early 2001, it requested proposals from interested developers to assist in financing and developing the overall project. Although the Nation ultimately interviewed several qualified bidders, the returns sought by each developer were consistently more than the Nation could agree to. Consequently, to ensure that the project benefited Nation members to the maximum degree possible, the Nation decided to forego a developer and undertake the project on its own.

This decision had significant ramifications for the Nation's compact negotiations because it meant that the Nation had to plan for a project that required a significant capital budget, with the understanding that the Nation's capital resources were limited, particularly in the initial phases of the project. Many of the key commercial points in the final Compact reflect this essential fact.

---

[1] Where capitalized terms are not otherwise defined in this document, they have the same meaning as set forth in the Compact.

As the Nation evaluated the compact proposals from the State, the Nation determined that the State could greatly extend the Nation's limited capital resources and bargained with the State to obtain such assistance. One key element of consideration for the Nation in this regard was the State's ability to transfer title for the Niagara Falls Convention Center ("Convention Center") to the Nation for a total purchase price of $1.00.[2] This dramatically reduced the capital expenditures that the Nation would otherwise have to make in the initial phases of the project, making it practically feasible for the Nation to proceed with it on its own.[3]

In essence, by working with the Nation to address the capital requirements of this self-developed project in its early phases, the State became the Nation's economic partner in it. For its part, the State asked the Nation to agree to: (i) repay the outstanding Empire State Development Corporation bonds ("ESDC bonds") as of July 1, 2001; and, (ii) and provide the State with additional revenue share from the Gaming Facilities.

The Nation's repayment obligation for the ESDC bonds is contingent on the Nation constructing and beginning operation of a permanent Gaming Facility in Niagara Falls. This contingency was inserted in order to ensure that the Nation would be able to accrue capital during the initial years of operation of the temporary Gaming Facility in the Convention Center and repay the bonds only upon successful transition to a permanent Gaming Facility.

It is important to note that the repayment of the ESDC bonds by the Nation is being made in the form of a contingent lease payment. The State could not directly loan the Nation capital for the project, but it was able to defer repayment of the bonds until some future date, at which time the Nation could readily afford to either repay the bonds from cash flow or finance the payment. The Nation and the State agreed that a logical contractual arrangement to provide a legally binding mechanism to accomplish this contingent repayment was a lease/leaseback agreement between the two parties. The lease payments, both the annual rent and the balloon rent payment for the ESDC bonds, are contractual obligations of the Nation and the State that are separate and independent of the land transfer.

We would emphasize that the purchase price of the Convention Center is only $1.00. If the Nation does not build a permanent Gaming Facility on the site in Niagara Falls, then the Nation's obligation to make the balloon payment on the sub-lease from the State never takes

---

[2] Other forms of State assistance that the Nation bargained for and obtained included, among others: (i) the State's agreement to use eminent domain to acquire other parcels of land required for the project that were not directly owned by the State; (ii) graduated revenue share; (iii) delaying revenue share payments during the initial phases of the project; (iv) assistance with housing projects contiguous to proposed gaming facilities for Nation members who are to work in such facilities; and (v) making local community payments to the host communities out of the total State revenue share.

[3] The estimated replacement value of the Convention Center is approximately $70-75 million, excluding the value of the land on which the Convention Center sits. The 12.9 acres on which the Convention Center sits is valued at approximately $12-15 million.

effect. In either event, the Nation will obtain and retain title to the Convention Center and the land on which it is located upon payment of $1.00 in funds appropriated by the Seneca Nation Land Claims Settlement Act ("SNLCSA")[4] and approval of the Compact by the Secretary.

In sum, the practical effect of this lease arrangement is that the State is providing the Nation with a form of interest free loan to assist the Nation in launching the project. This "loan" is repayable only if the Nation is successful in the venture and builds a permanent Gaming Facility to continue in its success. The loan repayment, in the form of the balloon rent payment, will be made, if at all, with either proceeds from the Gaming Facilities, or separate future financing.

B.    General Description of Land Transfer and Lease Documents[5]

    (1)    Land Transfer

The State is providing the Nation with a quit claim deed for the 12.9 acres on which the Convention Center sits and the improvements thereon.[6] Pursuant to an escrow agreement, the State will place the deed in escrow for its release to the Nation upon approval of the Compact by the Secretary and payment to the State of $1.00 in funds appropriated under the SNLCSA.

    (2)    Lease, Sublease, Sub-sublease

Upon receipt of title from the State, the Nation will lease the Convention Center to the Seneca Niagara Falls Gaming Corporation ("SNFGC"), a wholly owned, tribally chartered corporation charged with the responsibility for developing and operating the Niagara Falls Gaming Facility.

SNFGC will then sub-lease the Convention Center back to the State for a period of twenty-one years ("sub-lease"). The State will in turn sub-lease the Convention Center to SNFGC ("sub-sublease"). The annual rent shall be $1.00 per year in each instance. SNFGC has the option to purchase the State's interest in the sub-sublease, effectively removing the State from its position as a party to the leases, by paying the State a defined Supplemental Rent, which is equal to the value of the ESDC bonds as of July 1, 2001. The Nation has an obligation to pay such Supplemental Rent upon the Nation's construction of and initiation of operations at a permanent Gaming Facility on the site at Niagara Falls.

---

[4] 25 U.S.C. § 1774 et. seq.

[5] The key documents related to the land transfer and leases are as follows: (1) deed; (2) escrow agreement; (3) guaranty of payment of balloon rent payment; (4) non-disturbance agreement; (5) head-lease; (6) sublease; and (7) sub-sublease.

[6] The Nation is obtaining appropriate title insurance for this quit claim deed.

2.      The Department has asked the Nation to explain how the acquisition of land for housing under Section 11(c) is "directly related to the operation of gaming activities." Section 11(c) of the Compact provides that any SNLCSA funds remaining after the purchase of Niagara and Erie County land parcels identified under Section 11(a)(1) and 11(a)(2) will be used to acquire "parcels to meet the housing needs of the Nation's members." Both the Nation and the State agree that Section 11(b)(4) of the Compact, reserving $5 million of SNLCSA funds, will be used for the housing needs of the Nation as provided by Section 11(c).

As provided under Section 11(c), the housing parcels "shall be physically and immediately contiguous and adjacent to either (i) the existing reservation of the Nation, or (ii) the sites referenced in [Sections] 11(a)(1) and 11(a)(2) if actually acquired." Section 11(c) also provides that the State is to assist the Nation in developing such housing projects and shall assist the Nation with State and local notification of such acquisitions as required pursuant to the SNLCSA land acquisition provision, 25 U.S.C. § 1774f(c). Under 25 U.S.C. § 2710(d)(3)(C), IGRA states that provisions in a compact "may include provisions relating to . . . subjects that are directly related to the operation of gaming activities."

The land acquired for housing under Section 11(c) is directly related to the operation of gaming activities because the primary purpose in acquiring such parcels is to provide housing to tribal members employed by a Nation Gaming Facility and to allow those members to continue to reside on Nation lands while working at a Nation Gaming Facility. Such housing is integral to the operation of gaming activities, because Nation members working at Niagara County or Erie County facilities will be able to reside close to those Gaming Facilities, thereby ensuring tribal member employment at the facilities and also freeing up housing for other tribal members on existing Nation lands.[7]

The language of Section 11(c) also needs to be read in the context of the permissive phrasing of 25 U.S.C. § 2710(d)(3)(C), which states that the Compact "may" contain certain provisions "directly related to the operation of gaming activities." The Department has recognized that some elements of a gaming compact may address issues tangential to the operation of gaming activities, but still sufficiently related to the gaming operation to meet IGRA requirements. For example, the Department has permitted labor agreements related to casino employees to be included in gaming compacts. The Department should also consider that the Nation's negotiation of State assistance in acquiring land parcels for housing, as contained under Section 11(c), is a negotiated benefit of significant value to the Nation that is one of several

---

[7] In Section B of Appendix II to House Report No. 101-832, accompanying Public Law 101-503, the President of the Nation stated that with regard to use of SNLCSA funds, one of the long-term objectives of the Nation was use of funds for "land acquisition, which is necessary to address a critical land shortage which now forces many Nation members to live off the reservations." Therefore, Section 11(c) not only meets the operational needs of the gaming facilities in terms of housing gaming employees on Nation lands, but meets the Nation's general need for expanded housing on Nation lands.

factors to be considered in evaluating the appropriateness of the State revenue share under the Compact (as discussed in more detail below).

