IN ARBITRATION UNDER THE COMMERCIAL ARBITRATION RULES OF THE
AMERICAN ARBITRATION ASSOCIATION

Case No. 01-17-0005-3636

**State of New York**

Claimant

v.

**Seneca Nation of Indians**

Respondent

---

## STATEMENT OF DEFENSE

---

**October 26, 2018**

Michele Mitchell
Deputy General Counsel
SENECA NATION OF INDIANS
90 Ohi:yoʼ Way
Allegany Territory
Seneca Nation
Salamanca, New York 14779
(716) 945-1790

John G. Horn
HARTER SECREST & EMERY LLP
50 Fountain Plaza, Suite 1000
Buffalo, New York 14202-2293
(716) 853-1616

Riyaz A. Kanji
David A. Giampetroni
Lucy W. Braun
KANJI & KATZEN, PLLC
303 Detroit Street, Suite 400
Ann Arbor, Michigan 48104
(734) 769-5400

Carol E. Heckman
LIPPES MATHIAS WEXLER FRIEDMAN LLP
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202-2216
(716) 853-5100

*Counsel for Respondent*

<u>Table of Contents</u>

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 2

    I.      The IGRA Framework ................................................................. 2

    II.     The 2001 Memorandum of Understanding ...................................... 3

    III.    The 2002 Nation-State Class III Gaming Compact........................... 4

    IV.   The Nation's Compact Payments .................................................. 7

    V.    The Present Dispute ................................................................... 9

ARGUMENT ...................................................................................................... 12

    I.      Choice of Law .......................................................................... 13

    II.     Governing Principles of Contract Interpretation ............................ 13

    III.    The Compact Unambiguously Requires the Nation To Make Payments for Three Fixed Periods and No Further ........................ 16

    IV.   The State's Textual Arguments Provide No Basis To Depart from the Plain Terms of the Compact.................................................. 23

          A.    Renewal Had No Effect on the Nation's Payment Obligations.......... 23

          B.    The "Structure" of Paragraph 12 Provides No Basis To Depart from the Plain Meaning of Its Text ..................................... 26

    V.    The State's "Commercial Reasonableness" and "Absurdity" Arguments Provide No Basis To Depart from the Plain Language Agreed To by the Parties............................................................. 27

          A.    Paragraph 12 As Written Is Not Commercially Unreasonable.......... 27

          B.    Enforcing Paragraph 12 As Written Would Not Lead to Absurd Results.................................................................... 29

    VI.   The State's Extrinsic Evidence is Not Cognizable........................... 32

          A.    Both New York and Federal Common Law Preclude Consideration of the State's Extrinsic Evidence ....................... 32

B.      The State's "Course of Performance" Argument Finds No Support
        in the Law ................................................................................................ 35

C.      The State's Attempt to Manufacture Ambiguity Finds No Support
        in the Law ................................................................................................ 37

VII.    The Extrinsic Evidence Confirms the Plain Meaning of the Compact
        Terms .......................................................................................................... 38

A.      The 1998 – 2000 Negotiation Period .................................................... 38

B.      The 2001 Resumed Negotiations .......................................................... 38

C.      The Parties' Consideration and Rejection of Revenue-Based
        Payment Models .................................................................................... 40

D.      The Shift to a Time-Period-Based Payment Model and the 2001
        MOU ...................................................................................................... 42

E.      The Nation Rejected a Provision for Payments Through the
        21-Year Life of the Compact and the State Agreed ............................ 43

F.      The 2002 Correspondence Regarding Federal Approval of the
        Compact ................................................................................................ 46

CONCLUSION ........................................................................................................ 52

Cases

*605 Park Garage Assocs. LLC v. 605 Apartment Corp.*, 2004 WL 1562729
(S.D.N.Y. July 12, 2004) ............................................................................ 24

*Air Line Pilots Ass'n, Int'l v. Midwest Express Airlines, Inc.*, 279 F.3d 553
(7th Cir. 2002) .............................................................................................. 34

*Alternatives Fed. Credit Union v. Olbios, LLC*, 14 A.D.3d 779 (3d Dep't 2005) ............. 35

*AM Int'l v. Graphic Mgmt. Assocs.*, 44 F.3d 572 (7th Cir. 1995) ..................................... 34

*Am. Fed'n of Musicians and Employers' Pension Fund v. Atl. Recording Corp.*,
203 F. Supp. 3d 301 (S.D.N.Y. 2016) ......................................................... 36

*Arizona v. California*, 292 U.S. 341 (1934) ........................................................................ 33

*Arizona v. Tohono O'odham Nation*, 818 F.3d 549 (9th Cir. 2016) .......................... 14, 33

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1 (1st Dep't 2012) ...................... 15

*Assured Guar. Mun. Corp. v. DLJ Mortgage Capital, Inc.*, 117 A.D.3d 450
(1st Dep't 2014) ........................................................................................... 23

*Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69 (3d Cir. 2011) ...................... 36, 37

*Barseback Kraft AB v. United States*, 36 Fed. Cl. 691 (Fed. Cl. 1996) ........................... 37

*Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318 (2007) ............................................................. 14

*Brad H. v. City of New York*, 17 N.Y.3d 180 (2011) ........................................................ 15

*Cachil Dehe Band of Wintun Indians v. California*, 618 F.3d 1066
(9th Cir. 2010) ........................................................................................ 14, 33

*Cellular Mann, Inc. v. JC 1008 LLC*, 113 A.D.3d 521 (1st Dep't 2014) .......................... 36

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 773 F.3d 110
(2d Cir. 2014) ............................................................................................... 35

*Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226 (10th Cir. 2018) ...................... 14

*Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568 (2d Cir. 1993) ................... 33

*County of Jefferson v. Onondaga Dev.*, 151 A.D.3d 1793 (4th Dep't 2017) ..................... 20

*Dalton v. Pataki*, 5 N.Y.3d 243 (2005) ............................................................................... 2

*Dime Sav. Bank, FSB v. Montague St. Realty Assocs.*, 90 N.Y.2d 539 (1997) ................ 24

*Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239 (2014) ........................................... 14, 19, 32

*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015 (9th Cir. 2012) ........................... 37

*Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653 (8th Cir. 1992) ................................ 37

*Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202 (2d Cir. 2002) ........................... 14, 33

*Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding, LLC*,
20 N.Y.3d 438 (2013) ............................................................................................... 28

*Grace v. Nappa*, 46 N.Y.2d 560 (1979) ..................................................................... 14, 30

*Greenfield v. Philles Records*, 98 N.Y.2d 562 (2002) ......................................... 14, 15, 16

*Hudson-Port Ewen Assocs., L.P. v. Chien Kuo*, 165 A.D.2d 301 (3d Dep't 1991) .......... 17

*Huron Group, Inc. v. Pataki*, 785 N.Y.S.2d 827 (N.Y. Sup. Ct. 2004) ........................... 13

*Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095 (9th Cir. 2006) ............................... 13

*In re New Valley Corporation*, 89 F.3d 143 (3d Cir. 1996) ............................................ 36

*In re Victory Mkts.*, 221 B.R. 298 (B.A.P. 2d Cir. 1998) ................................................ 33

*Jade Realty LLC v. Citigroup Commercial Mortgage Trust 2005-EMG*,
20 N.Y.3d 881 (2012) ........................................................................................... 31, 32

*Kerin v. U.S. Postal Serv.*, 116 F.3d 988 (2d Cir. 1997) ................................................ 34

*Lipshultz v. K & G Indus., Inc.*, 742 N.Y.S.2d 90 (2d Dep't 2002) ................................ 20

*Marathon Oil Co. v. United States*, 42 Fed. Cl. 267 (Fed. Cl. 1998) .............................. 37

*Marin v. Constitution Realty, LLC*, 28 N.Y.3d 666 (2017) ............................................ 13

*Mason v. Mason*, 41 A.D.2d 607 (1st Dep't 1973) ....................................................... 45

*Meyer v. Stout*, 79 A.D.3d 1666 (4th Dep't 2010) .................................................... 31, 32

*Mount Vernon Fire Ins. Co. v. Creative Hous.*, 88 N.Y.2d 347 (1996) ........................... 37

*N. Fork Bank & Trust Co. v. Romet Corp.*, 596 N.Y.S.2d 449 (2d Dep't 1993) .............. 21

iv

*Nissho Iwai Europe v. Korea First Bank*, 99 N.Y.2d 115 (2002) ........................ 15, 20, 28

*Oklahoma v. New Mexico*, 501 U.S. 221 (1991) .................................................................. 33

*Oppenheimer & Co. v. Oppenheim*, 86 N.Y.2d 685 (1995) ................................. 16, 23, 45

*Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549 (2014) ...................... 15, 21, 25

*R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29 (2002) .................................................. 14

*Reiss v. Fin. Performance Corp.*, 279 A.D.2d 13 (1st Dep't 2000) ................................. 22

*Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195 (2001) .............................. 14, 15, 22, 25

*Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019 (9th Cir. 2010) ..................................................... 3, 51

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398 (2009) ......... 15

*Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430 (2013) .................................... 15, 22, 32

*State v. Indus. Site Servs., Inc.*, 52 A.D.3d 1153 (3d Dep't 2008) ................................... 35

*Texas v. New Mexico*, 462 U.S. 554 (1983) ........................................................................ 33

*Tonking v. Port Auth.*, 3 N.Y.3d 486 (2004) ...................................................................... 23

*Trustees of Freeholders & Commonalty v. Jessup*, 173 N.Y. 84 (1903) ................... 15, 21

*United States v. Hescorp, Heavy Equip. Sales Corp.*, 801 F.2d 70 (2d Cir. 1986) ........... 37

*Universal Am. Corp. v Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 25 N.Y.3d 675 (2015) ............................................................................................................................... 37

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470 (2004) ............. 15, 45

*W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157 (1990) .................................................... 14

*Wallace v. 600 Partners Co.*, 86 N.Y.2d 543 (1995) ................................................. passim

*Westlands Water Dist. v. United States*, 337 F.3d 1092 (9th Cir. 2003) ........................... 37

Statutes

Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 .............................. 1, 2, 3, 48, 50

Regulations

67 Fed. Reg. 72,968 ............................................................................................................... 6

Constitutional Provisions

N.Y. art. I, § 9(1)...............................................................................................................49

Other Authorities

Restatement (Second) of Contracts § 202(4) ......................................................................35

Restatement (Second) of Contracts § 214(c) and cmts ......................................................37

U.C.C. § 2-102 ....................................................................................................................37

# INTRODUCTION

This dispute centers on the proper interpretation of the 2002 Gaming Compact ("Compact") entered into by the Seneca Nation ("Nation") and the State of New York ("State") pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721 (RLA-1).  The Nation seeks to have the Compact enforced according to its plain terms.  Such enforcement would implement the expectations of the Parties and honor every bedrock principle governing the interpretation of those terms – principles arising out of IGRA as well as both state and federal contract law.

The State, by contrast, seeks an outcome nowhere reflected in the Compact.  It makes only a passing attempt at a textual argument and instead devotes the vast majority of its brief to volumes of extrinsic evidence.  That evidence is categorically inadmissible as a matter of law and the State's attempts to argue otherwise are foreclosed by the very cases on which it relies.  But even if it were admissible, none of the State's extrinsic evidence addresses the question at issue.  Faced with unambiguous and unfavorable text, the State seeks refuge in a narrative of distraction permeated with subjective conclusions presented as fact and claims of mutual intent demonstrably at war with the very evidence relied upon.  Moreover, while the State purports to have provided this Panel with a comprehensive account of the Parties' negotiations, its account does not include the exchange of draft language at the specific juncture in the negotiations where the Parties in fact considered the question at issue here.  That exchange shows that the Parties flatly *rejected* the position the State now espouses and accepted the Nation's.   If extrinsic evidence is to be considered, this objective evidence of the drafting history is fatal to the State's position.

Because the Nation's interpretation of the Compact is consistent with the text agreed to by the Parties, with controlling principles of contract law governing its proper interpretation, with the purposes of IGRA, and (if it is to be considered) with the relevant extrinsic evidence, the Nation respectfully requests that the Panel enter judgment in its favor.

## BACKGROUND

### I.     The IGRA Framework

The Nation operates and regulates gaming activities on its Territories as an incident of its sovereign authority over those lands.  Congress enacted IGRA in 1988 to provide a framework for the conduct of such gaming.  That framework calls for the negotiation of a gaming compact between a state and any Indian nation within its borders that seeks to engage in what the statute categorizes as Class III gaming on its sovereign territory.  *See id*. § 2710(d) (RLA-2).[1]  Such compacts may address matters including the types of games to be offered by the Indian nation, the licensing of facilities and employees, gaming standards, and "any other subjects that are directly related to the operation of gaming activities."  *Id*. § 2710(d)(3)(C).

