IN ARBITRATION UNDER THE COMMERCIAL ARBITRATION RULES OF THE
AMERICAN ARBITRATION ASSOCIATION

**State of New York**

    Claimant

v.

**Seneca Nation of Indians**

    Respondent

---

**CLAIMANT'S DEMAND FOR ARBITRATION**

---

**7 September 2017**

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
212-819-8200

Counsel for Claimant

# DEMAND FOR ARBITRATION

1. Under the August 18, 2002 Nation-State Gaming Compact (the "**Compact**") between the Seneca Nation of Indians (the "**Nation**" or "**Respondent**") and the State of New York, (the "**State**" or "**Claimant**"), the Nation was granted exclusivity to operate certain casino-type gaming devices in parts of Western New York in exchange for the obligation to pay to the State a portion of its gaming revenue (the "**State Contribution**"). The Compact is attached hereto as **Annex A**.

2. The Nation was required to make (and did make) the State Contribution to the State for the first 14 years under the Compact. It is undisputed that that the Compact automatically renewed for an additional seven years on December 9, 2016. Contract renewal means renewal of all of the rights and duties theretofore granted by the contract.

3. The issue in this case is whether, since renewal of the Compact, the Nation has breached the Compact by failing to continue to make the State Contribution payments in exchange for the State continuing to provide exclusivity for the Nation to operate its casino-type gaming devices.

4. The answer is clear: the Nation has breached the Compact. The Nation seeks to retain the benefits of the Compact, including exclusivity, but not the obligation to pay for them. But the Nation's position is illogical and has no basis in the Compact, in law or otherwise. The Nation cannot pick and choose the terms that are renewed.

5. To resolve this dispute and to affirm that the Nation must continue making the State Contribution under the Compact, the State demands arbitration under Paragraph 14 of the Compact.

I.  **THE PARTIES**

   A.  **Claimant**

6. The State is a state of the United States of America.

7. The State has broad jurisdiction to authorize and regulate gaming activities in New York.

### B. Respondent

8. The Nation is a domestic dependent sovereign Indian nation recognized by the United States of America.

## II. FACTUAL BACKGROUND

9. In 1988, the United States enacted the Indian Gaming Regulatory Act ("**IGRA**"),[1] which addresses the conduct of gaming on Indian lands (as defined by IGRA). IGRA divides gaming into three categories, one of which – so-called Class III gaming (*i.e.*, casino-type gaming) – is involved here. Under IGRA, an Indian tribe wishing to conduct Class III gaming must request the State in which the tribe's lands are located to enter into a gaming compact governing the conduct of such gaming activities and addressing, *inter alia*, the standards for operation and maintenance of gaming facilities, the criminal and civil laws and regulations applicable to such activities, and the allocation of criminal and civil jurisdiction between the State and the tribe to enforce such laws and regulations.[2]

10. In 1998, the Nation requested that the State enter into negotiations for the purpose of concluding a gaming compact to govern the conduct of Class III gaming activities by the Nation in New York. Following the execution of a Memorandum of Understanding between the State Governor and the President of the Nation on June 20, 2001,[3] the Parties concluded the Compact on August 18, 2002. In accordance with IGRA, the Compact was deemed to have been approved by the Secretary of Interior on November 12, 2002.[4] The "Effective Date" of the Compact was December 9, 2002, the date when the Secretary of the Interior of the United States published the notice of approval in the Federal Register as required by the IGRA.[5]

11. The Compact provides the Nation with exclusive rights with respect to the installation and operation of certain casino-type gaming devices (including slot machines) in an

---

[1] Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*
[2] Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d)(3).
[3] Memorandum of Understanding between the New York State Governor and the President of the Seneca Nation of Indians dated June 20, 2001.
[4] Letter from Gale A. Norton to the Honorable Cyrus Schindler dated November 12, 2002.
[5] Indian Gaming, A Notice by the Indian Affairs Bureau dated December 9, 2002, available online (as of August 21, 2017) at https://www.federalregister.gov/documents/2002/12/09/02-30967/indian-gaming.

expansive area of Western New York covering lands outside the reservation territories of the Nation (the "**Exclusivity Area**"). Paragraph 12(a)(1) of the Compact provides in relevant part:

