# EXHIBIT A

IN ARBITRATION UNDER THE COMMERCIAL ARBITRATION RULES OF THE
AMERICAN ARBITRATION ASSOCIATION

Case No. 01-17-0005-3636


**State of New York**

Claimant

**v.**

**Seneca Nation of Indians**

Respondent

---

**SWORN WITNESS STATEMENT OF ROBERT WILLIAMS**

---


**September 12, 2018**

STATE OF NEW YORK )

                      ) SS.:

COUNTY OF ALBANY )

ROBERT WILLIAMS, being duly sworn, states as follows:

1.      I make this statement on behalf of the State of New York (the "**State**") in respect of the arbitral proceedings initiated by the State against the Seneca Nation of Indians (the "**Nation**," together with the State, the "**Parties**"). This testimony is based on my personal knowledge and documents that I reference, and is, to the best of my knowledge, true and correct. While this statement has been prepared with the assistance of counsel, its content is entirely mine.

## I.    BACKGROUND

2.      I currently serve as a Deputy Secretary in the Office of New York State Governor Andrew M. Cuomo. In this role, I advise the Governor on the development and management of gaming and horseracing policy in the State of New York. I have held this position since August 2017.

3.      I joined the New York State government in 1992 and, since then, have held various positions with responsibility for racing and gaming matters, including Indian gaming. I first served as a Post-Graduate Legislative Fellow with the New York State Senate from September 1992 to July 1993. Later, I was appointed as counsel to the New York State Senate Finance Subcommittee on Racing, Gaming and Wagering from September 1993 to July 1995. In July 1995, I took employment with the New York State Racing and Wagering Board (the "**Board**") as a Confidential Racing Aide, working on special projects, before taking a position as an Assistant Counsel

assigned to the Bureau of Gaming Operations, which carried out the Board's regulatory responsibility regarding Indian gaming. During that period, I also served as Counsel to the New York State Task Force on Casino Gambling in 1996 and, between 2005 and 2007, as Executive Director of the New York State Committee on the Future of Racing.

4.      In late December 2010, I was promoted to Acting Director of Indian Gaming, with direct responsibility over the Board's Indian Gaming operations, including the casino inspection details deployed at the five tribal casinos in New York. In March 2011, I took employment as a Special Assistant Counsel to the Governor, with a portfolio limited to Native American affairs. In August 2012, I was appointed Director of the New York State Division of the Lottery and a member of the New York State Franchise Oversight Board.   In February 2013, I was named, in an acting capacity, Executive Director of the New York State Gaming Commission, a newly created Commission which effectively merged the two existing governmental agencies with jurisdiction over gaming matters, the Board and the New York Division of the Lottery. I received official confirmation in June 2014 from the New York State Senate to serve in that role.

5.      Because of my responsibility for Indian gaming at the Board, I was directly involved in the negotiations, drafting and implementation of the August 18, 2002 Nation-State Gaming Compact (the "**Compact**"). In particular, as a part of the State's negotiating team, I participated in the elaboration of the State's negotiating position and coordinated in-person meetings and conference calls with the Nation's representatives, took detailed notes of the Parties' negotiating sessions, drafted the State's proposed versions of the Memorandum of Understanding that memorialized the Parties' discussions, and drafted the State's proposed versions of the Compact.  In this role, I had a detailed understanding of the Parties' positions concerning the Compact, including the State Contribution and renewal provisions.

## II.     ORGANIZATION OF THIS WITNESS STATEMENT

6.       I am aware that the Nation contends that, upon renewal of the Compact in December 2016, its obligation to pay the State Contribution ceased, even though the State remains obligated to continue providing exclusivity for the Nation to operate its casino-type gaming devices in parts of western New York.

7.       I explain in detail below that this contention is at odds with the State's and the Nation's understanding when the Compact was negotiated, as reflected by the drafting choices that we made and my discussions with the Nation representatives at the time.

8.       The Compact granted the Nation the unprecedented and exclusive right to operate Las Vegas-style slot machines in western New York, and the Nation agreed in exchange to share the revenues of these machines with the State (the so-called State Contribution).  Previously, State law prohibited slot machines but this law was changed to enable the Nation to use such machines at its casinos. The Nation's payment of the revenue share was the consideration for the extremely valuable exclusive rights granted to the Nation to operate slot machines (and other electronic gaming devices) in western New York.  It is for this reason that the Compact expressly links exclusivity and the State Contribution.

9.       There never was any discussion between the State and the Nation that the Nation would be relieved of its obligation to share revenues and pay the State Contribution upon renewal of the Compact.  The State would never have agreed to that. Payment of the State Contribution in exchange for exclusivity was an integral inducement for the State Legislature and then-Governor Pataki to approve the Compact (and permit the use of slot machines).

10.      I understand that, in support of its contention, the Nation points out that the Compact sets out a "sliding scale" with increasing State Contribution levels during the 14-year term of the

Compact, and does not specify the State Contribution levels payable upon renewal. As I explain below, given the substantial initial investment to develop the casinos, the Nation wanted to "phase in" the State Contribution with lower rates in the early years of the Compact when costs were projected to be high and revenues low. This is what the sliding scale achieved. Pursuant to that sliding scale, the State Contribution rates increase through the 14-year term of the Compact to reach a stabilized 25% rate in Year 8.

11. The Parties never discussed, and in my view it is inconceivable that either ever intended, that State Contribution payments would cease and drop to zero upon renewal of the Compact, as this would have been inconsistent *inter alia* with the fact that the initial investment would have long been fully recouped and casino revenues would then be at their highest. It would also make no commercial sense from the State's point of view, as the State Contribution was and is the primary consideration flowing to the State under the Compact. It would have been commercially absurd, and a non-starter, for the Nation to suggest that the Compact should be extended for seven years on all terms except for the consideration flowing to the State, which would be zero. The Nation not surprisingly never suggested or hinted at that, until March 2017 when after renewal it refused to continue to make the State Contribution payments.

