# EXHIBIT D

IN ARBITRATION UNDER THE COMMERCIAL ARBITRATION
RULES OF THE
AMERICAN ARBITRATION ASSOCIATION
Case No. 01-17-0005-3636
----------------------------------------X
State of New York,

        Claimant,

    v.

Seneca Nation of Indians,

        Respondent.
----------------------------------------X


TRANSCRIPT OF PROCEEDINGS
New York, New York
December 12, 2018


BEFORE:  HON. JUDGE WILLIAM BASSLER
        HENRY GUTMAN, ESQ.
        KEVIN N. WASHBURN, ESQ.




Reported by:  BONNIE PRUSZYNSKI, RMR, RPR, CLR
JOB NO. 152544

1
2
3
4
5
6
7
8
9         December 12, 2018
10             10:39 A.M.
11
12
13
14      Transcript of Arbitration
15  Proceedings held at the offices of AAA, 150 East
16  42nd Street, New York, New York, before Bonnie
17  Pruszynski, a Registered Professional Reporter,
18  Registered Merit Reporter, Certified Livenote
19  Reporter, and Notary Public of the State of New
20  York.
21
22
23
24
25

1
2   A P P E A R A N C E S:
3   WHITE & CASE
4   Attorneys for Claimant
5       1221 Avenue of the Americas
6       New York, New York 10020
7   BY:   Paul Friedland, Esq.
8         Damien Nyer, Esq.
9   HARTER SECREST & EMERY
10  Attorneys for Respondent
11      50 Fountain Plaza
12      Buffalo, New York 14202
13  BY:  John Horn, ESQ.
14     and
15  KANJI & KATZEN
16      303 Detroit Street
17      Ann Arbor, Michigan 48104
18  BY:   Riyaz Kanji, Esq.
19        David Giampetroni, Esq.
20        Lucy Braun, Esq.
21     and
22  LIPPES, MATHIAS, WEXLER, FRIEDMAN
23      50 Fountain Plaza
24      Buffalo, New York 14202
25  BY:  Carol Heckman, Esq.

1
2   Also Present:
3       For Claimant:  Felipe E. Munoz
4                      Lauri Kai
5                      Robert Williams
6       For Respondent:  Michele Mitchell
7   Sandy Park, Assistant to the Panel
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1           Proceedings
2       CHAIRPERSON BASSLER:  Good
3   morning, everyone.  Just a couple of
4   preliminary remarks before we get
5   started, break the ice.
6       First of all, the panel thanks
7   counsel and the parties for the
8   opportunity to be engaged in this matter.
9   We appreciate that, something
10  particularly as important as this.
11      We also want to express our
12  appreciation for the quality of the
13  briefs that have been filed.  We have
14  given them serious consideration.
15      We have not had an opportunity to
16  talk among ourselves, and I say that
17  because we have -- we have no fixed ideas
18  as to the outcome here, and so we are
19  looking forward to a very engaged
20  conversation.  This is for us, and I know
21  for you, not a perfunctory experience.
22      I also want to thank you for giving
23  us the chance to bring Sandy Park on
24  board.  Sandy, I was very fortunate
25  having her clerk for me for several

Page 10

    Opening Statement by Mr. Friedland
running. So, in the first phase of the sliding scale, its percentage owed is at its lowest. It progressively gets higher. It ends up at 25 percent when its casino are fully up and running, and the Nation's position is that upon renewal at that point, its payment obligation went from 25 percent to zero, notwithstanding that its casinos were of course fully up and running throughout renewal, and notwithstanding that exclusivity has continued throughout renewal.

    So, a first question that you might ask yourselves and we all might ask ourselves, where the Nation's primary, not sole but primary obligation under the compact was to pay exclusivity payments, and where the primary, not sole but primary consideration flowing to the State was to receive exclusivity payments, if this fundamental contractual equillibrium were to vanish upon renewal, does your judgment and common sense tell

Page 11

    Opening Statement by Mr. Friedland
you that the compact might have said so?

