# ATTACHMENT A



September 16, 2021

Honorable Matthew Pagels
President, Seneca Nation of Indians
90 Ohiyo Way
Salamanca, NY 14779

Re: Payments to the State of New York

Dear President Pagels:

The National Indian Gaming Commission (NIGC) is in receipt of your September 1, 2021 letter seeking an update on a request that the NIGC review payments to the State of New York (State) made by the Seneca Nation of Indians (Nation) pursuant to its Class III Gaming Compact with the State. On July 27, 2021, the NIGC received financial information regarding the calculation of the revenue share payments to the State. The NIGC understands through this information and review of the Nation's audited financial statements that the Nation is set to pay the State over $470 million in gaming revenue in non-regulatory contributions accrued since 2017.

On September 15, 2021, NIGC Chairman Sequoyah Simermeyer also received a letter from Bryan Newland, the Department of the Interior's Assistant Secretary for Indian Affairs, referring the matter to the NIGC for investigation. In his letter, Assistant Secretary Newland expresses the Department's "serious concerns" that the payments were not previously reviewed by the Department and may conflict with IGRA purpose of ensuring that the Nation is the primary beneficiary of its gaming operation. The Assistant Secretary also shares our concern that the payments may violate IGRA's requirement that the Nation maintain the sole proprietary interest in its gaming operation. As the NIGC is the Agency charged with enforcing the requirements of IGRA, NIGC regulations, and the Nation's gaming ordinance, the Assistant Secretary referred the matter to NIGC for further investigation and potential corrective action.

The NIGC considers the circumstances significant and is conducting a review to determine whether this payment is permissible under IGRA's use of net gaming revenue requirement and its requirement that a tribe maintain the sole proprietary interest in its gaming operation.

The Nation and State entered into a compact which was approved by operation of law in 2002.[1] The 2002 compact provided for a term of 14 years with automatic renewal for an additional seven years.[2] The compact described revenue sharing contributions to the State in years 1-4, years 5-7, and years 8-14, but made no provisions for payments in the event of automatic renewal.[3] I understand that the parties arbitrated the extension of revenue sharing provisions and received a decision.

Because the Compact was not affirmatively approved, it was approved only to the extent that it is consistent with IGRA.[4] On April 15, 2021, Paula Hart, Director, Office of Indian Gaming within the Department of the Interior, informed the Nation that the Secretary of the Interior had neither reviewed nor analyzed any revenue sharing payment provisions beyond those expressly described in the 2002 Compact.[5] As such, the Department has made no determination as to whether the revenue share payments for the seven year extension are consistent with IGRA. Because the Department of the Interior did not review or analyze the revenue sharing payment for the seven-year extension, and have expressed "serious concerns about the extension of revenue sharing during years 15-21," the NIGC must determine whether those payments are consistent with IGRA.

IGRA prohibits states from imposing any tax, fee, charge, or assessment on an Indian tribe for Indian gaming except for an assessment to defray the costs of regulating Indian gaming.[6] As Ms. Hart stated in her letter,

> We begin with the premise that tribal payments for anything beyond actual and reasonable state regulatory costs are considered a "tax, fee, charge or other assessment" prohibited by IGRA. Our analysis first looks to whether a state has offered meaningful concessions to the tribe. A state must concede something of value that it was not otherwise required to negotiate, such as granting exclusive rights to operate class III gaming or other benefits with a gaming-related nexus. We then examine whether the value of the concessions provide substantial economic benefits to the tribe in a manner justifying the revenue sharing.[7]

If a state wants to receive a portion of a tribe's gaming revenues, then, it must offer the tribe something meaningful in exchange. A revenue share payment to a state that does not meet this standard is not consistent with IGRA.

---

[1] Letter to the Honorable Cyrus Schindler, Nation President, Seneca Nation of Indians from Gale A. Norton, Secretary of the Interior (November 12, 2002), *See also* 67 FR 72968 (December 9, 2002).
[2] Nation-State Gaming Compact Between the Seneca Nation of Indians and the State of New York, §4(B) (approved
[3] *Id.* § 12(b)(1).
[4] 25 U.S.C. § 2710(d)(8)(C).
[5] Letter to Honorable Matthew Pagels, President, Seneca Nation of Indians, From Paula Hart, Director, office of Indian Gaming, Department of the Interior, p. 2 April 15, 2021.
[6] 25 U.S.C. § 2710(d)(4)
[7] Letter to Honorable Matthew Pagels, President, Seneca Nation of Indians, From Paula Hart, Director, office of Indian Gaming, Department of the Interior, p. 2 April 15, 2021.

