# EXHIBIT A

Judgment in a Civil Case

United States District Court
WESTERN DISTRICT OF NEW YORK

SENECA NATION OF INDIANS,

                    Petitioner,

          v.

STATE OF NEW YORK,

                    Respondent

**JUDGMENT IN A CIVIL CASE**
CASE NUMBER: 19-CV-735-S

☐ **Jury Verdict**.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court**.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED: that the Nation's Petition and Motion to Vacate the Final Award (Docket Nos. 1,2) are denied. The State's Cross-Petition to confirm the Partial Final and Final Awards (Docket No. 9) is granted. The parties each bear their own attorney fees and costs. The Final Award (Docket No.2-3) and Partial Final Award (Docket Nos. 2-4, 2-5) are confirmed.

Date: November 12, 2019

MARY C. LOEWENGUTH
CLERK OF COURT

By: s/K.McMillan
      Deputy Clerk

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SENECA NATION OF INDIANS,

               Petitioner,

    v.

STATE OF NEW YORK,

               Respondent.

**DECISION AND ORDER**
19-CV-735S

## I. INTRODUCTION

The underlying dispute here concerns whether the Seneca Nation of Indians is required to pay the State of New York hundreds of millions of dollars in revenue-sharing payments under the terms of a 2002 gaming compact. A controlling majority of arbitrators recently held that the compact requires such payments. While this binding determination has widespread, directly inverse ramifications for the citizens of each party, the correctness of the decision is not now at issue. Rather, the exceedingly narrow question before this Court is whether the panel majority "manifestly disregarded" governing law in reaching its determination. Because this Court finds that it did not, the State's cross-petition to confirm the arbitration award must be granted, and the Nation's petition and motion to vacate the award must be denied.

## II. BACKGROUND[1]

### A. The Compact and the Underlying Dispute

---

1 The relevant facts, which are undisputed unless otherwise noted, are drawn from the parties' petitions and the evidence submitted in support thereof.

Seventeen years ago, the Seneca Nation of Indians ("the Nation") and the State of New York ("the State") entered a compact setting forth the terms and conditions under which the Nation could conduct certain casino-style gaming in New York ("the Compact"). Essentially, the State agreed to provide the Nation exclusive rights to conduct gambling operations in a large portion of Western New York in exchange for graduated revenue-sharing payments from gaming devices [2] for which exclusivity existed ("the State Contribution").   (See Compact, Docket No. 2-6, § 12 (b)(1).)

The Compact became effective December 9, 2002, see Dep't of the Interior Indian Gaming Notice, 67 Fed. Reg. 72968-01 (Dec. 9, 2002), and provided for an initial term of 14 years, with automatic renewal for an additional seven years, unless either party objected to renewal in writing.   (Id.)   The Nation's obligation to pay the State Contribution began on December 31, 2002, the date the Nation first began gaming operations under the Compact.   (Id.)   For years 1-4, the State Contribution was 18%. (Id.)   For years 5-7, it was 22%.   (Id.)   For years 8-14, it was 25%.   (Id.)   The Compact is silent with respect to the terms of any State Contribution in the 7-year renewal period.

During the initial 14-year period, the parties performed under the Compact: the State ensured exclusivity; the Nation paid the State Contribution. [3]   Toward the conclusion of the 14-year term, neither party delivered written objections to renewal to the other, resulting in automatic renewal of the Compact for an additional seven years on

---

[2] The Compact defines "gaming devices" as slot machines and video lottery games, as those devices are further defined in § 9 (a) of Appendix A to the Compact.   (See Compact, § 1 (m).)

[3] To provide some context, the Nation represents that it paid the State more than $1.4 billion over the initial 14-year term of the Compact.   (Memorandum of Law, Docket No. 2-1, p. 7.)

December 9, 2016.   (See Compact, § 4 (c)(1).)

The dispute underlying the present action arose shortly thereafter when, on March 31, 2017, the Nation notified the State that its State Contribution for the last quarter of 2016 would be its final payment under the terms of the Compact.   (See Declaration of Gregory M. Starner, Docket No. 9-3, Exhibit B.)   In the Nation's view, the Compact required only 14 years of State Contribution under § 12 (b)(1), with no State Contribution due during the renewal period.   The State, on the other hand, viewed the terms of the Compact as requiring a continuation of the State Contribution during the 7-year renewal period.   Unable to resolve this dispute themselves, the parties submitted it to binding arbitration in accordance with § 14 of the Compact.

## B. The Arbitration Proceedings

The parties submitted their dispute to a panel of three arbitrators as required under § 14 of the Compact: Hon. William G. Bassler, United States District Judge (ret.); Attorney Henry Gutman; and Dean Kevin Washburn, Dean of University of Iowa College of Law. By agreement of the parties, the panel bifurcated its consideration of liability and remedy after conducting full arbitration proceedings on December 12 and 13, 2018, resulting in a January 7, 2019 Partial Final Award (liability) (Docket No. 2-4), with Dissent (Docket No. 2-5); and an April 12, 2019 Final Award (remedy) (Docket No. 2-3).   The panel heard testimony and received a written witness statement from Robert Williams, Deputy Secretary in the Office of New York Governor Andrew M. Cuomo; and received witness statements from Todd Gates, President of the Seneca Nation of Indians, and David Sheridan, Chief Financial Officer of the Seneca Gaming Corporation.   (Partial Final

3

Award, Docket No. 2-4, p. 5.)   It also received other documentary evidence.   (Id. at pp. 4-5.)