3.       The Department has approved payments to a State by a tribe in connection with a tribal gaming compact in situations in which the compact provides the tribe with a valuable right or benefit from the State, such as the right to conduct Class III gaming operations exclusively within a defined geographic area.[8] In determining whether a proposed state revenue share is appropriate, the Department has considered whether "the benefit received by the State in a compact is appropriate in light of the benefit conferred on the tribe."[9] In other words, the Department has examined the terms of the negotiated agreement to ensure the tribe receives economic benefits that justify the amount of revenue going to the State.[10]

The Nation obtained several valuable rights and benefits from the State in exchange for the revenue share being provided by the Nation to the State, including, among others:

(1)       The unique right to operate slot machines within the State of New York;

(2)       The exclusive right to operate Gaming Devices, as defined in the Compact, within a defined geographic market that has a resident population larger than many other States in the Union and over fourteen million visitors a year;

(3)       Financial assistance to the Nation during the critical start up phase of the operation in the form of, among other things: (i) transfer of a ready-to-use facility at the cost of $1.00; (ii) graduated revenue share; (iii) delay in payment of revenue share during initial years of operation; and (iv) agreement to use the power of eminent domain to obtain properties not owned by the State and transfer them to the Nation for current fair market value, thereby diminishing significantly the speculative escalation of land values and concomitant increase in cost to the Nation during the critical start up phase of the project; and

(4)       Assistance with housing projects contiguous to the project area in order to provide Nation housing for Nation members that wish to work at the Gaming Facilities in question.

As demonstrated below, the economic benefits that the State is providing to the Nation pursuant to the Compact readily justify the level of contribution that is to be paid to the State pursuant to Section 12(b) of the Compact.

---

[8] For example, in the decision approving the compact of the Mohegan Tribe of Connecticut on December 5, 1994, the Department recognized that it is permissible under IGRA for tribes to exchange Class III revenues "for an exclusive right to commercial operation of slot machines within a State."

[9] See Letter from DOI to Wampanoag Tribe of Gay Head (Aquinnah) in Massachusetts (July 23, 1996).

[10] See id.

# AKIN GUMP
## STRAUSS HAUER & FELD LLP
Attorneys at Law

A.    Valuable Rights and Benefits to the Nation

(1)    Unique Right to Operate Slot Machines within the State of New York

Prior to the enactment of the New York legislation that authorized the Governor to enter into this and certain other tribal gaming compacts, the operation of slot machines was prohibited in the State. This Compact provides the Nation with the ability to operate slot machines, a critical element to success of the project on the scale contemplated. Preliminary market studies undertaken by the Nation indicated that without slot machines any facility located in close proximity would have great difficulty competing with the gaming facilities located in Canada.[11]

Other compacts between the State of New York and tribes located in New York do not currently allow for slot machines, but do provide a limited revenue share to the State. The inclusion of slot machines in this Compact makes it unique in the State, providing the Nation with a significant marketing advantage for its Gaming Facility within the entire State, at least until such time as the other compacts authorized by the State Legislature are finalized or the State Legislature adopts new legislation authorizing slot machines. In any event, this Compact would ensure that the ability of the Nation to operate slot machines within the zone of exclusivity established under this Compact[12] will remain exclusive or the payments of revenue share to the State on such machines will cease.[13]

(2)    Total Exclusivity within Extended, Populous and Well-visited Geographic Market

As stated in previous opinions by the Department on tribal gaming compacts, tribes must receive at least "substantial exclusivity" for Indian gaming in return for state revenue share, otherwise the state share is "in derogation of Congress' intent not to permit States to exact a tax, free, charge or other assessment upon an Indian tribe engaged in Class III gaming activities."[14] "Substantial exclusivity" is a *"complete prohibition of non-Indian gaming from competing with Indian gaming, or when all payments cease while the State permits such competition to take place"* (italics added).[15]

Section 12(a)(1) of the Compact grants the Nation "total exclusivity with respect to the installation and operation of, and no person or entity other than the Nation shall be permitted to

---

[11] See Preliminary Development Evaluation Study prepared by Gaming and Resort Development, Inc. (Tab A).

[12] Other than as allowed for the Tuscarora Indian Nation ("Tuscarora") and Tonawanda Band of Seneca Indians ("Tonawanda").

[13] See footnote 18.

[14] See Letter from DOI to Wampanoag Tribe of Gay Head (Aquinnah) in Massachusetts (July 23, 1996).

[15] See Letter from DOI to Mescalero Apache Tribe (compact "deemed approved") (Aug. 23, 1997).

install or operate, Gaming Devices, including slot machines,"[16] within the geographic area defined in the Compact (a 10,716.5 square mile portion of Western New York State).[17] Unlike other exclusivity provisions, this provision clearly encompasses the Government of the State of New York and any other entity other than specific Indian tribes.[18]

Section 9 of Appendix A of the Compact delineates two separate categories of gaming devices that are encompassed in the definition of "Gaming Devices:" (1) slot machines and (2) video lottery gaming devices ("VLTs"). Section 12(a)(1), therefore, provides the Nation with an exclusive franchise to offer VLTs and/or slot machines within this "zone of exclusivity." Moreover, should any entity begin operating either category of Gaming Device, the Nation's revenue share obligation ceases for all games included in the category of Gaming Device for which exclusivity is lost. Specifically, Section 12(a)(4) of the Compact provides that the Nation shall discontinue State revenue share payments for any category of Gaming Device (VLT or slot machine) for which exclusivity under Subsection 12(a) is breached by the State, and requires the Nation to continue making revenue share payments to the State only with regard to the category of Gaming Device over which the Nation continues to have exclusivity.[19]

---

[16] As discussed in the next section below and in footnote 18, the Compact does establish certain exceptions to this exclusivity for other Indian tribes.

[17] This area is described as follows: "To the east, State Route 14 from Sodus Point to the Pennsylvania border with New York; (ii) to the north, the border between New York and Canada; (iii) to the south, the Pennsylvania border with New York; and (iv) to the west, the border between New York and Canada and the border between Pennsylvania and New York."

[18] Recognizing that, although currently unlikely, the Tuscarora or the Tonawanda could change their current anti-gaming policy and decide to pursue a compact with the State, and not wanting to interfere with such a decision on their part, the Nation insisted on the inclusion of language in its Compact that would allow the State to permit either tribe to obtain the right to include Gaming Devices in a compact without abrogating the exclusivity provisions of the Compact, so long as either tribe located its proposed gaming facility either on its existing reservations or more than 25 miles from a Nation Gaming Facility.

It is important to note that the Nation fully preserved the rights of the Tuscarora and the Tonawanda to establish gaming facilities on their existing reservations. The Nation also has allowed them to establish an off-reservation facility anywhere outside the 25 mile zone of total exclusivity.

If either tribe seeks to establish such an off-reservation facility they will either have to seek the approval of the Governor through applicable statutory mechanisms for obtaining trust lands for gaming purposes, or obtain the lands through the settlement of a land claim. As to an off-reservation trust application for gaming purposes requiring the Governor's approval, the State's determination of a 25 mile zone of total exclusivity for the Nation is a legitimate exercise of the Governor's approval authority in this regard. As to the possibility of a land claim serving as the basis for obtaining land on which Indian gaming could take place, neither tribe currently has a land claim pending. If either tribe were to initiate such a claim in the very near future, the prosecution of such a claim to successful settlement would likely take as long as the term of the Nation Compact (14 years).

[19] It has been noted that the same New York State legislation that authorized this Compact also authorized the operation of VLTs within the State, including within the zone of exclusivity prescribed in this Compact. If a person or entity begins operation of any form of VLT within the zone of exclusivity, the Nation's obligation to pay a revenue share on any VLTs that it operates will cease. Although the Nation's obligation to pay a revenue share to the State on any slot machines it operates pursuant to this Compact will continue in this instance, the Nation will at

Therefore, the Nation has total exclusivity with regard to the operation of VLTs and slot machines in the geographic "zone of exclusivity" under the Compact.[20] The area of total exclusivity granted to the Nation is a 10,716.5 square mile area in Western New York that, based on professional analysis of the market from which the Nation's Gaming Facilities would draw, includes the primary (1-50 mile), secondary (51-99 mile) and tertiary (100-150) customer markets for any established Buffalo or Niagara Gaming Facility.[21] This professional analysis indicates a capturable gaming market of $9.39 billion (in 2001 dollars) over the 14-year term of the Compact.

To put the size of this area into context in terms of economic significance, the geographic zone for which the Nation has total exclusivity with regard to Gaming Devices is larger geographically than the states of Connecticut (5,544 sq. mi.), Rhode Island (1,545 sq. mi.), Massachusetts (10,555 sq. mi.), New Hampshire (9,351 sq. mi.), Vermont (9,615 sq. mi.), and Delaware (2,489 sq. mi.), and similar in size to Hawaii (10,932 sq. mi.). The area is 1/5 of the entire State of New York, the 3rd most populated state in the United States, and contains a larger population than the entire states of Rhode Island, Vermont, Maine, Delaware, Hawaii, New Mexico, Idaho, Nebraska, West Virginia, South Dakota, and Wyoming. Due to the draw of Niagara Falls, one of the wonders of the world, the Nation also has exclusivity as to a market of approximately 14 million visitors per year to the area.