Since the enactment of IGRA, a number of states and Indian nations have included revenue-sharing agreements in their compacts, under which an Indian nation makes payments (derived from its gaming activities) to a state in exchange for the state's guarantee that the nation will enjoy the exclusive right to conduct certain (or all) forms of

---

[1]  "Class III gaming is the most heavily regulated type of gaming under IGRA.  The federal regulations give examples of Class III gaming 'including but not limited to . . . [a]ny house banking game' such as baccarat or blackjack, casino games including roulette or keno, slot machines, sports betting and lotteries (*see* 25 CFR § 502.4)."  *Dalton v. Pataki,* 5 N.Y.3d 243, 252 n.1 (2005) (ellipsis and brackets in original) (RLA-3).

gaming within the state, or within a specified geographic region of the state.  The State and the Nation included such a revenue-sharing provision in their Compact and the proper interpretation of that provision is the focus of this dispute.

That provision, like all tribal-state compact provisions, must be construed "consistent with the purposes of IGRA[.]"  *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1033 (9th Cir. 2010) (RLA-4).  Congress's first stated purpose in enacting IGRA was "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments[.]"  25 U.S.C. § 2702(1) (RLA-5).  IGRA was not enacted to further state economic interests, and those interests are therefore not a permissible factor in interpreting revenue-sharing provisions.  *See Rincon*, 602 F.3d at 1035 (rejecting argument "that pursuit of state general economic interests is consistent with IGRA's purposes" and stating that "IGRA's stated purposes include ensuring that *tribes* are the *primary beneficiaries* of gaming . . . as a means of generating *tribal revenue*").  While gaming compacts may include provisions for "the assessment by the State of . . . such amounts as are necessary to defray the costs of regulating [the Indian nation's] gaming activity," 25 U.S.C. § 2710(d)(3)(C)(iii), states may not otherwise seek to impose "a tax, fee, charge, or other assessment" on the gaming activity, *id*. § 2710(d)(4).

## II.     The 2001 Memorandum of Understanding

The State and the Nation negotiated their Class III gaming Compact within the IGRA framework.  The negotiations resulted in a Memorandum of Understanding ("MOU"), executed by the Parties in 2001, that memorialized the key aspects of their

agreement, including its term, the location of the Nation's gaming facilities, licensing and law enforcement issues, and the types of games the Nation would conduct. Ex. CX-22.

The MOU provided for a Compact term of 21 years, consisting of a 14-year initial period with an automatic 7-year renewal period absent written objection by either Party. MOU at 1. It stated that the Nation would enjoy "total exclusivity" with respect to the operation of slot machines and other electronic gaming devices in a defined geographic area of western New York for the 21-year duration of the agreement. *Id.* at 3. In exchange, the Nation was to pay to the State an escalating share of the revenues from its operation of those devices over the course of three defined payment periods for a total of 14 years – beginning on the date the Nation commenced gaming. *Id.* at 4. The express terms of the three payment periods set forth in the MOU are identical to those set forth in the Compact.

As discussed in detail in Part VII. A.-E. below, the negotiations leading up to the execution of the MOU confirm that payments for the duration of these three periods – and no further – is precisely what the Parties agreed to. In an exchange of drafts, the Nation proposed that its payments extend through "Years 8-14" (pegged to the commencement of its gaming operations). Ex. RX-14 at 4. The State counter-proposed to extend them instead through "Years 7+," which by its plain meaning would have extended the Nation's payment obligations through the full life of the Compact. Ex. RX-15 at 4. The Nation rejected the State's proposal and the Parties agreed to the Nation's "Years 8-14" term in the final Compact.

### III.     The 2002 Nation-State Class III Gaming Compact

The Nation and the State executed the final Compact on August 18, 2002. Ex. CX-27 ("Compact"). The Secretary of the Interior allowed the Compact to take effect on

November 12, 2002, deeming it "approved, 'but only to the extent the compact is consistent with the provisions of [IGRA].'" Ex. CX-32 (November 12, 2002 Letter of Dep't of Interior to Seneca Nation at 7-8).

The Compact incorporated the terms of the MOU by reference. Like the MOU, it addressed matters including the location of the Nation's gaming facilities, licensing and law enforcement issues, and the types of gaming the Nation would conduct. Like the MOU, the Compact expressly provided for a term of 21 years, consisting of an initial period of 14 years and a 7-year renewal period. And like the MOU, the Compact provided that the Nation would enjoy exclusivity in a geographically defined area in Western New York for the 21-year duration of the Compact, in exchange for revenue-sharing payments to the State to be made according to a schedule (as agreed to by the Parties during their negotiation of the MOU) of three fixed periods, as follows:

12. **<u>EXCLUSIVITY AND STATE CONTRIBUTION</u>.**

(a)     <u>Exclusivity</u>.

(1)     [T]he Nation shall have total exclusivity with respect to the installation and operation of, and no person or entity other than the Nation shall be permitted to install or operate, Gaming Devices, including slot machines, within the [defined] geographic area . . . [in western New York].
. . . .

(b)     <u>State Contribution</u>.

(1)     In consideration of the exclusivity granted by the State pursuant to Paragraph 12(a), the Nation agrees to contribute to the State a portion of the proceeds from the operation and conduct of each category of Gaming Device for which exclusivity exists, based on the net drop of such machines (money dropped into machines, after payout but before expense)  and totaled on a cumulative quarterly basis to be adjusted annually at the  end of the relevant fiscal year, in accordance with the sliding scale set  forth below ("State Contribution"):

Years 1-4

18%, with "Year 1" commencing on the date on which the first Gaming Facility established pursuant to this Compact begins operation, and with Payments during this initial period are to be made on an annual basis.

Years 5-7

22%, with payments during this period to be made on a semi-annual basis.

Years 8-14

25%, with payments during this period to be made on a quarterly basis.

Compact ¶ 12.

Under these provisions, then, the Nation was required to make revenue-sharing payments over the course of three expressly defined payment periods (18% of "net drop" for "Years 1-4," 22% for "Years 5-7," and 25% for "Years 8-14"). *Id.* ¶ 12(b)(1). The first payment period was to "commenc[e] on the date on which the first Gaming Facility established pursuant to this Compact begins operation[.]" *Id.* The Parties further understood and agreed that the Nation could begin operations (and hence trigger the onset of the Nation's payment obligation) any time "within sixty (60) months of the Effective Date" of the Compact. *Id.* ¶ 12(a)(3). Accordingly, the three payment periods were independent of the initial 14-year term of the Compact. Because the "Year 1-4" period could commence up to five years after the Compact took effect, the "Years 8-14" period could extend a commensurate amount of time into the renewal period.

The Compact took effect on December 9, 2002, *see* 67 Fed. Reg. 72,968 (RLA-6), and the Nation began operating its first facility (on its Niagara Falls Territory) on December 31, 2002. As implemented, then, the Nation's payment obligations continued past the December 9, 2016, onset of the renewal period, concluding at the end of the "Years 8-14" period on December 31, 2016.

With respect to the types of games encompassed in the Parties' revenue-sharing agreement, the Compact defines "Gaming Device" as used in Paragraph 12 as including both slot machines and "video lottery games." Compact ¶ 1(m). The latter are commonly referred to as video lottery terminals, or VLTs. Under ¶ 12(b), the Nation's payment obligations and the State exclusivity obligations are bifurcated as between these two categories of devices. That is, if the State introduced one category into the Nation's exclusivity zone, the Nation no longer was obligated to share the revenues from its operation of that category of game, but was still required to share the revenues from its operation of the "category of Gaming Device for which exclusivity exists[.]" Compact ¶ 12(b)(1). The State authorized the operation of VLTs at three horse racing tracks in the Nation's exclusivity zone beginning in 2004. Sworn Witness Statement of David Sheridan ("Sheridan") ¶ 27. Therefore, the Nation was required to continue to share the revenues from its operation of slot machines so long as the State VLTs did not qualify as slot machines under the Compact.

## IV. The Nation's Compact Payments

The terms of the revenue-sharing arrangement set forth in Paragraph 12 of the Compact have proven highly remunerative for the State. Under those terms, the Nation made in excess of $1.4 billion in exclusivity payments to the State between 2003 and 2016. *See* Claimant's Demand for Arbitration ("Demand") ¶ 16. *See also* Sheridan ¶ 36.

The Nation's payment rates are based on a percentage of the "net drop" of its slot machines, defined as "money dropped into machines, after payout but before expense[.]" Compact ¶ 12(b)(1). In other words, the payments are made without taking into account the many significant expenses associated with the operation of the Nation's gaming

facilities, including labor, infrastructure, and all operating costs. Sheridan ¶ 23. When those expenses are taken into account, the Nation's payments to the State have

> accounted for 42.6% of the Nation's adjusted net income from its Class III gaming operations during the 14-year State Contribution term; and in the past three fiscal years, the State's cut has averaged more than 46%, with a high in 2015 of almost 49%.

Sheridan ¶ 24.

The State receives these payments while bearing none of the risk, operating costs, or capital expenditures associated with the Nation's gaming facilities. Sheridan ¶ 25. In addition, because the Nation's exclusivity rights under the Compact are, as noted above, bifurcated between VLTs and slot machines, Compact ¶ 12(a)(4), the State has been able to collect slot machine revenue-sharing payments from the Nation while at the same time authorizing and profiting from directly competitive VLT gaming within the Nation's exclusivity zone. Three State-licensed VLT facilities (Finger Lakes Gaming & Racetrack, Batavia Downs, and Hamburg Gaming) opened in the exclusivity zone in 2004 and 2005 and continue in successful operation today.[2]

Commencing in 2011, the Parties arbitrated a dispute arising out of the Nation's claim that the marketing of the State VLTs and facilities within the Nation's exclusivity zone as "slot machines" and "casinos," Sheridan ¶ 28, and the operation of games within

---

[2] The State-licensed VLTs are, from a player's perspective, indistinguishable from the Nation's slot machines. Bennett Liebman, who served as the Deputy Secretary for Gaming and Racing in Governor Cuomo's administration between 2011 and 2014, wrote in 2010 (when he was Executive Director of the Government Law Center of Albany Law School) that:

> New York State now has over 12,500 video lottery terminals at eight racetracks. These video lottery terminals play in the same manner as slot machines. . . . [The State] has machines denoted as video lottery machines that look, smell, play, and sound like slot machines to the general public.

*See* Sheridan ¶ 29, Ex. RX-12 (Liebman, *Gambling and the New York State Constitution*, 12 Gov't L. & Pol'y J. 46, 47-48 (Spring 2010). *Available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1645379.) *See also* New York State Gaming Commission, *Gaming* (VLTs "have the same appearance as slot machines."). *Available at* https://www.gaming.ny.gov/gaming/ (last visited Oct. 24, 2018).

the State facilities that satisfied the Compact definition of a "slot machine," breached the Nation's slot machine exclusivity. After a week-long arbitral trial in 2013, the Parties settled the matter.

The Nation's gaming operations have resulted in substantial benefit to the economies of the State and the local communities in which Nation casinos are located. The Nation has invested over $1.2 billion in its three casino properties and is one of the largest employers in Western New York. Sworn Witness Statement of Nation President Todd Gates ("Gates") ¶ 26. The State and local economies benefit from more than $150 million in wages and benefits paid to approximately 3,700 Nation gaming employees and from the Nation's $75 - $80 million of annual purchases from New York vendors. *Id*. Over 2,000 of these employees are covered under SGC's health insurance plans, including 827 families. *Id*. These contributions to the livelihood of employees and vendors, and the approximately 7.8 million customer visits to the Nation's facilities every year, *id.*, have yielded, and will continue to yield, significant economic development in the region, with concomitant benefits to the tax base for the State and local governments.

## V.    The Present Dispute

The initial 14-year term of the Compact ended on December 9, 2016. Neither Party objected to the automatic renewal of the Compact 120 days prior to that date. The Compact therefore renewed automatically for an additional 7 years pursuant to Paragraph 4(c)(1) and is currently in effect.

Under the payment schedule set forth in Paragraph 12 of the Compact, the Nation continued to make exclusivity payments based on slot revenues earned through December 31, 2016, or 14 years after the Nation had opened its first gaming facility. The State then informed the Nation that it interpreted the Compact to require the Nation to

make exclusivity payments for the duration of the Compact but pointed to no language imposing such a requirement. The Nation has informed the State that the Compact plainly and unambiguously identifies a fixed three-interval payment schedule that has concluded and that the Nation accordingly bears no further exclusivity payment obligations. *See* Gates ¶ 7.