> … the Nation shall have total exclusivity with respect to the installation and operation of, and no person or entity other than the Nation shall be permitted to install or operate, Gaming Devices, including slot machines, within the geographic area defined by: (i) to the east, State Route 14 from Sodus Point to the Pennsylvania border with New York; (ii) to the north, the border between New York and Canada; (iii) to the south, the Pennsylvania border with New York; and (iv) to the west, the border between New York and Canada and the border between Pennsylvania and New York.[6]

12. The exclusive privilege granted by the Compact and enjoyed by the Nation is highly valuable and has been hugely profitable to the Nation. The Nation has developed three Class III gaming facilities in the Exclusivity Area (which facilities include slot machines, table games and other amenities and offerings typical of Las Vegas style casinos), and has earned billions in revenues from the operation of gaming devices since the casinos have been in operation.

13. In exchange for the Nation's exclusivity to operate gaming devices in the Exclusivity Area, and as a key inducement for the State to enter into the Compact, the Nation agreed to pay to the State a portion of the Nation's proceeds from those devices, the so-called State Contribution. Paragraph 12(b)(1) of the Compact provides in relevant part:

> In consideration of the exclusivity granted by the State pursuant to Paragraph 12(a), the Nation agrees to contribute to the State a portion of the proceeds from the operation and conduct of each category of Gaming Device for which exclusivity exists, based on the net drop of such machines (money dropped into machines, after payout but before expense) and totaled on a cumulative quarterly basis to be adjusted annually at the end of the relevant fiscal year, in accordance with the sliding scale set forth below ("State Contribution"):
>
> Years 1-4

---

[6] Compact, Paragraph 12(a).

18% with "Year 1" commencing on the date on which the first Gaming Facility established pursuant to this Compact begins operation, and with Payments during this initial period are to be made on an annual basis.

Years 5-7

22%, with payments during this period to be made on a semi-annual basis.

Years 8-14

25%, with payments during this period to be made on a quarterly basis.[7]

14. The Nation's obligation to pay the State Contribution was (and is) for the State an essential condition of the Compact. The State Contribution constitutes the sole consideration flowing back to the State.

15. Paragraph 4(b) of the Compact provides that the Compact terminates on the 14th anniversary of the Effective Date (that is, December 9, 2002). Thus, the original termination date of the Compact was December 9, 2016.[8]

16. For the 14-year term of the Compact, the Nation enjoyed exclusivity and paid the State Contribution.[9] This amount totaled over $1.4 billion to the State, monies that were used to finance public services in local communities where the Nation's casinos are located, particularly Buffalo, Niagara Falls, and Salamanca.[10]

17. The Compact provides in Paragraph 4(c)(1) that, unless one of the parties objects in writing to the other party 120 days before the termination date (*i.e.*, December 9, 2016), the Compact automatically renews for an additional seven years.[11] Thus, the State or the Nation needed by August 11, 2016 to notify in writing to the other party if it had an

---

[7] Compact, Paragraph 12(b)(1).

[8] Paragraph 4(b) provides that "[t]his Compact shall terminate on the fourteenth (14th) anniversary of the Effective Date, unless renewed pursuant to Paragraph 4(c) or terminated pursuant to Paragraph 4(d)." Compact, Paragraph 4(b).

[9] Carolyn Thompson, *Seneca Nation to Stop Casino Payments to New York State,* U.S. NEWS, March 23, 2017, available online (as of August 22, 2017) at https://www.usnews.com/news/best-states/new-york/articles/2017-03-23/seneca-nation-to-stop-casino-payments-to-new-york-state.

[10] *Id.*

[11] Paragraph 4(c)(1) states: "[u]nless either Party objects in writing delivered to the other Party no later than one hundred twenty (120) days prior to the expiration of the fourteen (14)-year term established pursuant to Paragraph 4(b), the term of this Compact shall be renewed automatically for an additional period of seven (7) years." Compact, Paragraph 4(c)(1).

objection to the renewal of the Compact. Neither the Nation nor the State gave such notice. Accordingly, the Compact automatically renewed for an additional seven years until December 9, 2023.

18. Even though the Nation continues to enjoy exclusivity under the Compact in the Exclusivity Area, the Nation now refuses to pay the State Contribution. On March 31, 2017, the Nation declared that it would make its "final" State Contribution of around $30 million for the fourth quarter of 2016 and that it would make no future payments.[12]

### III. SUMMARY OF CLAIMS

19. The Nation's contention that it can unilaterally end paying the State Contribution while continuing to enjoy the benefits of the Compact has no basis in the Compact, law or logic.