12. To assist the Arbitral Tribunal in its evaluation of the Nation's position, I set out below the background of the Compact (Part III) and a description of the drafting history of the Compact, including the initial Memorandum of Understanding (Parts IV and V). I also discuss the representations that were made by the Nation and the State to the U.S. Department of the Interior to obtain approval of the Compact following its execution in August 2002 (Part VI). I finally discuss the current outstanding amount of State Contribution owed by the Nation to the State (Part VII).

## III.    ORIGIN OF THE COMPACT

13.    In 1988, Congress passed the Indian Gaming Regulatory Act (“**IGRA**”).  Under IGRA, certain types of gaming known as “class III” gaming (*i.e.*, Las Vegas-style casino gaming such as slot machines, blackjack and roulette) must be conducted pursuant to a “compact” between the Indian tribe and the state in whose territory such gaming is to be conducted.

14.    In 1998, the Nation requested that the State enter into negotiation for a gaming compact for a casino in western New York. The Governor at the time, George E. Pataki, agreed to this request, as he saw the opening of an Indian casino as an opportunity to revitalize depressed areas of western New York.  Because of my responsibility for Indian gaming  at the Board, I was asked to participate in the negotiations.

15.    On August 18, 2002, Governor Pataki and Nation President Cyrus Schindler executed the Compact.  The Compact was deemed approved by the U.S. Department of the Interior on November 12, 2002.  It entered into effect on December 9, 2002 after the Secretary of the Department of Interior published the notice of approval in the Federal Register.  A few weeks later, on December 30, 2002, the Nation opened its first Class III gaming facility, which was a Las Vegas-style casino with slot machines, table games and other amenities, in Niagara Falls, New York.  In May 2004 and July 2007, the Nation opened two additional facilities in Salamanca on Nation territory and in the City of Buffalo.  In its initial business plan, the Nation anticipated generating gaming revenues of approximately $5.5 billion over the 14-year term of the Compact (**CX-31**, p.8).  My understanding is that the Nation’s gaming revenues have far exceeded that figure and have been in the range of $6.5 billion.

16.    At the time of the negotiations, the State already had some experience negotiating and implementing gaming compacts.  In the early 1990s, two Indian tribes in New York, the Oneida

Indian Nation of New York (the "**Oneida Nation**" or "**Oneidas**") and the St. Regis Mohawk Tribe (the "**Mohawk Tribe**"), had requested to enter in negotiations with the State for gaming compacts. The State had entered into negotiations with the Mohawk Tribe in June 1990 and the Oneida Nation in August 1992.

17.     In April 1993, Governor Mario M. Cuomo signed on behalf of the State the Nation-State Compact between the Oneida Indian Nation of New York and the State of New York, allowing the Oneidas to operate a class III casino in New York (the "**Oneida Compact**"). The Oneida Compact contained no provisions on State Contribution, exclusivity, renewal or the use of slot machines. It provided that the agreement was effective "until terminated by written agreement of both parties." A copy of the Oneida Compact is appended as exhibit **CX-3** to the Statement of Claim.

18.     In October 1993, Governor Cuomo had executed the Tribal-State Compact between the St. Regis Mohawk Tribe and the State of New York, which allowed the Mohawk Tribe to conduct casino gaming (the "**Mohawk Compact**"). The Mohawk Compact had been amended in May 1999 to include, among other things, provisions on exclusivity and revenue sharing. Concerning the State Contribution, the 1999 amendment established a staggered formula, with increasing contribution levels starting from a minimum 10% contribution up to a maximum 25% contribution, depending on the annual net revenues from electronic gaming devices. A copy of the Mohawk Compact, as amended in 1999, is appended as exhibits **CX-4** and **CX-7** to the Statement of Claim.

19.     The State (and the Nation) were also paying attention to what was being done in neighboring states, in particular Connecticut, where the Joint Memorandum of Understanding ("Memorandum") signed with the Mashantucket Pequot Tribe in 1993 supported the successful development of the Foxwoods casino and resort, one of the largest gaming resorts in the United

States. Under that Memorandum, the parties not only resolved outstanding issues relating to the implementation of the Final Mashantucket Pequot Gaming Procedures, particularly concerning the use of slot machines, agreed to on May 31, 1991, but also agreed that Connecticut would receive a 25% revenue share in exchange for guaranteeing the Pequot Tribe exclusivity to operate such machines. This contribution level formed our baseline expectation as we engaged in negotiations with the Nation.

## IV.    NEGOTIATION OF THE COMPACT

20.    The negotiation of the Compact between the State and the Nation spanned four years between September 1998 and August 2002 when Governor Pataki and Nation President Schindler signed the Compact. The negotiations were conducted primarily through face-to-face meetings and telephone conferences. To begin, the State's negotiating team was headed by Judith A. Hard (Deputy Counsel to the Governor) and consisted of Patrick L. Kehoe (Senior Assistant Counsel to the Governor), Heather C. Wollowitz (Special Counsel to New York State Attorney General Dennis C. Vacco) and myself. John F. O'Mara, then Special Counsel to the Governor for Native American matters, soon took over as lead negotiator. The lead negotiator for the Nation was first William R. Perry of Sonosky, Chambers, Sachse, Endreson & Perry, LLP and from early 2001 onwards, Donald R. Pongrace of Akin Gump Strauss Hauer & Feld LLP. To my knowledge, I participated in all meetings and teleconferences. I also took detailed notes of the discussions. True and accurate copies of my notes are appended as exhibits **CX-9, CX-11, CX-14, CX-15, CX-17, and CX-18** to the Statement of Claim. While other members of the negotiating team or I may have had a few one-on-one conversations with the Nation's representatives, we kept each other apprised of the substance of such discussions.

## A.     Early Negotiations (1998 to 2000)

21.     The negotiations started slowly in the fall of 1998, with a first meeting in Buffalo in September and a second meeting in October 1998.  The purpose of these meetings was to define the parameters for the negotiations and to identify the main issues.  There was little activity in 1999.