    To formulate this a little bit differently, given that the Nation owed 25 percent quarterly, at the time of renewal, if the parties' agreement were that upon renewal the Nation would pay zero, or close to zero, do you think that the compact would simply provide for renewal and say nothing about no payment being owed?

    Another question we might all ask ourselves is, if a deal of this magnitude were struck during the negotiation of the compact, hundreds of millions of dollars turn on this deal, do you think that this might have been mentioned during the negotiation of the compact? Is it conceivable to you, as a matter of your judgment and common sense, that in a negotiation where there is extensive written back and forth, transcripts of negotiating sessions, the agreement that nothing would be paid during renewal was nowhere mentioned?

Page 12

    Opening Statement by Mr. Friedland
    Now, you might also ask yourselves, if the Nation had negotiated a deal of this nature, where they get a freebie for seven years, when the Nation developed talking points to explain to its tribal members what a great deal had been negotiated on their behalf, do you think they would have mentioned this? And when the Nation wrote to the Department of Interior to get approval of the compact, in the context where the Nation needed to explain to Interior that its exclusivity payments in context didn't amount to that much, and therefore didn't constitute an illegal tax, do you think they might have mentioned that they negotiated 21 years of exclusivity for 14 years of payment?

    Now, the author of that letter happened to be the chief negotiator of the compact on behalf of the Nation, Donald Pongrace, a partner at Akin Gump. He remains the Nation's counsel. He is available to be here.

    So a final question you might ask

Page 13

    Opening Statement by Mr. Friedland
yourself is, if Pongrace had really negotiated and secured this deal on behalf of the Nation, do you think he might be here to tell you this?

    So I'm going to move on to the language of the compact now, and we have a little booklet which is photocopies of exhibits from the record which we are going to distribute now.

    CHAIRPERSON BASSLER: Okay.

    MR. FRIEDLAND: Now, I should say these are exhibits. It's going to take me a while before we get to this booklet actually.

    I don't even think we need this audio. Do we need the mike or it's fine without it?

    CHAIRPERSON BASSLER: Try without it and see.

    MR. FRIEDLAND: Okay. You have been hearing me fine so far?

    CHAIRPERSON BASSLER: Yes. How about over here?

    MS. HECKMAN: It's fine.

Opening Statement by Mr. Kanji

You know full well then, Judge Bassler, that New York law is extremely strong on this idea that --

CHAIRPERSON BASSLER: I do.

MR. KANJI: Right, exactly.

And I think one of the -- what I want to underscore, just the reasons why the New York and the federal courts have taken that position and how it relates to what we are going to hear about today.

The -- as the New York Court of Appeals --

CHAIRPERSON BASSLER: Do we have closing arguments? I forgot.

MS. HECKMAN: Yes.

MR. FRIEDLAND: It remains to be discussed.

CHAIRPERSON BASSLER: Oh, okay.

MS. HECKMAN: Well, they were provided for in the procedural order number one, and we talked about it at the end of November.

CHAIRPERSON BASSLER: Yeah, okay. The answer is we do.

Opening Statement by Mr. Kanji

MR. FRIEDLAND: Okay.

CHAIRPERSON BASSLER: Forewarned is forearmed.

MR. KANJI: Certainly calibrating --

CHAIRPERSON BASSLER: I'm just wondering whether this -- this discussion is best left for the closing argument. But look, it's your time, go ahead.

MR. KANJI: Well, I think taking my cues, I will abbreviate the discussion about the legal principles. I will summarize them, which is as following.

Both the state court and the federal courts have been very clear that even if extrinsic evidence is entertained, in the event of ambiguity, that what the courts should not entertain, what should not be given any weight --

CHAIRPERSON BASSLER: We got it. Judge Posner.

MR. KANJI: Exactly, Judge Posner.

CHAIRPERSON BASSLER: New York

Opening Statement by Mr. Kanji

Second Circuit loves Judge Posner.

MR. KANJI: Yes.

CHAIRPERSON BASSLER: We got it.

MR. KANJI: And it's Judge Posner, it's Justice Brandeis in Arizona v. California, and the reasons that they say are because negotiator testimony can inherently be self-serving, and inherently --

CHAIRPERSON BASSLER: We got it.