      When the parties agreed to the Compact in 2002, the State offered four benefits in exchange for what was then estimated to be 17%[8] of the Nation's total revenues before expenses:[9]

- exclusivity in all of Western New York and within a 25-mile radius of any Seneca gaming facility authorized by the Compact;[10]

- transfer of the Niagara Falls Convention Center for $1, saving the Nation approximately $40 million dollars;[11]

- assistance in acquiring restricted fee status to create two off-reservation gaming facilities in Buffalo and Niagara Falls;[12] and

- use of the State's eminent domain powers to acquire other parcels of land necessary for the Nation's gaming project.[13]

      Here, the State's actions and the agreed upon 14-year period within which the tribe was to compensate it for them appear to be long since complete, yet the percentage of revenues the Nation is required to pay the State remain unchanged.

      Moreover, the economics have changed in the nearly two decades since the compact was entered into. The Department of the Interior relied on an economic analysis submitted with the Compact in 2002, which showed that the Nation expected to gross over $5 billion in the 14-year term of the Compact, of which less than $1 billion would be paid to the State, and the Nation would keep over $2 billion in profits.[14] Even at a full $1 billion, the parties expected the Nation's average yearly contribution to the State to be $71.4 million. Since 2017,[15] the contributions average $117.5 million per year for these benefits. The State appears to be receiving a revenue share that equates to a significant percentage of the Nation's net revenues. In light of this, we are

---

[8] Compact Amendment Submission, Attachment A (Partial Final Award State of New York v. Seneca Nation of Indians AAA Case Number: 01-17-0005-3636), p. 16 (submitted to Paula Hart, Director, Office of Indian Gaming, Department of the Interior, from Rickey L. Armstrong, Sr., President, Seneca Nation, April 16, 2019, *citing* Letter from D. Pongrace to G. Skibine at 8 (October 11, 2002)

[9] Compact § 11(b); *See also*, Letter to the Honorable Cyrus Schindler, Nation President, Seneca Nation of Indians from Gale A. Norton, Secretary of the Interior (November 12, 2002), p. 4.

[10] Nation-State Gaming Compact Between the Seneca Nation of Indians and the State of New York (Deemed approved 2002) ("Compact") § 12(a)

[11] Compact § 11(b); *See also*, Letter to the Honorable Cyrus Schindler, Nation President, Seneca Nation of Indians from Gale A. Norton, Secretary of the Interior (November 12, 2002), p. 4.

[12] Compact § 11(b)(3); *See also*, Letter to the Honorable Cyrus Schindler, Nation President, Seneca Nation of Indians from Gale A. Norton, Secretary of the Interior (November 12, 2002), p. 4.

[13] Compact § 11(b)(2)(d); *See also*, Letter to the Honorable Cyrus Schindler, Nation President, Seneca Nation of Indians from Gale A. Norton, Secretary of the Interior (November 12, 2002), p. 4.

[14] Letter to the Honorable Cyrus Schindler, Nation President, Seneca Nation of Indians from Gale A. Norton, Secretary of the Interior (November 12, 2002), p. 4.

[15] We do not have calculations for the time period prior to the disputed extension.

conducting an inquiry into whether the revenue share payment is consistent with the requirements of IGRA.

      This percentage of revenue split described above raises an additional question the NIGC is reviewing. One of the purposes of IGRA is to ensure that tribes are the primary beneficiaries of their gaming operations. In furtherance of the purpose, IGRA requires tribes to maintain the sole proprietary interest in their gaming operations. Among the factors the NIGC considers as part of a sole proprietary interest analysis is the amount of revenue paid to a third party and the term of the agreement. The NIGC's Compliance Division is reviewing financial information to determine whether the revenue share payment would lead to a violation of IGRA's sole proprietary interest requirement. The Regional Office and Auditors will be reaching out to you shortly with requests for interviews and additional information.

      If you have any questions, please do not hesitate to contact me at (202) 632-7003 or thomas.cunningham@nigc.gov or St. Paul Region Director Shawnna Castellano at (651) 290-4010 or shawnna.castellano@nigc.gov.

Sincerely,

Thomas Cunningham
Chief Compliance Officer
National Indian Gaming Commission
918.261.4093 (Mobile)

Cc: Michele Mitchell, General Counsel, Seneca Nation of Indians