### 1. The Partial Final Award

Judge Bassler and Attorney Gutman formed the panel majority.[4]   They first found that the relevant terms of the Compact were ambiguous as it concerned the Nation's obligation to pay the State Contribution during the 7-year renewal period.   (Partial Final Award, p. 6.)   They then turned to the extrinsic evidence to resolve the ambiguity, interpreting the Compact "to require the Nation to make revenue sharing payments in the renewal period (Years 15-21) at 25% of net drop of each category of gaming device for which exclusivity exists."   (Id. at p. 6.)   Essentially, the majority found that the State Contribution and exclusivity were directly linked, making the State Contribution due during all periods of exclusivity.   (See, e.g., id. at p. 44 ("The essential bargain of the Parties' agreement is a commercial agreement wherein exclusivity payments are made in consideration for exclusivity.").)

Regarding ambiguity, the majority found that the Compact terms were ambiguous as to whether the Nation's obligation to share revenue ended after the fourteenth year of the Compact or whether it continued upon renewal for the 7-year renewal period.   (Id. at p. 24.)   First examining the purpose of the Compact (§ 12 (b)), the majority found that it was intended to provide the Nation with an "exclusive franchise" in exchange for a revenue share to the State for each category of gaming device for which exclusivity existed.   (Id. at pp. 24-27.)   Second, the majority found that the term of the compact (§

---

4 As discussed further herein, Dean Washburn dissented in a separate opinion.   (Dissent, Docket No. 2-5.)

4 (b)) was 14 years, with a 7-year renewal option, as opposed to the straight 21-year term advocated by the Nation.   (Id. at pp. 27-30.)   Finally, after examining the renewal (§ 4 (c)) and other provisions of the Compact, the majority concluded that "it is ambiguous whether the term 'renew' means that the State Contribution payments continue at the 25% rate in effect when the initial 14-year term ended, or whether 'renew' means to continue with the original terms that did not expressly provide for any State Contribution payments in Years 15-21."   (Id. at pp. 30-36.)

Regarding the extrinsic evidence, the majority found that it supported the State's position.   It held that "'renewal' of the Compact means that the Nation's obligation to pay State Contribution in consideration for exclusivity rights continues in the renewal period for as long as exclusivity exists."   (Id. at pp. 47-48.)   In reaching this determination, the majority considered the parties' prior negotiations (id. at pp. 37-41), their post-execution communications (id. at pp. 41-45), and the surrounding facts and circumstances (id. at pp. 45-47).

As directly relevant here, the majority addressed the Nation's argument that the State's position could not stand because the Secretary of the Interior did not approve revenue sharing upon renewal of the Compact, as required by the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2710 (d)(8).   (Id. at pp. 42-43.)   Affirmatively recognizing that it had no authority to usurp the Secretary's approval authority, the majority found that it was nonetheless empowered to determine whether the terms of the already-approved Compact provided for revenue-sharing payments upon renewal.   (Id. at p. 42.)   And in that regard, the majority found no evidence that the Secretary

5

understood the Compact to contain a State Contribution-free 7-year renewal period at the time of approval.   (Id.)   The majority was further unpersuaded that its adoption of the State's position would be "approving" an additional seven years of payments without legal or economic warrant to do so, finding instead that "it would simply be finding that the terms of renewal in the Compact deemed approved by the Secretary included revenue sharing payment obligations."   (Id. at p. 43.)

Finally, in addition to examining the extrinsic evidence, the majority weighed the parties' positions in terms of common sense, absurdity, and commercial reasonableness, concluding that each favored the State's interpretation.   (Id. at pp. 49-53.)

Consequently, after examining the Compact as a whole and finding the renewal provision ambiguous, the majority found that "'renewal means that the Compact was continued on the same terms and conditions that were in place immediately prior to expiration of the Compact's initial term which entailed revenue sharing for exclusivity." (Id. at p. 54.)   It therefore held that "the Nation is obligated to make State Contribution payments of 25% of net drop payable on a quarterly basis during the seven-year renewal period."   (Id. at pp. 54-55.)

### 2.  The Dissent

Taking the opposite view of the Compact terms and extrinsic evidence, Dean Washburn dissented.   He viewed the terms of the Compact as unambiguously providing for only 14 years of State Contribution, with no State Contribution due in the 7-year renewal period.   (Dissent, Docket No. 2-5, pp. 4-5.)   He further viewed the extrinsic evidence, the context of the negotiations, and the intent of the parties as failing to support

6

the State's position that the parties meant for the Compact to provide for State-Contribution payments during the renewal period.   (Id. at pp. 5-19.)

As it relates to the application of the IGRA, Dean Washburn found the majority's holding inconsistent with federal law and policy.   First, he noted that if the Compact is indeed ambiguous, it should be interpreted liberally in the Nation's favor and to its benefit. (Id. at p. 19 (citing Oneida Cty., N.Y. v. Oneida Indian Nation of N.Y. State, 470 U.S. 226, 247, 105 S. Ct. 1245, 84 L.Ed.2d 169 (1985) ("it is well established that treaties should be construed liberally in favor of the Indians, . . . with ambiguous provisions interpreted to their benefit").)   Second, he viewed the majority's construction of the Compact and award of hundreds of millions of dollars to the State as directly counter to the purpose of the IGRA, which is to promote tribal economic development, self-sufficiency, and strong tribal governance.   (Id. at p. 19 (citing 25 U.S.C. § 2702).)   Finally, Dean Washburn suggested that if the Compact is ambiguous, the Secretary of the Interior "cannot be said to have considered and reviewed or approved this key [renewal] provision," thereby giving the majority's ruling "the effect of enforcing an agreement that goes beyond what was approved by the DOI,[5] thus potentially undermining DOI's important regulatory role." (Id. at p. 20.)