The Nation has undertaken a market analysis for the geographic market in question, which has been adjusted to account for the size and nature of the operations contemplated under the Compact. The total revenues currently anticipated from the gaming operations contemplated under the Compact exceed $5,487,000,000.00. Of this total revenue, the State will receive around $825,000,000.00, approximately $206,000,000.00 of which will be returned by the State to the host governments for the facilities, leaving approximately $618,000,000.00 in net revenue for the State, approximately 17% of the total revenues before expenses. The anticipated return to the Nation, on the other hand, is estimated to significantly exceed $2 billion over the 14 year term of the Compact.

---

that point have the flexibility to determine whether the operation of slot machines with a revenue share is the Nation's most profitable option. If VLTs continue to develop to the point that they could provide a revenue stream equivalent to that provided by slot machines, taking into account the revenue share to be paid on slot machines, then the Nation will have the option of shifting its entire operation over to VLTs should it so desire. Because the Nation has complete control over the mix of Gaming Devices that it will operate under the Compact, the Nation will have the flexibility to adapt to any change in circumstance of this kind that might arise.

[20] See footnote 18 for discussion of the exception to this total exclusivity for the Tuscarora and Tonawanda.

[21] See Preliminary Development Evaluation Study prepared by Gaming and Resort Development, Inc. (Tab A). Professional analysis confirms that gaming facilities draw only a negligible number of daily customers outside the tertiary customer market.

# AKIN GUMP
## STRAUSS HAUER & FELDLLP
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Attorneys at Law

Exclusivity in a gaming market of this size is extremely valuable for the Nation and justifies on its own the average 17% revenue share that the State will receive pursuant to the Compact.

(3)     Financial Assistance to Nation During Critical Start-up Phase of Project

As noted above, the Nation determined at the outset that it could not afford to bring in a developer to assist it in the financing and development of this project. The Nation was and is, however, fully aware of the significant capital expenditures required to launch a project of this type. Exclusive of land acquisition and initial operating capital, the Nation's anticipated capital budget for the Gaming Facility will exceed $40 million. If the Nation had had to purchase the Convention Center and the land on which it sets, this initial capital cost would likely have risen by an additional $40 million and perhaps more.[22]

As the Nation evaluated the compact proposals from the State, the Nation determined that the State could greatly extend the Nation's limited capital resources and bargained with the State to obtain such assistance. One key element of consideration for the Nation in this regard was the State's ability to transfer title for the Convention Center to the Nation for a total purchase price of $1.00.[23] As indicated above, this dramatically reduced the capital expenditures that the Nation would otherwise have to make in the initial phases of the project, making it practically feasible for the Nation to proceed with the project without a developer.

Without the State's agreement to such a transfer, the Nation would either have been unable to undertake the project due to an inability to obtain financing, or it would have had significantly increased financing costs. The State's provision of this benefit as consideration for a larger revenue share during the later stages of the project was of critical importance to the Nation as it considered the overall Compact.

---

[22] A study by the City of Niagara Falls in 1999 indicated that the replacement cost for the Niagara Falls Convention Center would be approximately $70-75 million. (See Tab B). Current estimates of land values within the area in Niagara Falls that are to be conveyed to the Nation pursuant to the Compact indicate that the value of the land on which the Convention Center sits has a value of between $12-15 million. Thus, the total value of a newly constructed facility on the site would be nearly $90 million. The Nation is refurbishing the Convention Center for approximately $40-50 million. Thus, the transfer of the Convention Center and the underlying land produced a net reduction in the initial capital budget of at least $40 million, of which the Nation will be required to repay only $24 million, which repayment will not need to be made, if at all, until the Gaming Facility in Niagara Falls is successful enough to justify the construction of a permanent facility to replace the temporary facility planned for the Convention Center.

[23] Other forms of State assistance that the Nation bargained for and obtained included, among others: (i) the State's agreement to use eminent domain to acquire other parcels of land required for the project that were not directly owned by the State; (ii) graduated revenue share; (iii) delayed revenue share payments during the initial phases of the project; (iv) assistance with housing projects contiguous to proposed gaming facilities for Nation members who are to work in such facilities; and (v) making local community payments to the host communities out of the total State revenue share.

The State also agreed to utilize its power of eminent domain to assist the Nation in acquiring properties necessary for the development of the project that were not directly owned by the State in order to ensure that the Nation would not be subjected to the speculative land value escalation that would otherwise have occurred. The ability to work with the State in this fashion will dramatically decrease the capital costs for the Nation in acquiring the remaining 38 acres of land in downtown Niagara Falls and in acquiring a site on reasonable terms in Buffalo.

In addition to these valuable benefits, the Nation also bargained for other very significant economic benefits from the State in order to ease the Nation's "capital crunch" in the initial phases of the project. For example, not only did the State agree to a graduated revenue share, which only increases to 25% over seven years, it also agreed to allow the Nation to delay its revenue share payments in the early years, a concession that is very important to an operation that is sensitive to significant swings in cash flow in its early months and years of operation. Thus, in the first years of operation of the Gaming Facilities, the Nation will make its revenue share payments on an annual basis, with the frequency of such payments increasing to quarterly after Year 7.[24]

In sum, without the State's financial assistance to the Nation in the early phases of the project, the Nation would not have been able to undertake the project without a developer to assist it. The economic significance of this cannot be underestimated. Each developer proposal requested 30% of net revenues in exchange for the necessary financial assistance on the project. A conservative estimate is that this would have produced over $1 billion in revenue to such a developer. In addition, the Nation would still have had to pay some revenue share to the State and a local impact payment. By any analysis, the revenue share that the Nation agreed to pay in exchange for the State's assistance in the early phases of the project saved the Nation several hundred million dollars that it would otherwise have been forced to pay to a developer.

(4) Assistance with Housing Projects Contiguous to the Project Area in Order to Provide Nation Housing for Nation Members Who Wish to Work at the Gaming Facilities in Question

As noted elsewhere in this letter, a primary goal of the Nation through this project was the creation of job opportunities for Nation members. A difficulty that the Nation faced was that the Gaming Facilities would be located in Buffalo and Niagara Falls, a distant commute from the Nation's existing reservations. Consequently, the Nation determined it would be necessary to establish additional Nation housing close to the proposed Gaming Facilities. The State recognized this as an important element of the project for the Nation and, as part of the consideration provided to the Nation in the Compact, to provide the Nation with assistance in establishing such housing.

---

[24] For example, in the first year of operation, this means that the Nation will make one annual payment of approximately $25 million instead of quarterly payments of $6.25 million, significantly easing the Nation's cash flow during the year.

# AKIN GUMP
## STRAUSS HAUER & FELD LLP

Attorneys at Law

B.     State Revenue Share

As consideration for the total exclusivity granted to the Nation in the zone of exclusivity and the other economic benefits outlined above, Section 12(b)(1) of the Compact provides that "the Nation agrees to contribute to the State a portion of the proceeds from the operation and conduct of each category of Gaming Device for which exclusivity exists." Pursuant to Section 12(b) of the Compact, the percentage that the Nation has agreed to pay the State starts at 18% of net drop for slots and VLTs for the first four (4) years of the Compact (Years 1-4). It then increases to 22% for the next three (3) years (Years 5-7) and then increases to 25% for the final seven (7) years of the Compact (Years 8-14). Section 11(d) of the Compact provides that the State (not the Nation) shall compensate host municipalities in a manner so as to allow them to adjust to the economic development expected to result from this Compact. The State Legislature has determined that the minimum necessary for such compensation shall be 25% of any revenue the State itself receives pursuant to the Compact.

Taking account of all the factors limiting the anticipated State share, as indicated in the attached chart, over the 14-year term of the Compact, the State's revenue share will average approximately 17% of Gaming Facility revenues per year. To illustrate, total revenues over the 14-year period of the Compact for all Class III gaming activity is estimated to be approximately $5.5 billion dollars -- a figure which includes projected revenues from all Class III games operated by facilities established by the Nation under the Compact (and not including facilities currently operated by the Nation).[25]

Net slot machine drop is estimated to account for approximately 66% of total Class III revenues at such facilities. Thus, the total net slot drop revenue is estimated to be $3.6 billion over the 14-year term of the Compact. Of this total amount, the State revenue share is approximately $825 million over the 14-year term of the Compact (averaging the state percentage received annually in Years 1-14), approximately $206 million of which, over the 14-year term of the Compact, will go to municipal governments pursuant to Article 6, Section 99-h of the New York Consolidated Laws (providing a minimum of 25% local share from the total State revenue share for facilities in Niagara or Erie counties). Taking into account the local share, therefore, the actual State share of net slot drop revenues generated under the Compact will be approximately 17%, or a total of $618 million over the 14-year term of the Compact.[26]

---

[25] This estimate is also based on the fact that the Nation will likely install and operate mainly slot machines at its Gaming Facilities, as the currently most profitable category of Gaming Device.