In a transparent attempt to bias the Panel, the State alleges – with no evidentiary support – that the Nation thereafter "rebuffed all meaningful attempts made by the State to engage in negotiations, resulting in the commencement of this arbitration." State Br. ¶ 31. In fact, in five letters written by Nation President Gates and his senior staff over a five-month period between March and July 2017, the Nation explicitly and unequivocally expressed the President's willingness to meet with the Governor in good faith and to give him a fair opportunity to explain the State's position. Gates ¶¶ 10-13, 15. The Governor finally agreed to meet with the President but then twice cancelled, the second time abruptly backing out the day after the Nation had undertaken extensive preparations for the meeting. *Id.* ¶¶ 16-17. Rather than trying to work through matters with the Nation as promised, the State chose instead to initiate a campaign of disparagement and economic threats against the Nation in the press. Gates ¶¶ 14, 18.[3]

The State also contends that the Nation's fulfillment of its payment obligations "took . . . the local communities in western New York . . . by complete surprise." State Br. ¶ 28. But the Compact requires that "*the State* shall reach financial agreements with the host municipal governments[.]" Compact ¶ 11(d) (emphasis added). Thus, if the

---

[3] The State made a similar, unsupported claim regarding the Nation's alleged unwillingness to resolve this dispute in its Demand for Arbitration. *See* Demand ¶ 36. In its Answer, the Nation responded with the documentary evidence to the contrary noted here. *See* Answer ¶¶ 25-28 and Attachment 1. The State nevertheless insists on reiterating its disproven claims, but mere repetition cannot turn accusations into fact.

local governments were in fact "surprise[d]" to learn of the duration of the Nation's payments, that is simply the result of the State's failure to communicate with them regarding the clear terms of the Compact. But more fundamentally, the Compact did not require the Nation to compensate local communities at all. It required the State to do so:

> The Parties agree that host municipalities should be compensated to be able to adjust to the economic development expected to result from the Gaming Facilities authorized under this Compact. Consistent with this goal, the State shall reach financial agreements with the host municipal governments, *and any payments made pursuant to such agreements shall be made by the State.*

*Id.* (emphasis added). The State has received $1.4 billion from the Nation since 2002. If it failed to properly budget that money (with respect to its commitments to the local governments) in light of the plain terms of the Compact, that again lies at the feet of the State. The State's attempt to portray the Nation as somehow pulling the rug out from beneath the local governments is simply deflection of its own error.

And, most importantly, the Nation has in fact sought to ameliorate any harm to the local governments from the State's error. Indeed, while the Nation was attempting to meet with the Governor, it also reached out to the mayors of the three cities in which its casinos are located. In a series of phone calls and letters, President Gates expressed his desire to discuss how best to continue the Nation's contributions to the financial well-being of the region. Gates ¶¶ 21-23. To that end, the Nation has informed each mayor that "we remain committed to being good neighbors in the region and will continue working with your government and local charitable leaders to see how we can be most helpful to our neighboring communities." Gates ¶ 22, Ex. RX-7. Unfortunately, only one mayor has thus far responded to the Nation's outreach efforts. Gates ¶¶ 24-25.

The Nation, in sum, has made repeated good-faith efforts to engage in meaningful discussions over Compact issues with both the State and the relevant local units of government, and the State's naked claims to the contrary are simply inexplicable.

The State filed this action on September 7, 2017.

## ARGUMENT

This Panel must choose between two competing interpretations of the 2002 Gaming Compact. The State's interpretation is inconsistent with the purposes of IGRA and violates controlling principles of state and federal contract law because it directly contradicts the unambiguous language agreed to by the Parties. By contrast, the Nation's interpretation honors the purposes of IGRA and adheres to governing principles of contract law because it follows the express terms negotiated by the Parties, which are clear, complete, and enforceable according to their plain meaning. As such, the Nation should prevail as a matter of law.

Recognizing that it lacks a plausible textual basis for its position, the State makes only nominal textual arguments and instead spends the vast majority of its brief on selectively curated extrinsic evidence of the Parties' negotiations. As demonstrated below, that evidence is categorically inadmissible under both New York and federal common law; and even if it were admissible, it says nothing about the question before this Panel. Further, in its "detailed account of the negotiations," State Br. ¶ 32, the State makes no mention of the *one* item of extrinsic evidence – the documentary exchange of proposed exclusivity payment language – establishing that the Parties *expressly considered and rejected* the very result the State now urges this Panel to ordain.

## I. Choice of Law

The Compact does not include a choice of law provision. At the outset of these proceedings, the Parties agreed that New York contract law would govern this Panel's interpretation of the Compact. *See* Demand ¶ 34 ("In light of the location of the Parties and the subject of the Compact, the substantive laws of New York should apply."); Answer ¶ 2. They continue to agree that New York contract law applies. *See* State Br. ¶¶ 79, 103. However, the State now asserts that the federal common law of contracts also applies. *Id*. ¶ 79. The State has belatedly altered its position because it believes it has found an opening in federal common law, foreclosed under New York law, through which it can inject volumes of extrinsic evidence into these proceedings. In fact, as demonstrated below, there is no difference between New York contract law and the federal common law of contracts that would permit consideration of the State's extrinsic evidence under the latter. Accordingly, the Nation will frame its arguments under New York contract law, as the Parties agree that it generally governs, and will address federal common law only on the points on which the State alleges any differentiation exists. *Cf. Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095, 1098 (9th Cir. 2006) (RLA-7) (applying state contract law to interpret IGRA compact where there is "no difference between [state] and federal contract law"). *See also*, *e.g.*, *Huron Group, Inc. v. Pataki*, 785 N.Y.S.2d 827, 856 (N.Y. Sup. Ct. 2004) (RLA-8), *aff'd*, 23 A.D.3d 1051 (4th Dep't 2005) (applying New York contract law to interpret Seneca Nation gaming compact).

## II. Governing Principles of Contract Interpretation

Contracts "'are construed in accord with the parties' intent,'" and "[t]he best evidence of that intent is the parties' writing[.]" *Marin v. Constitution Realty*, *LLC,* 28 N.Y.3d 666, 673 (2017) (RLA-9) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562,

569 (2002) (RLA-10). Accordingly, "courts may not by construction add or excise terms . . . and thereby make a new contract for the parties under the guise of interpreting the writing." *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001) (RLA-11) (internal quotation marks and citations omitted). Instead, "it is the duty of a court to enforce rather than reform the bargain struck." *Grace v. Nappa*, 46 N.Y.2d 560, 565 (1979) (RLA-12) (citations omitted). In doing so, "[t]he words and phrases used by the parties must . . . in all cases involving contract interpretation, be given their plain meaning." *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014) (RLA-13) (citations omitted). *See also Greenfield*, 98 N.Y.2d at 569 (same).

It is hence a bedrock principle of New York contract law that "[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract[.]" *Ellington*, 24 N.Y.3d at 244. *See also*, *e.g.*, *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007) (RLA-14) (same); *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 33 (2002) (RLA-15) (same); *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) (RLA-16) (same); *Greenfield*, 98 N.Y.2d at 574 (referring to "the 'four corners' rule that New York has long applied").[4]

---

[4] Federal common law likewise adheres to the four corners principle, as the State's own cases demonstrate. *See Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 560-561 (9th Cir. 2016) (RLA-17) (interpreting IGRA compact and stating that "[f]ederal common law follows the traditional approach" that a "contract[] must be discerned within its four corners") (brackets in original) (cited at State Br. ¶ 79 & ns.91-92); *Cachil Dehe Band of Wintun Indians v. California*, 618 F.3d 1066, 1073, 1075 (9th Cir. 2010) (RLA-18) (applying "[g]eneral principles of federal contract law" to IGRA compact, finding it facially ambiguous, and stating that, "*[g]iven this ambiguity*, we are permitted to consider extrinsic evidence when interpreting the Compact" (emphasis added)) (cited at State Br. ¶ 79 n.91). *See also*, *e.g.*, *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002) (RLA-19) (applying "federal common law of contract" and stating that "[i]t is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence"); *Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226, 1239 (10th Cir. 2018) (RLA-20) (interpreting IGRA compact and stating same).

Under these principles, "[a]mbiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence[.]" *Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) (RLA-21); *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013) (RLA-22) (same); *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (RLA-23) (same). Nor can ambiguity be found on the basis of a purported textual omission. *See Reiss*, 97 N.Y.2d at 199 (2001) ("An omission . . . in a contract does not constitute an ambiguity[.]"). Instead, whether a contract is ambiguous "must be determined by the court . . . looking solely to the plain *language used by the parties*" in the agreement. *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7 (1st Dep't 2012) (RLA-24) (emphasis added). Thus, "ambiguity does not arise from silence[.]" *Nissho Iwai Europe v. Korea First Bank*, 99 N.Y.2d 115, 121-22 (2002) (RLA-25) (citing *Trustees of Freeholders & Commonalty v. Jessup*, 173 N.Y. 84, 90 (1903) (RLA-26) (ambiguity "never arises out of what was not written at all, but only out of *what was written*" (emphasis added))). *See also Greenfield*, 98 N.Y.2d at 573 (the "suggestion that the failure of a contract to address certain categories of royalties allows a court to look beyond the four corners of the document to discern the parties' true intent conflicts with our established precedent that silence does not equate to contractual ambiguity"). Therefore, "if parties to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014) (RLA-27).

Finally, all of these principles govern with "special import" where a contract is "negotiated between sophisticated, counseled [parties] negotiating at arm's length," *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) (RLA-

28) (internal quotation marks and citation omitted), which is certainly an apt way to describe the negotiations between the sovereign State and Nation over the Compact. In such circumstances, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Id.* (internal quotation marks and citation omitted). *See also*, *e.g.*, *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548 (1995) (RLA-29) (same). Thus, if "sophisticated parties . . . . are dissatisfied with the consequences of their agreement, the time to say so [was] at the bargaining table[.]" *Oppenheimer & Co. v. Oppenheim*, 86 N.Y.2d 685, 695 (1995) (RLA-30) (internal quotation marks and citation omitted) (first brackets in original).

## III. The Compact Unambiguously Requires the Nation To Make Payments for Three Fixed Periods and No Further

"[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield*, 98 N.Y.2d at 569 (citations omitted). Such is the case here. As set forth above, the Parties agreed to a 21-year Compact term, with a 14-year initial term and a 7-year renewal to take effect automatically absent written objection by either Party. Compact ¶ 4. The Nation's right to exclusivity under the Compact is unrestricted in duration and continues so long as the Compact is in effect. *See* Paragraph 12(a)(1) ("the Nation *shall have* total exclusivity" (emphasis added)). This fact is undisputed. *See* State Br. ¶ 27 ("the Nation continues to enjoy exclusivity under the Compact in the Exclusivity Area").

Indeed, the Compact contains numerous promises like this that are, by their plain terms, unlimited as to duration and that remain in effect for so long as the Compact does. *See*, *e.g.*, Compact ¶ 5(a) (the Nation "*shall have* responsibility for the on-site regulation" of gaming); ¶ 6(a) (State Gaming Officials "*shall have* responsibility to ensure Nation

compliance with the terms of this Compact"); ¶ 8(a) ("The Nation Gaming Operation *shall make* and keep books and records that accurately and fairly reflect each day's transactions") (emphases added).

Paragraph 12(b), requiring the Nation to make revenue-sharing payments to the State, stands in contrast. It does not provide, in open-ended fashion, that in exchange for exclusivity the Nation "shall make payments" to the State at specified rates, as is the State's theory. Instead, it expressly delimits the Nation's payment obligations to a timetable of three fixed payment periods, as follows: "In consideration of the exclusivity granted by the State pursuant to Paragraph 12(a), the Nation agrees" to make exclusivity payments to the State "*in accordance with the sliding scale set forth below*[.]" Compact ¶ 12(b)(1) (emphasis added). That sliding scale expressly requires the Nation to make net drop payments of 18% for "Years 1-4," 22% for "Years 5-7," and 25% for "Years 8-14." *Id*. The Compact makes no reference whatsoever to payments by the Nation beyond those three discrete periods.