20. Renewal of the Compact in December 2016 meant renewal of all of the parties' rights and duties. It did not mean renewal of the Nation's exclusive right to operate casinos in the Exclusivity Area without renewal of the Nation's corresponding obligation to pay for it.

21. The Nation reads into the Compact an implied term that the State Contribution drops to zero if the Compact is renewed. There is no basis in the Compact for such an implied term, and no commercial sense to such a position. The fundamental bargain of the Compact is that, so long as the State continues to authorize the Nation to operate gaming devices on an exclusive basis in Western New York, the Nation must continue to make the State Contribution.

22. The Compact explicitly links the Nation's obligation to make the State Contribution with the exclusive privilege granted to the Nation to operate gaming devices in the Exclusivity Area. Paragraph 12 of the Compact is entitled "Exclusivity and State Contribution", and Paragraph 12(b)(1) expressly provides that the State Contribution is payable by the Nation "in consideration of the exclusivity granted by the State" to operate gaming devices as stated in Paragraph 12(a)(1). *See also* Paragraph 12(a)(4) (providing that the

---

[12] *Id.*

Nation's obligation to pay the State Contribution and the State's right to receive this Contribution "cease[s] immediately" if the State breaches the exclusivity provisions in Paragraph 12(a) but only "as to that particular category of Gaming Device for which exclusivity no longer applies"); Paragraph 12(a)(5) (providing that the Nation's obligation to pay the State Contribution and the State's right to receive this Contribution "shall cease immediately as to all categories of Gaming Devices" if, as provided in Paragraph 12(a)(2)(i), the State permits another Indian Nation to operate a Class III Gaming facility within 25 miles of any facility authorized under the Compact).[13]

23. Paragraph 12(b)(1) of the Compact sets out a sliding scale for payments by the Nation over the 14-year expected term of the Compact. This scale sets low payments during the early years of the Compact when the Nation was investing in its casinos and casino revenues were expected to be low, and higher payments for later years when casino revenues were expected to be higher. The parties' assumption that higher payments would continue to be paid during the latter years of the Compact applies following renewal when casino revenues will presumptively continue at the high level before renewal.

24. The Nation's reading of the Compact cannot be seen even as a good faith misinterpretation of the agreement. The State's receipt of the State Contribution constitutes the sole benefit that it receives under the Compact, and was the condition for the State's agreement to the Compact. Under the Nation's reading of the Compact, the Compact continues for seven years during which the State provides a broad range of benefits to the Nation (e.g., the privilege to establish Gaming Facilities in Western New York (Paragraph 11(a)), the State's assistance in acquiring the sites for the Gaming Facilities (Paragraph 11(b)(2)), the privilege to operate gaming devices on the Gaming Facilities (Paragraph 12(a)(1)), but the State does not receive what it was promised by and from the Nation: the payment of the State Contribution.

---

[13] Compact, Paragraph 12.

## IV. ARBITRATION AGREEMENT

25. Paragraph 14 of the Compact sets out the dispute resolution procedures for the parties to follow.

26. Paragraph 14(b) provides that the parties must use their best efforts to negotiate in good faith to settle the dispute before submitting a claim to arbitration:

   > Negotiation. In the event of any dispute, claim, question, or disagreement arising from or relating to this Compact or the breach hereof, the Parties shall use their best efforts to settle the dispute, claim, question or disagreement. To this effect, either party may provide written notice of a claim to the other. Upon receipt of such written notice, the Parties shall then meet within fourteen (14) days, shall negotiate in good faith and shall attempt to reach a just and equitable solution satisfactory to both Parties.[14]

27. If the parties are unable to settle the dispute through negotiation after 30 days, Paragraph 14(c) provides that either party may submit the dispute to arbitration after providing written notice to the other party:

   > Method of dispute resolution. If the Parties do not reach such solution within a period of thirty (30) days after such meeting, or if the Parties fail to meet and thirty (30) days pass after the written notice of a claim is received, then upon notice by either Party to the other, either Party may submit the dispute, claim, question, or disagreement to binding arbitration.[15]

28. Paragraph 14(d) provides that the arbitration notice submitted by a party must "specify with particularity the nature of the dispute, the particular provision of the Compact at issue and the proposed relief sought by the Party demanding arbitration; provided, however, that neither Party may seek monetary damages for any alleged dispute, claim, question or disagreement" (emphasis in original).[16]

29. Paragraph 14(f) provides that the arbitration "shall be conducted in accordance with the rules of the American Arbitration Association or such other rules as the Parties may

---

[14] Compact, Paragraph 14(b).
[15] Compact, Paragraph 14(c).
[16] Compact, Paragraph 14(d).

mutually agree."[17] The State requests that this arbitration is conducted under the Commercial Arbitration Rules of the American Arbitration Association.