22.     In an effort to move the process forward, the State produced a draft compact in December 1999 (Exhibit **CX-8**).  I prepared that draft.  As the notes that I took during the next negotiation meeting on January 10, 2000 reflect (Exhibit **CX-9**, p. 3), the Nation and the State had sharply contrasting views on the Compact term, with the Nation opposed to any fixed term and the State adamant that a sunset clause be included:

> Term of Compact. [William] Perry [the Nation's attorney] stated that he had a substantial concern with the inclusion of a term of Compact section in part because there is no similar section in the Oneida and Mohawk Compacts. [Robert] Williams explained that his review of Governor Pataki's commentary on the existing compacts illustrated that was a concern to the Governor. Williams also mentioned that the Oneida and Mohawk Compacts do not contain any sections regarding the effect of IGRA's invalidation or changes in the New York State Constitution. [Patrick] Kehoe [the State's representative] reiterated that Governor Pataki was strongly interested in a sunset and pointed out that the Mohawk Gaming Devices amendment contained a sunset clause. J.C. Seneca [the Nation's Treasurer] and [Ann] Noto [the Nation's attorney] expressed extreme concern that any limitation of years on a compact would be arbitrary. Noto added that the State of Minnesota does not have any expirations [sic] of their compacts.

23.     We continued to negotiate over the Compact term throughout April and May 2000 but achieved little success.  The draft Compact that the Nation produced dated April 5, 2000 reflected its position that the Compact contain no fixed term.  The Nation's draft not only eliminated the express term that was contained in the State's first draft Compact, but also explicitly provided that

the Compact had "no expiration except upon written agreement of the parties."  A copy of these draft provisions is appended as exhibit **CX-10** to the Statement of Claim. As I recall, the main issue for the Nation was to have enough time to recoup its initial investment costs.

24.     The question of revenue sharing – the State Contribution – also arose during that period. As the notes that I took during a negotiation session on April 12, 2000 reveal (Exhibit **CX-11**, p. 1), the State representative Patrick Kehoe explained the State's expectation of a 25% share of the revenues of the Nation's from slot machines.   He explained that, since slot machines were prohibited in New York at that time, the New York state legislature would likely not support a bill to allow slot machines and approve the Compact unless the State received a revenue share of 25%:

> PK [Patrick Kehoe]:  Issue of slot machines is paramount. There exist arguments for slots now, but they are not strong. Gov[ernor] wants NY's casinos to compete with AC, Foxwoods, etc. Video technology is good, but not quite there. Kehoe then discussed each element of the Program bill. Everything geared toward legislative appeasement, they likely wouldn't permit such or act on any bills without something in it for them. That's where the 25% revenue share kicks in. The § 20 approval language is [a] response to campaign against unilateral gubernatorial action, also to short circuit legal challenges.

25.     For the balance of the year, the Parties failed to reach any agreement on the State Contribution.   The Parties made some progress concerning the Compact term.   During a negotiation session dated May 15, 2000, the Nation explained that while it still preferred that the Compact not include any fixed term, it was open to compromise and proposed a 30-year term with a renewal term between 15 to 20 years.  As the notes that I took during that meeting reflect (Exhibit **CX-11**, p. 12), the State expressed the view that a 30-year term was "extremely long" and that, based on the State's experience with the Oneida and Mohawk Compacts, the Nation would likely be able to recoup its development costs for the casinos within one or two years.

26.     The Nation and the State exchanged draft Compacts on May 26 and July 3, 2000, but we were unable to reach any agreement.   In particular, we failed to reach any agreement on the Compact term. The Nation's May 26, 2000 draft Compact contained no fixed term, stating that "[o]nce effective, this Compact shall be in effect until terminated by written agreement of both parties." (Exhibit **CX-12**, p. 5) A copy of the May 26, 2000 draft Compact is appended as exhibit **CX-12** to the Statement of Claim. By contrast, the State's July 3, 2000 draft Compact contained a seven-year initial term with a five-year renewal term, providing in pertinent part:

> (a)     Termination Date. This Compact shall terminate on July 1, 2007, unless renewed pursuant to subsection (c) or terminated earlier pursuant to subsection (d).

> (b)     Renewals.  The duration of this Compact may be extended for a single term of five years upon written mutual agreement of the parties

(Exhibit **CX-13**, p. 9) A copy of the July 3, 2000 draft Compact is appended as Exhibit **CX-13** to the Statement of Claim.

27.     I recall that the Parties held a conference call in late 2000.[1] As my notes from the conference call with the Nation reflect (Exhibit **CX-14**, pp. 3-4), the Nation continued to have concerns about a 25% revenue share and asserted that such a share was the highest in the country and would make it difficult to obtain approval of the Compact from the U.S. Department of Interior:

> WP [William Perry]: Discussed before. 25% is highest amount in country. Higher percentage, more difficult in approvals. Look @

---

[1]     Although my notes of this conference call (Exhibit **CX-14**) are undated, to the best of my knowledge this call occurred after the Parties exchanged draft compacts in May and July 2000 because neither draft compact contains the Nation's proposed  Compact term consisting of a single 10-year term renewable for 10 years and because William Perry was still acting as the Nation's representative at that time (and not Donald Pongrace who took over as the Nation's representative in early 2001).

NM. Reimbursement: fundamental concern: state saying what['']s needed and Indians paying it.

PK [Patrick Kehoe]: Expenses disputes have been worked out w/ Oneida & Mohawk.

WP [William Perry]: Not proposing any limit on what State does. Revenue sharing developments: DOI's rejection of Mohawk compact – last part of letter on revenues. Saratoga case also presents additional level of risk. Concern that Nation invests in gaming facility, revenue sharing and casinos get shut-down. If there is a revenue sharing provision but compact overturned → problem.

PK [Patrick Kehoe]: Saratoga case → better feeling soon. Motion for leave; appeal. If given right, win win on appeal. Win win on merits. Interior analysis: not true. Casino as a whole could lose money and still pay us but not if machines lose. Amendment to be resubmitted soon.

New amendment addresses keno games. Lottery has keno, albeit in different form. If carve out for lottery is limited to current games lottery operates. Graduated system of profitability. Education of Interior on this point.

28.     As my notes also reflect, during this conference call Mr. Perry suggested "principles" that

the Nation could agree to concerning the revenue share:

WP [William Perry]: Suggest principle that Nation could agree to[:]

1.      Should be based amount on which there is no revenue sharing:

- ➤ Cover expenses

- ➤ See [Kevin Gover] letter.[2] Should be only if casino makes money as a while. If facility loses money, then revenue sharing should not [be] made.