MR. KANJI: -- subject to the vagaries of memory.

I want to underscore two points. That is the reason why we do not have Mr. Pongrace here today, because we are not going to urge on this panel the position that self-serving negotiator testimony should not be entertained.

CHAIRPERSON BASSLER: But we don't know -- he is not here. We don't know whether it's self-serving or not. Maybe it wouldn't be self-serving, or maybe it would be self-serving and there would be an objection to it. We just don't know.

Opening Statement by Mr. Kanji

Maybe it wouldn't be self-serving.

Was he the negotiator for the contract? Did he draft this? Was he a draftsman?

MR. KANJI: He was the Nation's lead negotiator, part of the negotiating team.

CHAIRPERSON BASSLER: But I mean, did he draft it?

MR. KANJI: He had some role in the drafting.

CHAIRPERSON BASSLER: Who else had a role in the drafting?

MR. KANJI: Well, he had other -- there is sort of a multi-headed monster, but there were other lawyers in his firm, the Akin Gump firm, who played a role. The Nation had a negotiating committee that also consisted of Nation counsel and Nation leaders.

CHAIRPERSON BASSLER: Thank you. Okay.

MR. KANJI: So, it was a multi-group effort.

Opening Statement by Mr. Kanji

verge of collapse, but the parties decided to try to forge ahead with putting together a memorandum of understanding.

But then here is where the infirmities in Mr. Williams' testimony become very clear, because after May 21, Mr. Williams has very little to say about how the parties actually got to an agreement that was embodied in the memorandum of understanding that they came to on June 20th. That month-long period is virtually absent from his account, and it's virtually absent in a couple of notable ways.

One, Mr. Williams notes stop on May 21st. We have no notes after May 21st. So, Mr. Friedland said in his statement that we have transcripts of the negotiations, we have these written records. We do not. We do not. We have no transcripts to begin with. All we have are Mr. Williams' notes, and those notes stop before the critical

Opening Statement by Mr. Kanji

discussions took place that got the parties to an agreement.

Secondly, not only do we not have notes, but in Mr. Williams' account, proffered to this panel, we did not have the critical exchange of drafts between the parties that went to this very specific issue.

And if we can put up slide 28.

This slide shows the critical exchange of drafts as the parties shifted from this revenue-based model to a model based on periods of time, which of course is where we ended up with in the compact.

When the parties shifted to this model, it was the Nation who initiated the drafts on this, and as you see from this chronology, on June 5th of 2001, nowhere reflected in Mr. Williams' notes, because we don't have them, the Nation proposed payments based on two time periods: years one to seven and years eight to 14, 16 percent and 22 percent payments.

Opening Statement by Mr. Kanji

Six days later, the Nation tweaked its proposal, and in some ways bidding against itself, kept to the years one to seven and years eight to 14 periods, but shifted the payments up a little bit, 18 percent and 22 percent.

And now here is the critical draft and the critical point, and this is what was missing from Mr. Williams' initial testimony to this panel. On June 12th, the next day, the State countered, and it was Patrick Kehoe who was one of the State's lead negotiators, who is not here. Mr. Kehoe counters, sends a draft, which provides for three payment periods, and the critical point, of course, is that the third and final of those payment periods was years seven plus.

We have three periods. We have one to four, five to seven, and years seven plus, which clearly would have provided for payments through the lifetime of the compact, whatever that lifetime ended up being, 25 percent payments.

Opening Statement by Mr. Kanji

That is the State's position today in front of the panel, is that this is what the compact requires the Nation to do. That was the State's proposal on June 12th, not a word about it from Mr. Williams or the State in their submissions to this panel, their initial submissions, even though this was a State document, and this was a document that the parties had provided to one another in connection with our last arbitration, not part of the purportedly comprehensive and detailed account of the negotiations.

Then -- that is the State's proposal, years seven plus. Eight days later, after rounds of intense negotiations, the parties reached their agreement that was embodied in the memorandum of understanding and in the compact. And the critical point, of course, is that in place of the years seven plus, the parties reverted to the State's -- I'm sorry, to the Nation's idea that there would be three finite