### 3.  The Final Award

On April 12, 2019, the majority issued the Final Award resolving the remedy portion of the proceedings.   First, it held that "the Nation is obliged under [§§] 4(c)(1) and 12(b) of the Compact to continue to pay the State Contribution during the Compact renewal

---

5 Referring to the United States Department of the Interior.

period at a rate of 25% of Net Drop of each category of Gaming Device for which exclusivity exists payable on a quarterly basis."   (Final Award, Docket No. 2-3, p. 1.) Second, it directed the Nation to specifically perform its obligation "by paying the State Contribution currently owed to the State, including all past due payments, and by making all future payments in accordance with the Compact."   (Id. at p. 2.)   Third, by agreement of the parties, the majority found that the State Contribution owed by the Nation to the State for the period January 1, 2017, to December 31, 2018, is $255,877,747.44, with the amount attributable to the fourth quarter of 2018 due and payable by March 31, 2019. (Id.)   Finally, the majority directed the parties to each bear their own respective costs and expenses (including attorney's fees) of the arbitration and to split evenly the fees and expenses due the American Arbitration Association and the arbitrators.   (Id.)

## C.  Procedural History

On June 6, 2019, the Nation filed a petition and motion to vacate the Final Award under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10.   (Docket Nos. 1, 2.)   The State cross-petitioned to confirm the Partial Final and Final Awards under the FAA, 9 U.S.C. § 9, on July 12, 2019.   (Docket No. 9.)   The parties completed briefing on August 27, 2019. (Docket Nos. 10-12.)   Thereafter, on September 11, 2019, this Court determined upon preliminary review that oral argument was unnecessary and took the petitions and motion under advisement.   (Docket No. 13.)

## III. DISCUSSION

The Nation instituted this action seeking vacatur of the Final Award under § 10 of the FAA.   It maintains that the majority's award requiring it to pay State Contribution

during the 7-year renewal period was issued in "manifest disregard" of the IGRA, since the Secretary of the Interior never approved such revenue-sharing payments. Alternatively, the Nation suggests that the question of whether the Secretary approved such payments should be referred to the Department of the Interior under the primary-jurisdiction doctrine to assist in resolution of the cross-petitions.

The State, on the other hand, seeks to confirm the majority's Partial Final and Final Awards under § 9 of the FAA.   It first argues that the Nation's petition and motion to vacate are untimely because they were filed more than three months after the Partial Final Award resolving liability was issued.   Second, it argues that no basis for vacatur exists, statutorily or otherwise, and that the primary-jurisdiction doctrine does not apply.   Finally, it seeks to recover its attorney's fees and costs incurred in this action.

For the reasons set forth below, this Court finds that the Partial Final and Final Awards must be confirmed and that each party should bear its own attorney's fees and costs.

**A. This Court has Proper Subject-Matter Jurisdiction.**

Each party seeks relief under the FAA.   But the FAA itself does not confer federal jurisdiction.   See Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 581-82, 128 S. Ct. 1396, 170 L. Ed. 2d 254 (2008) ("As for jurisdiction over controversies touching arbitration, the [FAA] does nothing, being 'something of an anomaly in the field of federal-court jurisdiction' in bestowing no federal jurisdiction but rather requiring an independent jurisdictional basis.") (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25, n.32, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)).   An independent basis for

9

jurisdiction must therefore exist.   See id.; Vaden v. Discover Bank, 556 U.S. 49, 59, 129 S. Ct. 1262, 173 L. Ed. 2d 206 (2009); see also 9 U.S.C. § 4 (requiring independent basis for jurisdiction under Title 28).   In the Second Circuit, "the existence of federal-question jurisdiction over an FAA petition turns on whether the district court would possess jurisdiction over the underlying dispute under the standards of [28 U.S.C.] § 1331."   See Doscher v. Sea Port Grp. Sec., LLC, 832 F.3d 372, 388 (2d Cir. 2016).

Because the underlying dispute here involves the terms and conditions of a gaming compact entered into and approved pursuant to the federal IGRA, this Court has proper subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question), and neither party argues otherwise.   See id.

**B.  The Petitions are Timely.**

An application for judicial confirmation of an arbitration award must be made within one year of the date the award is made.   See 9 U.S.C. § 9.   Here, the State's July 12, 2019 Cross-Petition to confirm the January 7, 2019 Partial Final Award and April 12, 2019 Final Award is made within one year of the dates those awards were made.   The State's petition is therefore timely, and there is no argument to the contrary.

The State, however, challenges the timeliness of the Nation's petition and motion. A motion to vacate, modify, or correct an arbitration award must be served within a shorter window than an application to confirm an award: within three months after the award is filed or delivered.   See 9 U.S.C. § 12.   This deadline is "not subject to extension." Barclays Capital, Inc. v. Hache, No. 16 Civ. 315 (LGS), 2016 WL 3884706, at *2 (S.D.N.Y. July 12, 2016) (relying on Florasynth, Inc. v. Pickholz, 750 F.2d 171, 175 (2d Cir. 1984));

<u>Triomphe Partners, Inc. v. Realogy Corp.</u>, No. 10 Civ. 8248, 2011 WL 3586161, at *2 (S.D.N.Y. Aug. 5, 2011) (holding motion to vacate served three months and one day after receipt of arbitration award untimely).   The Nation filed its petition and motion to vacate the Final Award on June 6, 2019.   This is within three months of the April 12, 2019 Final Award, but more than three months after the January 7, 2019 Partial Final Award.

The State contends that the Nation ultimately seeks to vacate the determination that it is liable for State-Contribution payments during the renewal period of the Compact, which the majority made in the Partial Final Award, not the Final Award.   In its view, the Partial Final Award is a final arbitration award subject to confirmation or vacatur under the FAA because the parties agreed to bifurcate liability and remedy.   <u>See</u> <u>Trade & Transport, Inc. v. Nat. Petroleum Charterers, Inc.</u>, 931 F.2d 191, 195 (2d Cir. 1991) (finding a partial final award resolving liability to be "final" for purposes of the FAA).   Viewed in this manner, the Nation's filings seeking vacatur would be untimely under § 12 of the FAA.