[26] See detailed breakdown of the 14-year State and local revenue share projection (Tab C). By way of comparison, the State revenue-share under the New Mexico gaming compacts is calculated based on a flat 16% of net win (meaning the total amount wagered at a gaming facility on gaming machines, including slots, less pay out of prizes from such machines, the regulatory fees paid to the State, and the sum of $250,000 per year representing tribal regulatory fees (adjusted upward 5% per year after the first year)). In return for the 16% revenue share, tribes

# AKIN GUMP
# STRAUSS HAUER & FELD LLP
━━━━━━━━━━━━━━━━━━━━━━ Attorneys at Law

Finally, we urge the Department to consider, in evaluating the overall economic benefit of this Compact to the Nation, that the Nation will be managing its own gaming operations, and thus revenues under the Compact will not be further reduced by payment of non-Indian gaming management fees. The Nation, as discussed previously, also receives under the Compact numerous economic benefits from the State as consideration for the revenue share. Overall, after careful negotiation and with professional advice and assistance, the Nation has determined that the economic benefits it will receive pursuant to the Compact readily justify the revenue share that its partner, the State, shall receive as a result of this project.

4.    In 1990, the United States Congress passed the Seneca Nation Land Claims Settlement Act (SNLCSA).[27] The SNLCSA, among other things, provided the Nation with fair compensation for use of its land and for the impact on the Nation from prior lease arrangements in the city of Salamanca, New York. The funds appropriated under the SNLCSA are available to be used at the Nation's option to acquire lands to increase the land base of the Nation.[28] With the SNLCSA, the Congress created a special process by which the Nation could reacquire its lost lands. The process, found at 25 U.S.C. § 1774f(c), provides that the Nation may acquire land within its aboriginal area or lands situated within or near proximity to former reservation lands with funds appropriated by the SNLCSA.

Section 11 of the Compact authorizes the Nation to establish three Gaming Facilities, two off-reservation in the cities of Niagara Falls and Buffalo, and one on current Nation reservation territory. The Compact also contemplates the use of the SNLCSA to acquire the off-reservation parcels in restricted fee status for gaming purposes.

In Question 4, you have asked the Nation[29] to provide additional explanation as to whether the off-reservation parcels would be within the Nation's aboriginal area or situated within or close proximity to its former reservation. You further ask for additional explanation as to whether the lands acquired under the SNLCSA qualify as "Indian lands" under IGRA and whether 25 U.S.C. § 2719 is applicable to lands acquired pursuant to the SNLCSA. For the

---

receive exclusivity for Class III activity within the State for gaming machines, including slot machines, but the compact requires the revenue share to continue even with "limited use" of slot machines by racetracks, veterans' and fraternal organizations.

     In contrast, under Section 12(a)(4) of the Nation's Compact, the operation of slot machines by any person or entity other than the Tuscarora or the Tonawanda is a breach of the exclusivity provision under 12(a)(1) and terminates the Nation's obligation to share slot revenues. Moreover, the economic returns to New Mexico tribes pale in comparison to those that will be available to the Nation as a result of the Compact.[26] As noted above, the Nation currently estimates that it will receive over $2 billion in net revenue from this project over the term of the Compact.

     [27] 25 U.S.C. § 1774 et. seq.

     [28] See S. Rept. 101-511 at 24; H.Rept., 101-832 at 21.

     [29] Although the Compact contemplates the use of the SNLCSA for such purpose, other means are also contemplated if appropriate and necessary. See, e.g., Section 11(b)(3).

12

reasons provided below, lands acquired by the Nation pursuant to the SNLCSA in the cities of Niagara Falls and Buffalo will constitute "Indian lands" over which the Nation may conduct Class III gaming activities pursuant to IGRA.

A.     The Cities of Niagara Falls and Buffalo Are within the Aboriginal Area of the Nation

The Nation is a federally recognized Indian tribe, governing pursuant to a Constitution adopted in 1848, as amended. The Nation resides on three Reservations – the Allegany, Cattaraugus and Oil Springs Reservations – which were secured to the Nation by the Treaty of November 11, 1794, 7 Stat. 44.[30] The lands comprising the Nation's Reservations lie within the Nation's aboriginal territory and are held by the Nation in restricted fee.[31]

As Congress found, the aboriginal lands of the Nation "centered on what is now western New York State."[32] In 1794, the United States and the Iroquois Confederacy entered into the Treaty of Canandaigua.[33] Article III of the Treaty of Canandaigua delineated the precise boundaries of the Seneca land as follows:

> Beginning on Lake Ontario at the northwest corner of the land they sold to Oliver Phelps, the line runs westerly along the lake as far as Oyongwongyeh Creek at Johnson's landing place, about four miles eastward from the Fort of Niagara; thence southerly up that creek to its main fork then straight to the main fork of Stedman's Creek which empties into the Niagara River above Fort Schlosser and then onward from that fork continuing the same straight course to that river. This line from the mouth of Oyongwongyeh Creek to the River Niagara above Fort Schlosser being the eastern boundary of a strip of land extending from the same line to Niagara River which the Seneca Nation ceded to the King of Great Britain at a treaty held about thirty years ago with Sir William Johnson, then the line runs along the River Niagara to Lake Erie; then along Lake Erie to the northeast corner of a triangular piece of land which the United States conveyed to the State of Pennsylvania as by the President's patent dated the third day of March 1792, then due south to the northern boundary of that state; then due east to the southwest corner of the land sold by the Seneca Nation to Oliver Phelps; then north and northerly along the Phelps line to the place of beginning on Lake Ontario. Now the United States acknowledge all the land within the aforementioned boundaries to be the property of the Seneca Nation and the United States will never claim the same nor disturb the Seneca Nation nor any of the Six Nations or of their Indian

---

[30] See The New York Indians, 72 U.S. (5 Wall.) 761 (1867).

[31] See Banner v. United States, 238 F.3d 1348, 1350 (Fed. Cir. 2001); see also S.Rept. 101-511, 101st Cong., 2d Sess. at 4 (1990); H.Rept., 101-832, 101st Cong., 2d Sess. at 3 (1990).

[32] S. Rept. 101-511 at 4; H.Rept., 101-832, at 3.

[33] 7 Stat. 44.

13

friends residing thereon and united with them in the free use and enjoyment
thereof but it shall remain theirs until they choose to sell the same to the people of
the United States who have the right to purchase.[34]

By this treaty, the United States expressly recognized the boundary of the territory of the Nation
consisting of much of the western part of the State of New York.[35]

The United States Court of Appeals for the Federal Circuit recently discussed the vast
aboriginal territory of the Nation in Banner v. United States.[36] More specifically, the Banner
court stated as follows:

Specifically, the Treaty of Canandaigua set the boundary of the land of the
[Nation] consisting of much of the western part of the State of New York; it was
bounded by Lake Ontario just west of modern-day Rochester, west to the
Canadian border, south along the Niagara River through modern-day Buffalo,
southwest along Lake Erie to the Pennsylvania border, east to the Genesee River,
and north through modern-day Geneseo back to Lake Ontario.[37]

The Banner court further found that "[u]nder the Treaty of Canandaigua, the land of the [Nation]
consisted of modern-day Chautauqua, Cattaraugus, Erie, Niagara, Orleans, and Wyoming
Counties, most of modern-day Allegany and Genesee Counties, and portions of modern-day
Monroe and Livingston Counties."[38]

Based on the foregoing, specifically the Treaty of Canandaigua, the legislative history of
the Act, and the Banner decision, it is clear that the cities of Niagara Falls and Buffalo lie within
the Nation's aboriginal area, an area which includes much of the western part of New York State,
including both Niagara and Erie Counties.[39]

---

[34] 7 Stat. 44.

[35] Id.; see also S. Rept. 101-511 at 4; H.Rept., 101-832, at 3 ("The November 11, 1794, Treaty of
Canandaigua with Six Nations recognized the right of the Seneca Nation to a portion those lands which included all
of the State of New York west of the Genessee River.").

[36] 238 F.3d 1348, 1350 (Fed. Cir. 2001).

[37] Banner, 238 F.3d at 1350 (emphasis added).

[38] Id. at n. 1 (emphasis added).