The State refers, without support, to its "*assumption* that higher payments would continue[.]" Demand ¶ 23 (emphasis added). *See also* State Br. ¶ 32 (referring to "basic assumptions"). But it is well-settled that "the express provisions of the contract must prevail over the conclusory allegations of either party, whose subjective intent is irrelevant." *Hudson-Port Ewen Assocs., L.P. v. Chien Kuo*, 165 A.D.2d 301, 305 (3d Dep't 1991) (RLA-31) (citation omitted), *aff'd*, 78 N.Y.2d 944 (1991).

That the Nation's payment obligation is limited under the Compact to those three periods is reinforced by the fact that the obligation commenced "on the date on which the first Gaming Facility established pursuant to this Compact begins operation[.]" Compact

¶ 12(b)(1). In other words, revenue-sharing payments would not begin until the Nation had an operating facility able to generate revenue. And the Parties expressly agreed and understood that this could have been *up to five years* after the Compact went into effect. *See id.* ¶ 12(a)(3) (conditioning exclusivity on the Nation beginning operations "within sixty (60) months of the Effective Date.").

Thus, under the plain terms of Paragraph 12, the Nation could have (though only as a theoretical matter) opened its first facility (commencing its payment obligations) on the effective date of the Compact. In that case the 14-year payment period (shown below with the "Years 1-4" period in yellow, "Years 5-7" in green, and "Years 8-14" in blue, with renewal noted by "[**R**]") would coincide with the first 14-year term, as follows:

1 2 3 4 5 6 7 8 9 10 11 12 13 14 [**R**] 15 16 17 18 19 20 21

Or, *under those same plain terms*, the Nation could have opened its first facility as late as December 9, 2007, and its 14-year payment period (starting with the "Years 1-4" period) would have commenced on that date, with the "Years 8-14" period, then, ending on December 9, 2021 – *i.e.*, deep into the renewal period and nearly to the conclusion of the 21-year term of the Compact – as follows:

1 2 3 4 5 6 7 8 9 10 11 12 13 14 [**R**] 15 16 17 18 19 20 21

Indeed, the Nation could have opened its first facility at any point within 5 years of December 9, 2002, with its payment obligation extending into the renewal period a corresponding length of time. The 14-year payment window, then, was contingent. Its start and end dates did not become fixed until the Nation opened its first facility after the Compact went into effect. Had the Nation not opened its first facility for 5 years, thus extending the payment period as in the second example above, the State's claim for

payments beyond the express "Years 8-14" period would have evidently made no sense. It makes no more sense simply because the Nation successfully opened its first facility shortly after the Compact took effect.

The Parties' express specification of three fixed payment periods constitutes definitive evidence of their intent that the Nation would have no payment obligation beyond those periods. "[W]ords and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning." *Ellington*, 24 N.Y.3d at 244 (internal quotation marks and citations omitted). The term "Years 8-14" is not remotely susceptible to being interpreted as encompassing "Year 15" or any year thereafter. Had the Parties intended that the Nation make exclusivity payments beyond "Years 8-14," they could easily have used a term to capture that intent, such as "Years 8 and after," "Years after 7," or "Years 7+."

In fact, as noted above and discussed in Part VII. E. below, the Parties expressly considered *and rejected* a proposal by the State to use "Years 7+" for the duration of the final payment period and chose instead to use the Nation's proposed "Years 8-14." By contrast, the State successfully negotiated for such a provision in its 2005 Compact amendment with the St. Regis Mohawk Tribe. There, the State agreed to provide slot machine exclusivity to the Tribe in exchange for a percentage of net drop as follows: "in years one through four, eighteen percent; years five through seven, twenty-two percent; and *in years after seven,* twenty-five percent."[5] The Parties could have used a similar formulation here but did not. The formulation they instead chose – "Years 8-14" –

---

[5] 2005 Amendment to the Tribal-State Compact Between the St. Regis Mohawk Tribe and the State of New York, at 4 (emphasis added). *Available at* https://www.indianaffairs.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-025234.pdf.

simply cannot be stretched, as a matter of plain meaning, to extend past the time period covered by its unambiguous terms.

Nor does that conclusion change when the payment schedule is considered in the context of the Compact as a whole. When the Parties intended other payment obligations of the Nation to span the entire 21-year period of the Compact, they accomplished that intent expressly. Paragraph 12(b) is one of two provisions in the Compact setting forth payment obligations between the Parties. The other is Paragraph 11, which pertains to the sites for the Nation's gaming facilities and includes an arrangement whereby the Nation agreed to make nominal lease payments for the Niagara Falls Convention Center "for a period of twenty one (21) years[.]" Compact ¶ 11(b)(2)b-c. Thus, the Parties clearly understood how to specify a performance obligation that could span the entire 21-year term of the Compact. Under fundamental principles of contract law, the Parties' decision not to employ a like formulation in Paragraph 12 must be honored. *See, e.g.*, *Lipshultz v. K & G Indus., Inc.*, 742 N.Y.S.2d 90, 92 (2d Dep't 2002) (RLA-32) (where the parties "needed and/or wanted to refer to the general contractor elsewhere in the contract, they specifically did so. The parties easily could have included the general contractor in the [contract provision at issue], but chose not to do so.").

Nor does the fact that the Compact makes no reference to a payment obligation beyond "Years 8-14" render the Compact ambiguous. The law is emphatic that "ambiguity does not arise from silence[.]" *Nissho Iwai Europe*, 99 N.Y.2d at 121-22. *See also County of Jefferson v. Onondaga Dev.*, 151 A.D.3d 1793, 1798 (4th Dep't 2017) (RLA-33) (the "contention that the failure of the contract to address [road] grading allows the court to look beyond the four corners of the document to discern the parties' true

intent conflicts with the well-settled principle that silence does not equate to contractual ambiguity" (internal quotation marks and citation omitted)), *amended on other grounds*, 162 A.D.3d 1602 (4th Dep't 2018). As the New York Court of Appeals has explained, contractual ambiguity "must arise out of the words used . . . . [It] never arises out of what was not written at all[.]" *Jessup*, 173 N.Y. at 90.

In fact, far from creating an ambiguity, the Compact's lack of any provision for a payment obligation beyond "Years 8-14" definitively evidences the Parties' intent that no such obligation exists. As the New York Court of Appeals, discussing "well-established principles of contract interpretation," has recently explained, "if parties to a contract omit terms – particularly, terms that are readily found in other, similar contracts – the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Prods.*, 23 N.Y.3d at 560. Here, exclusivity payment obligations are not only "found in other, similar contracts," they are found, for three express periods, *in this very agreement*. The Parties' decision to concentrate the Nation's payment obligations in those three periods is clear evidence of their intent, not a springboard for a nontextual interpretation that would instead require the Nation to make additional payments in years where no such obligation is provided for. *See also N. Fork Bank & Trust Co. v. Romet Corp.*, 596 N.Y.S.2d 449, 449-50 (2d Dep't 1993) (RLA-34) ("It is well settled that courts are to enforce, not rewrite, contracts . . . . [The contract] *contained no provision* requiring the Bank to provide advancements on the $4,000,000 loan . . . . *Therefore, the Bank had no such obligation*[.]" (emphases added)).

The Court of Appeals' decision in *Reiss* well demonstrates how faithfully New York courts adhere to plain language principles. There, contracts (in the form of stock

warrants) gave a party the right to buy company stock at a specified price per share. The warrants did not provide for a price adjustment in the event of a reverse stock split, and a subsequent reverse split caused the per-share price of the stock to increase five-fold. When the plaintiff sought to buy stock at the pre-reverse split price specified under the warrants, the defendant company insisted that a price adjustment to account for the reverse split was an essential term and therefore implicit in the warrant. 97 N.Y.2d at 198-200. An Appellate Division majority agreed, declining to "bow to the written word" of the agreements, and finding that "the only reasonable term would be . . . a term requiring a proportional adjustment[.]" *Reiss v. Fin. Performance Corp.*, 279 A.D.2d 13, 19-20 (1st Dep't 2000) (RLA-35). The Court of Appeals forcefully rejected this view, noting that the warrants "were drafted by sophisticated and counseled business persons" and that "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." 97 N.Y.2d at 198 (internal quotation marks and citations omitted).

The *Reiss* Court underscored that courts "will not imply a term," particularly where "the parties, when the contract was made, *must have foreseen the contingency at issue*[.]" *Id.* at 199 (emphasis added). Here, the Parties not only "must have foreseen" the possibility of the Compact (and hence the State's exclusivity obligations) extending beyond the three fixed payment periods, they unquestionably did so, as they expressly provided for renewal and a 21-year Compact term. Had the Parties and their experienced counsel agreed on a corresponding payment obligation for that full period, they could readily have reduced that agreement to writing. *See*, *e.g.*, *Schron*, 20 N.Y.3d at 437 ("[H]ad these sophisticated business entities, represented by counsel, intended [a certain

contractual outcome], they easily could have included a provision to that effect." (footnote and citations omitted)); *Assured Guar. Mun. Corp. v. DLJ Mortgage Capital, Inc.*, 117 A.D.3d 450, 450-51 (1st Dep't 2014) (RLA-36) ("Where . . . a contract is the result of negotiations between sophisticated [parties], failure to include" a specific term in the contract "can only be construed as the intentional exclusion" of that term.); *Tonking v. Port Auth.*, 3 N.Y.3d 486, 490 (2004) (RLA-37) ("[W]e are unwilling to rewrite the contract and supply a specific obligation the parties themselves did not spell out."); *Oppenheimer*, 86 N.Y.2d at 695 ("Freedom of contract prevails in an arm's length transaction between sophisticated parties . . . . If they are dissatisfied with the consequences of their agreement, the time to say so [was] at the bargaining table." (quotation marks and citation omitted) (brackets in original)).

In sum, the State is asking this Panel to rewrite the Compact to add a post-"Years 8-14" payment term not included by the Parties. Every relevant principle of applicable contract law militates against departing from the four corners of the Compact in this fashion.

## IV. The State's Textual Arguments Provide No Basis To Depart from the Plain Terms of the Compact

The State asserts two textual arguments, the first based on the meaning of the term "renewed" in Paragraph 4(c) of the Compact, and the second based on the "structure" of Paragraph 12. Neither argument has merit.

### A. Renewal Had No Effect on the Nation's Payment Obligations

The December 9, 2016, automatic renewal of the Compact did not alter the agreed-upon duration of the Nation's revenue-sharing obligation. Paragraph 4(c) of the Compact ("Renewals") simply provided that, absent written objection by either Party 120

days prior to the expiration of the initial term, "the *term* of this Compact shall be renewed automatically for an additional period of seven (7) years." Compact ¶ 4(c)(1) (emphasis added). Indeed, the State acknowledges that renewal simply continued the Nation's payment obligations "on the same terms and conditions as in effect immediately prior to renewal." State Br. ¶ 5. But this statement begs the question of what those "terms and conditions" were. And the answer is right there in the text. The Nation was required to make payments on revenues earned through three fixed time periods concluding at the end of the "Years 8-14" period. Those are the "terms and conditions" in place prior to renewal. And they remained in effect upon renewal and were properly honored by the Nation when it made payments to the State based on revenues earned past the renewal date up to the conclusion of the "Years 8-14" period.

In sum, renewal is not reinvention. It simply continued the Nation's extant payment obligations on the terms plainly set forth in the text. *See*, *e.g.*, *Dime Sav. Bank, FSB v. Montague St. Realty Assocs.*, 90 N.Y.2d 539, 543 (1997) (RLA-38) (under New York law, renewal "is a prolongation of the original agreement"); *605 Park Garage Assocs. LLC v. 605 Apartment Corp.*, 2004 WL 1562729, at *5-*6 (S.D.N.Y. July 12, 2004) (RLA-39) (explaining that renewal "does not exist independent of the lease itself. . . . [R]ather the original lease agreement is prolonged . . . . [and] governs throughout the extended renewal period"), *aff'd*, 412 F.3d 304 (2d Cir. 2005).

The State seeks to undercut the clear force of this law through a hypothetical. It posits a rental agreement that

> does not say what rent is owed during the renewal period. The Nation's position is that, by not saying expressly that the lessee has to continue paying rent during the renewal, the rental agreement is to be read as saying that the lessee gets to stay in the apartment rent-free during the seven-year renewal period.

State Br. ¶ 4.  But the State flatly misunderstands both this case and the Nation's position, and its hypothetical cannot help it.

First, the hypothetical does not capture the payment structure of the Compact.  It is simply not the case that the Compact "does not say what [amount] is owed during the renewal period."  As discussed above, the Compact expressly requires the Nation to pay 25% of the net drop from its slot machines during and to the conclusion of the "Years 8-14" period.  And the Compact is crystal clear – that date could have extended as far as 5 years into the renewal period, concluding only 2 years before the conclusion of the 21-year life of the Compact.