30. Paragraph 14(e) provides that "[e]ach Party shall select one arbitrator and the two arbitrators shall select the third."[18]

31. Paragraph 14(g) provides that the "cost of arbitration shall be shared equally by the Parties, but the Parties shall bear their own costs and attorneys' fees associated with their participation in the arbitration."[19]

32. Paragraph 14(h) sets out the remedies that the arbitrators may award:

> Remedies. The arbitrators shall exempt the Nation from the payment of the State Contribution for any breach of the State's commitments to exclusivity as set forth in Paragraph 12(a). For Material Breaches, the arbitrators may impose as a remedy only specific performance or termination of the Compact. For all other breaches other than Material Breaches, the arbitrators may impose as a remedy only specific performance. In no event shall monetary damages, other than specific performance, be available as a remedy to either Party for any alleged breaches of this Compact, including Material Breaches. An arbitration award against the Nation for specific performance that entails the payment of money to the State shall be satisfied solely and exclusively from the revenues of the Nation's Class III Gaming Facilities operated pursuant to this compact. Either Party may apply to the arbitrators seeking injunctive relief for an alleged violation of this Compact, and with respect to the relevant site, until the arbitration award is rendered or the controversy is otherwise resolved.[20]

33. Paragraph 14(i) provides:

> Arbitration decision. The decision of the arbitrators shall be final, binding and non-appealable. Failure to comply with the arbitration award within the time specified therein for compliance, or should a time not be specified, then forty-five (45) days from the date on which the arbitration award is rendered, shall be deemed a breach of the Compact. The prevailing party in an arbitration proceeding may bring an action solely and exclusively in the U.S. District

---

[17] Compact, Paragraph 14(f).
[18] Compact, Paragraph 14(e).
[19] Compact, Paragraph 14(g).
[20] Compact, Paragraph 14(h).

>Court for the Western District of New York to enforce the arbitration award and the Parties agree to waive their sovereign immunity solely and exclusively for the strictly limited purpose of such an enforcement action in such court and for no other purpose.[21]

34. The Compact contains no governing law provision. In light of the location of the Parties and the subject of the Compact, the substantive laws of New York should apply.

35. The Compact does not specify the seat of arbitration. The State requests that the City of New York, New York, be selected as the seat of arbitration.

36. On July 14, 2017, the State gave written notice to the Nation of the existence of a claim and requested negotiations under Paragraph 14(b) of the Compact.[22] The Nation has refused to meet on reasonable terms. No meeting having taken place within 30 days of the notice, the State is now entitled to proceed directly to arbitration under Paragraphs 14(c) and 14(d) of the Compact.

## V. FURTHER SUBMISSIONS AND RESERVATION OF RIGHTS

37. The State reserves all of its rights in this matter, including the right to amend this Demand for Arbitration, to make further submissions with respect to the facts and law, merits, costs, and any other relevant matters, and/or to expand or vary their claims and the relief they seek up to the date of the final award.

\*\*\*

---

[21] Compact, Paragraph 14(i).
[22] Letter from Alphonso B. David, Counsel to the Governor, to Todd Gates, Nation President, dated July 14, 2017.

## VI. RELIEF REQUESTED

38. For the reasons set out above, the State respectfully requests that the Arbitral Tribunal to be constituted in this case:

    (i) Declare that the Nation is in breach of its obligations under Paragraphs 4(c)(1) and 12(b) of the Compact by failing to pay the State Contribution after the Compact's renewal;

    (ii) Order the Nation specifically to perform its obligation under Paragraphs 4(c)(1) and 12(b) by paying the State Contribution currently owed to the State and by making all future payments in accordance with the Compact; and,

    (iii) Award the State any and all further or other relief as the Arbitral Tribunal may deem appropriate.

WHITE & CASE LLP
By:

_[signature]_

_____
Paul Friedland
Damien Nyer

*Counsel for Claimant*

Dated: 7 September 2017