---

[2]     Kevin Gover served as the Assistant Secretary for Indian Affairs in the U.S. Department of the Interior from 1997 to 2000.

> ➤ PK [Patrick Kehoe]: State would not want to tie its interest to the casinos as a whole. State's interest is only on machines.

> ➤ WP [William Perry]: Set among on machines after profitability.

2.    After that base amount, sliding scale on par with St. Regis. That model makes some sense.

3.    Revenue sharing should be based on net win of machines minus regulatory expenses. The revenue share should take care of <u>all</u> state expenses. Pay once, not twice.

29.    As my notes of the conference call reveal, the Nation and the State then discussed the Compact term and the renewal provisions. The Nation proposed a single 10-year term renewable for 10 years and proposed a "straightforward" renewal of the Compact that would "automatically extend" after a period of time to cure any purported breaches of the Compact:

> WP [William Perry]: Nation feels strongly. If overall package adequate then Nat[ion] may agree length of time of effect. Important to Nat[ion] view gaming as vehicle for economic development. Not only how long to pay back bills but expand economic vision. Term crucial because not just short term infusion of cash then return to prior. State Police is big concession. If made with short-term compact, upside should be longer term. This is the balance point for NYSP.
> …

> Term

> 1.    10 year initial term
> 2.    10 year renewal term

> Renewal provisions would be straightforward. Renewal available in uncured breach. Look to Salamanca leases. At specified term before expiration. One party feels the other about [to] breach, give time for cure and then automatically extend.

> PK [Patrick Kehoe]: Great movement. Need to reserve judgment. Must discuss w/ NYSP, Go[vernor], O'Mara, NYS RWB.

30.     To the best of my recollection, the negotiations were suspended for the remainder of 2000.

**B.     Resumed Negotiations (2001)**

31.     The Nation and the State resumed negotiations in 2001. The Nation was then represented by a new counsel, Mr. Pongrace, of Akin Gump. During a negotiation session in March 2001, the Nation reiterated its interest in revenue sharing (and exclusivity) and the State reiterated its position that it expected a 25% revenue share. The notes that I took from the March 26, 2001 meeting confirm this (Exhibit **CX-15**, p. 3):

> [Don] Pongrace: … As for revenue sharing, we're interested. We would like to leave the money in western New York. Percentages is [sic] a future discussion.
>
> [Michael] Brown: In Connecticut, we should have addressed the localities in the revenue share. They have a mess now because no revenue goes directly. They are dealing with the expansion of casinos and the problems now.
>
> [John] O'Mara: Same as Connecticut, twenty-five percent.
>
> [Don] Pongrace: How would you like to split between state and local?
>
> [John] O'Mara: You misunderstood, the state's share is twenty-five percent.

32.     We continued to negotiate in April 2001 but still had significant differences over the Compact term and the State Contribution. The agenda for our meeting on April 3, 2001 (Exhibit **CX-16**, p. 1) demonstrates the opposing views that the State and the Nation had at that time, with the State seeking "7 years and 25% of Gross Slot Revenues to State (local revenue share to be supplementary to State share)" and the Nation contending that our proposal was a "deal breaker" because the "[t]erm was too short and the percentage too high."

33.     My notes of the April 3, 2001 meeting reflect (Exhibit **CX-17**, p. 3) that the Nation rejected our proposal of a seven-year initial term with a five-year renewal period. The Nation claimed that

our proposal was a "deal-breaker" because it purportedly would not give the Nation enough time to recoup its development costs for the casinos.

34.    As my notes of that meeting also reveal (Exhibit **CX-17**, p. 3), the State and the Nation had sharp differences over how to calculate the State Contribution and what percentage of gaming revenues the State would receive:

> [Don] Pongrace: Twenty-five percent. No one has come close to twenty-five percent or a term of seven years in any compact that I have dealt with. We need to deal with SNI projections. To help Niagara Falls and Buffalo and for economic development on the reservation. This will require a significant financial investment: the financial people will want a slice, the manager will want a slice, the developer will want a slice[,] the state will want a slice, and the locals will want a slice. We need to make sure that a casino benefits the Nation. I've always said that the Pequots [the Mashantucket Pequot Tribe] are the poorest rich people on earth. Let me be blunt, the term of the compact must be long enough to pay the debts associated with the casino and to help the Nation. The seven year, twenty-five percent is a deal breaker.

> [John] O'Mara: Let me be equally blunt. We can be flexible on the term but not on the revenue sharing.

35.    As my notes reflect, it was during that April 3, 2001 meeting that Mr. Pongrace, the Nation's outside counsel and lead negotiator, proposed, as a compromise, a "sliding scale" that "builds [up] to twenty-five percent":

> [Don] Pongrace: This issue is very politically volatile on the reservation. Can we set up a process that builds to a twenty-five percent sliding scale so that we can have our economic benefit secured[?]

> [John] O'Mara: We have a sliding scale built into the Mohawk Compact with twenty-five percent being the highest. There was an understanding that the sliding scale applied only to on-reservation casinos and only to VLT's.

> [Don] Pongrace: We must be able to sell this agreement to our respective constituencies.

> [John] O'Mara: The political realities are evident.

As the above reflects and as I recall, the purpose of the proposed sliding scale was to allow the Nation to phase in the State Contribution and recoup its initial investment costs in the early years of operations.