The State construes the Nation's filings as seeking vacatur of the Partial Final Award for several reasons.   First, the State views the Final Award as a purely remedial order that does not contain the liability reasoning and determination that the Nation contests.   Second, the State couches the Nation's arguments as attacking the majority's finding that the Compact requires the Nation to pay the State Contribution during the renewal period, which is a determination made in the Partial Final Award.   Third, the State notes that the Nation's only basis for vacatur—that the majority reached its decision in manifest disregard of the IGRA's Secretary-approval requirement—is directed at the

11

Partial Final Award, which is where the majority considered and rejected that argument. Finally, the State highlights that the majority designated the Partial Final Award as "a PARTIAL FINAL AWARD ON LIABILITY" and deemed it "final as to liability only." (Partial Final Award, p. 55 (emphasis in original).) The State therefore contends that the Nation's petition and motion, construed as seeking to vacate the Partial Final Award, are untimely.

The Nation, on the other hand, maintains that it timely seeks to vacate the Final Award—not the Partial Final Award—because that is the award that mandates payment of the disputed State Contribution through specific performance. It specifically disclaims challenging the majority's Compact interpretation, noting that its arguments are instead focused on the legal propriety of the specific-performance order in light of the IGRA's Secretary-approval requirements. According to the Nation, until the majority ordered specific performance in the Final Award, its liability determination was not subject to challenge.

The Nation also maintains that by its plain terms, the Partial Award was not a final arbitration award: it was "final as to liability only" and disclaimed that "[t]his partial final award does not include a determination of all issues submitted to the Panel." (Id. at pp. 55, 56.) The Final Award, on the other hand, expressly states that "this decision is a Final Award and includes a determination of all issues submitted to the Tribunal." (Final Award, p. 2.) Thus, according to the Nation, the arbitrators themselves did not intend the Partial Final Award to be a final arbitration award under the FAA. See Michaels v. Mariforum Shipping, S.A., 624 F.2d 411, 413-14 (2d Cir. 1980) ("In order to be 'final,' an arbitration award must be intended by the arbitrators to be their complete determination

12

of all claims submitted to them.   Generally, in order for a claim to be completely determined, the arbitrators must have decided not only the issue of liability of a party on the claim, but also the issue of damages.") (citations omitted).   Viewed in this light, the Nation insists that its petition and motion to vacate the Final Award are timely.

Having considered the parties' arguments, this Court agrees with the Nation's position and finds that its petition and motion are properly construed as timely seeking to vacate the Final Award.   The Final Award is the one that contains the remedy that the Nation finds unpalatable: the order of specific performance requiring payment of the State Contribution during the Compact's renewal period.   The Nation views this award as made in manifest disregard of the law because it impermissibly amends the Compact to impose a payment obligation that the Secretary of the Interior neither reviewed nor approved. And while the State correctly notes that the reasoning for the award is contained in the Partial Final Award,[6] the Nation's challenge is at bottom to the remedy of specific performance ordering payment.   Since that remedy is contained in the Final Award, that is where the Nation's challenge lies.

This Court further finds that the Final Award is the final arbitration award for purposes of the FAA.   Federal courts may only review arbitration awards that are final. See Schreiber v. Friedman, 15-CV-6861 (CBA)(JO), 2017 WL 5515853, at *2 (E.D.N.Y. Mar. 30, 2017) (citing Michaels, 624 F.2d at 414).   To be final, an arbitration award "must

---

[6]The State also rightly notes that the Partial Final Award contains what reads as an order of specific performance.   (See Partial Final Award, p. 55 ("The Nation is ordered to specifically perform its obligation under ¶¶ 4(c)(1) and 12(b) by paying the State Contribution currently owed to the State, including all past due payments, and by making all future payments in accordance with the Compact[.]")   But because the Partial Final Award was limited to liability by the express agreement of the parties, the majority's specific performance order did not become effective until awarded as a remedy in the Final Award.   (See Procedural Order No. 4, Docket No. 9-8.)

13

resolve all the issues submitted to arbitration, and . . . must resolve them definitively enough so that the rights and obligations of the two parties, *with respect to the issues submitted*, do not stand in need of further adjudication." Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc., 157 F.3d 174, 176 (2d Cir. 1998) (per curiam) (emphasis in original); see Kerr-McGee Refining Corp. v. M/T Triumph, 924 F.2d 467, 471 (2d Cir. 1991) (finding a "Partial Final Award" not final under the FAA because it "did not finally dispose of an independent claim because it left open the question of damages").   And a final award must be intended by the arbitrators to resolve all claims submitted to them. See Michaels, 624 F.2d at 413-14.

The State relies heavily on Trade & Transport, a case in which the Second Circuit found a partial final award to be final for purposes of the FAA.   There, the parties asked their arbitrators to make an immediate determination on a liability issue so that they could immediately proceed with a related district court action.   See Trade & Transport, 931 F.2d at 192.   The arbitrators acceded to the parties' request and rendered an immediate partial final award the same day.   Id. at 193.   When the losing party subsequently sought reconsideration of the partial final award, the arbitrators denied the request, finding that their decision was final as to liability and that they were therefore without power to modify it (*functus officio*).   Id.   The district court confirmed the award over objection.   Id. at 194.

On appeal, the Second Circuit rejected the argument that the partial final award was not final for purposes of the FAA.   Noting the general rule that an arbitration award lacks finality unless it resolves every point included in the parties' submissions, the court nonetheless held that when parties explicitly agree to bifurcate their arbitration

14

proceedings through a limited submission, a partial award may be deemed final, despite the fact that other issues, such as damages, remain unresolved. Id. at 195.