[39] The recent decision in Seneca Nation of Indians v. New York, 206 F.Supp.2d 448 (W.D.N.Y. June 21,
2002), has no bearing on this particular issue. First, the precise question before the United States District Court for
the Western District of New York was "whether in 1815, the Seneca Nation actually held either aboriginal or
recognized title to the Niagara Islands . . . ," see id. at 455, not whether the cities of Niagara Falls and Buffalo were
within the aboriginal area of the Nation. While the court inexplicably stated that "[t]he Seneca Nation's ancestral
homelands were located in the Genesee Valley, not in the Niagara region and certainly not on the Niagara Islands"
see id. at 540, such a statement was made only after the court ruled on the issue before it, and only after the court
posited that "even if aboriginal title existed (which the Court passes no opinion on), such title was extinguished by

B.    The Cities of Niagara Falls and Buffalo Are Situated Within or Near Proximity to Former
      Reservation Land

Notwithstanding the fact that the lands are clearly within the Nation's aboriginal area, we
can also clearly show that any of the lands within cities of Niagara and Buffalo are within or near
proximity to former reservation land.

With the Big Tree cession, the Nation relinquished a large portion of their lands in the
State of New York.[40] "The Senecas' ancestral lands, with the exception of several reservations, .
. . were ceded to Robert Morris at Big Tree."[41] The Big Tree cession left the Senecas with ten
reservations carved out of the overall area ceded."[42] As discussed by the Indian Claims
Commission in Seneca Nation of Indians, "[t]he 1797 Big Tree cession provided . . . for the
reservation of various tracts selected by the Seneca Nation for the continued residence of its
members."[43] Two of the reservations reserved at the Big Tree cession were the Buffalo Creek
Reservation and the Tonawanda Reservation.[44] In 1842, the Buffalo Creek Reservation
"consisted of 49,920 acres, and was significant because part of the reservation was immediately
adjacent to the Buffalo city limits."[45] In 1842, the Tonawanda Reservation "consisted of 12,800
acres along Tonawanda Creek."[46]

The SNLCSA provides that lands "situated within or near proximity to former reservation
land may be acquired by the Seneca Nation . . ."[47] Neither the Act or its legislative history shed
any light on the meaning of the term "near proximity." However, in other contexts, both courts
and federal agencies have found that geographic distances in the 15-35 mile range satisfy

---

Great Britain pursuant to the 1764 treaties of peace." See id. at 508 (emphasis added). Thus, the court's statement
that the Nation's ancestral homelands did not include the Niagara region was clearly dicta. Lastly, the Banner
decision and the United States' current position in Seneca Nation of Indians v. New York –a case that is now on
appeal– fully support the Nation's position that its aboriginal area includes the cities of Niagara Falls and Buffalo.

[40] See Contract between Robert Morris and the Seneka Nation, Sept. 15, 1797, 7 Stat. 601 (Sept. 15, 1797);
see also Seneca Nation of Indians v. United States, 28 Ind. Cl. Comm. 12, 15 (1972).

[41] Seneca Nation of Indians, 28 Ind. Cl. Comm. at 15-16.

[42] Id. at 24; see also Tuscarora Nation of Indians v. Power Authority of State of N Y, 164 F.Supp. 107, 112
(W.D.N.Y. 1958) ("The agreement specifically reserved ten tracts of land to the Indians . . .").

[43] 28 Ind. Cl. Comm. at 71.

[44] See 7. Stat. 601.

[45] Seneca Nation of Indians, 28 Ind. Cl. Comm. at 38-39; see also Fellows v. Blacksmith, 60 U.S. 366, 369
(Mem) (1856) ("the Buffalo Creek reservation, contain[ed] 49,920 acres . . ."); Felix S. Cohen, Handbook of Federal
Indian Law, 420 (1942) ("[T]here was also a deed to the Ogden Land Co., of all of the Senecas' lands, consisting of the
valuable Buffalo Creek Reservation of 49,920 acres . . .").

[46] Seneca Nation of Indians, 28 Ind. Cl. Comm. at 37; see also Fellows, 60 U.S. at 369 ("and the
Tonawanda, 12,800 acres."); Felix S. Cohen, Handbook of Federal Indian Law, 420 (1942) ("as well as the
Tonawanda Reservation of 12,800 . . .).

[47] 25 U.S.C. § 1774f(c).

requirements of "close proximity."[48] In using these cases as a guide, combined with the Indian canon of construction that provides that "statutes are to be construed liberally in favor of the Indians,"[49] it is clear that both the cities of Buffalo and Niagara Falls are located either within or near proximity to former reservation land.

The former Buffalo Creek Reservation "was immediately adjacent to the Buffalo city limits."[50] In fact, as depicted on the attached maps prepared by the New York State Office of General Services, the former Buffalo Creek Reservation sits on top of portions of the City of Buffalo.[51] Moreover, as depicted on the attached maps, the City of Buffalo is located just 15 miles from the former Tonawanda Reservation. Thus, although the exact parcel has not yet been identified in the City of Buffalo, it is clear that the yet-to-be identified site will either be situated within or near proximity to the former Buffalo Creek Reservation, or in close proximity to the former Tonawanda Reservation.

As depicted on the attached maps prepared by the New York State Office of General Services, the City of Niagara Falls is located just 14 miles from the former Buffalo Creek Reservation.[52] Interpreting the term "near proximity" liberally in favor of the Nation leads to only one conclusion: that the City of Niagara Falls' proximity to the former Buffalo Creek Reservation is sufficient so as to bring it within the meaning of "near proximity" as set forth in section 1774f(c).

---

[48] See, e.g., Mount Elliott Cemetery Ass'n v. Troy, 171 F.3d 398, 407-08 (6th Cir. 1999) (addressing claim of exclusionary zoning, which required showing that the land use sought by petitioner did not otherwise occur "within close geographical proximity" of the city's boundaries, court found that use which occurred within 16 miles of city limits was in close geographical proximity); Athens Community Hosp., Inc. v. Shalala, 21 F.3d 1176, 1178 (D.C. Cir. 1994) (discussing and noting earlier decision upholding Department of Health and Human Service regulations for redesignation of hospital's geographic designation, used to determine medical reimbursement rates, that required "close proximity" to the redesignated area and defined "close proximity" as "35 road miles"); United States v. Atofina Chemicals, Inc., 2002 WL 1832825 at *5 n.4 (E.D.Pa. 2002) (EPA's Supplemental Environmental Project Policy, which provides agency guidelines for allowing beneficial projects to mitigate civil penalties for environmental violations, requires "adequate nexus" between project and violation, which turns in part on "geographic proximity" of project and violation; 50 miles is benchmark for determining geographic proximity).

[49] See Montana v. Blackfeet of Indians, 471 U.S. 759, 766 (1985). This canon is rooted in the unique trust relationship between the United States and Indian tribes, and Congress's obligation to act on behalf of these "dependent and sometimes exploited Indian nations." Seminole Nation v. United States, 316 U.S. 286, 296-97 (1942).

[50] Seneca Nation of Indians, 28 Ind. Cl. Comm. at 38-39.

[51] See Maps of Location of Buffalo Creek Reservation (Tab D).

[52] The Nation has identified the parcel of land on which it intends to conduct Class III gaming in the City of Niagara Falls. The Nation intends to have approximately 50 acres of land, referred to as the "Niagara Falls parcel", placed into restricted fee status. As described in Appendix I to the Compact, the Niagara Falls parcel is bounded to the North by Niagara Street, to the East by John Daly Boulevard, to the South by Rainbow Boulevard, and to the West by Third Street.

C.    Indian Lands

The issue presented is whether lands placed in "restricted fee" status pursuant to the SNLCSA are "Indian lands" as defined by IGRA. A tribe may engage in gaming pursuant to IGRA only on "Indian lands within such tribe's jurisdiction."[53] Indian lands include, but are not limited to, lands located within the boundaries of an Indian reservation. For non-reservation lands to qualify as Indian lands under IGRA, the land must be held in either trust by the United States for the benefit of any Indian tribe or individual, or held by any Indian tribe or individual subject to restriction by the United States against alienation, and the tribe must exercise "governmental power" over those lands.[54]

(1)    Restricted Lands

The Compact authorizes the Nation to conduct Class III gaming on sites to be located in the cities of Niagara Falls and Buffalo, on land to be placed into restricted status by the Secretary pursuant to the SNLCSA.[55] Pursuant to the land acquisition provision contained in the SNLCSA, the Nation will submit an application to have certain lands in the cities of Niagara Falls and Buffalo placed into restricted fee status by the Secretary. The Secretary has 30 days after the expiration of the comment period within which she may decide that the land should not be subject to restrictions against alienation contained in 25 U.S.C. § 177.[56] As an initial matter, the land to be acquired will be held by the Nation in restricted fee status and can only be alienated or encumbered by the Nation with the approval of the Secretary pursuant to federal law. Thus, all lands placed into restricted status pursuant to the SNLCSA will satisfy the first part of the Indian lands definition: that the land be held in restricted status by an Indian tribe.[57]

---

[53] See 25 U.S.C. § 2710(b).