Second, it is telling that the State has only a hypothetical and not a case to point to on this score.  As detailed above, pursuant to "well established principles of [New York] contract interpretation," when a contract is negotiated at arm's length by sophisticated, counseled parties, if those "parties . . . omit terms – *particularly, terms that are readily found in other, similar contracts* – the inescapable conclusion is that the parties intended the omission."  *Quadrant Structured Prods. Co.*, 23 N.Y.3d at 560 (emphasis added). *See also*, *e.g.*, *Wallace*, 86 N.Y.2d at 548 ("it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make" (quotation marks omitted)); *Reiss*, 97 N.Y.2d at 199 (courts "will not imply a term," particularly where "the parties, when the contract was made, must have foreseen the contingency at issue").

The State presumably would respond that in its hypothetical the parties did not intend to omit a renewal payment provision, but simply forgot.  But in an agreement between sophisticated, counseled parties, that is simply not the presumption under the law, as it would allow for endless attempts by such parties to achieve through litigation

what they were unable to accomplish through negotiation, or to alter agreements that they wish were different in hindsight.  The law does not countenance efforts like those of the State to evade clear written agreements, and for good reason.[6]

B.  The "Structure" of Paragraph 12 Provides No Basis To Depart from the Plain Meaning of Its Text

The State next argues that the "structure" of Paragraph 12(a) and (b) renders the Nation's position "inconceivable."  State Br. ¶¶ 89-91.  But simply proclaiming this does not make it so.  The text plainly requires that the Nation's payment obligations be performed, not coterminous in time with the State's exclusivity obligations, but instead "in accordance with the sliding scale set forth below[.]"  Compact ¶ 12(b)(1).  The text could not be any clearer.

The State nevertheless asserts that "the structure of the Compact reveals that the payment of the State Contribution by the Nation is *linked* to the provision of exclusivity by the State[.]"  State Br. ¶ 82 (emphasis added).  The State is suggesting that because the Nation's payments are for exclusivity, the two must coincide in time throughout the life of the Compact.  But the text, yet again, disproves this theory.  As noted above, Paragraph 12 provides that

> The exclusivity granted under Paragraph 12(a)(1) shall *cease to apply* . . . if the Nation fails to commence Class III Gaming operations . . . within sixty (60)  months of the Effective Date.

---

[6] The State's hypothetical is further inapt because the relationship between the State and the Nation is simply not analogous to that between landlord and tenant.  A tenant enters a rental transaction with no  rights to occupy the landlord's property.  In that case, a direct exchange of money for occupancy over time is intuitive.  But the Nation is no tenant.  It not only owns but enjoys sovereignty over its territories, and possesses an independent sovereign right to conduct gaming on those territories grounded in a federal statute.  The only thing the State controls – in the context of the revenue-sharing transaction at issue here – is the extent to which *others* may conduct gaming in competition with the Nation beyond the Nation's properties.

Compact ¶ 12(a)(3) (emphasis added).  This language confirms that the State's exclusivity obligations commenced upon the Compact's effective date, and only "cease[d] to apply" if the Nation did not begin gaming within 5 years.  Thus, the "structure" of Paragraph 12 clearly did not mandate synchronicity in performance, but rather allowed for the possibility that the State would have to provide the Nation with exclusivity for up to 5 years without receiving any payments from the Nation.[7]

## V.    The State's "Commercial Reasonableness" and "Absurdity" Arguments Provide No Basis To Depart from the Plain Language Agreed To by the Parties

Bereft of a compelling textual argument, the State is left to argue that interpreting the Compact according to its plain meaning would have "absurd" and "commercially unreasonable" results.  *See* State Br. ¶¶ 5, 92-94.  These claims invoke well-settled doctrines of New York contract law, yet the State makes no attempt to articulate the relevant standards under which this Panel should evaluate its claims, much less to explain how its claims meet those standards.  The New York Court of Appeals has addressed the requirements of these doctrines in detail and the State's arguments fail resoundingly under both.

### A.  Paragraph 12 As Written Is Not Commercially Unreasonable

As a threshold matter, the State's argument that enforcing Paragraph 12 as written – *i.e.*, with payments concluding at the end of the "Years 8-14" period – would be "commercially unreasonable" is not available to it in this case.  As the New York Court

---

[7] The State also asserts that Paragraph 12's provision of express exceptions to the Nation's payment obligations undermines the Nation's position because "[n]o other exceptions to the Nation's obligation to pay the State Contribution are provided in the Compact."  State Br. ¶ 90.  This argument is a straw man.  The Nation is not seeking an "exception" to any obligation set forth in the Compact.  Its argument instead is that, according to the plain language of the Parties' agreement, it has performed its payment obligations in full.

of Appeals has instructed, "an inquiry into commercial reasonableness is *only* warranted where a contract is ambiguous." *Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding, LLC*, 20 N.Y.3d 438, 445 (2013) (RLA-40) (emphasis added). The State has pointed to no ambiguity in Paragraph 12 or elsewhere in the Compact. *See Nissho Iwai Europe*, 99 N.Y.2d at 121-22 ("ambiguity does not arise from silence"). Where that is the case, its commercial reasonableness "is beside the mark." *Fundamental Long Term Care*, 20 N.Y.3d at 445.

Even if the argument were available here, the New York courts have established an extremely high standard for declaring a contract commercially unreasonable, particularly one negotiated between sophisticated, counseled parties. For example, in *Fundamental Long Term Care*, the Court of Appeals rejected the argument "that the payment of $1,000 for a membership interest valued at $33 million is commercially unreasonable" because parties enter contracts "for all sorts of reasons, and . . . this agreement was executed by sophisticated, counseled parties." *Id.* at 445-46.

The State has not come remotely close to overcoming such a high bar here. In fact, far from being commercially unreasonable by any standard, Paragraph 12 has instead proven highly remunerative for the State and will continue to be so throughout the 21-year term of the Compact, even with the Nation's payment obligations fulfilled. Between 2003 and 2017, the State received "over $1.4 billion" in exclusivity payments from the Nation. Demand ¶ 16. Indeed, the Nation's payments to the State amount to an average of approximately $70 million per year for every year between 2002 and 2023 (the full 21-year term of the Compact). *See* Sheridan ¶ 36.[8]

---

[8] Moreover, the Nation's market analysis – cited by the State here as evidence of the expectations in 2002 – projected the State to receive $825 million in revenue-sharing payments over the initial 14-year term of the

Further, the State has received these hefty payments, approaching 50% of the Nation's net gaming revenues in recent years, *see supra* p. 8, while bearing none of the risks or costs associated with generating those revenues, and while also collecting revenues from the operation of directly competitive gaming facilities located in the heart of the Nation's exclusivity zone.[9] This arrangement simply cannot be described as "commercially unreasonable" for the State.

B. Enforcing Paragraph 12 As Written Would Not Lead to Absurd Results

The State observes that enforcing the three express payment periods set forth in the text would require the State to provide exclusivity during periods where it was not receiving payments. According to the State, this result is "plainly absurd," State Br. ¶ 5, and this Panel should therefore rewrite the Compact to include a term (a fourth payment period) that the Parties clearly did not include in their agreement.

But under New York law, a tribunal may revise a contract only in those rare cases where the terms agreed to by the Parties will lead to patently absurd and unenforceable results. *Wallace*, 86 N.Y.2d at 547-48. Paragraph 12 as written does no such thing. At roughly $70 million per year for over two decades, *see* Sheridan ¶ 36, it is certainly not absurd from the State's perspective. And the State has made no argument that it is unenforceable as written – nor could it. Paragraph 12 is simply a contract provision with respective party performance obligations set forth under differing timetables, with the Nation's payment obligations scheduled for three fixed periods and the State's

_____

Compact. *See* State Br. ¶ 76. That would amount to $59 million per year, or $1.23 billion if the Nation made payments at that rate for a full 21 years under the State's theory. The State has already received well over $100 million *more* than that amount, which it clearly thought commercially reasonable at the time.
[9] Since the State's introduction of VLTs in the Nation's exclusivity zone, gaming patrons in that zone have spent more than $37 billion playing the State-licensed VLTs. *See* Sheridan ¶ 30.

exclusivity obligations spanning the full 21-year term.  Contracting parties "are free to tailor their contract to meet their particular needs and to include or exclude those provisions which they choose."  *Grace*, 46 N.Y.2d at 565.  And as discussed above, the Compact clearly contemplated that the State could be required to provide exclusivity for up to 5 years without receiving payments from the Nation.  That the Parties likewise contemplated the possibility of such a period occurring at the back end of the Compact does not somehow render it absurd, particularly when the payments actually made to the State were at rates rendering them exceptionally lucrative for the State and likewise costly to the Nation.

The New York Court of Appeals' decision in *Wallace* demonstrates just how high the bar is for declaring a contract absurd and thus subject to judicial revision.  There, a lease provided for a 33-year renewal term with a renewal-period rent adjustment to be determined no earlier than 1 year prior to the "*expiration* of any such renewal term[.]"  86 N.Y.2d at 546.  According to the Court of Appeals:  "If read literally, [the lease] requires that the determination of the rent amount for the first renewal term . . . take place *32 years after the term began*[.]"  *Id*. (emphasis added).  The tenant sought reformation of the lease.  *Id*.  Both lower courts declined to do so under the principle that unambiguous contracts negotiated by sophisticated, counseled parties should be enforced according to their terms.  *See id*. at 546-47.

The dissent in the Appellate Division observed that "'this provision is so at odds with normal business practice as to render its meaning unclear,' thus necessitating a trial on the issue of the parties' intent."  *Id*. at 547.  The Court of Appeals rejected that position, describing the rule that clear, complete contracts should be enforced according

to their terms as a "sensible proposition of law, which we reaffirm today," and one that carries "even greater force" where, as here, the contract was the product of "sophisticated, counseled business people negotiating at arm's length." *Id*. at 548 (internal quotation marks and citation omitted). Accordingly:

> We conclude that article 17 as written is not unenforceable and does not create an absurd result. Considered in isolation or in the context of the ground lease as a whole, article 17 is clear and complete and allows for the implementation and enforcement of its terms. While the retrospective appraisal mechanism may be novel or unconventional . . . . it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make[.]

*Id*. (internal quotation marks omitted).

Similarly, in *Jade Realty LLC v. Citigroup Commercial Mortgage Trust 2005-EMG*, 20 N.Y.3d 881, 884 (2012) (RLA-41), a commercial loan agreement provided for pre-payment premiums that were, quite unconventionally, higher in the later years of the loan than in the earlier years. The trial court concluded that the agreement was "'absurd and illogical,'" thus justifying the judicial revision of the contract to rectify the purported absurdity. *Id*. at 883. The Court of Appeals, citing *Wallace*, rejected that conclusion:

> Application of the note's literal language . . . does not result in either absurdity or an unenforceable agreement. . . . While these terms might be "novel or unconventional," that, by itself, does not render the result here absurd (*Matter of Wallace,* 86 N.Y.2d at 548). . . . The note, as written, is enforceable according to its terms.

*Id*. at 884.

The cases where courts have found contractual absurdity sufficient to override plain language likewise demonstrate that honoring the three fixed payment periods contained in Paragraph 12 does not remotely approach that standard. For example, in *Meyer v. Stout*, 79 A.D.3d 1666 (4th Dep't 2010) (RLA-42), a deed provided for an easement on property not encompassed by the deed. Citing *Wallace*, the Fourth

Department found that "to interpret the deed in such a manner would create the absurd result that the easement would commence on property that plaintiff did not own and would continue onto property that he also did not own," *id*. at 1668, an outcome that was simply not enforceable according to its plain terms. That is plainly not the case here. Paragraph 12 is "clear and complete and allows for the implementation and enforcement of its terms." *Wallace*, 86 N.Y.2d at 548. The State has provided this Panel with no legitimate basis to hold otherwise.[10]

## VI. The State's Extrinsic Evidence is Not Cognizable

As will be discussed in detail in Part VII. below, none of the State's extrinsic evidence remotely supports its position. To the contrary, the only relevant evidence – tellingly absent from the State's account of the Compact negotiations – confirms the Nation's interpretation of the Compact. That said, the State's evidence is not admissible to begin with.

### A. Both New York and Federal Common Law Preclude Consideration of the State's Extrinsic Evidence

The Parties agree that the Compact is unambiguous. As discussed above, under that circumstance, New York law unquestionably forbids the consideration of extrinsic evidence to interpret it, or to "reveal" an ambiguity not apparent on its face. *See Ellington*, 24 N.Y.3d at 244; *Schron*, 20 N.Y.3d at 436. The State does not dispute that New York law so holds.