36.     The negotiations continued into May 2001.  As the notes that I took from the May 21, 2001 negotiation meeting reveal (Exhibit **CX-18**, p. 5), we were on the verge of abandoning the negotiations altogether due to the impasse concerning the State Contribution, as the State could not agree to receive less than 25% and "do less than a neighboring state," namely, Connecticut:

> [Don] Pongrace: … If there is a make or break point on these negotiations it is with the revenue share. We cannot politically do a project where the State makes more money tha[n] the Nation. Our research indicates that class II gaming will make money on the reservation. We need to justify to the people the expense and hassle of a gaming compact. With class II there is no revenue share, no regulation. The figures just do not match up. I have been clear – I cannot make the equation work.
>
> [John] O'Mara: I have been upfront. Our instructions have been clear. It's 25%. We cannot do less than a neighboring state. We have our marching orders.
>
> [Don] Pongrace: It's a deal breaker. 25% plus 3% for local costs is an effective 28% revenue share. We are now looking at a blended management fee of 23%. This will be a $250 million investment and create 3,000 jobs. We just cannot be in a position of taking less tha[n] what the State does. [Pongrace then provided figures of State and Nation share for the first three years of operation].
>
> …
>
> [Don] Pongrace: I just cannot sell 25% to the Council or the Nation. We are at a point fundamentally where we have to make a decision whether to work or not. We have no managerial experience or money. We have to pay for those. It's a reality.

37.     Mr. Kehoe noted that it would take only "four to seven years to get up to speed" (and for the Nation to recoup the initial investment):

[Patrick] Kehoe: Two issues. It will take four to seven years to get up to speed. At year 10 we see that there is plenty to deal with. This issue here is just the 25% share to the State. It's political, not economic.

[Don] Pongrace: I don't think I can sell it. It is political. Economically it may not be feasible. Will we hear back from you guys that we can provide less than 25%?

38.     We agreed that the best path forward was to attempt to draft a Memorandum of Understanding (the "**MOU**").   The purpose behind drafting the MOU was twofold: (1) to memorialize the terms of the Parties' Compact; and (2) to have the MOU serve as a vehicle to obtain the New York State Legislature's approval of the Compact.

## V.     THE MEMORANDUM OF UNDERSTANDING (2001)

39.     From May to June 2001, the Parties exchanged several draft MOUs that addressed the Compact term and the State Contribution.   I prepared, in consultation with Messrs. O'Mara and Kehoe, the State's May 2001 draft MOU.   A copy of the State's May 2001 draft MOU is appended to the Statement of Claim as Exhibit **CX-45**.   To the best of my recollection, this draft was prepared after our May 21, 2001 negotiation meeting. For the Compact term, we adopted the Nation's proposal of an initial 10-year term and an automatic 10-year renewal term:

> ***Term of Agreement***. The parties agree and understand that the facilities contemplated by this agreement hold(s) tremendous potential for creating a stable economic resource for the Nation and the western region of the State. The parties, agree, however that it is in the best interests of both that this agreement be periodically revisited, to permit the parties to account for new or unanticipated contingencies, or to merely provide an opportunity for both governments to review and reassess of [sic] the terms contained herein.   Therefore, the initial term of this agreement shall be 10 years, with an automatic 10 year renewal upon the expiration thereof, unless either party objects in writing not less than 120-days prior to the end of the initial term.

40.     The document shows my notes of the Nation's comments, which I believe must have been communicated to me during a meeting or call with Mr. Pongrace. The note directly below the proposal reveals that the Nation preferred an initial 14-year term coupled with a seven-year automatic renewal term.  As explained by Mr. Pongrace, the Nation preferred such an approach so that the Compact term would more closely align with standard seven-year terms used in casino management contracts:

> **\*DP [Donald Pongrace]: 20 year term sounds good, but because management contracts normally tract a 7 year duration, Tribe would prefer a 14 + 7 term.**

41.     As for the State Contribution, the State's draft May 2001 MOU proposed a sliding scale building up to 25% of the net drop of the Nation's gaming devices.[3]  We proposed this sliding scale as a compromise to address the Nation's concerns that it needed a sufficiently long phase-in period to ensure that it could recoup its initial development costs for the casinos. In particular, in the May 2001 MOU the State proposed:

- 15% if annual net drop totals $0 to $49,999,999.99

- 20% if annual net drop totals $50,000,000.00 to $99,999,999.99

- 25% if annual net drop totals $100,000,000.00 or more

42.     The Nation agreed with the principle of the State's proposed sliding scale but wanted to pay in smaller percentage increments in case the casinos were not initially successful.  In particular, as shown by notes directly below our proposal, Mr. Pongrace commented:

> **\*DP [Donald Pongrace]: Tribe does not want pay % on totals; Tribe wants to pay % on increments, so only paying 25% on**

---

[3]     The "net drop" is understood in the casino industry as the money dropped into a slot machine (or other gaming device), after payouts to the players, but before expenses.

> very high end of net. Also, **Tribe wants to start at 10%, with much higher thresholds. I told DP we were clear up front we wanted a flat rate; they wanted insurance in case the casino tanked – that's what I gave them above. He agreed that was true, but the Tribe wants to pay in increments. He's going to propose a counter along the lines of the Tribe's wishes. I told him he was free to do so, but I thought we'd compromised enough on this issue by offering a sliding scale. Also, Tribe does not want revenue sharing for on-reservation casino.**

43.     The sliding scale proposed by the State and commented on by the Nation was not tied to specific years of the Compact term; to the contrary, it was tied to the Nation's gaming revenues (that is, revenues from slot machines and video lottery terminals).  For the State, there was no question that the proposed sliding scale would apply equally during the term of the Compact and upon renewal (when the Nation's casino gaming revenues would be at their highest).  I have no recollection that the Nation ever questioned that approach.  The State would never have agreed to the Compact if the revenue share had dropped to zero upon renewal.

44.     The parties continued to exchange draft MOUs throughout the remainder of May and into June 2001.  Concerning the Compact term, the Parties adopted the Nation's proposal of a single term renewable for seven years.  The Nation reiterated in its May 21, 2001 draft MOU that this change was necessary to satisfy developers it was negotiating with:

> The Nation has increased the initial term from 10 to 14 years in response to the fact that the various developer/managers with which it is currently negotiating are all requesting 7 year terms with an option for a renewal term of another 7 years.  Each developer/manager has expressed a need for the project term to be as long as possible in order to justify their investment of time and money in the project.