The Court reached this determination for three principal reasons. First, citing the principle that the parties' submission defines the scope of the arbitrators' authority, see Ottley v. Schwartzberg, 819 F.2d 373, 376 (2d Cir. 1987), the court noted that "the parties modified their original submission to the arbitrators in order to cause a bifurcated decision," Trade & Transport, 931 F.2d at 195. That is, the parties carved out liability as a separate, independent issue intended for immediate resolution. See id. Second, citing the principle that arbitrators lose their authority over a given issue once they have finally decided it (again, *functus officio*), see Ottley, 819 F.2d at 376, the court found that the parties asked the arbitrators to decide the issue of liability immediately and finally, see Trade & Transport, 931 F.2d at 195. Finally, the court noted that the "panel understood that this was to be a final decision as to liability" and that their award "did conclusively decide every point required by and included in the first part of the parties' modified submission." Id. at 195; see Michaels, 624 F.2d at 413-14 (noting that a final award must be intended by the arbitrators to resolve all submitted claims).

As a result, Trade & Transport recognizes an exception to the general arbitration-finality requirement when parties expressly request immediate determinations in bifurcated proceedings. See Pearl Seas Cruises, LLC v. Irving Shipbuilding, Inc., Civil No. 3:10-CV-1294 (JBA), 2011 WL 577333, at *7 (D. Conn. Feb. 9, 2011). Here, however, Trade & Transport does not apply for several reasons.

First, the State and Nation did not modify their submission to the panel or bifurcate

15

the proceedings to address liability only, as was done in Trade & Transport.  See Ins. Co. of N. Am. v. Pub. Serv. Mut. Ins. Co., 609 F.3d 122, 129 (2d Cir. 2010) ("In Trade & Transport, the parties and arbitrators agreed to bifurcate the arbitration proceedings so the first stage would determine liability and the second damages.").  Rather, the panel conducted the full arbitration proceeding on December 12 and 13, 2018, after which the parties agreed to have the panel resolve liability first, and then, if necessary, proceed to remedy.  (See Procedural Order No. 4, Docket No. 9-8.)  The arbitration proceeding itself was not bifurcated.

Second, despite the panel majority's notation that its Partial Final Award "is final as to liability only," the parties expressly agreed that the panel's liability determination would be a final award *only if* the panel found no liability, which it did not.  (Id. ("If the Panel finds no liability, then that award will be the final award in this matter.")  Thus, the parties' own agreement defeats the State's finality argument.

Third, because the parties did not limit their arbitration submission to the issue of liability, the panel did not resolve all issues submitted to it, as expressly noted in the panel majority's decision.  (Compare Partial Final Award, p. 56 ("The Panel reserves jurisdiction to issue a later final award on the remaining issues.  This partial final award does not include a determination of all issues submitted to the Panel.") with Final Award, p. 2 ("[T]his decision is a Final Award and includes a determination of all issues submitted to the Tribunal.").

Consequently, Trade & Transport does not apply.  Under the general rule, this Court finds that it was upon issuance of the Final Award that the proceedings became

16

subject to review under the FAA.   See Michaels, 624 F.2d at 414.   That is the award that finally settled the rights and obligations of the parties and all issues submitted to the panel. See Rocket Jewelry Box, 157 F.3d at 176.   Further, it is the award that the parties and arbitrators expressly agreed would be the final award in this matter.   See Michaels, 624 F.2d at 413-14.   Accordingly, because the Nation brought its petition and motion within three months of the Final Award, they are timely.

## C. The Arbitration Award Must be Confirmed.

Turning to the arbitration award[7] itself, this Court finds that it must be confirmed. Arbitration awards are not self-enforcing; judicial orders are required to give them force and effect.   D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 104 (2d Cir. 2006).   Under the FAA, which was enacted to overcome judicial resistance to arbitration and instill a national policy favoring it, see Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006), a court may confirm, vacate, modify, or correct an award, see 9 U.S.C. §§ 9-11.

Confirmation of an arbitration award is usually "'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court,' and the court 'must grant' the [motion to confirm] unless the award is vacated, modified, or corrected." D.H. Blair, 462 F.3d at 110 (citing Florasynth, 750 F.2d at 176).   "[A]n extremely deferential standard of review" applies "[t]o encourage and support the use of arbitration by consenting parties."   Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC, 497 F.3d 133, 139 (2d Cir. 2007); see also Landau v. Eisenberg, 922 F.3d 495, 498 (2d Cir. 2019)

---

7 Because the State seeks confirmation of both the Partial Final Award and Final Award, this Court will refer to them collectively as "the arbitration award" for ease of reference.

(per curiam) ("The FAA creates a strong presumption in favor of enforcing arbitration awards and courts have an extremely limited role in reviewing such awards.") (citations and quotation marks omitted); Folkways Music Publishers, Inc. v. Weiss, 989 F.2d 108, 111 (2d Cir. 1993) ("Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.").

The burden of proof required to avoid confirmation of an arbitration is therefore very high, since courts afford great deference to arbitration decisions. See Ottley, 819 F.2d at 376; Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 388 (2d Cir. 2003) ("A party petitioning a federal court to vacate an arbitral award bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law."). Indeed, "an arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is 'a barely colorable justification for the outcome reached.'" Landy Michaels Realty Corp. v. Local 32B-32J, Serv. Emps. Int'l Union, AFL-CIO, 954 F.2d 794, 797 (2d Cir. 1992) (quoting Andros Compania Maritima, S.A. v. Marc Rich & Co., 579 F.2d 691, 704 (2d Cir. 1978)).

Consequently, "[v]acatur of arbitral awards is extremely rare." Hamerslough v. Hipple, No. 10 Civ. 3056 (NRB), 2012 WL 5290318, at *3 (S.D.N.Y. Oct. 25, 2012). Nonetheless, four statutory grounds exist to vacate, modify, or correct an arbitration award. See 9 U.S.C. § 10 (a); Weiss v. Sallie Mae, Inc., 939 F.3d 105, 108-109 (2d Cir. 2019). And a court may also vacate an arbitration award if it is rendered in "manifest

18

disregard of the law."[8]   Id. at 109 (citing Schwartz v. Merrill Lynch & Co., Inc., 665 F.3d 444, 451 (2d Cir. 2011) (internal quotation marks omitted)).