[54] See id. § 2703(4)(B).

[55] Section 11(a)(c) of the Compact provides that the Nation may establish Gaming Facilities "on current Nation reservation territory." Because such lands undeniably constitute "Indian lands" over which the Nation may lawfully conduct gaming pursuant to IGRA, no discussion is necessary on this category of land. See 25 U.S.C. § 2703(4)(A) ("all lands within the limits of any Indian reservation").

[56] Section 177, otherwise known as the Non-Intercourse Act, provides in pertinent part as follows:

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

See 25 U.S.C. § 1774ff(c).

[57] See 25 U.S.C. § 2703(4)(B).

# AKIN GUMP
## STRAUSS HAUER & FELD LLP

━━━━━━━━━━━━━━━━ Attorneys at Law

a.     Jurisdiction

IGRA permits tribes to conduct gaming on Indian lands only if they have jurisdiction over those lands, and only if they can and do use that jurisdiction to exercise governmental power that will enable the tribe, through appropriate ordinances, to satisfy IGRA's substantial and detailed requirements for the regulation of gaming. This interpretation is consistent with IGRA's language limiting the applicability of its key provisions to "[a]ny Indian tribe having jurisdiction over Indian lands," or to "Indian lands within such tribe's jurisdiction."[58]

Historically, the term "Indian country" has been used to identify land that, "[g]enerally speaking," is subject to the "primary jurisdiction . . . [of] the Federal Government and the Indian tribe inhabiting it."[59] In 1948, Congress enacted the statutory definition of Indian country, which consists of "all land within the limits of any Indian reservation,"[60] "all dependent Indian communities,"[61] and "all Indian allotments, the Indian titles to which have not been extinguished."[62] The Supreme Court has noted that the 1948 definition accomplished several purposes. First, and most generally, Congress meant to include within "Indian country" any lands that met two requirements: "first they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence."[63] In large measure those requirements were meant to codify pre-existing case law concerning "Indian country,"[64] and there is no doubt that they include lands acquired by the Nation and placed into restricted status by the Secretary pursuant to the SNLCSA.[65]

(i)     Federal Set Aside

As mentioned, to constitute Indian country for jurisdictional purposes, lands placed into restricted status pursuant to the SNLCSA must be set aside by the Federal Government for the use of the Nation.[66] Congress included the land acquisition provision in the SNLCSA because

---

[58] 25 U.S.C. §§ 2710(d)(3)(A), 2710(b)(1).

[59] Alaska v. Native Village of Venetie Tribal Gov't, 522 U.S. 520, 527 n.1 (1998).

[60] 18 U.S.C. § 1151(a).

[61] 18 U.S.C. § 1151(b).

[62] 18 U.S.C. § 1151(c).

[63] Venetie, 522 U.S. at 527.

[64] Id.

[65] It is unnecessary to decide whether lands placed into restricted status pursuant to the SNLCSA are more properly categorized as Indian country under 1151(a), (b) or (c), because, regardless of the category, the "set aside" and "superintendence" requirements that underlie the Supreme Court's focus are met and the land is undeniably "Indian country" under section 1151. See U.S. v. Roberts, 185 F.3d 1125, 1133 (10th Cir.1999), cert. denied 529 U.S. 1108 (2000) ("We need not further expound on the Supreme Court's cases in this area because, no matter which categorical label we choose to affix, the property in this case, . . . is Indian Country . . .").

[66] See Venetie, 522 U.S. at 527.

18

Congress recognized that the Nation had lost a considerable part of its reservation lands.[67] The SNLCSA reflects and embodies a federal intent to "set aside" land for the use of the Nation, as it expressly authorizes the Nation to use federal funds appropriated under the SNLCSA to acquire land within the Nation's aboriginal area or situated within or near proximity to former reservation land.[68] "The funds appropriated under [the SNLCSA] may be used at the Nation's option, to acquire lands to increase the land base of the Seneca Nation . . ."[69]

Moreover, placement of the land into restricted fee status can only be accomplished by filing a request with the Secretary, who must consider, among other things, the impact of the removal of such lands from real property tax rolls of the State of New York and its political subdivisions.[70] Thus, the SNLCSA does, in fact, set aside the land for the use by the Nation. Based on the foregoing, lands placed into restricted status by the Secretary pursuant to the SNLCSA will be "validly set apart for the use of Indians as such" as the federal government must take some affirmative action indicating that the land is designated for use by the Nation, and subject to the protections of Section 177.

### (ii) Federal Superintendence

Congress has provided for "federal supervision" of lands placed into restricted status pursuant to the SNLCSA by protecting such lands from state taxation and by barring future alienation of such lands. Section 177 "imposes upon the federal government a fiduciary's role with respect to protection of the lands of a tribe covered by the Act."[71] In Federal Power Comm'n v. Tuscarora Indian Nation, the Supreme Court said: "The obvious purpose of that statute is to prevent unfair, improvident and improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress, and to enable the Government, acting as *parens patriae* for the Indians, to vacate any disposition of their lands made without its consent."[72] In addition, 25 U.S.C. § 81 requires Secretarial approval for certain contracts and agreements that encumber tribal land, including restricted land. Lastly, 25 U.S.C. § 415 provides that Indian lands, including restricted lands, may be leased by those tribes or individuals who own them with the approval of the Secretary. Based on the foregoing, it is clear that there will be federal supervision of lands placed into restricted status pursuant to the SNLCSA.[73]

---

[67] See S.Rept. 101-511, 101st Cong., 2d Sess. at 4; H.Rept., 101-832, 101st Cong., 2d Sess. at 3.

[68] See 25 U.S.C. § 1774f(c).

[69] See S.Rept. 101-511 at 24; H.Rept., 101-832 at 21.

[70] See 25 U.S.C. § 1774f(c).

[71] Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370, 379 (1st Cir. 1975).

[72] 362 U.S. 99, 119 (1960).

[73] Lands placed into restricted status pursuant to the SNLCSA are readily distinguishable from the lands at issue in Venetie where the Court ruled that land conveyed by the federal government, under the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601, to private corporations having Indian shareholders, in fee simple without restrictions, and subsequently conveyed to Indian tribes, was not "Indian country." See 522 U.S.

In addition to the foregoing, the SNLCSA authorizes the Secretary to place lands into restricted status for the benefit of the Nation, and contemplates the Secretary may officially declare them to be reservations "in accordance with the procedures established by the Secretary for this purpose."[74] For the following reasons, this particular provision provides compelling evidence that Congress intended such lands to be held in the same legal manner in which Nation Territories were held, and in the same legal manner as trust lands.

At the outset, it is important to note that the Secretary may proclaim trust land acquired for an Indian tribe organized under the authority of the Indian Reorganization Act (IRA) as a new reservation, or as an addition to the existing reservation, of said tribe.[75] While the Secretary has not formally issued a set of regulations for declaring land to be part of a tribe's reservation, the Secretary does follow informal guidelines for making such proclamations. The guidelines provide that "[o]nly those lands taken in trust pursuant to the IRA or Indian Land Consolidation Act may be proclaimed as additions to the reservation land base."[76] Thus, it appears that the Secretary is only authorized to proclaim "trust" lands as additions to reservation land bases.[77] The rationale behind such a policy stems from the fact that reservation lands and trust lands are

---

520. Whereas the gaming sites identified in Section 11(a)(1)&(2) of the Compact will be placed into restricted status by the Secretary, the disputed land in Venetie was owned in communal fee simple by an Indian tribe pursuant to ANCSA. In Venetie, there was no possibility the lands could qualify as a reservation under 18 U.S.C. § 1151(a) because the ANCSA had explicitly abrogated its reservation status, see id. at 953, whereas the SNLCSA authorizes the Secretary to place lands into restricted status for the benefit of the Nation, and contemplates the Secretary may officially declare them to be reservations. See 25 U.S.C. § 1774f(c).