While the State argues that its extrinsic evidence can come in under federal common law, the cases it cites to are likewise clear that "[f]ederal common law follows

---

[10] The State's assertion that the Nation's interpretation of the Compact "is even more absurd given that it failed to raise any objection to the renewal of the Compact before the original termination date," State Br. ¶ 94, is hard to decipher. The Nation had no objection to the renewal of the Compact.

the traditional approach" that a "contract[] must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the [contract]." *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 560-561 (9th Cir. 2016) (RLA-17) (quotation marks omitted) (second and third brackets in original); *Cachil Dehe Band of Wintun Indians v. California*, 618 F.3d 1066, 1075 (9th Cir. 2010) (RLA-18) (same). *See also*, *e.g.*, *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002) (RLA-19) (same); *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993) (RLA-43) (same); *In re Victory Mkts.*, 221 B.R. 298, 303 (B.A.P. 2d Cir. 1998) (RLA-44) (same under both federal common law and New York law).[11]

There exists one difference between New York and federal common law of contracts, in that the latter permits a narrow category of extrinsic evidence to interpret a facially unambiguous contract that the former does not. But the State does not rely on this difference, and for good reason. For far from encompassing the State's extrinsic evidence, this narrow exception affirmatively excludes it. As Judge Posner has explained:

> The famous contract in *Raffles v. Wichelhaus* . . . was clear on its face. It called for the shipment of a specified amount of cotton . . . on the ship *Peerless*. Clear as a bell. Only there were two (if not more) ships *Peerless*, and it was impossible to tell which one the contract referred to. . . . Take another example. Suppose the parties to the contract in *Raffles* had been members of a trade in which the term "cotton" was used to refer to guncotton rather than to the cotton used in textiles. The ordinary reader of English would not know about this special trade usage, and so would suppose the contract unambiguous. . . .
>
> There has to be a means by which the law allows these surfaces to be penetrated, but without depriving contracting parties of the protection from the vagaries of judges and juries that they sought by reducing their contract to

---

[11] The Supreme Court cases relied on by the State, State Br. ¶ 102 & n.122-24, do not hold otherwise, as each premised its resort to extrinsic evidence on a finding of facial ambiguity. *See Oklahoma v. New Mexico*, 501 U.S. 221, 235 n.5 (1991) (RLA-45); *Texas v. New Mexico*, 462 U.S. 554, 568 & n.14 (1983) (RLA-46); *Arizona v. California*, 292 U.S. 341, 359-60 (1934) (RLA-47).

writing. . . . [T]he key is the distinction between what might be called "objective" and "subjective" evidence of ambiguity. . . . By "objective" evidence we mean evidence of ambiguity that can be supplied by disinterested third parties: evidence that there was more than one ship called *Peerless*, or that a particular trade uses "cotton" in a nonstandard sense. . . . *By "subjective" evidence we mean the testimony of the parties themselves as to what they believe the contract means.* Such testimony is invariably selfserving . . . and is inherently difficult to verify. "Objective" evidence is admissible to demonstrate that apparently clear contract language means something different from what it seems to mean; *"subjective" evidence is inadmissible for this purpose.*

*AM Int'l v. Graphic Mgmt. Assocs.*, 44 F.3d 572, 575 (7th Cir. 1995) (RLA-48) (Posner, J.) (emphases added).

The Second Circuit has described Judge Posner's reasoning as "[t]he most thoughtful consideration of this issue under federal common law," pursuant to which a "court could *never* consider subjective evidence to determine whether a contract [is] ambiguous[.]" *Kerin v. U.S. Postal Serv.*, 116 F.3d 988, 992 n.2 (2d Cir. 1997) (RLA-49) (emphasis added). But the State's extrinsic evidence consists entirely of subjective evidence, grounded as it is in the testimony of Mr. Williams "as to what [he and the State] believe the contract means." *Id.* As such, both New York and federal common law prohibit the State's evidence from being considered in discerning the meaning of a Compact that is facially clear.[12]

---

[12] This applies as well to the State's purported "commercial context" evidence. *See* State Br. ¶¶ 95-99. Commercial context evidence is objective; for example, "evidence that there was more than one ship called *Peerless,* or that a particular trade uses 'cotton' in a nonstandard sense." *AM Int'l*, 44 F.3d at 575. *See also, e.g., Air Line Pilots Ass'n, Int'l v. Midwest Express Airlines, Inc.*, 279 F.3d 553, 556 (7th Cir. 2002) (RLA-50) (applying federal common law and describing "the commercial context of the contract" as "the nonstandard verbal usages current in the activity out of which the contract arose"). The State, by contrast, alleges that "the Parties had in their contemplation" the Mohawk and Pequot revenue-sharing agreements, which thus allegedly informed their "baseline expectation" for their own agreement. State's Br. ¶¶ 96, 99. This does not go to any objective commercial context at all but is instead patently subjective in nature.

B.  The State's "Course of Performance" Argument Finds No Support in the Law

The State further asserts that certain communications made prior to the effective date of the Compact, including the Parties' letters to the Department of the Interior and the Nation's communications with its citizens about the meaning of the Compact, constitute "course of performance" evidence, which "may be considered even absent a showing of ambiguity."  State Br. ¶ 108 & ns. 132-35.  However, according to the State's own authority, course of performance evidence is evidence of "repeated occasions for performance" by one party without objection by the other.  Restatement (Second) of Contracts § 202(4) (Am. Law Inst. 1981) (RLA-51).  For example, had the Nation made multiple exclusivity payments after the conclusion of the "Years 8-14" period, that would have constituted clear "course of performance" evidence.  *See*, *e.g.*, *State v. Indus. Site Servs., Inc*., 52 A.D.3d 1153, 1160 (3d Dep't 2008) (RLA-52) (referring to "course of performance during the contract in that [plaintiff] continued to pay" disputed payment).  While party statements *can* constitute course of performance evidence, the State makes no attempt to explain (as is its burden) how *the statements it relies on* qualify as such evidence.

And even if the State's evidence could be shoe-horned into that category, the State's own cases, *see* State Br. ¶ 108 n.133, again defeat its argument that such evidence is admissible absent a facial ambiguity.  In *IBJ Schroeder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 375 (2d Cir. 1994) (RLA-53), the court considered what a party had "stated repeatedly (32 times)" after a contract was formed, but only after finding the contract ambiguous.  *See also Alternatives Fed. Credit Union v. Olbios, LLC*, 14 A.D.3d 779, 781 (3d Dep't 2005) (RLA-54) (considering party's post-contract statements "[t]o resolve this ambiguity"); *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.,*

*N.A.*, 773 F.3d 110, 121 (2d Cir. 2014) (RLA-55) (Failla, J., dissenting) (courts may

consider party statements "in interpreting ambiguous provisions"). *See also*, *e.g.*,

*Cellular Mann, Inc. v. JC 1008 LLC*, 113 A.D.3d 521, 521 (1st Dep't 2014) (RLA-56)

(where contract unambiguous, lower court "therefore correctly refused to consider

extrinsic evidence of . . . the parties' . . . course of performance"); *Am. Fed'n of

Musicians and Employers' Pension Fund v. Atl. Recording Corp.*, 203 F. Supp. 3d 301,

311 (S.D.N.Y. 2016) (RLA-57) (applying federal common law and declining to consider

"course of performance" evidence where contract was unambiguous).

The State cites to the Third Circuit's decision in *In re New Valley Corporation*, 89

F.3d 143 (3d Cir. 1996) (RLA-58). State Br. ¶ 108 n.135. But just as Judge Posner

explained in *AM International*, the Third Circuit is clear that such evidence must be

"objective" extrinsic evidence. *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69,

76-77 (3d Cir. 2011) (RLA-59). "For example, if the evidence show[s] that the parties

normally meant to refer to Canadian dollars when they used the term 'dollars,' this [is]

evidence of the right type. *Evidence regarding a party's beliefs about the general

ramifications of the contract [is not] the right type*[.]" *Id.* (quotation marks omitted)

(brackets in original) (emphasis added).

The letters to the Department of the Interior and the Nation's communication with

its members are "[e]vidence regarding a party's beliefs about the general ramifications of

the contract." *Id.* *See*, *e.g.*, State Br. ¶ 109 (describing Nation communication to its

members as "highlight[ing] the most beneficial aspects of the deal negotiated with the

State"); *id.* ¶ 7 (describing 2002 letters to the Department of Interior as addressing "the

benefits of the Compact to the Nation"). They hence are inadmissible under any recognized standard.[13]

## C. The State's Attempt to Manufacture Ambiguity Finds No Support in the Law

Finally, the State asserts that if the Panel finds the Nation's interpretation of the Compact to be reasonable it then, "as a matter of law, could not conclude that the State's interpretation is unreasonable" because "an ambiguity would exist under the Compact and evidence of the Parties' negotiations would be admissible under New York law to resolve the ambiguity." State Br. ¶ 103. The State is trying to conjure ambiguity where none exists as a vehicle for its extrinsic evidence. But ambiguity does not arise simply because parties disagree over the meaning of a contract. *See*, *e.g.*, *Universal Am. Corp. v Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 25 N.Y.3d 675, 680 (2015) (RLA-68) ("[P]arties cannot create ambiguity from whole cloth where none exists, because provisions 'are not ambiguous merely because the parties interpret them differently.'" (quoting *Mount Vernon Fire Ins. Co. v. Creative Hous.*, 88 N.Y.2d 347, 352 (1996) (RLA-69))).

---

[13] Article 2 of the Uniform Commercial Code, State Br. ¶ 108 n.135, does not help the State because the Compact does not involve a sale of goods between the Parties. *See* U.C.C. § 2-102 (Am. Law Inst. & Unif. Law Comm'n 2018) (RLA-60) ("this Article applies to transactions in goods"). *See also*, *e.g.*, *United States v. Hescorp, Heavy Equip. Sales Corp.*, 801 F.2d 70, 74 n.1 (2d Cir. 1986) (RLA-61) (distinguishing "between contracts for the *sale* of goods, which are subject to the U.C.C., and contracts for the provision of services, which are not"); *Barseback Kraft AB v. United States*, 36 Fed. Cl. 691, 705 (Fed. Cl. 1996) (RLA-62) (same), *aff'd*, 121 F.3d 1475 (Fed. Cir. 1997). Thus, the State's reliance on *Westlands Water Distrist v. United States*, 337 F.3d 1092 (9th Cir. 2003) (RLA-63), *see* State Br. ¶ 108 n.135, is misplaced because *Westlands* is a U.C.C. case. Nor do the comments to section 214(c) of the Restatement (RLA-64), *see* State Br. ¶ 102 n.121, help the State. *See*, *e.g.*, *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1022 (9th Cir. 2012) (RLA-65) (citing § 214(c) and stating that "to the extent" contract "is ambiguous" "we may use" extrinsic evidence); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 657 (8th Cir. 1992) (RLA-66) (same); *Marathon Oil Co. v. United States*, 42 Fed. Cl. 267, 275 (Fed. Cl. 1998) (RLA-67) (same).

In sum, the State's myriad attempts to distract from its lack of a textual argument by injecting volumes of subjective extrinsic evidence into these proceedings are precluded by both New York contract law and the federal common law of contracts. And as demonstrated next, even were this Panel to consider the extrinsic evidence in this case, that evidence helps the State not a whit.

## VII. The Extrinsic Evidence Confirms the Plain Meaning of the Compact Terms

Should this Panel determine that applicable law permits it to consider extrinsic evidence, none of the State's proffered evidence, individually or collectively, provides a basis to depart from the plain language agreed to by the Parties. The exchange of drafts not included in the State's narrative, by contrast, confirms that the Compact text means exactly what it says.

### A. The 1998 – 2000 Negotiation Period

The State's extrinsic evidence begins with the Parties' initial compact negotiations from 1998 to 2000. The State's account of those negotiations simply portrays two parties sharply at odds about both the term of a compact agreement and an appropriate amount of revenue sharing. *See* State Br. ¶¶ 35-45. It further shows that this first round of negotiations ended at an impasse with the State insisting on a 25% revenue share and the Nation rejecting that rate because it would have the Nation paying the "'highest amount'" in the United States. *See id*. ¶ 43. None of this extrinsic evidence is probative of the specific question at issue, nor does the State claim otherwise.