45.     In its May 21, 2001 draft MOU, the Nation proposed a sliding scale for the State Contribution based on smaller percentage increments and revenue levels:

Revenue Level                                   Revenue Share Percentage

| | |
|---|---|
| Up to $100 million | 10% |
| 100,000,001 to 150,000,000 | 12.5% |
| 150,000,001 to 175,000,000 | 15% |
| 175,000,001 to 200,000,000 | 17.5% |
| 201,000,001 to 225,000,000 | 20% |
| 225,000,001 to 250,000,000 | 22.5% |
| 250,000,001 and above | 25% |

46.     Similar to the State's initial proposal described above, the Nation's proposed sliding scale:

(1) achieves a 25% revenue share for the State; (2) was not expressly tied to specific years of the

Compact term; and (3) does not suggest that the revenue share would not apply during the renewal

period.  A copy of the May 21, 2001 draft MOU is appended to the Statement of Claim as Exhibit

**CX-20**.

47.     We continued to negotiate the sliding scale in June 2001.  The Nation's June 5, 2001 draft

MOU proposed a different sliding scale with State Contribution levels increasing over time:

| Years 1-7 | Years 8-14 |
|---|---|
| 16% | 22% |

The Nation and the State agree that the total government share (State
and local) shall not exceed 19% in Years 1-7 and that it shall not
exceed 25% in Years 8-14.

48.     The Nation's proposal to link specific years of the Compact term to specific percentages

of the State Contribution was driven by the same desire to phase-in the revenue share under the

Compact.  The phase-in did not mean (and the Nation's representatives never told us or otherwise

suggested) that the State Contribution would be paid only during the 14-year term of the Compact

and not upon renewal.  As such, the Nation's proposal had the same intent and effect as previous

sliding scale proposals, namely, to permit the Nation to recoup its development costs for the casinos during the early years of the project (by allowing it to retain a greater share of its revenues), while permitting the State to receive a larger share of casinos revenues during the latter years (including the renewal period) when the Nation's development costs would have been recouped. A copy of the June 5, 2001 draft MOU is appended to the Statement of Claim as Exhibit **CX-21**.

49.     The final MOU executed between the Parties on June 20, 2001 reflects our understandings concerning the Compact term and the State Contribution.  The final MOU confirms that the Compact term includes a 14-year initial term with a seven-year automatic renewal:

> **Term of Agreement.** The initial term of this Agreement shall be 14 years, with an automatic seven-year renewal upon the expiration of the initial 14 year term, unless either Party objects in writing not less than 120-days prior to the end of the initial term. In the event either Party does object to the automatic renewal of this Agreement, the Parties agree to use their best efforts to address the objecting Party's concerns through frequent and regular good faith negotiations. In the event the objecting Party's concerns cannot be overcome within a period of 120-days from the commencement of such negotiations, either Party may submit the issue of the other Party's good faith in renewal negotiations to binding arbitration pursuant to the procedures set forth in the Compact. During the pendency of the arbitration, the existing terms of the Compact shall continue to apply. Notwithstanding the term of this Agreement, the Parties may amend, eliminate, or terminate, any part or all of this Agreement, at any time, by mutual consent…

50.     In addition, the final MOU sets out the sliding scale for the State Contribution:

> In exchange and consideration for this exclusive franchise, the Nation agrees to share with the State a portion of the proceeds from electronic gaming devices, including "slot machines," based on the net drop of such machines (money dropped into machines, after payout but before expense) and totaled on a cumulative quarterly basis to be adjusted annually at the end of the fiscal year, according to the sliding scale set forth below (this being the "State Revenue Share" referred to elsewhere herein):

> Years 1-4                    Years 5-7                    Years 8-14

|        18%        |        22%        |        25%        |

51.     This provision satisfied the Parties' principal goals: for the State, achieving a 25% revenue share on the Nation's gaming device revenues, and for the Nation, achieving a long phase-in over the Compact term before reaching the 25% State Contribution. (Exhibit **CX-22**, p. 4) A copy of the June 20, 2001 MOU is attached as Exhibit **CX-22** to the Statement of Claim. This provision was later incorporated into Paragraph 12 of the Compact.

## VI.     APPROVAL OF THE COMPACT BY THE DOI

52.     Following the execution of the Compact on August 18, 2002, the Compact was submitted to the DOI for review and approval as required under IGRA.  I was personally involved in this process and attended meetings between the Parties and the DOI's representatives.

53.     The DOI was especially interested in, and scrutinized, the revenue sharing mechanism of the Compact.  At no point did anyone from the Nation or the State suggest to the DOI that the revenue sharing mechanism would stop upon renewal of the Compact.  To the contrary, the submissions that both the Nation and the State made to the DOI to obtain approval show that the Nation and the State fully understood that the Nation would have to pay the State Contribution, including during the seven-year renewal term, as long as the State continued to provide exclusivity for the Nation to operate its gaming devices.

54.     Following the submission of the Compact for review and approval, a meeting took place with the DOI on September 13, 2002.  I was in attendance as well as representatives of the Nation and the State.  The State Contribution was one of the main concerns of the DOI during that meeting. I have no recollection of anyone from the Nation or the State advising the DOI during that meeting that the State Contribution would go away upon renewal of the Compact.  As shown in my notes (Exhibit **CX-28**, p. 6), we explained to the DOI the value of the Exclusivity Area under the

Compact and that the revenue share was linked to the Compact term to permit the Nation to recoup its development costs:

> Great market → people would be willing to pay greatly for exclusivity in this market
>
> Revenue share linked by time – permits capitalization for development.

55.     By letter dated September 30, 2002, George Skibine, then Director of the Office of Indian Gaming Management at the DOI, requested (Exhibit **CX-29**) that the Parties provide "additional documentation that explains why you believe that the payment is appropriate in exchange for the economic benefit secured by the Nation under the Compact":

> In order for us to approve such a provision, we need to the determine that it does not violates 25 U.S.C. § 2710(d)(4) of IGRA which prohibits the imposition of any tax, fee, charge, or other assessment on an Indian tribe. As part of this determination, we also need to assess whether the economic benefit that the Nation is receiving under the Compact is sufficient consideration that justifies the payment to the State. As you know, to date, the Department of the Interior has approved payments to the State only when the State has agreed to provide substantial exclusivity for Indian gaming within the State, i.e., where the compact provides a tribe with substantial economic benefits in the form of a right to conduct Class III gaming activities in the State that are on more favorable terms than any rights of non-Indians to conduct similar gaming activities. ***Please submit additional documentation that explains why you believe that the payment is appropriate in exchange for the economic benefit secured by the Nation under the Compact***. (Emphasis added).