### 1.  There are No Statutory Grounds to Vacate the Arbitration Award.

Section 10 (a) of the FAA sets forth four statutory grounds for vacatur of an arbitration award:

> (1)   where the award was procured by corruption, fraud, or undue means;
>
> (2)   where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3)   where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4)   where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

None of these grounds are apparent from the face of the arbitration award or the evidence regarding the arbitration proceedings, nor does the Nation assert any of them as cause for vacatur.   This Court therefore finds no statutory basis to vacate the arbitration award.

### 2.  The Arbitration Award is Not in Manifest Disregard of the Law.

"To vacate an award on the basis of a manifest disregard of the law, the court must

---

8 In Weiss, the Second Circuit declined to resolve the "epistemological debate" over whether the "manifest disregard" paradigm is an independent basis for judicial review or simply "judicial gloss" on the enumerated grounds for vacatur in § 10 (a).   939 F.3d at 109 (citing Schwartz v. Merrill Lynch & Co., 665 F.3d 444, 451-52 (2d Cir. 2011)).   Either way, "manifest disregard" remains a valid ground for vacating an arbitration award.   See id.

find 'something beyond and different from mere error in the law or failure on the part of the arbitrators to understand or apply the law.'" Jock v. Sterling Jewelers Inc., 646 F.3d 113, 121 n. 1 (2d Cir. 2011) (quoting Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 208 (2d Cir. 2002)); see T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 339 (2d Cir. 2010) (errors of law and fact insufficient to vacate arbitration award). Rather, the challenging party "must clearly demonstrate[ ] 'that the panel intentionally defied the law.'" STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC, 648 F.3d 68, 78 (2d Cir. 2011) (quoting Duferco, 333 F.3d at 389); see, e.g., N.Y. Tel. Co. v. Commc'ns Workers of Am. Local 1100, 256 F.3d 89, 93 (2d Cir. 2001) (per curiam) (finding manifest disregard standard satisfied where arbitrator explicitly rejected controlling Second Circuit authority in favor of applying an out-of-circuit rule). Notably here, "[w]ith respect to contract interpretation, this standard essentially bars review of whether an arbitrator misconstrued a contract." T.Co Metals, 592 F.3d at 339.

Just weeks ago, the Second Circuit articulated the manifest disregard standard as follows:

> A litigant seeking to vacate an arbitration award based on alleged manifest disregard of the law bears a heavy burden, as awards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent. We will uphold an arbitration award under this standard so long as the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract. Vacatur is only warranted, by contrast, when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice.

Weiss, 939 F.3d at 109 (citations and quotation marks omitted).

20

A two-part inquiry applies.   First, the court must consider "whether the 'governing law alleged to have been ignored by the arbitrators [was] well defined, explicit, and clearly applicable.'"   Westerbeke, 304 F.3d at 209 (quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 934 (2d Cir. 1986) (alteration in original)).   Second, the court must determine whether the arbitrators knew of "the existence of a clearly governing legal principle but decided to ignore it or pay no attention to it."   Id.

As to the first inquiry, the Nation alleges that the panel ignored the Secretary-approval provisions of the IGRA.   See 25 U.S.C. § 2710 (d)(3)(B) (providing that a Tribal-State gaming compact "shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register); 25 C.F.R. § 293.4 (providing that compacts and amendments to compacts are subject to review and approval by the Secretary).   Assuming that these provisions constitute governing law, there is no dispute that this requirement was well defined and explicit at the time of the panel's decision.

As to the first part of the second inquiry, it is apparent from both the majority decision and the dissent that the panel was actually aware of the IGRA Secretary-approval provisions, because both documents discuss them.   (See Partial Final Award, p. 42; Dissent, pp. 19-20.)

It is the remaining part of the second inquiry where the Nation's cause limps: it has made no showing that the IGRA Secretary-approval requirement clearly governs or that the panel simply ignored it.   Again, the Nation's burden is to clearly show that the arbitrators intentionally defied the law, STMicroelectronics, 648 F.3d at 78, engaged in

21

egregious impropriety, T.Co Metals, 592 F.3d at 339, or dispensed their own brand of industrial justice, Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp., 559 U.S. 662, 671, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010) (citations omitted).

The Nation contends that the majority exhibited manifest disregard for the IGRA by consciously amending the Compact to impose a payment obligation that was never reviewed and approved by the Secretary.   It argues that, if the Compact's renewal provision is ambiguous, as the majority found, it cannot be said that the Secretary approved the ordered payments.   And it further maintains that the Secretary approved only 14 years of State Contribution and never had or reviewed the extrinsic evidence the majority relied on to interpret the meaning of the renewal provision.

In opposition, the State argues that the majority did not consciously act in manifest disregard of the law, but rather, simply resolved the parties' contractual dispute as it related to the Compact provisions.   It notes that the majority acted with full jurisdiction, because the parties agreed to submit their disputes arising out of the Compact to binding arbitration, not to the Secretary of the Interior.   The State therefore maintains that the majority's arbitration award is not an amendment to the Compact subject to Secretary approval, but rather an interpretation of the Compact's provisions not subject to Secretary review.