In addition, there are significant reasons as to why lands placed into restricted status pursuant to the SNLCSA are distinguishable from the lands at issue in Buzzard v. Oklahoma Tax Comm'n, where the Tenth Circuit held that land purchased and owned in fee simple with a restriction against alienation was not Indian country. 992 F.2d 1073, 1076–77 (1993), cert. denied sub nom., United Keetoowah Band of Cherokee Indians v. Oklahoma Tax Comm'n, 510 U.S. 994 (1993). Contrary to the fee simple ownership in Buzzard, land placed into restricted status by the Secretary is held in restricted status by the federal government pursuant to federal law. In other words, the federal government must take some action indicating that the land is designated for use by the Nation, unlike the situation in Buzzard. Moreover, the SNLCSA does not provide that the Nation can unilaterally create Indian country in the absence of federal approval and input from the State of New York. In fact, placement of land into restricted fee status can only be accomplished by filing a request with the Secretary. Moreover, as required by the SNLCSA, the Nation notified the state and local governments of its intent to acquire certain lands in the City of Niagara Falls, and provided an opportunity to comment on the impact of the removal of such lands from real property tax rolls. The State was also provided an opportunity to comment on the Nation's intent to have certain lands in both Niagara Falls and Buffalo placed into restricted status through the compact negotiation process. The Nation's interest in assuming jurisdiction over lands placed into restricted status in both Niagara Falls and Buffalo was the topic of negotiation and the State assented to the Nation's assumption of jurisdiction over such lands as contemplated by the SNLCSA.

[74] See 25 U.S.C. § 1774f(c).

[75] See id. § 467.

[76] See Department of the Interior Guidelines for Proclamations (emphasis added).

[77] See Citizen Band Potawatomi Indian Tribe of Oklahoma v. Anadarko Area Director, Bureau of Indian Affairs, 28 IBIA 169, 177 n. 11 (1995) ("The Board is not aware of any other statutory authority under which the Secretary may proclaim Indian reservations.").

coterminous. In other words, because trust land is held in the same legal manner and is on the same jurisdictional footing as reservation lands, such lands can expand existing reservation boundaries if contiguous thereto.

The SNLCSA appears to represent the only piece of federal legislation authorizing lands held in "restricted" status to expand or become part of reservation boundaries. The factor that the Secretary is to consider in making her determination as to whether lands placed into restricted status pursuant to the SNLCSA should expand existing Nation reservation boundaries, is the proximity of such lands thereto. Again, the Secretary is authorized to so designate such land in accord with "procedures [s]he may establish for that purpose."[78] As mentioned, the procedures for expanding reservation boundaries are in the form of informal guidelines, which are made applicable to lands placed into restricted status pursuant to the SNLCSA.

When Congress authorized the Secretary to place land into restricted status for the benefit of the Nation, it clearly intended such lands to be held in the legal manner and condition in which existing Nation Territories were held, within the Nation's jurisdiction. Although additions to reservation land bases pursuant to 25 U.S.C. § 467 are generally limited to "trust lands", Congress specifically provided that "[b]ased on the proximity of the land acquired to the Seneca Nation's reservations, [restricted] land acquired may become a part of and expand the boundaries of the Allegany Reservation, the Cattaraugus Reservation, or the Oil Springs Reservation in accordance with the procedures established by the Secretary for this purpose."[79]

The informal guidelines followed by the Secretary for expanding reservation boundaries are made applicable to land placed into restricted status pursuant to the SNLCSA.[80] While lands placed into restricted status in Niagara Falls and Buffalo do not appear to be eligible to become part of or expand the boundaries of Nation Territories, the fact remains that Congress manifested its intent to treat lands placed into restricted status pursuant to the SNLCSA on the same footing as trust lands.[81] Moreover, while all Nation Territories are held in restricted fee status, Congress made clear that lands placed into restricted status pursuant to the SNLCSA are the legal

---

[78] 25 U.S.C. § 1774f(c).

[79] 25 U.S.C. § 1774f(c).

[80] See id. § 1774f(c).

[81] The lack of reservation status of the subject lands does not have any bearing on the Nation's jurisdiction over such lands. Again, because of the severe land losses discussed above, Congress established a means by which the Nation could use SNLCSA funds to acquire lands within its aboriginal territory and have such lands placed into restricted fee status. As provided in the Senate Report accompanying S. 2895, the bill that eventually became the Act, "[t]he funds appropriated under [the Act] may be used at the Nation's option, to acquire lands to increase the land base of the Seneca Nation . . ." See S.Rept. 101-511 at 24; H.Rept., 101-832 at 21. Based on these severe land losses, Congress's clear intent was to increase the land base of the Nation, irrespective of whether such lands were contiguous to or far removed from existing reservation boundaries. Moreover, the Venetie Court explained that in United States v. Sandoval, 231 U.S. 28 (1913), Pueblo Indian land held in fee simple by the Pueblo, restricted from alienation by the federal government, met the set aside and superintendence requirements and constituted Indian country, even though the land was not a formal reservation. Venetie, 522 U.S. at 528.

equivalent to "trust lands" for jurisdictional purposes. Again, only trust lands and lands placed into restricted status pursuant to the SNLCSA may become part of or expand reservation boundaries.

The informal guidelines followed by the Secretary for expanding reservations are instructive as well. One item, among others, that is required to be addressed with each request is "[e]vidence that a 30-day notice of the proposed action has been provided by the [BIA] to the state, county, and municipal; government within whose jurisdiction such land is located."[82] As it relates to a tribe's jurisdiction, the notice also serves to "clarif[y] tribal jurisdiction over the trust property." Because tribal jurisdiction over trust parcels is presumed, even where such parcels are far removed from reservation boundaries, the notice merely serves to clarify and confirm existing tribal jurisdiction over the identified trust parcel. Significantly, the informal guidelines do not contain any mechanism for bestowing jurisdiction on tribes over such lands as jurisdiction is already presumed. Because these guidelines are made applicable to restricted lands of the Nation pursuant to 25 U.S.C. § 1774f(c), the only logical conclusion is that the Nation's jurisdiction over SNLCSA lands is likewise presumed, even where such lands are far removed from reservation boundaries. In other words, because the informal guidelines for expanding reservation boundaries do not contain any mechanism for bestowing jurisdiction, assumption of jurisdiction by the Nation occurs upon placement of the land into restricted fee status, and is not contingent upon its merger into the reservation.

Lastly, in its final rule revising and clarifying the procedures used by Indian tribes and individuals to request the Secretary to acquire title to land into trust on their behalf, the Bureau of Indian Affairs (BIA) confirmed that trust lands and restricted lands are indistinguishable from a jurisdictional standpoint. In its final rule, the BIA stated as follows:

> The rationale for excluding the other types of acquisitions from the regulation is that trust to trust and restricted fee to restricted fee, and restricted fee to trust and land exchanges not involving fee land do not have an impact on the local governments because these lands are not already under their jurisdiction.[83]

Moreover, the rule further states that "[t]he trust-to-trust, restricted fee-to-restricted fee, and restricted fee-to-trust land acquisitions do not impact local and state governments because these lands are not presently subject to state or local jurisdiction or taxation."[84] Thus, the agency with primary responsibility for evaluating Indian country jurisdictional questions, readily concedes that restricted fee land is Indian country for both federal and tribal jurisdictional purposes. For the foregoing reasons, lands placed into restricted status pursuant to the SNLCSA

---

[82] See Department of the Interior Guidelines for Proclamations.

[83] See Acquisition of Title to Land in Trust, 66 Fed. Reg. 3452, 3453 (Jan. 16, 2002)(to be codified at 25 C.F.R. part 151).

[84] 66 Fed. Reg. at 3457. These regulations have since been withdrawn for unrelated reasons. See Acquisition of Title to Land in Trust, 66 Fed. Reg. 56608 (Nov. 9, 2001)(withdrawal of final rule).

are indistinguishable from lands placed into trust status pursuant to the IRA, land that the Interior Department has repeatedly held constitute "Indian lands" for purposes of IGRA, and "Indian country" for purposes of tribal jurisdiction.

### (iii) Exercise of Governmental Power

IGRA does not define the circumstances under which a tribe "exercises governmental power" over restricted lands. The legislative history of IGRA provides no guidance on this issue either. Moreover, the NIGC has decided not to define the term but rather has chosen to make such determinations on a case-by-case basis.[85]

As a matter of administrative practice, the Department has treated lands to be acquired in trust for gaming purposes differently than those lands already in held in trust. To be clear, the Department has not required a tribe to show that it "exercises governmental power" over land for which the tribe has yet to acquire or place into trust or restricted status.[86] Thus, because the subject parcel is not currently within the Nation's jurisdiction, it would be impossible at this time to satisfy this particular requirement. Based on Department precedent, however, the Nation is not required to establish exercise of governmental power until such lands have been placed into restricted fee status pursuant to the SNLCSA.

### D. Applicability of 25 U.S.C. § 2719[87]

IGRA provides for a general prohibition on lands acquired in trust by the Secretary after October 17, 1988 subject to a few exceptions. You have asked us to further explain the applicability of 25 U.S.C. § 2719 to the lands the Nation will acquire under the SNLCSA. The threshold issue is whether the "restricted fee" status that the land will obtain under the SNLCSA is the same as "trust" for purposes of 25 U.S.C. § 2719. The next issue is what, if any, exceptions apply to allow the lands to be used for gaming. For the following reasons, IGRA's

---

[85] See National Indian Gaming Commission: Definitions Under the Indian Gaming Regulatory Act, 57 Fed. Reg. 12382, 12388 (1992).