### B. The 2001 Resumed Negotiations

The State then turns to the Parties' "resumed negotiations in 2001," *id*. ¶ 46, which show that the Parties remained at an impasse regarding the 25% revenue share figure, with the State being "adamant" in insisting on that figure, *id.*, and the Nation viewing it as a

"'deal breaker,'" *id*. ¶ 47.  The evidence further makes clear that the  State's insistence on 25% was "'political, not economic.'" *Id*. ¶ 50.  Nothing about this  evidence suggests the Parties intended to extend the Nation's payment obligations  beyond the "Years 8-14" period.

This evidence does, however, demonstrate the relevance of the Connecticut-Pequot agreement that the State and Mr. Williams rely on, but not in the way the State claims.  The State asserts that the agreement (along with the Mohawk agreement) served as "*the Parties*' baseline expectation" in negotiating the Compact.  *Id*. ¶ 104 (emphasis added).  *See also id*. ¶ 99 (Pequot and Mohawk agreements served as "baseline expectation" for "the Parties" (citing Williams ¶¶ 18-19)); *id*. ¶ 32 (referring to "the Parties' basic assumptions")).  These repeated iterations of shared intent are the foundation of the State's extrinsic evidence presentation.  Yet the foundation dissolves upon even cursory inspection of the State's evidence.  While *the State* hoped to secure a revenue-sharing agreement on terms the "'Same as Connecticut,'" *id*. ¶ 46, *the Nation* was intent on avoiding the fate of the Pequots, whom Nation negotiators viewed as "'the poorest rich people on earth,'" *id*. ¶ 48.  Indeed, even the State's own witness – the *sole* source of the State's oft-repeated "baseline expectation" claim – does not identify the Pequot or Mohawk agreements as providing "the Parties'" baseline expectation as claimed in the State's brief.  He instead refers to those agreements as providing "*our* baseline expectation as we engaged in negotiations with the Nation."  Williams ¶ 19 (emphasis added).

The State's assertions of shared intent, in other words, are founded on thin air.  That one party enters arm's-length negotiations with certain expectations is hardly

evidence that the other party shared those expectations, much less that those expectations were realized in their final agreement.[14]

C. The Parties' Consideration and Rejection of Revenue-Based Payment Models

The State's evidence shows that by May of 2001, the Parties had reached an impasse over the 25% figure and, according to the State, "were on the brink of abandoning their negotiations[.]" State Br. ¶ 50. It further shows the Parties negotiating to break that impasse, including consideration of various proposals to reconcile the State's "'political, not economic,'" *id.*, need for a 25% component in the agreement, with the Nation's insistence on a lesser effective rate, *id.* ¶ 54.

In one of those proposals, excerpted in the State's brief, the State suggested having escalating revenue-sharing rates pegged to rising revenue levels at specified thresholds. *See* State Br. ¶ 54. The State's evidence supports that the Nation rejected that proposal because the level of payments was unacceptably high, *see id.* ¶ 56, and responded with a counterproposal that, while still accommodating the State's political need for a 25% component, provided for payment levels far lower than the State's proposal, *id.* ¶ 58. This evidence simply demonstrates that the Parties were still far apart

---

[14] Indeed, the Pequot revenue-sharing arrangement (along with a similar agreement between the Mohegan Tribe and the State of Connecticut) is vastly different from the arrangement to which the Parties agreed. For example, in stark contrast to the Nation's exclusivity, which is limited both geographically and by game type, the Connecticut agreements provided for a flat revenue-sharing rate of 25% in exchange for *statewide* exclusivity and exclusivity as to *all* gaming machines as well as all "*other commercial casino games.*" Mashantucket Pequot Tribe Second Amendment MOU ¶ 1 (April 25, 1994) (emphasis added). *Available at* https://portal.ct.gov/-/media/DCP/pdf/gaming/MemorandumOfUnderstandingFoxwoods1pdf.pdf?la=en. The introduction of *any* such games (including VLTs and commercial casinos) by other than the Pequots or Mohegans anywhere in Connecticut would terminate the Pequots' payment obligations immediately. *See* Op. Att'y Gen. Conn. (Jan. 31, 2002). *Available at* https://portal.ct.gov/AG/Opinions/2002-Formal-Opinions/Susan-G-Townsley-Division-of-Special-Reveue-2002003-Formal-Opinion-Attorney-General-of-Connecticut. This is far more liberal exclusivity than that afforded the Nation, which makes the State's claims that the payment side of the ledger should be construed identical to the Pequot compact ring all the more hollow.

on the amount of revenue sharing and were bargaining hard over various solutions to bridge their gap.

The State urges a different meaning from this evidence. It emphasizes that "[b]ecause the State Contribution levels under these proposals were linked to gaming revenues, the State Contributions would unquestionably have continued to apply upon renewal." *Id.* ¶ 106. *See also id.* ¶¶ 55, 59 (same). The State, then, is seeking an inference that because the Parties so provided in the text of those earlier proposals, they must therefore have had the same intention with respect to their final agreement. But any such inference fails because the Parties roundly *rejected* the revenue-sharing model embodied in those earlier proposals in favor of a radically different one in the final Compact. The State offers *no evidence* that the Parties' understood their final agreement to nevertheless carry over that one aspect of a vastly different and expressly rejected payment model. If that were their intent, it is simply remarkable that such a fundamental development in their negotiations would have escaped Mr. Williams' note-taking. That it appears as his wholly subjective and factually unsubstantiated recollection sixteen years later is probative of nothing.[15]

---

[15] This reasoning likewise defeats the State's assertions that the Mohawk agreement served as a basis for the Parties' mutual intent. That agreement also utilized the revenue-threshold model *rejected* by the Parties in favor of the markedly different model they adopted in the Compact. Moreover, the Mohawk compact was not affirmatively approved by the Department of the Interior and expired after only one year. *See* https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/pdf/idc1-025712.pdf. Two subsequent amendments that purported to offer exclusivity on the same basis were *rejected* by the Department in 2000, *during* the Parties' negotiations here. *See* https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/pdf/St%20Regis%20Disapproval%20Ltr%20July%2026%20%202000.pdf; https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/pdf/St%20Regis%20Dec2000%20disapproval%20letter.pdf. The Parties were well aware of this, as the State's extrinsic evidence shows. *See* State Br. ¶ 43 (reproducing negotiation notes showing that Nation negotiator referred to "'DOI's rejection of Mohawk compact – last part of letter on revenues.'").

D.  <u>The Shift to a Time-Period-Based Payment Model and the 2001 MOU</u>

The State's extrinsic evidence then turns to the Parties' proposals wherein they abandoned the prior model and turned to the one they would eventually agree upon in both the 2001 MOU and the 2002 Compact, with payment levels tied to discrete time periods.  The State sets forth the first such payment scheme proposed by the Nation on June 5, 2001, as follows:

| Years 1-7 | Years 8-14 |
|-----------|------------|
| 16%       | 22%        |

State Br. ¶ 60.  This draft provided for those 14 years of payments *and* (absent written objection) a 21-year term of the agreement.  *See* Ex. CX-21 at 2 (Terms of Agreement).  The State's narrative then jumps to the final executed June 20, 2001, MOU, which contained a payment schedule as follows:

| Years 1-4 | Years 5-7 | Years 8-14 |
|-----------|-----------|------------|
| 18%       | 22%       | 25%        |

*See* State Br. ¶ 61.  This draft likewise provided for a 21-year life of the agreement and is the payment scale that ended up in Paragraph 12 of the Compact.

According to Mr. Williams, the Nation's proposal (in its June 5 draft) to tie revenue sharing to discrete time periods "was driven by the same desire" and "had the same intent and effect" as the prior proposals tying revenue sharing to revenue thresholds, including requiring payments through the life of the Compact.  Williams ¶ 48.  However, the State's evidence contains not a shred of support that the Nation shared that "same intent" and "same desire," and Mr. Williams accordingly cites to none.  *See id*.  Indeed, the *only* support Mr. Williams offers for his assertion that the Parties shared an

understanding that the payments would extend beyond the "Years 8-14" period is that "the Nation's representatives never told us" otherwise. *Id*.

These, then, are the conclusory musings of a party representative about his own uncommunicated, subjective intent projected onto the other party at a 16-year remove. And as perhaps befits such recollections, they are far off the mark. As discussed next, the Nation did in fact reject the State's position that payments should continue throughout the life of the Compact, as the documentary record well establishes.

E.   The Nation Rejected a Provision for Payments Through the 21-Year Life of the Compact and the State Agreed

Of a piece with Mr. Williams' subjective recollections about what was not said during a negotiation, the State claims there is no "evidence in the drafting history" supporting the Nation's position. State Br. ¶ 62. But in making this claim, the State did not include for this Panel the *one* exchange of drafts between the Parties that in fact addresses the question at hand and does so in direct contradiction to the State's position.

As noted above, the State highlights the Nation's June 5, 2001, proposal of a payment scheme as follows:

| Years 1-7 | Years 8-14 |
|-----------|-----------|
| 16% | 22% |

State Br. ¶ 60. The State's "detailed account of the negotiations," State Br. ¶ 32, then skips to the finalized June 20, 2001, MOU, setting forth the three-period scheme that would become part of the final Compact. *See* State Br. ¶ 61. However, the Parties exchanged additional drafts between those dates, with the State providing a draft on June 7, 2001, and the Nation providing a draft in return on June 11, 2001. *See* Ex. R-14 at 1 (showing dated email transmissions). The payment schedule in the Nation's June 11

draft was identical to its June 5 draft (reproduced above) except that the first payment period rate had been raised to 18%. *See id*. at 4.

On June 12, 2001, via email copied to Mr. Williams and entitled "State's Reply," the State's lead negotiator, Patrick Kehoe, provided a counterproposal to the Nation's June 11 proposal. Ex. RX-15. That counterproposal changed the Nation's proposal from two to three payment periods and set the rate for the third period at 25%. And of critical significance here, the State also changed the duration of the final payment period from the Nation's proposed "Years 8-14" period to one denoted "Years 7+," as follows:

| Years 1-4 | Years 5-7 | Years 7+ |
|-----------|-----------|----------|
| 18%       | 22%       | 25%      |

Ex. RX-15 at 5.

As evidenced by the final MOU and Compact, the Parties accepted the State's three-period proposal and its payment rates for each period. But they rejected the State's proposed "Years 7+" duration for the final period in favor of a return to the Nation's proposed "Years 8-14" formulation.

The implications of this are self-evident. This item of extrinsic evidence – unlike every item in the State's voluminous compilations – zeroes in on the singular question before this Panel. A "Years 7+" duration for the final payment period, unlike the Nation's "Years 8-14" iteration, would have expressly extended the Nation's payment obligations to the conclusion of the 21-year term of the Compact. In other words, *the State proposed, and the Parties considered and rejected, the State's precise position in this dispute*.

Very clearly, the Parties did not share the "same desire" or "same intent," Williams ¶ 48, that the Nation's payment obligations would continue past the "Years 8-14" period, as nakedly alleged by the State. While the State obtained much of what it fought for in those negotiations, in *this* particular aspect of the bargain – the result of arm's-length negotiations between sophisticated, counseled parties – the Nation's desire prevailed.[16]

The State, then, is inviting this Panel to rewrite the Compact to give the State what it sought and failed to obtain during documented arm's-length negotiations. No principle of law warrants acceptance of the State's invitation. *See*, *e.g.*, *Mason v. Mason*, 41 A.D.2d 607, 607-08 (1st Dep't 1973) (RLA-70) (declining to interpret a contract to contain a term that was "proposed and rejected" by the parties and stating that "[a]n instrument cannot be reformed to include a provision that the parties advisedly omitted, no matter what the reason for the omission. To do so would constitute the making of a new contract for the parties, a power denied to the courts"); *Vermont Teddy Bear*, 1 N.Y.3d at 475 (in contracts between sophisticated, counseled parties, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include" (quotation marks omitted)); *Oppenheimer*, 86 N.Y.2d at 695 (if "sophisticated parties . . . . are dissatisfied with the consequences of their agreement, the time to say so [was] at the bargaining table" (quotation marks omitted) (brackets in original)).

---

[16] The drafting history set forth here belies the State's litigation rhetoric that "[t]he Nation's refusal to make the State Contribution payments took the State . . . by complete surprise," State Br. ¶ 28, and that it was "blindsided," *id*. ¶ 94, by the Nation's "unilateral decision to stop paying the State Contribution," *id*. ¶ 29.

Should this Panel consider extrinsic evidence, the Parties' express consideration and rejection of the State's proposed "Years 7+" Compact term is dispositive of this dispute. It directly addresses the Parties' respective positions, contradicting the State's and confirming the Nation's, and does so in complete harmony with the plain text of the Compact.