56.     On October 11, 2002, James M. McGuire, Counsel to the Governor, presented the State's written submissions to DOI in response to Director Skibine's letter (Exhibit **CX-30**), describing the "sweeping exclusivity rights" that justified the revenue share:

> Paragraph 12 of the Compact grants sweeping exclusivity rights to the Nation with respect to the operation of two highly lucrative types of gaming devices: slot machines and video lottery gaming devices (collectively, the "gaming devices"). The State has granted the Nation these exclusivity rights within a vast geographical area of

nearly 11,000 square miles – an area roughly twice the size the State of Connecticut – in the western part of New York. No person or entity may install or operate either gaming device in this zone of exclusivity, with the exception of only the Tuscarora Indian Nation (the "Tuscarora") and the Tonawanda Band of Seneca Indians (the "Tonawanda"). Even if the State were to enter into compacts with the Tuscarora or the Tonawanda authorizing the use of these gaming devices, any such gaming facility must be located more than 25 miles from any gaming facility authorized by the Compact unless it is located on federally recognized Indian lands existing as of the effective date of the Compact.

57.     In the letter, Mr. McGuire nowhere suggested that, as an added concession to the Nation, the State Contribution would not be paid during the renewal term; rather, he noted that the State Contribution was the Nation's consideration for the exclusivity rights and emphasized the "phased-in nature of the payments":

> As consideration for its purchase of these valuable exclusivity rights from the State, the Nation agreed to provide payments to the State in accordance with a sliding-scale based on the "net drop" (gross money wagered, after payout but before expenses) from the gaming devices for which exclusivity has been granted. The Compact provides that the Nation shall pay the State 18% of the net drop from the gaming devices in the first four years after gaming commences pursuant to the Compact, 22% of the net drop in years five through seven and 25% of the net drop in years eight through fourteen. **These sliding-scale provisions of the Compact enable the Nation to retain a greater share of the net drop in the earlier stages of the development of its gaming facilities, thereby enhancing the Nation's ability to cover its start-up costs**. And the phased-in nature of the payments reduces significantly the overall effective rate of the payments over the life of the Compact. Further, a minimum of 25% of the funds received by the State pursuant to the Compact shall be made available to local governments hosting the gaming facilities to defray the costs associated with such facilities – costs the Nation might otherwise bear. (Emphasis added).

58.     Likewise, in the Nation's own written submissions to the DOI in response to Director Skibine's request, also sent on October 11, 2002 (Exhibit **CX-31**), Mr. Pongrace nowhere stated that the Nation had no obligation to pay the State Contribution during the renewal period, even

though he took pain to highlight the four "valuable rights and benefits" that the Nation received

from the State in exchange for revenue sharing:

    (1)    The unique right to operate slot machines within the State of New York;

    (2)    The exclusive right to operate Gaming Devices, as defined in the Compact, within a defined geographic market that has a resident population larger than many other States in the Union and over fourteen million visitors a year;

    (3)    Financial assistance to the Nation during the critical start up phase of the operation in the form of, among other things: (i) transfer of a ready-to-use facility at the cost of $1.00; (ii) graduated revenue share; (iii) delay in payment of revenue share during initial years of operation; and (iv) agreement to use the power of eminent domain to obtain properties not owned by the State and transfer them to the Nation for current fair market value, thereby diminishing significantly the speculative escalation of land values and concomitant increase in cost to the Nation during the critical start up phase of the project; and

    (4)    Assistance with housing projects contiguous to the project area in order to provide Nation housing for Nation members that wish to work at the Gaming Facilities in question.

59. I find it inconceivable that Mr. Pongrace, who was intimately involved in the Parties' negotiations of the Compact, would have failed to mention to the DOI (if it were true) the extraordinarily significant "valuable right and benefit" that the Nation would no longer have an obligation to make State Contribution payments upon renewal of the Compact, which could save the Nation in the region of $ 1 billion in revenue.

## VII.    AMOUNT OF STATE CONTRIBUTION OWED BY THE NATION

60. The Compact renewed on December 9, 2016, neither side having objected to the renewal by August 11, 2016. To my knowledge, the State first learned about the Nation's decision to cease making State Contribution through a series of communications starting in March 2017.

61.     Pursuant to New York State Finance Law, Section 99-h(3), a significant portion of the State Contribution owed by the Nation under the Compact, 25 percent, is earmarked for the economically depressed communities in western New York where the Nation's casinos are located, including the cities of Buffalo, Niagara Falls and Salamanca.  As a result of the Nation's withholding payment of the State Contribution, these communities face serious fiscal crises, which have been well documented in the media.

62.     The Nation's decision in March 2017 caught us (and the local communities in western New York that rely on the revenues generated by the State Contribution) completely by surprise.  Both the State and the local communities had factored in the State Contribution in their budget for the Year 2017.  As reflected in the State's Fiscal Year 2017-2018 budget (Exhibit **CX-38**, p. T-227), the State had budgeted $200 million in tribal-state compact revenues, which included gaming revenues from the State Contribution under the Compact.   Under the State's 2017 budget, local municipalities were budgeted to receive $74.8 million and the State was budgeted to receive $121.2 million in 2017.  Similarly, as shown in its Fiscal Year 2017-2018 budget (Exhibit **CX-41**, p. 2), the city of Salamanca had budgeted $5,500,000 in gaming revenues to be received from the State Contribution in 2017. Likewise, as shown by their budgets for 2017, the cities of Buffalo (Exhibit **CX-43**, p. 1-2) and Niagara Falls (Exhibit **CX-35**) had budgeted $7,000,000 and nearly $11,000,000, respectively, in gaming revenues from the State Contribution in 2017.