The panel addressed these arguments.   In rejecting the same Secretary-approval arguments that the Nation lodges here, the majority expressly found that it lacked the legal authority to usurp the Secretary's approval role to enforce a Compact term that the Secretary did not approve.   (Partial Final Award, p. 42.)   It further found, however, that

22

its decision did not encroach the Secretary's province, and therefore the IGRA did not apply.   Rather, it viewed its decision as falling squarely within its mandate—to determine whether the Compact provides for revenue-sharing payments upon renewal.   It wrote: "upholding the State's interpretation of the Compact would not be "approving" an additional seven years of payment without legal or economic warrant to do so; rather, it would simply be finding that the terms of the renewal in the Compact deemed approved by the Secretary included revenue[-]sharing payment obligations."   (Id. at p. 43)   Thus, the majority found that it was interpreting the terms of the already-approved Compact (specifically the renewal portion), not amending the Compact to impose new, unapproved terms.   (Id.)   In doing so, it highlighted the fact that the Secretary approved the renewal provision being interpreted, with "no evidence" that the Secretary did so sharing the same view of the provision that the Nation now advocates—as providing a State Contribution-free renewal period.   (Id.)

Having closely reviewed the record and considered the parties' arguments, this Court finds that the Nation has failed to carry its heavy burden of demonstrating that the panel acted in manifest disregard of the law.

The Nation's position is premised on a proposition that it has provided no authority for—that the arbitration award is an amendment to the Compact that requires the Secretary's approval under the IGRA.   Two points bear noting.   First, the Nation has provided no legal authority holding that a contract interpretation resulting in an arbitration award, made pursuant to a binding arbitration provision contained in a gaming compact approved by the Secretary, constitutes an amendment to the compact subject to further

23

Secretary approval.   It is therefore questionable whether the Nation even presented the panel with a "clearly governing legal principle" that it allegedly decided to ignore.   See Westerbeke, 304 F.3d at 209.   Second, even assuming that the Secretary-approval provision of the IGRA is a "clearly governing legal principle" here, it is apparent from the face of the majority's decision that it did not consciously disregard it.   Instead, in rejecting the very same arguments that the Nation lodges here, the majority found that its decision did not constitute an amendment to the Compact that would require Secretary approval. The majority considered the Nation's arguments and rejected them.   It follows then that the panel did not ignore or pay no attention to the Nation's proffered "clearly governing legal principle."   See id.   That the Nation may disagree or find error in the majority's determination is not a basis to find manifest disregard.   See Jock, 646 F.3d at 121 n.1; T.Co Metals, 592 F.3d at 339.

Relatedly, the majority did not impose a new revenue-sharing obligation as the Nation contends.   Rather, it found that the parties' existing, already-approved Compact required revenue sharing during the renewal period.   It is undisputed that the Secretary of the Interior reviewed and approved the Compact.   In doing so, the Secretary approved the "Party Dispute Resolution" provision (§ 14), which provides that if the parties are unable to resolve "*any* dispute, claim, question, or disagreement arising from or relating to this Compact," then the dispute is to be resolved through binding arbitration. (Compact, § 14 (emphasis added).)   The parties further agreed—and the Secretary approved—that the arbitrators would be permitted to order specific performance as a

24

remedy for any breaches.[9] (Id. at § 14 (h).) And notably, the parties contemplated—and the Secretary approved—that an arbitration award could be entered against the Nation for specific performance requiring the payment of money to the State, agreeing that such payments would be satisfied solely from the revenues of the Nation's Class III Gaming conducted under the Compact. (Id.)

It is against this backdrop that the parties submitted their dispute to the panel. The panel's task was "to determine whether upon renewal of the Compact, the Nation must continue to pay to the State a portion of its gaming revenue . . . in exchange for the State granting the Nation exclusive rights to operate slot machines and video lottery games in parts of Western New York." (Partial Final Award, p. 6.) The panel was therefore charged with interpreting the Compact's renewal provision (§ 4 (c)), a provision that the Secretary approved. Consequently, in finding that the renewal provision required payment of the State Contribution during the renewal period, the majority simply construed the parties' existing, approved compact.[10] It did not impose a new revenue-sharing obligation, and its Compact interpretation is not reviewable under the manifest-disregard standard. See T.Co Metals, 592 F.3d at 339; Unite Here Local 100 v. Westchester Hills Golf Club, Inc., 161 F. Supp. 3d 262, 265 (S.D.N.Y. 2016) ("An arbitrator's 'factual findings and contractual interpretation are not subject to judicial

---

9 The majority found the Nation in breach for failing to pay the State Contribution after the Compact's renewal. (Partial Final Award, p. 55.)

10 The Nation challenges this finding on the basis that, in its view, the Secretary approved only 14 years of payments. But the majority viewed the evidence differently, explicitly finding "no evidence" that the Secretary understood the renewal provision to include no revenue sharing. (Partial Final Award, p. 42.) While the Nation pans the majority's finding as "inverted reasoning," it remains that a tribunal's error is not grounds to find manifest disregard. See Jock, 646 F.3d at 121 n.1.

challenge.'") (quoting Westerbeke, 304 F.3d at 214).

Accordingly, this Court finds no merit in the Nation's contention that the arbitration award must be vacated as made in manifest disregard of the law. The Nation has not shown that the arbitrators intentionally defied governing law, engaged in egregious impropriety, or dispensed their own brand of industrial justice. See STMicroelectronics, 648 F.3d at 78; T.Co Metals, 592 F.3d at 339; Stolt-Nielsen, 559 U.S. at 671. Since the arbitration award is not otherwise subject to vacatur, modification, or correction, it must be confirmed. See 9 U.S.C. § 9; Florasynth, 750 F.2d at 176; see also Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez., 863 F.3d 96, 118 n. 18 (2d Cir. 2017) ("In FAA practice, an order 'confirming' an arbitral award must be issued upon timely application of any party to the arbitration and upon prior notice served upon the adverse party unless the award is vacated, modified, or corrected as provided for by the Act.").