[86] See, e.g., December 12, 2000 Memorandum from the Acting Associate Solicitor, Division of Indian Affairs to the Regional Director, Midwest Regional Office, Bureau of Indian Affairs at 2 ("could the Sackrider property, . . . come within one of the exceptions contained in Section 20 of IGRA?".); see also August 5, 1999 Memorandum from the Associate Solicitor, Division of Indian Affairs to the Director, Indian Gaming Management Staff at 1 ("The Little Traverse Bay Bands has an application pending before the Minneapolis Area Office to acquire the Victories Tract in trust for gaming purposes."); March 16, 1998 Memorandum from the Associate Solicitor, Division of Indian Affairs to the Acting Director, Indian Gaming Management Staff at 1 ("The Tribe has submitted an application for a fee to trust acquisition to the [BIA] . . . The property is not currently owned in fee by the Tribe, but the Tribe has entered into an Option/Purchase Agreement with the current owner, Manistee Orchards, Inc., to purchase the property . . .").

[87] We have concluded for purposes of this response that Section 2719 does apply to restricted lands. We note, however, that the State has reached an alternative conclusion on equally persuasive grounds.

AKIN GUMP
STRAUSS HAUER & FELDLLP

prohibition against the use of trust lands acquired after October 17, 1988 for gaming purposes does not serve to prohibit gaming on lands placed into restricted status pursuant to the SNLCSA.

As discussed above, land placed into restricted fee status pursuant to the SNLCSA is virtually indistinguishable from land held in trust. Only trust lands and lands placed into restricted status pursuant to the SNLCSA are eligible to become part of or expand reservation boundaries. It is clear that Congress intended for the restricted status of land acquired under the SNLCSA to be the same as trust lands.

In any event, the general prohibitions of Section 2719 do not apply when lands are taken in trust as part of "a settlement of a land claim."[88] For the reasons provided below, lands placed into restricted status pursuant to the SNLCSA are eligible for gaming pursuant to the "settlement of a land claim" exemption.

Neither IGRA nor the legislative history explain the "settlement of a land claim" provision of Section 20. In fact, we are not aware of any administrative decision made by either the Department or the National Indian Gaming Commission (NIGC) that has squarely addressed the "settlement of a land claim" exception. The only guidance we have been able to find regarding the definition of the "settlement of a land claim" provision stems from a 1998 Department memorandum. To be precise, the Associate Solicitor, Division of Indian Affairs posited that "[a] land claim is a claim for land by a tribe on the basis that the land was alienated without the express approval of Congress as required by 25 USC 177 (the Indian Non-Intercourse Act)."[89] Moreover, the memorandum goes further by stating that "[t]he settlement of a land claim must be valid in order to qualify under this exception. Validity necessarily requires Congressional approval." Id. Applying these criteria to the instant matter clearly reveals that the land placed into restricted status pursuant to the SNLCSA are exempt from Section 20's general prohibition.

The SNLCSA clearly represents a settlement of a land claim within the meaning of that term in 25 U.S.C. § 2719(b)(1)(B). The purpose of the SNLCSA was "to establish a framework for cooperation of a mutually beneficial nature between the Seneca Nation of Indians and the City of Salamanca, New York; . . . and to provide the Nation with fair compensation for the use of its land and for the impact on the Nation from prior lease arrangements."[90] "The Federal and State governments have agreed that there is a moral responsibility on the part of both governments to help secure a fair and equitable settlement for past inequities."[91] Moreover, the SNLCSA was designed "to provide compensation to the Nation from the United States and the

---

[88] 25 U.S.C. § 2719(b)(1).

[89] See November 18, 1998 Memorandum from the Associate Solicitor, Division of Indian Affairs to the Director of the Indian Gaming Office at 1.

[90] See S.Rept. 101-511 at 3; H.Rept., 101-832 at 2.

[91] 25 U.S.C. § 1774(a)(6).

State for loss of the fair market value of their lands during the last 99 years due to the action of the United States."[92] "The Agreement is rooted in an appreciation of the heavy toll paid by the Nation in the historical development of the City of Salamanca."[93] To provide equitable compensation for causing, and failing to prevent, losses of Nation lands, "funds appropriated under [the Act] may be used at the Nation's option, to acquire lands to increase the land base of the Seneca Nation . . ."[94] The SNLCSA funds "are intended to compensate the Seneca Nation for the losses it has sustained during the lease period."[95]

In consideration of the compensation provided to the Nation, the SNLCSA specifically provides that its purpose is "to avoid the potential liability on the part of the United States that could be a direct consequence of not reaching a settlement."[96] Moreover, the SNLCSA contemplates that "the Seneca Nation shall execute appropriate documents relinquishing all claims against the United States, the State, the city, the congressional villages, and all prior lessees . . ."[97]

Lastly, "[a] land claim is a claim for land by a tribe on the basis that the land was alienated without the express approval of Congress as required by 25 USC 177 (the Indian Non-Intercourse Act)."[98] The SNLCSA clearly satisfies this requirement as well. Again, Section 177 prohibits the "purchase, grant, lease, or other conveyance of lands" without Federal Approval. The severe land losses discussed above were largely attributable to circumstances and situations whereby Nation lands were alienated without the requisite Federal approval as required by 25 U.S.C. § 177.[99] Moreover, "a New York state court invalidated [certain] leases because the

---

[92] See S.Rept. 101-511 at 6; H.Rept. 101-832 at 5.

[93] See S.Rept. 101-511 at 16.

[94] See S.Rept. 101-511 at 24; H.Rept. 101-832 at 21.

[95] See S.Rept. 101-511 at 31.

[96] 25 U.S.C. § 1774(b)(8).

[97] 25 U.S.C. § 1774b(b); see also S.Rept. 101-511 at 3; H.Rept. 101-832 at 6 ("the Seneca Nation must execute a release of all claims against the United States, the State of New York, the City of Salamanca, and the congressional villages . . .").

[98] See November 18, 1998 Memorandum from the Associate Solicitor, Division of Indian Affairs to the Director of the Indian Gaming Office at 1.

[99] See S.Rept. 101-511 at 1 ("[T]he leases were found by the courts of New York state to be unlawful and void . . ."); see also H.Rept., 101-832 at 3 ("In the mid-nineteenth century, the Seneca began leasing rights-of-way through portions of the reservation to several railroads, . . . without Federal authorization . . ."); H.Rept., 101-832 at 4 ("A careful consideration of the validity of these leases under New York State authority led State courts to the conclusion that such leases were void as being in violation of Federal restrictions against leasing or alienation of Indian lands."); H.Rept., 101-832 at 4 ("The conclusion of the State courts that the non-Indian leases on the Allegany Reservation were void for lack of Federal authorization caused great consternation among the non-Indian lessees . . ."). The United States' brief in the Banner decision also reveals that the Act represents a claim for land by the Seneca Nation on account that the land was alienated without the requisite federal approval. See Brief of Appellee at 4, Banner v. United States, 238 F.3d 1348 (Fed. Cir. 2001) (No. 00-5006) ("A New York state court . . .

# AKIN GUMP
# STRAUSS HAUER & FELDllp

━━━━━━━━━━━━━━ Attorneys at Law

[Nation], a Native American tribe, did not have congressional authority to lease land."[100] Based on the foregoing, lands placed into restricted status pursuant to the SNLCSA and purchased with settlement monies will clearly be acquired as part of "a settlement of a land claim", and thus, the Nation is authorized to use such land for gaming purposes pursuant to IGRA.

　　　　*　　　*　　　*

We appreciate the opportunity to provide this information to you and your staff. Should you have any additional questions about any provisions of the Compact, please feel free to contact either Don Pongrace or Barry Brandon directly at (202) 887-4466 and (202) 887-4542, respectively.

Very truly yours,

Donald R. Pongrace
Barry W. Brandon

---

declared those leases void, since [the Nation] was not authorized to lease reservation land without Congressional approval.").

[100] Banner v. United States, 238 F.3d at 1351 (citation omitted); see also Oneida Indian Nation of N.Y. State v. Oneida County, New York, 414 U.S. 661, 672 n. 8 (1974)("The question of the application of federal law to Indian tribal property in New York was litigated in the state courts in the intervening years as well. In 1870, an unreported decision of the New York Supreme Court held that tribal leases of Seneca reservation lands, ratified by the New York Legislature, were invalid in the absence of approval from the United States."); see also Felix S. Cohen, Handbook of Federal Indian Law, 420 (1942) ("A careful consideration of the validity of these leases under state authority led state courts to the conclusion that such leases were void as being in violation of federal restrictions on Indian lands against leasing or alienation").