F. The 2002 Correspondence Regarding Federal Approval of the Compact

The State's final category of extrinsic evidence consists of correspondence exchanged between the Parties and the Department of the Interior in the fall of 2002 after they had executed the Compact and were seeking the Department's federally required approval of its terms. *See* State Br. ¶¶ 69-78, 108-112. The State's entire argument on this evidence is that in seeking the Department's approval for the Compact, "the Parties had a strong motivation to show the DOI the benefits that the Nation had achieved in the negotiations. . . . [Yet] neither party made any mention of the Nation's current reading of the Compact." *Id*. at ¶ 69. The obvious inference sought by the State is that they, therefore, must not have believed that reading to be what the Compact provided.

This argument is fatally flawed in multiple ways. First, the Parties also did not convey to the Department *the State's* "current reading of the Compact," and the State makes no claim that they did. By the State's own logic, then, the Parties did not share *its* view of the Compact either. The reality (as plainly reflected in the correspondence) is that neither the Parties nor the Secretary focused their discussion on any aspect of the Compact beyond its guaranteed initial 14-year term. *See*, *e.g.*, Ex. CX-31 at 8 (October 11, 2002 Nation Letter to Department discussing the "capturable gaming market of $9.39 billion . . . *over the 14-year term of the Compact*" and "[t]he anticipated return to the Nation . . . *over the 14-year term of the Compact*" (emphases added)); Ex. CX-32 at 4

(November 12, 2002 Department Letter to Nation discussing Nation's "anticipated [economic] return *over the 14-year term of the Compact*" (emphasis added)). This body of correspondence is accordingly irrelevant to the issue in this dispute.

In any event, limiting their focus in this way was the prudent and responsible thing for the Parties to do. As is evident from the Nation's letter, the Nation's market analysis (a standard component of submissions to the Department seeking approval of revenue-sharing arrangements) covered only 14 years. Ex. CX-31 at 8. The Parties had no sound economic analysis on which to base claims beyond that time period. Moreover, renewal itself was not a certain prospect, as it was subject to unilateral rejection by either party (to be followed by negotiations the outcome of which would have been impossible to predict) and was at that point 14 years into the future. That the Parties would refrain from making claims about economic outcomes that far into an uncertain future – particularly in the face of a gaming market that was evolving rapidly and in unpredictable ways – was simple prudence on their part in light of the accuracy and candor they owed to the Secretary.[17]

Second, that the Parties' letters to the Department did not extoll a particular benefit does not remotely support a logical inference that they understood the Compact to provide no such benefit. For example, both Parties unquestionably anticipated that, in the event of renewal, the Nation would continue to be able to offer gaming in the renewal period, yet they never mentioned *that* benefit either, instead limiting their discussion to

---

[17] This reasoning is equally applicable to the State's arguments regarding the Nation's 2002 "FAQ" communications to its citizens. *See* State Br. ¶¶ 65-68. There, the Nation was providing information so that its membership could make an informed decision of extreme economic importance to the future of the Nation, involving both great potential and great risk. Responsible governments provide such information conservatively, avoiding speculation and conjecture. That the Nation avoided mention of a largely speculative "tremendous selling point," *id.* ¶ 66, is not evidence of anything other than good governance.

"the 14-year term of the Compact." Ex. CX-31 at 8. Under the State's logic, given the Parties' motivation to extoll the benefits of the Compact to the Secretary, that omission would support the inference that the Parties did not understand the Compact to provide for gaming in the renewal period *at all*. To state the proposition is to defeat it, yet it is precisely the logic the State invites this Panel to adopt.

Third, of the three letters submitted by the State pertaining to the 2002 Department review of the Compact, only one actually sets forth the operative details of the Compact payment scheme. That letter is the State's, and it does so in terms entirely consistent with the Nation's reading of the Compact:

> The Compact provides that the Nation shall pay the State 18% of the net drop . . . in the first four years *after gaming commences* pursuant to the Compact, 22% of the net drop in years five through seven and 25% of the net drop in years eight through fourteen.

CX-30 at 3 (emphasis added). Hence, the State well understood what it now appears to have forgotten – that the Nation's payment obligations began when "gaming commences."

Finally, and of critical importance, in limiting the review to the first 14 years of the Compact, the Secretary did not address, *and therefore did not approve*, a stream of 25% payments flowing from the Nation to the State after the "Years 8-14" period and continuing for the remainder of the 21-year life of the Compact. Under IGRA, approval and disapproval of Compact provisions are the exclusive province of the Secretary. 25 U.S.C. § 2710(d)(8). What the State is asking this Panel to do is to usurp that role and bless a Compact term that the Secretary never considered and clearly did not bless.

Moreover, the State is asking this Panel to do so in a gaming landscape radically different from that prevailing in 2002 when the Secretary evaluated the permissibility of

the Nation's payments under IGRA vis-à-vis the level of exclusivity provided by the State. At that time, the Nation explained that it would enjoy "total exclusivity with regard to the operation of VLTs and slot machines" in the exclusivity zone. Ex. CX-31 at 8. Indeed, as the State explained to the Secretary,

> the Compact grants sweeping exclusivity rights to the Nation with respect to the operation of . . . slot machines and video lottery gaming devices . . . .
>
> [T]he exclusivity rights purchased by the Nation effectively establish a monopoly in the zone of exclusivity over the operation of slot machines and video lottery gaming . . . . Indeed, the economic benefits to the Nation from the exclusivity rights are significantly enhanced by the fact that even outside the zone of exclusivity in New York State, no person or entity is authorized to operate slot machines and no non-Indian person or entity is authorized to operate video lottery gaming devices. . . .
>
> [T]he economic benefits to the Nation of these exclusive rights . . . are truly extraordinary.

Ex. CX-30 at 3-4. None of this is true anymore. VLTs that by the State's own account provide the identical playing experience as slot machines permeate the State of New York, *see supra* note 2, including at three State-licensed facilities in the heart of the Nation's exclusivity zone. And the State amended its Constitution in 2013 to permit the operation of full-fledged casinos in regions across the State. *See* N.Y. Const. art. I, § 9(1) (RLA-71). It authorized one of those facilities ("Lago") at the very edge of the Nation's exclusivity zone. Independent analysts concluded "that Lago's location and product offerings uniquely position it to cannibalize gaming customers from its competitors."[18] The State likewise acknowledged Lago's "potential cannibalization of revenue from existing . . . Native American facilities" but disregarded that concern because a casino at

---

[18] Joseph Spector, *Moody's: Lago casino will "cannibalize" market*, PressConnects, USA Today, Feb. 5, 2016 (internal quotation marks omitted). *Available at* http://www.pressconnects.com/story/news/local/new-york/2016/02/05/moodys-lago-casino-cannabilize-market/79895978/ (last visited Oct. 24, 2018).

that location "is projected to generate significantly greater tax revenues to the State than the other" proposed locations.[19]

If the value of the rights being purchased by the Nation were thus "significantly enhanced" by the State-guaranteed freedom from such competition, as the State explained to the Department, Ex. CX-30 at 3, then the value of those rights has been significantly degraded by the State's steady withdrawal of those guarantees and the resulting proliferation of competition in the years since the Secretary rendered her evaluation. None of these circumstances was before the Secretary in 2002 when she allowed the Compact to go into effect.[20]

The State now asks this Panel to displace the role of the Secretary and approve an *additional* 7 years of payments to the State at a revenue-sharing rate exceeded nowhere in the United States for an exclusivity zone both surrounded and permeated by state-sanctioned competition. There exists no legal warrant for this Panel to do that. *See* 25

---

[19] Report and Findings of the New York Gaming Facility Location Board, Feb. 27, 2015, at 9, 32. *Available at* https://www.gaming.ny.gov/pdf/02.27.15.GFLBFinalAppendicesWebSmall.pdf (last visited Oct. 24, 2018).

[20] The Secretary's contemporaneous consideration of revenue-sharing arrangements where such circumstances were in place is instructive. For example, in 1997, the Secretary deemed a 16% of net win payment rate impermissible under IGRA because "[t]he Compact does not provide substantial exclusivity," where it permitted (as is permitted in the Nation's zone) "a state lottery" and "the operation of electronic gaming devices at horse tracks[.]" Letter of Dep't of Interior to Mescalero Apache Tribe at 2 (Aug. 23, 1997). *See* https://www.indianaffairs.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc-038382.pdf. By contrast, in 2001, the Secretary found 8% of net win payments justified by substantial exclusivity, thus permissible under IGRA, despite an exception for electronic gaming machines at race tracks because – as is *not* the case in the Nation's exclusivity zone – the "tracks [were] not a significant competitive force in the market." Letter of Dep't of Interior to Pueblo of Isleta at 1-2 (Nov. 21, 2001). *See* https://www.indianaffairs.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc-038351.pdf. In 1999, the Secretary could not conclude that an 8% revenue-sharing rate was permissible under IGRA where the State of Michigan had recently passed a law authorizing three casinos in Detroit, *several hundred miles* from the tribes' facilities. According to the Secretary, by "allowing non-Indian gaming to compete with and draw customers from Indian gaming," the law "may make *de minimis* the promised exclusivity." Letter of Dep't of Interior to Little Traverse Bay Bands of Odawa Indians at 2 (Feb. 9, 1999). *See* https://www.indianaffairs.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-025948.pdf. *See also* Letter of Dep't of Interior to Little River Band of Ottawa Indians at 2 (Feb. 9, 1999) (same). *See* https://www.indianaffairs.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-025946.pdf.

U.S.C. § 2710(d)(8). There certainly exists no economic warrant for it. The State's plea that enforcing the plain terms of the Compact will place it "'at the mercy'" of the Nation in a relationship with a "'harshly uneven allocation of economic power'" is ludicrous. State Br. ¶ 92 & ns.105-06. The plain terms of the Compact have been a windfall for the State – which has thumbed its nose at the spirit, and at times the letter, of exclusivity – and they will continue to have been a windfall at the end of the Compact's full term, to the tune of roughly $70 million per year, money for which the State risks nothing. Now the State seeks to massively compound its receipts.

And make no mistake, while the "pursuit of state general economic interests" is nowhere among the purposes of IGRA, *Rincon*, 602 F.3d at 1035, this arbitration goes even beyond that pursuit and amounts to an act of economic aggression by the State. Prior to initiating it, the Governor threatened to assault the viability of the Nation's gaming operations should the Nation not bend to the State's will.[21] But among Congress's core purposes in enacting IGRA was the "setting [of] boundaries to restrain aggression by powerful states." *Id.* at 1027. Secretarial review of proposed revenue-sharing provisions is where those boundaries are drawn and that restraint is implemented. The State seeks to evade these boundaries by asking this Panel to approve what the Secretary did not have before her in 2002 and would not approve today. Neither the plain language of the Compact nor – should this Panel deem it admissible – the relevant extrinsic evidence supports the State's groundbreaking request.

---

[21] Tom Precious, *Cuomo threatens new casino in Niagara Falls; Senecas call it 'foolish,'* The Buffalo News, Aug. 22, 2017 (quoting Governor Cuomo as stating that should the Nation not continue paying 25% revenue-sharing payments for the life of the Compact, "I have no doubt that we would get companies from around the world to bid on casino rights in the Buffalo/Niagara area. I have no doubt."). *Available at* http://buffalonews.com/2017/08/22/cuomo-seneca-nation-breach-casino-compact/ (last visited Oct. 24, 2018).

## CONCLUSION

The Nation respectfully requests that the Panel enter judgment in its favor, finding

the Nation is not in breach of the Compact and has fulfilled its payment obligations under

the Compact in full.

Dated:  October 26, 2018          Respectfully submitted,


Michele Mitchell                        Riyaz A. Kanji
Deputy General Counsel                  David A. Giampetroni
SENECA NATION OF INDIANS                Lucy W. Braun
90 Ohi:yoʹ Way                          KANJI & KATZEN, PLLC
Allegany Territory                      303 Detroit Street, Suite 400
Seneca Nation                           Ann Arbor, Michigan 48104
Salamanca, New York 14779               (734) 769-5400
(716) 945-1790


John G. Horn                            Carol E. Heckman
HARTER SECREST & EMERY LLP              LIPPES MATHIAS WEXLER FRIEDMAN LLP
50 Fountain Plaza, Suite 1000           50 Fountain Plaza, Suite 1700
Buffalo, New York 14202-2293            Buffalo, New York 14202-2216
(716) 853-1616                          (716) 853-5100


*Counsel for Respondents*