63.     The Nation is currently withholding payment of the State Contribution and is no longer providing to the State Gaming Commission the "net drop" of the Nation's slot machines (to determine, *inter alia,* the State Contribution owed by the Nation).  The Gaming Commission, using historical "net drop" and applying a regional trend analysis, estimates that the amounts owed by the Nation from January 1, 2017 to June 30, 2018, total $185 million (exclusive of interest).

Appended to this Statement as **Appendix A** is a schedule prepared by Commission staff, under my supervision, and reflecting amounts owed by the Nation.



Robert Williams

Sworn to before me this 12th day of September, 2018

Notary Public

Alyssa Ann McGrath
Notary Public, State of New York
No. 01MC6265877
Qualified in Rensselaer County
Commission Expires July 23, 2020

# Appendix A

**ESTIMATE OF OUTSTANDING STATE CONTRIBUTION PAYMENTS AND LOCAL DISTRIBUTIONS FOR THE PERIOD JANUARY 1, 2017 THROUGH JUNE 30, 2018**

## 1. January 1, 2017 through December 31, 2017

Using historical net drop and applying a regional trend analysis for January 2017 through December 2017, the Commission estimates the net drop subject to State Contribution payment to be **$122,500,000** as follows:

- For Seneca Niagara, $250,000,000.  From this, the Seneca Nation's payment to the State would be $62,500,000. Thus, the host local share payment, pursuant to N.Y. State Finance Law § 99-h (3) inclusive of distributions required by N.Y. State Finance Law § 99-h (4), is estimated to be $15,625,000. The regional share, pursuant to N.Y. State Finance Law § 99-h (3-a), is estimated $6,250,000.

- For Seneca Allegany, $110,000,000. From this, the Seneca Nation's payment to the State would be $27,500,000. Thus, the host local share payment, pursuant to N.Y. State Finance Law § 99-h (3), is estimated to be $6,875,000. The regional share, pursuant to N.Y. State Finance Law § 99-h (3-a), is estimated $2,750,000.

- For Seneca Buffalo Creek, $130,000,000. From this, the Seneca Nation's payment to the State would be $32,500,000. Thus, the host local share payment, pursuant to N.Y. State Finance Law § 99-h (3), is estimated to be $8,125,000. The regional share, pursuant to N.Y. State Finance Law § 99-h (3-a), is estimated $3,250,000.

**CHART 1: ESTIMATE OF STATE CONTRIBUTION AND DISTRIBUTION, 2017**

| | 2017 | | | |
| --- | --- | --- | --- | --- |
| | Seneca Niagara | Seneca Allegany | Seneca Buffalo | Total |
| Net Drop | $ 250,000,000 | $ 110,000,000 | $ 130,000,000 | $ 490,000,000 |
| **State Contribution** | **62,500,000** | **27,500,000** | **32,500,000** | **122,500,000** |
| - incl. Host Local Share[1] | 15,625,000 | 6,875,000 | 8,125,000 | 30,625,000 |
| - incl. Regional Share[2] | 6,250,000 | 2,750,000 | 3,250,000 | 12,250,000 |

[1] The host local share, which totals twenty-five percent of the State Contribution, is distributed to certain counties, towns and identified entities pursuant to N.Y. State Finance Law.

[2] Pursuant to Chapter 174, Laws of 2013, ten percent funds received by the State pursuant to the tribal-state compacts and agreements are distributed to counties in each respective exclusivity zone on a per capita basis provided they do not otherwise receive a share of said revenues pursuant to this section. This distribution is codified at N.Y. Racing, Pari-Mutuel Wagering and Breeding Law § 1311 (2)(b).

**Appendix A to Sworn Witness Statement of Robert Williams**

2. <u>**January 1, 2018 through June 30, 2018**</u>

Using historical net drop and applying a regional trend analysis for January 2018 through June 2018, the Commission estimates the net drop subject to State Contribution payment to be **$62,500,000 as** follows:

- For Seneca Niagara, $125,000,000. From this, the Seneca Nation's payment to the State would be $31,250,000. Thus, the host local share payment, pursuant to N.Y. State Finance Law § 99-h (3) inclusive of distributions required by N.Y. State Finance Law § 99-h(4), is estimated to be $7,812,500. The regional share, pursuant to N.Y. State Finance Law § 99-h (3-a), is estimated $3,125,000.

- For Seneca Allegany, $55,000,000. From this, the Seneca Nation's payment to the State would be $13,750,000. Thus, the host local share payment, pursuant to N.Y. State Finance Law § 99-h (3), is estimated to be $3,437,500. The regional share, pursuant to N.Y. State Finance Law § 99-h (3-a), is estimated $1,375,000.

- For Seneca Buffalo Creek, $70,000,000. From this, the Seneca Nation's payment to the State would be $17,500,000. Thus, the host local share payment, pursuant to N.Y. State Finance Law § 99-h (3), is estimated to be $4,375,000. The regional share, pursuant to N.Y. State Finance Law § 99-h (3-a), is estimated $1,750,000.

CHART 2: ESTIMATE OF STATE CONTRIBUTION AND DISTRIBUTION, THROUGH JUNE 30, 2018

|  | 2018 | | | |
|---|---|---|---|---|
|  | Seneca Niagara | Seneca Allegany | Seneca Buffalo | Total |
| Net Drop | $ 125,000,000 | $ 55,000,000 | $ 70,000,000 | $ 250,000,000 |
| **State Contribution** | **31,250,000** | **13,750,000** | **17,500,000** | **62,500,000** |
| - incl. Host Local Share[1] | 7,812,500 | 3,437,500 | 4,375,000 | 15,625,000 |
| - incl. Regional Share[2] | 3,125,000 | 1,375,000 | 1,750,000 | 6,250,000 |

[1] The host local share, which totals twenty-five percent of the State Contribution, is distributed to certain counties, towns and identified entities pursuant to N.Y. State Finance Law.

[2] Pursuant to Chapter 174, Laws of 2013, ten percent funds received by the State pursuant to the tribal-state compacts and agreements are distributed to counties in each respective exclusivity zone on a per capita basis provided they do not otherwise receive a share of said revenues pursuant to this section. This distribution is codified at N.Y. Racing, Pari-Mutuel Wagering and Breeding Law § 1311 (2)(b).