## D. Referral to the Department of the Interior is Unnecessary.

The Nation suggests that this Court invoke the primary-jurisdiction doctrine to refer to the Department of the Interior the question whether the Secretary approved State-Contribution payments during the renewal period back in 2002. Even if applicable, application of the discretionary doctrine under the circumstances here would undermine the parties' arbitration agreement and the panel's determination.[11] The arbitration

---

[11] The primary-jurisdiction doctrine, which is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties, may apply in an action that "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." In re KIND LLC "Health & All Natural" Litig., 209 F. Supp. 3d 689, 693 (S.D.N.Y. 2016); see also Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 58-59 (2d Cir. 1994) (finding that the doctrine "applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body."). The doctrine permits a court to defer to an administrative agency "for advisory findings." Petrosino v. Stearn's Prod.,

question was not whether the Secretary explicitly approved State-Contribution payments during the renewal period, but rather, whether the terms of the Compact that the Secretary *did approve* provide for payment of the State Contribution during that term.   Resort to the primary-jurisdiction doctrine is not necessary to assess the propriety of the panel's resolution of that question.   See N.Y. State Thruway Auth. v. Level 3 Commc'ns, LLC, 734 F. Supp. 2d 257, 265 (N.D.N.Y. 2010) ("Contract disputes are legal questions within the conventional competence of the courts and thus the doctrine of primary jurisdiction does not normally apply.").   Moreover, the Nation's request once again assumes the veracity of its unsupported premise that Secretary approval of the panel's arbitration award is required.[12]   There has been no showing that such is the case, particularly since the panel neither created a new compact nor amended an existing one.   See 25 C.F.R. § 293.4.   Consequently, even if the primary-jurisdiction doctrine could apply, this Court finds no cause to invoke it here as it would not materially assist in the resolution of the relevant issues.   See Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 58-59 (2d Cir. 1994).

### E.  There is no Cause to Award the State Attorney's Fees and Costs.

Along with confirmation of the arbitration awards, the State seeks to recover its

---

Inc., No. 16-CV-7735 (NSR), 2018 WL 1614349, at *10 (S.D.N.Y. Mar. 30, 2018).   Courts consider four factors when determining whether to apply the doctrine: "(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made."   Ellis v. Tribune Television Co., 443 F.3d 71, 82-83 (2d Cir. 2006).

12 Or as the State puts it, the Nation has not "established that Congress has delegated to the Secretary any authority over arbitral awards pertaining to approved compacts."   (Memorandum of Law, Docket No. 12, p. 17.)

attorney's fees and costs incurred in this action.   "The general rule in our legal system is that each party must pay its own attorney's fees and expenses."   Perdue v. Kenny A. *ex rel.* Winn, 559 U.S. 542, 550, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010).   Consequently, "in a federal action, attorney's fees cannot be recovered by the successful party in the absence of statutory authority for the award."   Int'l Chem. Workers Union (AFL-CIO), Local No. 227 v. BASF Wyandotte Corp., 774 F.2d 43, 47 (2d Cir. 1985).

The FAA does not provide for an award of attorney's fees and expenses for arbitration-confirmation proceedings, but a court remains authorized to enter such an award "[p]ursuant to its inherent equitable powers."   Id.   In the arbitration confirmation context, "the guiding principle has been stated as follows: when a challenger refuses to abide by an arbitrator's decision without justification, attorney's fees and costs may properly be awarded."   Id.   Such awards may be made, for example, when a party pursues a frivolous course.   See, e.g., Smiga v. Dean Witter Reynolds, Inc., 766 F.2d 698, 708 (2d Cir. 1985) (upholding imposition of sanctions where the plaintiff "had presented 'frivolous, unreasonable and groundless' opposition" to confirmation of an arbitration award); Prospect Capital Corp. v. Enmon, No. 08 Civ. 3721(LBS), 2010 WL 907956, at *6-8 (S.D.N.Y. Mar. 9, 2010) (imposing sanctions for a party's "persist[ence] in bringing frivolous arguments that misrepresented the record" in opposing the confirmation of an arbitration award).

The State seeks an award of attorney's fees and costs on the basis that the Nation's effort to vacate the arbitration award is a frivolous delay tactic designed to avoid the panel's binding decision.   Though unsuccessful, the Nation's position cannot fairly

28

be said to be frivolous—indeed, it was persuasive to Dean Washburn, see Dissent, pp. 19-20—and there has been no showing that the Nation sought vacatur simply as a dilatory tactic.   Cf. Benihana, Inc. v. Benihana of Tokyo, LLC, 15 Civ. 7428, 2016 WL 3913599, at *24 (S.D.N.Y. July 15, 2016) (denying Rule 11 sanctions in arbitration-confirmation proceedings, *inter alia*, because arguments made in support of vacatur were not "at all" frivolous as demonstrated by the dissenting arbitrator advancing the same arguments). This Court therefore finds that the parties should bear their own attorney's fees and expenses under the general American rule.

## IV. CONCLUSION

The Nation and State agreed to resolve disputes arising from or related to the Compact through binding arbitration.   A majority of the arbitration panel assigned to the dispute definitively held in the State's favor.   Whether this Court or any other would interpret the Compact the same way is not at issue, for a federal court must confirm an arbitration award so long as there is a "barely colorable justification for the outcome reached," a standard that is easily met here.   See Andros Compania Maritimo, 579 F.2d at 704.   Because there exist no grounds to vacate the majority's arbitration award, it must and will be confirmed.   The parties will each bear their own attorney's fees and costs.

## V. ORDERS

IT HEREBY IS ORDERED, that the Nation's Petition and Motion to Vacate the Final Award (Docket Nos. 1, 2) are DENIED.

FURTHER, that the State's Cross-Petition to Confirm the Partial Final and Final Awards (Docket No. 9) is GRANTED.

FURTHER, that the parties each bear their own attorney's fees and costs.

FURTHER, that the Clerk of Court is directed to enter judgment confirming the Final Award (Docket No. 2-3) and Partial Final Award (Docket Nos. 2-4, 2-5) and then CLOSE this case.

SO ORDERED.

Dated:   November 8, 2019
       Buffalo, New York

s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge
